

1   Paul Alexander (Bar No. 49997)
     AlexanderP@howrey.com
2   HOWREY LLP
     1950 University Avenue
3   East Palo Alto, CA 94303
     650.798.3500
4   650.798.3600 (fax)

5

6   Robert G. Abrams
     AbramsR@howrey.com
7   Thomas A. Isaacson
     IsaacsonT@howrey.com
8   Peter A. Barile III
     BarileP@howrey.com
9   HOWREY LLP
     1299 Pennsylvania Avenue, N.W.
10   Washington, DC 20004
     202.783.0800
11   202.383.6610 (fax)

12

13   Emily L. Maxwell (Bar No. 185646)
     MaxwellE@howrey.com
14   HOWREY LLP
     525 Market Street, Suite 3600
15   San Francisco, CA 94105
     415.848.4947
16   415.848.4900 (fax)

**E-filing**

**FILED**

**JAN - 2 2009**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

17   *Attorneys for Plaintiffs, on behalf of themselves and others similarly situated*

18              UNITED STATES DISTRICT COURT

19            NORTHERN DISTRICT OF CALIFORNIA

**FAXED**

20   ANDREA RESNICK, GARY BUNKER, JOHN   )   Case No. **CV 09   0002**
21   HALEY, AMY LATHAM, ERIC ROSLANSKY, )
     and KEVIN SIMPSON, on behalf of themselves )
22   and others similarly situated,              )   CLASS ACTION COMPLAINT
            *Plaintiffs,*         )
23            v.              )   JURY TRIAL DEMANDED
                               )
24   WALMART.COM USA LLC, WAL-MART      )
     STORES, INC and NETFLIX, INC.,        )
25                                 )
26         *Defendants.*         )
                                )
27   _____ )

28

**MEJ**

HOWREY LLP

CLASS ACTION COMPLAINT
Case No.

1    NOW COME Plaintiffs, ANDREA RESNICK, GARY BUNKER, JOHN HALEY, AMY LATHAM, ERIC

2  ROSLANSKY, and KEVIN SIMPSON, for their Complaint brought under Sections 1 and 2 of the Sherman

3  Antitrust Act of 1890, 15 U.S.C. §§1-2, and Sections 4 and 16 of the Clayton Antitrust Act of 1914, 15

4  U.S.C. §§15 & 29, for treble damages and injunctive relief against Defendants Netflix, Inc. ("Netflix"),

5  Wal-Mart Stores, Inc. ("Wal-Mart Stores"), and Walmart.com USA LLC ("Walmart.com").

6       Based upon personal knowledge, information, and belief, and the investigation of counsel,

7  Plaintiffs allege as follows:

## NATURE OF THE ACTION

9    1.  On or about May 19, 2005, Netflix, Wal-Mart Stores, and Walmart.com, a wholly owned

10  subsidiary of Wal-Mart Stores, entered into an agreement to divide the markets for the sales and online

11  rentals of DVDs in the United States ("Market Division Agreement"), with the purpose and effect of

12  monopolizing and unreasonably restraining trade in at least the online DVD rental market.

13    2.  The meetings that led to the conspiracy began in January 2005, when Reed Hastings, the

14  CEO of Netflix, and John Fleming, then the CEO of Walmart.com, met with each other for dinner to

15  discuss the online DVD rental and DVD sales markets and how they could reach an agreement that

16  would reduce or eliminate competition in those markets. According to Hastings, having "noticed how

17  low Wal-Mart's prices [for DVDs] were," he "called the CEO [of Walmart.com] in January and asked

18  if he could have dinner." Fleming, who reported directly to Wal-Mart Stores' CEO Lee Scott,

19  accepted Hastings' invitation; the two thereafter met and, as a result of the meetings and exchanges

20  that followed, Defendants entered into the contract, combination, and conspiracy alleged herein. At

21  the time of their initial meeting and prior to entering into the Market Division Agreement, Netflix and

22  Walmart.com were direct competitors in renting DVDs online and all three defendants were potential

23  competitors in selling new DVDs to consumers. However, by no later than May 19, 2005, Netflix,

24  Wal-Mart Stores, and Walmart.com entered into an agreement by which Walmart.com would stop

25  competing with Netflix in the online DVD rental business and Netflix would promote the sales of new

26  DVDs by Wal-Mart Stores and Walmart.com, and not sell new DVDs in competition with them.

27    3.  Wal-Mart Stores actively participated in this conspiracy. This is confirmed by, among

28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 1 -
Case No.

1    other things, the fact that prior to the announcement of the Market Division Agreement, John Fleming
2    was promoted to Chief Marketing Officer of Wal-Mart Stores. As of the time of the announcement of
3    the Market Division Agreement, Fleming thus was acting in his capacity both as the Chief Marketing
4    Officer of Wal-Mart Stores and the Wal-Mart Stores executive responsible for overseeing the
5    operations of Walmart.com. As Chief Marketing Officer of Wal-Mart Stores, Fleming was responsible
6    for deciding "what the largest, most powerful retailer in history will stock on its shelves, and how
7    much those products will cost. Such decisions, when made at Wal-Mart, can help make or break entire
8    industries."

9        4.  Defendants' conspiracy enabled Netflix to charge its customers higher subscription prices
10   for the rental of DVDs than it otherwise would have. As a result of their contract, combination, and
11   conspiracy as well as Netflix's unlawfully acquired and maintained market and monopoly power,
12   Netflix actually did overcharge Plaintiffs, and millions of other consumers similarly situated, and
13   continues to do so.

14       5.  Under the Market Division Agreement, Netflix, Wal-Mart Stores, and Walmart.com agreed
15   that they would restrain trade and eliminate competition. Wal-Mart Stores and Walmart.com agreed
16   that Walmart.com would stop competing with Netflix in the online rental market. Netflix agreed that it
17   would not sell new DVDs, but instead would promote the DVD sales of Wal-Mart Stores and
18   Walmart.com. In agreeing to promote the sale of DVDs by Wal-Mart Stores and Walmart.com,
19   Netflix provided consideration for the agreement by Wal-Mart Stores and Walmart.com that
20   Walmart.com would exit the online DVD rental market and simultaneously confirmed to Wal-Mart
21   Stores and Walmart.com that Netflix would not enter the market to sell new DVDs, as Netflix was
22   well-positioned and otherwise had the unilateral economic incentive to do. Since entering into the
23   Market Division Agreement, neither Wal-Mart Stores nor Walmart.com have rented DVDs online and
24   Netflix has not sold new DVDs. The Market Division Agreement served to entrench and enhance
25   Defendants' dominant market positions and otherwise cause harm to competition, including enabling
26   Netflix to charge higher subscription prices for online DVD rentals than it would have had they not
27   entered into the agreement. Plaintiffs and all other similarly situated consumers in fact paid the higher

28

1 subscription prices to Netflix.

2      6. As alleged below, this case is brought as a class action on behalf of all consumers in the
3 United States who, during the period May 19, 2005, to the present (hereinafter, the "Class Period"),
4 paid a subscription fee to rent DVDs from Netflix. Plaintiffs bring this action under Sections 4 and 16
5 of the Clayton Antitrust Act to seek redress in the form of treble damages and other relief for their
6 injuries resulting from Defendants' violations of law on behalf of themselves and other similarly
7 injured consumers nationwide and to seek a declaration that the Market Division Agreement is null and
8 void.

9                                        **PLAINTIFFS**

10      7. ANDREA RESNICK ("Resnick") is an individual consumer who resides in San Francisco,
11 California. During the Class Period, Resnick directly subscribed to Netflix for her personal, non-
12 commercial use. The subscription fees Resnick paid to Netflix for renting DVDs were greater than she
13 would have paid, but for the antitrust violations alleged herein.

14      8. GARY BUNKER ("Bunker") is an individual consumer who resides in San Angelo, Texas.
15 During the Class Period, Bunker directly subscribed to Netflix for his personal, non-commercial use.
16 The subscription fees Bunker paid to Netflix for renting DVDs were greater than he would have paid,
17 but for the antitrust violations alleged herein.

18      9. JOHN HALEY ("Haley") is an individual consumer who resides in Fairfax, Virginia. During
19 the Class Period, Haley directly subscribed to Netflix for his personal, non-commercial use. The
20 subscription fees Haley paid to Netflix for renting DVDs were greater than he would have paid, but for
21 the antitrust violations alleged herein.

22      10. AMY LATHAM ("Latham") is an individual consumer, who resides in Bristow, Virginia.
23 During the Class Period, Latham directly subscribed to Netflix for her personal, non-commercial use.
24 The subscription fees Latham paid for renting DVDs were greater than she would have paid, but for
25 the antitrust violations alleged herein.

26      11. ERIC ROSLANSKY ("Roslansky") is an individual consumer who resides in Boulder,
27 Colorado. During the Class Period, Roslansky directly subscribed to Netflix for his personal, non-

28

1   commercial use. The subscription fees Roslansky paid to Netflix for renting DVDs were greater than
2   he would have paid, but for the antitrust violations alleged herein.

3       12. KEVIN SIMPSON ("Simpson") is an individual consumer who resides in Washington, DC.
4   During the Class Period, Simpson directly subscribed to Netflix for his personal, non-commercial use.
5   The subscription fees Simpson paid to Netflix for renting DVDs were greater than he would have paid,
6   but for the antitrust violations alleged herein.

7                                         **DEFENDANTS**

8                                          **NETFLIX**

9       13. Defendant Netflix is a Delaware corporation headquartered at 100 Winchester Circle, Los
10  Gatos, California, 95032. Netflix is publicly traded on the NASDAQ under the symbol NFLX. Its
11  revenues earned from engaging in interstate commerce exceed $1 Billion annually. Through its
12  website, www.netflix.com, Netflix rents DVDs directly to consumers nationwide by charging monthly
13  subscription fees, which entitle customers to rent DVDs pursuant to various subscription plans. Netflix
14  has possessed a market share of at least 75% of the Online DVD Rental Market in the United States, as
15  defined herein, at all times during the Class Period.

16                                        **WAL-MART**

17      14. **Wal-Mart Stores.** Defendant Wal-Mart Stores is the largest retailer in the United States.
18  Wal-Mart Stores is a Delaware corporation headquartered at 702 S.W. 8th Street, Bentonville,
19  Arkansas, 72716. Wal-Mart Stores is publicly traded on the New York Stock Exchange under the
20  symbol WMT. Its revenues earned from engaging in interstate and foreign commerce approach $400
21  Billion annually. Through its retail stores and its website, www.walmart.com, Wal-Mart Stores sells
22  DVDs directly to consumers nationwide. Wal-Mart Stores sells far more DVDs than any other retailer
23  in the United States, accounting for about 40% of all new DVDs sold to consumers domestically. Prior
24  to the Market Division Agreement, Wal-Mart Stores' wholly-owned subsidiary Walmart.com
25  competed with Netflix in the Online DVD Rental Market through the "Walmart DVD Rentals" service,
26  which was available on www.walmart.com.

27

28

1    15. **Walmart.com.** Defendant Walmart.com is a wholly-owned subsidiary of Wal-Mart Stores.
2    Walmart.com is a Delaware company with its headquarters at 7000 Marina Boulevard, Brisbane,
3    California, 94005. It is the online component of Wal-Mart Stores' retail empire that is the leading
4    seller of new DVDs in the United States. Prior to the conspiracy alleged herein, Walmart.com was
5    also a major competitor of Netflix in the Online DVD Rental Market through the "Walmart DVD
6    Rentals" service, which was available on www.walmart.com. While its financials are not publicly
7    reported by Wal-Mart Stores, Walmart.com is ranked as the 14th largest online retailer in the United
8    States. Through the website, www.walmart.com, Walmart.com sells DVDs directly to consumers
9    nationwide. Consumers who purchase DVDs via www.walmart.com may have them either mailed or
10   otherwise delivered to them directly, or may pick them up at a Wal-Mart Stores retail location via
11   Walmart.com's and Wal-Mart Stores' "Site to Store" program.

12   16. **Wal-Mart Stores and Walmart.com.** Walmart.com and Wal-Mart Stores are, in essence,
13   completely integrated and operated as a single commercial enterprise and hold themselves out to the
14   public as such, by which Walmart.com is an internet sales channel for Wal-Mart Stores, rather than
15   being an independent business entity. Wal-Mart Stores is the registrant of the www.walmart.com
16   domain name that is used to sell products and services by Walmart.com. Likewise, Wal-Mart Stores is
17   the registrant of www.walmartdvdrentals.com. Wal-Mart Stores' Chief Marketing Officer John
18   Fleming has explained the relationship between Wal-Mart Stores and Walmart.com as follows: "Wal-
19   Mart Stores set up Walmart.com as a separate company with some outside investors, but within six
20   months Wal-Mart Stores bought back the outside interest and Walmart.com; Walmart.com now serves
21   as a 'marketing channel' for Wal-Mart Stores."

22   17. **Wal-Mart Stores' Active Participation in the Conspiracy.** Wal-Mart Stores was actively
23   involved in the conspiracy alleged herein, as alleged more specifically below. For purposes of these
24   allegations, both Wal-Mart Stores and Walmart.com are active participants in the conspiracy and each
25   is liable for the unlawful conduct alleged herein, with each, among other things, participating in, and
26   benefiting from, the Market Division Agreement. Moreover, Wal-Mart Stores directed, ratified,
27   approved, supported, and otherwise aided and abetted Walmart.com's violations of law.

28

1    18. Wal-Mart Stores had a strong incentive to accomplish the Market Division Agreement. In
2  addition to its interests as the 100% owner of Walmart.com, Wal-Mart Stores had further incentive to
3  enter into this Agreement, since it obtains substantial revenues from sales of new DVDs, as well as
4  store traffic resulting in the sales of other goods, which would have been threatened by Netflix's entry
5  into new DVD sales, and which were enhanced by Netflix's promotion of Wal-Mart Stores and
6  Walmart.com through the Market Division Agreement. In a letter submitted to this Court in
7  connection with a prior antitrust case brought against Netflix by other plaintiffs for other alleged
8  violations of law, an assistant general counsel of Wal-Mart Stores, referring specifically to Wal-Mart
9  Stores, wrote of "Wal-Mart's decision to discontinue renting DVDs." Moreover, it was Wal-Mart
10  Stores that announced in part the Market Division Agreement, which identifies Wal-Mart Stores, in the
11  "About" section of the press release. The announcement quoted John Fleming, who was then Chief
12  Marketing Officer of Wal-Mart Stores, regarding the Agreement. It explained that Walmart.com's
13  DVD sales are in fact Wal-Mart Stores' "online movie sales business," and that, more generally, Wal-
14  Mart Stores' "[o]nline merchandise sales are available at www.walmart.com."

15    19. Whenever reference is made in this Complaint to a statement or transaction of any
16  corporation or entity, the allegation means that the corporation or entity acted by or through its
17  directors, members, partners, officers, employees, affiliates, or agents, while engaged in the
18  management, direction, control, or conduct of the corporation's or entity's business and acting within
19  its scope of authority.

20                        **JURISDICTION AND VENUE**

21    20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 & 1337 and 15
22  U.S.C. §§1-2, 15 & 26.

23    21. Venue is proper in this District pursuant to 28 U.S.C. §§15, 22 & 26 and pursuant to 28
24  U.S.C. §1391(b), (c) & (d), because at all times relevant to the Complaint: (a) Defendants transacted
25  business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial
26  part of Plaintiffs' claims occurred in this District; and (c) a substantial portion of the affected interstate
27  trade and commerce described below has been carried out in this District.

28
HOWREY LLP

CLASS ACTION COMPLAINT                - 6 -
Case No.

1    22. This Court has personal jurisdiction over Defendants because, *inter alia*, each of the

2  Defendants is headquartered in this State or has transacted business; maintained continuous and

3  systemic contacts; purposefully availed itself of the benefits of doing business; and committed acts in

4  furtherance of the alleged conspiracy in this State.

5                                 **INTRADISTRICT ASSIGNMENT**

6        23. Pursuant to Civil L.R. 3-2, this case should be assigned to the San Francisco Division

7  because a substantial part of the events giving rise to the claims occurred within this division. Plaintiff

8  Andrea Resnick resides in San Francisco County and Defendant Walmart.com is headquarted in San

9  Mateo County.

10                              **INTERSTATE TRADE AND COMMERCE**

11       24. Defendants' conduct has taken place within the flow of, and substantially affected the

12  interstate commerce of, the United States. By way of example, Defendants have sold and/or rented

13  DVDs throughout the United States, involving hundreds of millions or billions of dollars in interstate

14  commerce, and used the instrumentalities of interstate commerce, including interstate wires and the

15  U.S. mail, to sell and/or to rent DVDs throughout the United States.

16                                    **RELEVANT MARKET**

17       25. Defendants' market allocation conspiracy is *per se* illegal and requires no allegation of

18  market definition.

19       26. For those claims that may require market definition, the Relevant Market for purposes of

20  these allegations during the Class Period at least is: the Online DVD Rental Market in the United

21  States.

22       27. "DVD," as defined herein, refers to a Digital Video Disc or Blu-ray Disc containing

23  commercially recorded entertainment programs for personal viewing. DVDs are the primary medium

24  by which movies and other recorded entertainment are distributed in the United States. Revenues on

25  DVDs far exceed those generated from box office receipts. In addition, DVDs have become a

26  particularly lucrative means for the distribution of previously aired television programs, surpassing

27

28
HOWREY LLP
     CLASS ACTION COMPLAINT                    - 7 -
     Case No.

1    even television syndication rights as a revenue stream in many instances.  As defined herein, "DVD"

1  even television syndication rights as a revenue stream in many instances. As defined herein, "DVD"
2  does not refer to blank Digital Video Discs, which are used to store or record data.

3       28. The relevant market is for the rental of DVDs online by subscription for delivery by mail
4  ("Online DVD Rental Market"). At all relevant times, there have been no reasonably interchangeable
5  substitutes for this service, which is differentiated, from both the demand and the supply side, from
6  other methods of DVD distribution channels, as well as other methods of entertainment content
7  delivery.

8       29. In the Online DVD Rental Market, for a monthly subscription fee, a consumer may rent
9  DVDs from an online service provider, such as Netflix, Blockbuster Online, or (prior to May 19, 2005)
10  Walmart DVD Rentals. There are no late fees and no due dates, but, within any given plan, the
11  consumer pays the subscription fee regardless of how many DVDs he or she rents per month. Thus,
12  even a consumer who does not rent a DVD for months still is charged the subscription fee; Netflix
13  CEO Reed Hastings calls this the "gym membership effect."

14       30. To rent DVDs, consumers fill out a rental "queue" in their online profile, listing in order of
15  preference the DVDs they wish to rent. The DVDs are then sent by the provider to the consumer's
16  home via U.S. mail. To return the DVD and receive the next DVD in the queue, the consumer inserts
17  the DVD in a prepaid envelope provided with the rental and mails it back; the service provider then
18  mails the next movie on the list to the consumer. The library of titles available from online service
19  providers has grown over time, now ranging near 100,000 DVDs—often twenty to one-hundred times
20  the selection of titles stocked (not to mention available) at any single video rental store.

21       31. From the consumer's perspective, online DVD rentals are a differentiated service that is not
22  reasonably interchangeable with traditional bricks-and-mortar video rental. In traditional video rental
23  from physical stores, consumers drive to or otherwise arrive at the store, find (or do not find) what they
24  are looking for, and pay on a per-DVD basis for their selection(s). After the designated rental period
25  of one or more days, usually depending upon the release date of the DVD, the consumer returns his
26  selection or potentially incurs late fees. During the Class Period as alleged herein, these late fees have

27
28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 8 -
Case No.

1 accounted for as much as 20% of the revenues in traditional video rental stores; there are no late fees
2 or due dates in the Online DVD Rental Market.

3 32. There are numerous other practical indicia of the Online DVD Rental Market being a
4 relevant product market, distinct from other forms of DVD rental, including:

5    a. **Price Competition.** No direct price competition exists between online rental and other
6       forms of DVD rental, whether in-store, kiosk, or video downloading, which are not
7       reasonably interchangeable with online DVD rental. For example, online DVD rentals
8       generally are priced on a monthly subscription basis. Within any given plan, the
9       subscription rate is independent of the number of DVDs the customer actually rents in a
10      month. In-store DVD rentals, kiosks, and downloading generally are priced on a pay-
11      per-view basis. Also, changes in the price of online rentals do not closely track changes
12      in the price of in-store rentals. The pricing of online rentals is generally nationwide in
13      scope and is not affected by local in-store prices and competition. As a result, the
14      pricing of online rentals would generally be the same to a customer, regardless of
15      whether the nearest rental store is two minutes or two hours away. Online rentals
16      generally offer additional services, such as movie reviews, customer-specific
17      recommendations based on viewing and preference history, and other metrics of
18      popularity. The cross-elasticity of demand between these products is such that a small
19      but significant non transitory increase in price ("SSNIP") would not cause consumers to
20      switch from online rental to in-store rental or any other arguable method of DVD
21      distribution and *vice versa*.

22   b. **Functional Differences.** Online rentals fundamentally differ from in-store rentals in
23      that (1) they do not require travel to a store (including a second trip to return the DVD
24      and potentially multiple trips if the store does not have the DVD in stock at the right
25      time), (2) are available to anyone with a postal address, regardless of proximity to a
26      store, (3) are primarily subscription-based services, and (4) provide a much wider
27      selection of titles than can a brick-and-mortar store. For these reasons, among others,

28

1  Online and in-store DVD rentals are not reasonably interchangeable. Likewise, other

2  modes of content distribution, such as kiosk, video-on-demand, and downloading,

3  among other forms, are not reasonably interchangeable with online DVD rentals for a

4  number of reasons, including relative selection and convenience for consumers, pricing,

5  as well as, from the supply perspective, licensing considerations and technological

6  limitations.

7      c. **Public and Industry Perceptions.** The online rental market is recognized as a distinct

8        market by the public and the industry, including by Defendants.

9      d. **Admissions.** By word and deed, Defendants have confirmed and recognized the

10        existence of a discrete online rental market. Admissions of a discrete online rental

11        market abound from Netflix and Walmart.com and Wal-Mart Stores executives alike,

12        including Hastings and Fleming. Very recently, a Netflix executive told the Wall Street

13        Journal that other types of rental services, such as kiosk and in-store rentals, do not

14        present a direct competitive threat to Netflix. That same executive acknowledged that

15        while video downloads may be a competitive force in the future, DVD will be the

16        dominant medium for years to come, making the entry of this technology not timely

17        enough to be considered a competitive force in the relevant market. Netflix CEO Reed

18        Hastings has observed that the competitive threat of internet downloading to online

19        DVD rental during the Class Period is like that of hydrogen powered cars to gasoline

20        powered cars—inconsequential for many years to come. He has further explained that

21        DVDs will be the dominant medium for movies for perhaps as long as the gasoline

22        engine.

23      33. Online DVD rentals are also a separate market from DVD sales. The pricing of DVD sales

24  and online DVD rentals is very different. For example, the price to buy a new DVD depends heavily

25  on how popular it is, including whether it is a new release or how successful the title originally was at

26  the box office or on television. By contrast, online DVD renters generally charge based on a

27  subscription fee, regardless of whether the consumer is renting popular or obscure DVDs. The

28

1 industry and the public perceive online DVD rentals as separate from DVD sales, whether in-store or
2 online. The factors motivating a consumer to buy a DVD are different from those that lead to renting a
3 DVD. The former generally applies to DVDs that the consumer intends to view (either personally, or
4 their family or friends) numerous times. The latter generally applies to DVDs that the consumer
5 intends to view once and then return. DVDs sold at retail have other distinguishing characteristics,
6 such as packaging and special features not available with rentals, which are delivered unadorned in
7 envelopes. In addition, the fact of whether a DVD is new or used is not an issue in rental, but is a
8 significant factor in sales, for used DVDs are sold at a significant discount to their new counterparts,
9 due to them being relatively less desirable to consumers. DVD sales and online rentals also are not
10 reasonably interchangeable for consumers intending to collect physical DVDs or to give a DVD as a
11 gift. The cross-elasticity of demand between these products is such that a SSNIP would not cause
12 consumers to switch from online renting to purchasing DVDs and *vice versa*.

13 34. The Geographic Market for the Online DVD Rental Market is the United States. The
14 practical reality is that, among other things, shipping costs and transglobal differences in DVD data
15 encoding make it neither practical nor feasible for entities located in other countries to rent DVDs to
16 U.S. consumers.

17 **MARKET AND MONOPOLY POWER**

18 35. At all relevant times, Netflix dominated the Online DVD Rental Market. Netflix has an
19 approximate market share of 75% in the Online DVD Rental Market, and is far and away the market
20 leader in the Online DVD Rental Market. As a result of this market share, Netflix has had and
21 continues to have market and monopoly power in the Online DVD Rental Market; it has the power to
22 control prices or exclude competition in this Relevant Market.

23 36. Netflix's market and monopoly power is strengthened by the significant barriers to entry in
24 this market. There have been no significant market entrants in the more than three years since
25 announcement of the Market Division Agreement, which increased those barriers. Online DVD rental
26 is highly capital intensive. A firm must operate on a large scale to be successful. It requires the
27 possession of a significant number of shipping facilities strategically located throughout the United

28

1   States to ensure timely delivery. It also requires stocking an extensive inventory of DVDs to maintain
2   the selection of titles that consumers demand. As Netflix CEO Reed Hastings has observed, "When
3   you think about the barriers to entry to this business, it is subtle because it appears easy. A kid can
4   open a website. But the barriers to profitability are very large."

5       37. Since the implementation of the Market Division Agreement, the Online DVD Rental
6   Market has been overwhelmingly comprised of only two firms: Netflix and Blockbuster, which
7   possesses nearly all of the remaining 25% of the Online DVD Rental Market that Netflix does not
8   control. A few minor firms have shares of less than 1-2% of the market. During fiscal years 2005-
9   2007 combined, Netflix earned nearly $4 Billion in revenues and $1.3 Billion in gross profit from
10  renting DVDs to consumers—a margin of more than 33%. As a result of Netflix's abuse of its
11  monopoly power alleged herein, its subscription fees have been higher than they otherwise would have
12  been.

13      38. Wal-Mart Stores and its wholly-owned subsidiary Walmart.com combined have an
14  industry-leading 40% of domestic DVD retail sales. During fiscal years 2005-2008 combined, they
15  earned revenues in excess of $25 Billion by selling DVDs to consumers. Both Wal-Mart Stores and
16  Walmart.com benefit from the Market Division Agreement.

17      39. Further evidence of Netflix's market and monopoly power is reflected in the
18  anticompetitive effects alleged herein.

19                          **THE ILLEGAL AGREEMENT**

20      40. **Pre-Agreement Competition in the Online DVD Rental Market.** In early 2005, Netflix
21  was coming off a year in which competition was growing and its stock price had dropped
22  precipitously. It faced increasing competition from Walmart DVD Rentals and from Blockbuster
23  Online, the latter of which had just entered the online rental market.

24      41. By mid-2004, Netflix was charging $21.99 for its most popular subscription rental plan.
25  Blockbuster entered the online market in earnest in August, at first charging $19.99 but then reducing
26  its price in November to $17.49 for its similar plan. After that, the Walmart DVD Rentals rate was
27  reduced from $18.86 to $17.36. In the wake of these price cuts, Netflix reduced its prices by nearly

28

1 | 20% (to $17.99 per month) soon thereafter. After that, Blockbuster further decreased its price to
2 | $14.99—20% below Netflix's already reduced price and more than 40% below the price Netflix was
3 | charging just months earlier.

4 | 42. Meanwhile, Wal-Mart Stores and its wholly-owned subsidiary Walmart.com, which had
5 | established themselves as the leader in new DVD sales, were facing increasing competition from in-
6 | store and online channels of distribution in new DVD sales, including competition from Amazon.com.
7 | At the time, Netflix was a significant potential additional competitor, since it had a subscriber base of
8 | millions of customers who were known in the industry to be prolific DVD buyers, and the sales and
9 | profits of Wal-Mart Stores and Walmart.com stood to suffer if Netflix began selling new DVDs to
10 | these customers. Conversely, Wal-Mart Stores and Walmart.com stood to gain significant additional
11 | sales and profits and to gain further market share in the sale of new DVDs if these customers were to
12 | make their purchases of new DVDs from them instead.

13 | 43. **The Walmart Price Cut.** On January 7, 2005, Walmart DVD Rentals dropped the price on
14 | its most popular DVD rental plan significantly—to $12.97 per month—creating further price pressure
15 | on Netflix to reduce its DVD rental prices. In order to respond to the increased competition, Netflix
16 | would have been forced to lower its prices and thereby reduce its profits.

17 | 44. **The January Dinner Meeting.** Faced with this increasing competition, Reed Hastings, the
18 | Chairman and CEO of Netflix, called John Fleming, then the CEO of Walmart.com, and invited him to
19 | dinner to discuss the their companies' DVD sales and rentals businesses. Fleming accepted the
20 | invitation; the two met together in January 2005 and embarked upon a scheme that would result in the
21 | contract combination, and conspiracy, and agreement reflected in the Market Division Agreement.

22 | 45. **Hastings' Subsequent "Prediction."** On May 5, 2005, in Netflix's First Quarter earnings
23 | call with financial analysts, held after the January dinner but only two weeks prior to the public
24 | announcement of the Market Division Agreement, Hastings made plain the motive for Netflix to
25 | conspire with Wal-Mart Stores and Walmart.com:

26 | In terms of profitability over the coming years, the key issue is the number of major
27 | competitors. If there are only two major players, Blockbuster and Netflix, the
    | profitability may be substantial like other two-firm entertainment markets. If, on the
28 | other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major competitors in

1    online rental, then the profits would likely be small.

2    Hastings went on to "predict" on that conference call:

3        [T]he likely case is [that] online rental becomes a two-firm market over the coming
4        years.

5    46. **The Public Announcement.** On May 19, 2005, shortly after Fleming had been promoted
6    to Chief Marketing Officer of Wal-Mart Stores, Defendants issued a joint press release that revealed
7    the existence of the Market Division Agreement, by which they unlawfully divided and allocated the
8    markets for DVD sales and rentals, and did, in fact, create the two-firm market that Hastings sought.

9    47. **The Media's Reaction.** The news of the agreement was featured in a number of
10   newspapers and other publications, in articles with aptly colorful titles, such as:

11       •   "Wal-Mart and Netflix Scratch Each Other's Backs,"

12       •   "Truce in DVD-Rental Wars,"

13       •   "Wal-Mart and Netflix: An Alliance," and

14       •   "Wal-Mart Loves Netflix: And Vice-Versa."

15   48. **The Execution.** Beginning on May 19, 2005, Walmart.com, as agreed, did in fact exit the
16   online rental business. Walmart.com announced to all of the subscribers to "Walmart DVD Rentals"
17   that it was exiting the online DVD rental business and that those subscribers could be transferred to
18   Netflix. Walmart.com took additional steps to affirmatively implement the Market Division
19   Agreement by adding a prominently placed link to the Netflix website to encourage customers to
20   transfer their subscriptions to Netflix. Since the date of their joint announcement on May 19, 2005
21   (apart from the 30 days that Walmart.com used to wind down its existing online rental business),
22   neither Walmart.com nor Wal-Mart Stores has participated in the Online DVD Rental Market, and
23   Netflix has not sold new DVDs.

24   49. As a result of the Market Division Agreement, downward pricing pressure from
25   Walmart.com was eliminated and the Online DVD Rental Market was reduced to two competitors.
26   Absent the Market Division Agreement, Netflix would have lowered its prices no later than May 19,
27   2005. As a result of the elimination of a competitor in this Relevant Market, Blockbuster was able to

28

1 raise its subscription price in July to match that of Netflix, from $14.99 per month to $17.99 per
2 month, in accord with Hastings' expectation that "[i]f there are only two major players, Blockbuster
3 and Netflix, the profitability may be substantial like other two-firm entertainment markets." In
4 Netflix's next earnings call, on August 8, 2005, Hastings boasted:

> Last quarter we said online rental was shaping up to be a two-player market, and that is
> indeed what is happening.

7 50. The Market Division Agreement was not in the independent self-interest of Wal-Mart
8 Stores, Walmart.com, or Netflix. Neither Wal-Mart Stores nor Walmart.com would have wanted
9 Walmart.com to withdraw from the online rental market, encourage its subscribers to be transferred to
10 Netflix, and promote Netflix's rental business absent substantial consideration from Netflix, such as an
11 agreement not to compete for new DVD retail sales. But for the Market Division Agreement,
12 Walmart.com would not have exited the Online DVD Rental Market when it did. Likewise, Netflix
13 would not have foreclosed its opportunity to sell DVDs to its millions of subscribers—a base of
14 customers who purchase on average 25 DVDs per year each—and would not have promoted new DVD
15 sales by Wal-Mart Stores and Walmart.com, rather than its own sales, absent an agreement from them
16 not to compete against Netflix's online rental business.

17 **ANTICOMPETITIVE EFFECTS**

18 51. Defendants' illegal acts and practices have caused anticompetitive effects in the Online
19 DVD Rental Market. The subscription fees charged by Netflix to Plaintiffs, as well as the other
20 members of the Class, were maintained at artificially high and supracompetitive levels. Plaintiffs and
21 the other members of the Class paid higher subscription prices to Netflix than they otherwise would
22 have paid.

23 52. The Market Division Agreement (i) eliminated one of only three significant competitors in
24 the Relevant Market, (ii) eliminated competition between Defendants, and (iii) enabled Netflix to
25 acquire market power and also acquire and maintain monopoly power in the Relevant Market. The
26 Market Division Agreement has enabled Netflix to implement monopolistic and supracompetitive
27 pricing in the Relevant Market.

28

1    53. The Market Division Agreement and Defendants' acts and practices in furtherance thereof

2    have no procompetitive benefits. They do not create information that consumers need, nor do they

3    create new or better products or services. Rather, they have served to reinforce the true

4    anticompetitive nature of the Market Division Agreement by assuring, for example, that Walmart.com

5    not only withdrew from the Online DVD Rental Market, but further enhanced Netflix's position in that

6    market. Even if there were any such benefits, they would not outweigh any of the anticompetitive

7    effects described herein, and, in any event, could be achieved by less restrictive means.

8                              **CLASS ACTION ALLEGATIONS**

9        54. Plaintiffs bring this action on their own behalf and as class actions under Rules

10   23(a), 23(b)(2), and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the

11   Class, as defined herein.

12       55. Bunker, Haley, Latham, Resnick, Roslansky, and Simpson bring this action on behalf of

13   themselves and the members of the Class, defined as comprising:

14       Any person in the United States that paid a subscription fee to Netflix to rent DVDs, on
          or after May 19, 2005 up to the present. Excluded from the Class are government
15        entities, Defendants, their co-conspirators and their representatives, parents,
          subsidiaries, and affiliates.
16

17       56. The Class numbers in the millions, the exact number and identities of the members being

18   known by Defendants.

19       57. The Class is so numerous and geographically dispersed that joinder of all members is

20   impracticable.

21       58. There are questions of law and fact common to the Class and the members

22   thereof. These common questions relate to the existence of the conspiracy alleged, and to the type

23   and common pattern of injuries sustained as a result thereof. The questions include, but are not

24   limited to:

25            a.    Whether Defendants engaged in a contract, combination, or conspiracy to
                   allocate markets;
26
              b.    Whether Defendants unreasonably restrained trade in the Online DVD Rental
27                 Market;

28

c.   Whether Defendants had the specific intent for Netflix to monopolize the Online DVD Rental Market;

d.   The nature and character of the acts performed by Defendants in the furtherance of the alleged contract, combination, and conspiracy;

e.   Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

f.   Whether the alleged contract, combination, and conspiracy violated Section 2 of the Sherman Act;

g.   The anticompetitive effects of Defendants' violations of law;

h.   Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

i.   Whether the conduct of Defendants, as alleged in this Complaint, caused Netflix subscription fees to be higher than they otherwise would have been and thereby caused injury to the business and property of Plaintiffs and other members of the Class.

59. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including the legal and factual issues relating to liability and damages.

60. Bunker, Haley, Latham, Resnick, Roslansky, and Simpson are members of the Class. Their claims are typical of the claims of other members of the Class, and they will fairly and adequately protect the interests of the members of the Class. Their interests are aligned with, and not antagonistic to, those of the other members of the Class.

61. Plaintiffs are represented by competent counsel experienced in class action antitrust litigation.

62. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate antitrust claims such as are asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## ANTITRUST INJURY AND STANDING

2      63. During the Class Period, Plaintiffs and the members of the Class have directly paid

3 monthly DVD subscription fees to Netflix in the United States, and many continue to do so.

4      64. Plaintiffs and the members of the Class have suffered, and many continue to suffer, injury

5 of the type that the antitrust laws are designed to punish and prevent. Plaintiffs and the members of

6 the Class have paid, and many continue to pay, more to subscribe to Netflix than they would

7 have, absent the Market Division Agreement. As a direct and proximate result of the unreasonable

8 restraint of trade and market and monopoly power created by the Market Division Agreement,

9 Plaintiffs and the members of the Class were, and many continue to be, injured and financially

10 damaged in their businesses and property, in amounts that are not presently determined. As the

11 direct victims of Defendants' antitrust violations, Plaintiffs are the most efficient enforcers of the

12 antitrust claims made herein.

13                                **COUNT ONE**

14            **SHERMAN ACT SECTION ONE (15 U.S.C. §1)**
                   **Illegal Market Division**
15                   **(Against All Defendants)**

16      65. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

17      66. Defendants have entered into a *per se* illegal market division agreement, in violation of

18 Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1. Even if evaluated under the Rule of Reason, the

19 Market Division Agreement is an unreasonable restraint of trade in violation of Section 1 of the

20 Sherman Antitrust Act, 15 U.S.C. §1.

21      67. Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors

22 in the Online DVD Rental Market. In addition, Netflix, on the one hand, and Wal-Mart Stores and

23 Walmart.com, on the other hand, were potential competitors in new DVD sales. Wal-Mart Stores and

24 Walmart.com were actual participants and Netflix was a potential participant, with the means and

25 economic incentive to sell new DVDs—in the absence of the Market Division Agreement.

26      68. Defendants shared a conscious commitment to a common scheme designed to achieve the

27 unlawful objective of dividing the markets for online DVD rentals and new DVD sales. The Market

28

HOWREY LLP

CLASS ACTION COMPLAINT           - 18 -
Case No.

1 │ Division Agreement allocated the Online DVD Rental Market to Netflix, with Wal-Mart Stores and

2 │ Walmart.com agreeing not to compete in that Relevant Market. The agreement also allocated new

3 │ DVD sales to Wal-Mart Stores and Walmart.com, with Netflix agreeing to refrain from selling new

4 │ DVDs in competition with them. In addition to explicitly or *de facto* agreeing not to sell new DVDs,

5 │ Netflix also obtained the Market Division Agreement by providing potentially valuable promotion to

6 │ Wal-Mart Stores and Walmart.com. In so doing, Netflix provided significant consideration to Wal-

7 │ Mart Stores and Walmart.com for their agreement that Walmart.com would withdraw from, and both

8 │ Walmart.com and Wal-Mart Stores would not compete in, the Online DVD Rental Market.

9 │ 69. The Market Division Agreement has created significant anticompetitive effects and no pro-

10 │ competitive benefits. It eliminated competition in the Relevant Market, raising prices paid by

11 │ consumers. To the extent that there are any procompetitive benefits at all resulting from the

12 │ agreement, they would not outweigh the agreement's anticompetitive effects. In any event, to the

13 │ extent that there were any, they could have been achieved by less restrictive means.

14 │ 70. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,

15 │ Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

16 │ ## COUNT TWO

17 │ **SHERMAN ACT SECTION TWO (15 U.S.C. §2)**
18 │ **Monopolization of Online DVD Rental Market**
   │ **(Against Netflix)**

19 │ 71. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

20 │ 72. Netflix has monopoly power in the Online DVD Rental Market.

21 │ 73. Netflix willfully acquired and maintained its monopoly in the Online DVD Rental Market

22 │ by its acts and practices described herein, including by executing, implementing, and otherwise

23 │ complying with the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust

24 │ Act, 15 U.S.C. §2.

25 │ 74. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,

26 │ Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

27 │

28 │

| 1 | <div align="center">**COUNT THREE**</div> |

<div align="center">**SHERMAN ACT SECTION TWO (15 U.S.C. §2)**
**Attempt to Monopolize Online DVD Rental Market**
**(Against Netflix)**</div>

75. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

76. If Netflix does not already have monopoly power, then Netflix has a dangerous probability of success in achieving monopoly power in the Online DVD Rental Market.

77. With the specific intent to achieve a monopoly, Netflix, by its acts and practices described herein, including by executing, implementing, and otherwise complying with the Market Division Agreement, has attempted to monopolize the Online DVD Rental Market, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2.

78. As a result of this violation of law, Netflix's subscription prices charged to, and paid by, Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

<div align="center">**COUNT FOUR**</div>

<div align="center">**SHERMAN ACT SECTION TWO (15 U.S.C. §2)**
**Conspiracy to Monopolize Online DVD Rental Market**
**(Against All Defendants)**</div>

79. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

80. Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the Online DVD Rental Market. Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the Online DVD Rental Market. Defendants conspired with the specific intent, knowledge and purpose that their anticompetitive agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Relevant Market. Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the Market Division Agreement would be the monopolization of the Relevant Market by Netflix. Defendants have committed overt acts in furtherance of their conspiracy, including entering into, complying with, and implementing the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2.

81. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,

1  Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

2  **PRAYER FOR RELIEF**

3  WHEREFORE, Plaintiffs respectfully request that:

4   A.  The Court determine that this action may be maintained as a class action under
5       Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed
        class representatives, and that Plaintiffs' counsel be appointed as counsel for the
6       Class.

7   B.  Defendants be adjudged to violate Sections 1 and 2 of the Sherman Antitrust Act
        of 1890, 15 U.S.C. §§1-2.
8

9   C.  The Court declare the Market Division Agreement between Defendants
        announced May 19, 2005, to be unlawful and null and void.

10
    D.  Judgment be entered for Plaintiffs and the members of the Class against
11      Defendants, jointly and severally, for three times the amount of damages
        sustained by Plaintiff and the Class, under Section 4 of the Clayton Antitrust Act
12      of 1914, 15 U.S.C. §15, together with the costs of the action, including
13      reasonable attorneys' fees, and such other relief as is appropriate.

14  E.  Defendants, their affiliates, successors, transferees, assignees, and the officers,
        directors, partners, agents and employees thereof, and all other persons acting or
15      claiming to act on their behalf, be permanently enjoined and restrained from, in
        any manner, continuing, maintaining or renewing the contract, combination or
16      conspiracy alleged herein, or from engaging in any other contract, combination
        or conspiracy having similar purpose or effect, and from adopting or following
17      any practice, plan, program or device having a similar purpose or effect,
18      pursuant to Section 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §29.

19  F.  Plaintiffs and the members of the Class have such other, further, and different
        relief as the case may require and the Court may deem just and proper under the
20      circumstances.

21

22

23

24

25

26

27

28

1

## JURY DEMAND

2          Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of

3    all issues triable by jury.

4    Dated: January 2, 2009

5                                    Respectfully submitted,

6

7                              By: _____

                                   Paul Alexander
8                                  HOWREY LLP
                                   1950 University Avenue
9                                  East Palo Alto, CA 94303
                                   650.798.3500
10                                 650.798.3600 (fax)

11
                                   Robert G. Abrams
12                                 Thomas A. Isaacson
                                   Peter A. Barile III
13                                 HOWREY LLP
                                   1299 Pennsylvania Avenue, N.W.
14                                 Washington, DC 20004
                                   202.783.0800
15                                 202.383.6610 (fax)

16
                                   Emily L. Maxwell
17                                 HOWREY LLP
                                   525 Market Street, Suite 3600
18                                 San Francisco, CA 94105
                                   415.848.4947
19                                 415.848.4999 (fax)

20
                                   *Attorneys for Plaintiffs and others similarly situated*
21

22

23

24

25

26

27

28

**HOWREY LLP**

CLASS ACTION COMPLAINT                          - 22 -
Case No.