Daniel C. Girard (CA Bar No. 114826)
Elizabeth C. Pritzker (CA Bar No. 146267)
Alex C. Turan (CA Bar No. 227273)
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Bryan L. Clobes *(pro hac vice)*
Ellen Meriwether *(pro hac vice)*
Timothy Fraser *(pro hac vice)*
**CAFFERTY FAUCHER LLP**
1717 Arch Street, Ste. 3610
Philadelphia, PA 19103
Telephone: (215) 864-2800
Facsimile: (215) 864-2810

Nyran Rose Pearson *(pro hac vice)*
**CAFFERTY FAUCHER LLP**
30 N. LaSalle Street, Suite 3200
Chicago, IL 60602
Telephone: (312) 782-4880
Facsimile: (312) 782-4485

*Attorneys for Plaintiffs Jonathan Groce and Susan Horowitz*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN GROCE and SUSAN HOROWITZ, on behalf of herself and all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>NETFLIX, INC., WAL-MART STORES, INC., and WALMART.COM USA LLC,<br><br>        Defendants. | Case No. 09-cv-0139 MEJ<br><br><br>**DECLARATION OF ALEX C. TURAN IN SUPPORT OF ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED** |

Dockets.Justia.com

I, Alex C. Turan, declare as follows:

1.      I am a member in good standing of the California State Bar and an attorney at the law firm of Girard Gibbs LLP, counsel of record for Plaintiffs in *Jonathan Groce, et al. v. Netflix, Inc., et al.*, Case No. 09-cv-0139 MEJ.  I make this declaration based on my personal knowledge, and if called to testify to the contents, I cold and would competently do so.

2.      Attached as <u>Exhibit A</u> is a true and correct copy of the class action complaint filed on January 2, 2009 in *Resnick, et al. v. Walmart.com USA LLC, et al.*, Case No. 09-cv-0002, and assigned to the Honorable Phyllis J. Hamilton.

3.      Attached as <u>Exhibit B</u> is a true and correct copy of the class action complaint filed on January 12, 2009 in *Groce, et al. v. Netflix, Inc., et al.*, Case No. 09-cv-0139 MEJ.

4.      Defendants that have been sued in *Groce* have yet to appear in the action.  Local Rule 3-12 requires an Administrative Motion to Consider Whether Cases Should Be Related to be filed promptly.  Therefore, a stipulation could not be entered prior to the filing of Plaintiffs' Administrative Motion.

I declare under penalty of perjury that the foregoing facts are true and correct and that this declaration was executed this 14th day of January, 2009, in San Francisco, California.


By: ___/s/ Alex C. Turan_____
        Alex C. Turan

EXHIBIT A

1  Paul Alexander (Bar No. 49997)
   AlexanderP@howrey.com
2  HOWREY LLP
   1950 University Avenue
3  East Palo Alto, CA  94303
   650.798.3500
4  650.798.3600 (fax)

5
   Robert G. Abrams
6  AbramsR@howrey.com
   Thomas A. Isaacson
7  IsaacsonT@howrey.com
   Peter A. Barile III
8  BarileP@howrey.com
9  HOWREY LLP
   1299 Pennsylvania Avenue, N.W.
10 Washington, DC  20004
   202.783.0800
11 202.383.6610 (fax)

12
   Emily L. Maxwell (Bar No. 185646)
13 MaxwellE@howrey.com
   HOWREY LLP
14 525 Market Street, Suite 3600
   San Francisco, CA  94105
15 415.848.4947
   415.848.4900 (fax)
16

**E-filing**

17 *Attorneys for Plaintiffs, on behalf of themselves and others similarly situated*

18              UNITED STATES DISTRICT COURT

19            NORTHERN DISTRICT OF CALIFORNIA

20 ANDREA RESNICK, GARY BUNKER, JOHN  )  Case No. **CV 09          0002**
   HALEY, AMY LATHAM, ERIC ROSLANSKY, )
21 and KEVIN SIMPSON, on behalf of themselves )
22 and others similarly situated,             )   CLASS ACTION COMPLAINT
                    *Plaintiffs*,            )
23        v.                                  )   JURY TRIAL DEMANDED
                                             )
24 WALMART.COM USA LLC, WAL-MART            )
25 STORES, INC and NETFLIX, INC.,           )
                                             )
26        *Defendants*.                      )
                                             )
27 ─────────────────────────────────────────)

28

**MEJ**

FILED
JAN - 2 2009
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FAXED

1    NOW COME Plaintiffs, ANDREA RESNICK, GARY BUNKER, JOHN HALEY, AMY LATHAM, ERIC

2  ROSLANSKY, and KEVIN SIMPSON, for their Complaint brought under Sections 1 and 2 of the Sherman

3  Antitrust Act of 1890, 15 U.S.C. §§1-2, and Sections 4 and 16 of the Clayton Antitrust Act of 1914, 15

4  U.S.C. §§15 & 29, for treble damages and injunctive relief against Defendants Netflix, Inc. ("Netflix"),

5  Wal-Mart Stores, Inc. ("Wal-Mart Stores"), and Walmart.com USA LLC ("Walmart.com").

6    Based upon personal knowledge, information, and belief, and the investigation of counsel,

7  Plaintiffs allege as follows:

8                                      **NATURE OF THE ACTION**

9    1.  On or about May 19, 2005, Netflix, Wal-Mart Stores, and Walmart.com, a wholly owned

10  subsidiary of Wal-Mart Stores, entered into an agreement to divide the markets for the sales and online

11  rentals of DVDs in the United States ("Market Division Agreement"), with the purpose and effect of

12  monopolizing and unreasonably restraining trade in at least the online DVD rental market.

13    2.  The meetings that led to the conspiracy began in January 2005, when Reed Hastings, the

14  CEO of Netflix, and John Fleming, then the CEO of Walmart.com, met with each other for dinner to

15  discuss the online DVD rental and DVD sales markets and how they could reach an agreement that

16  would reduce or eliminate competition in those markets. According to Hastings, having "noticed how

17  low Wal-Mart's prices [for DVDs] were," he "called the CEO [of Walmart.com] in January and asked

18  if he could have dinner." Fleming, who reported directly to Wal-Mart Stores' CEO Lee Scott,

19  accepted Hastings' invitation; the two thereafter met and, as a result of the meetings and exchanges

20  that followed, Defendants entered into the contract, combination, and conspiracy alleged herein. At

21  the time of their initial meeting and prior to entering into the Market Division Agreement, Netflix and

22  Walmart.com were direct competitors in renting DVDs online and all three defendants were potential

23  competitors in selling new DVDs to consumers. However, by no later than May 19, 2005, Netflix,

24  Wal-Mart Stores, and Walmart.com entered into an agreement by which Walmart.com would stop

25  competing with Netflix in the online DVD rental business and Netflix would promote the sales of new

26  DVDs by Wal-Mart Stores and Walmart.com, and not sell new DVDs in competition with them.

27    3.  Wal-Mart Stores actively participated in this conspiracy. This is confirmed by, among

28

HOWREY LLP

CLASS ACTION COMPLAINT                                      - 1 -
Case No.

1   other things, the fact that prior to the announcement of the Market Division Agreement, John Fleming

2   was promoted to Chief Marketing Officer of Wal-Mart Stores. As of the time of the announcement of

3   the Market Division Agreement, Fleming thus was acting in his capacity both as the Chief Marketing

4   Officer of Wal-Mart Stores and the Wal-Mart Stores executive responsible for overseeing the

5   operations of Walmart.com. As Chief Marketing Officer of Wal-Mart Stores, Fleming was responsible

6   for deciding "what the largest, most powerful retailer in history will stock on its shelves, and how

7   much those products will cost. Such decisions, when made at Wal-Mart, can help make or break entire

8   industries."

9       4.   Defendants' conspiracy enabled Netflix to charge its customers higher subscription prices

10  for the rental of DVDs than it otherwise would have. As a result of their contract, combination, and

11  conspiracy as well as Netflix's unlawfully acquired and maintained market and monopoly power,

12  Netflix actually did overcharge Plaintiffs, and millions of other consumers similarly situated, and

13  continues to do so.

14      5.   Under the Market Division Agreement, Netflix, Wal-Mart Stores, and Walmart.com agreed

15  that they would restrain trade and eliminate competition. Wal-Mart Stores and Walmart.com agreed

16  that Walmart.com would stop competing with Netflix in the online rental market. Netflix agreed that it

17  would not sell new DVDs, but instead would promote the DVD sales of Wal-Mart Stores and

18  Walmart.com. In agreeing to promote the sale of DVDs by Wal-Mart Stores and Walmart.com,

19  Netflix provided consideration for the agreement by Wal-Mart Stores and Walmart.com that

20  Walmart.com would exit the online DVD rental market and simultaneously confirmed to Wal-Mart

21  Stores and Walmart.com that Netflix would not enter the market to sell new DVDs, as Netflix was

22  well-positioned and otherwise had the unilateral economic incentive to do. Since entering into the

23  Market Division Agreement, neither Wal-Mart Stores nor Walmart.com have rented DVDs online and

24  Netflix has not sold new DVDs. The Market Division Agreement served to entrench and enhance

25  Defendants' dominant market positions and otherwise cause harm to competition, including enabling

26  Netflix to charge higher subscription prices for online DVD rentals than it would have had they not

27  entered into the agreement. Plaintiffs and all other similarly situated consumers in fact paid the higher

28

CLASS ACTION COMPLAINT                    - 2 -
Case No.

1 subscription prices to Netflix.

2    6. As alleged below, this case is brought as a class action on behalf of all consumers in the
3 United States who, during the period May 19, 2005, to the present (hereinafter, the "Class Period"),
4 paid a subscription fee to rent DVDs from Netflix. Plaintiffs bring this action under Sections 4 and 16
5 of the Clayton Antitrust Act to seek redress in the form of treble damages and other relief for their
6 injuries resulting from Defendants' violations of law on behalf of themselves and other similarly
7 injured consumers nationwide and to seek a declaration that the Market Division Agreement is null and
8 void.

9                                    **PLAINTIFFS**

10    7. ANDREA RESNICK ("Resnick") is an individual consumer who resides in San Francisco,
11 California. During the Class Period, Resnick directly subscribed to Netflix for her personal, non-
12 commercial use. The subscription fees Resnick paid to Netflix for renting DVDs were greater than she
13 would have paid, but for the antitrust violations alleged herein.

14    8. GARY BUNKER ("Bunker") is an individual consumer who resides in San Angelo, Texas.
15 During the Class Period, Bunker directly subscribed to Netflix for his personal, non-commercial use.
16 The subscription fees Bunker paid to Netflix for renting DVDs were greater than he would have paid,
17 but for the antitrust violations alleged herein.

18    9. JOHN HALEY ("Haley") is an individual consumer who resides in Fairfax, Virginia. During
19 the Class Period, Haley directly subscribed to Netflix for his personal, non-commercial use. The
20 subscription fees Haley paid to Netflix for renting DVDs were greater than he would have paid, but for
21 the antitrust violations alleged herein.

22    10. AMY LATHAM ("Latham") is an individual consumer, who resides in Bristow, Virginia.
23 During the Class Period, Latham directly subscribed to Netflix for her personal, non-commercial use.
24 The subscription fees Latham paid for renting DVDs were greater than she would have paid, but for
25 the antitrust violations alleged herein.

26    11. ERIC ROSLANSKY ("Roslansky") is an individual consumer who resides in Boulder,
27 Colorado. During the Class Period, Roslansky directly subscribed to Netflix for his personal, non-

28

**HOWREY LLP**

CLASS ACTION COMPLAINT                - 3 -
Case No.

1   commercial use. The subscription fees Roslansky paid to Netflix for renting DVDs were greater than

2   he would have paid, but for the antitrust violations alleged herein.

3       12. KEVIN SIMPSON ("Simpson") is an individual consumer who resides in Washington, DC.

4   During the Class Period, Simpson directly subscribed to Netflix for his personal, non-commercial use.

5   The subscription fees Simpson paid to Netflix for renting DVDs were greater than he would have paid,

6   but for the antitrust violations alleged herein.

7                                   **DEFENDANTS**

8                                     **NETFLIX**

9       13. Defendant Netflix is a Delaware corporation headquartered at 100 Winchester Circle, Los

10  Gatos, California, 95032. Netflix is publicly traded on the NASDAQ under the symbol NFLX. Its

11  revenues earned from engaging in interstate commerce exceed $1 Billion annually. Through its

12  website, www.netflix.com, Netflix rents DVDs directly to consumers nationwide by charging monthly

13  subscription fees, which entitle customers to rent DVDs pursuant to various subscription plans. Netflix

14  has possessed a market share of at least 75% of the Online DVD Rental Market in the United States, as

15  defined herein, at all times during the Class Period.

16                                    **WAL-MART**

17      14. **Wal-Mart Stores.** Defendant Wal-Mart Stores is the largest retailer in the United States.

18  Wal-Mart Stores is a Delaware corporation headquartered at 702 S.W. 8th Street, Bentonville,

19  Arkansas, 72716. Wal-Mart Stores is publicly traded on the New York Stock Exchange under the

20  symbol WMT. Its revenues earned from engaging in interstate and foreign commerce approach $400

21  Billion annually. Through its retail stores and its website, www.walmart.com, Wal-Mart Stores sells

22  DVDs directly to consumers nationwide. Wal-Mart Stores sells far more DVDs than any other retailer

23  in the United States, accounting for about 40% of all new DVDs sold to consumers domestically. Prior

24  to the Market Division Agreement, Wal-Mart Stores' wholly-owned subsidiary Walmart.com

25  competed with Netflix in the Online DVD Rental Market through the "Walmart DVD Rentals" service,

26  which was available on www.walmart.com.

27

28

HOWREY LLP

CLASS ACTION COMPLAINT                          - 4 -
Case No.

1    15. **Walmart.com.** Defendant Walmart.com is a wholly-owned subsidiary of Wal-Mart Stores.

2    Walmart.com is a Delaware company with its headquarters at 7000 Marina Boulevard, Brisbane,

3    California, 94005. It is the online component of Wal-Mart Stores' retail empire that is the leading

4    seller of new DVDs in the United States. Prior to the conspiracy alleged herein, Walmart.com was

5    also a major competitor of Netflix in the Online DVD Rental Market through the "Walmart DVD

6    Rentals" service, which was available on www.walmart.com. While its financials are not publicly

7    reported by Wal-Mart Stores, Walmart.com is ranked as the 14th largest online retailer in the United

8    States. Through the website, www.walmart.com, Walmart.com sells DVDs directly to consumers

9    nationwide. Consumers who purchase DVDs via www.walmart.com may have them either mailed or

10   otherwise delivered to them directly, or may pick them up at a Wal-Mart Stores retail location via

11   Walmart.com's and Wal-Mart Stores' "Site to Store" program.

12    16. **Wal-Mart Stores and Walmart.com.** Walmart.com and Wal-Mart Stores are, in essence,

13   completely integrated and operated as a single commercial enterprise and hold themselves out to the

14   public as such, by which Walmart.com is an internet sales channel for Wal-Mart Stores, rather than

15   being an independent business entity. Wal-Mart Stores is the registrant of the www.walmart.com

16   domain name that is used to sell products and services by Walmart.com. Likewise, Wal-Mart Stores is

17   the registrant of www.walmartdvdrentals.com. Wal-Mart Stores' Chief Marketing Officer John

18   Fleming has explained the relationship between Wal-Mart Stores and Walmart.com as follows: "Wal-

19   Mart Stores set up Walmart.com as a separate company with some outside investors, but within six

20   months Wal-Mart Stores bought back the outside interest and Walmart.com; Walmart.com now serves

21   as a 'marketing channel' for Wal-Mart Stores."

22    17. **Wal-Mart Stores' Active Participation in the Conspiracy.** Wal-Mart Stores was actively

23   involved in the conspiracy alleged herein, as alleged more specifically below. For purposes of these

24   allegations, both Wal-Mart Stores and Walmart.com are active participants in the conspiracy and each

25   is liable for the unlawful conduct alleged herein, with each, among other things, participating in, and

26   benefiting from, the Market Division Agreement. Moreover, Wal-Mart Stores directed, ratified,

27   approved, supported, and otherwise aided and abetted Walmart.com's violations of law.

28

HOWREY LLP

CLASS ACTION COMPLAINT                     - 5 -
Case No.

1    18. Wal-Mart Stores had a strong incentive to accomplish the Market Division Agreement. In
2    addition to its interests as the 100% owner of Walmart.com, Wal-Mart Stores had further incentive to
3    enter into this Agreement, since it obtains substantial revenues from sales of new DVDs, as well as
4    store traffic resulting in the sales of other goods, which would have been threatened by Netflix's entry
5    into new DVD sales, and which were enhanced by Netflix's promotion of Wal-Mart Stores and
6    Walmart.com through the Market Division Agreement. In a letter submitted to this Court in
7    connection with a prior antitrust case brought against Netflix by other plaintiffs for other alleged
8    violations of law, an assistant general counsel of Wal-Mart Stores, referring specifically to Wal-Mart
9    Stores, wrote of "Wal-Mart's decision to discontinue renting DVDs." Moreover, it was Wal-Mart
10   Stores that announced in part the Market Division Agreement, which identifies Wal-Mart Stores, in the
11   "About" section of the press release. The announcement quoted John Fleming, who was then Chief
12   Marketing Officer of Wal-Mart Stores, regarding the Agreement. It explained that Walmart.com's
13   DVD sales are in fact Wal-Mart Stores' "online movie sales business," and that, more generally, Wal-
14   Mart Stores' "[o]nline merchandise sales are available at www.walmart.com."

15   19. Whenever reference is made in this Complaint to a statement or transaction of any
16   corporation or entity, the allegation means that the corporation or entity acted by or through its
17   directors, members, partners, officers, employees, affiliates, or agents, while engaged in the
18   management, direction, control, or conduct of the corporation's or entity's business and acting within
19   its scope of authority.

20                            **JURISDICTION AND VENUE**

21   20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 & 1337 and 15
22   U.S.C. §§1-2, 15 & 26.

23   21. Venue is proper in this District pursuant to 28 U.S.C. §§15, 22 & 26 and pursuant to 28
24   U.S.C. §1391(b), (c) & (d), because at all times relevant to the Complaint: (a) Defendants transacted
25   business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial
26   part of Plaintiffs' claims occurred in this District; and (c) a substantial portion of the affected interstate
27   trade and commerce described below has been carried out in this District.

28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 6 -
Case No.

1        22. This Court has personal jurisdiction over Defendants because, *inter alia*, each of the

2   Defendants is headquartered in this State or has transacted business; maintained continuous and

3   systemic contacts; purposefully availed itself of the benefits of doing business; and committed acts in

4   furtherance of the alleged conspiracy in this State.

5                              **INTRADISTRICT ASSIGNMENT**

6        23. Pursuant to Civil L.R. 3-2, this case should be assigned to the San Francisco Division

7   because a substantial part of the events giving rise to the claims occurred within this division. Plaintiff

8   Andrea Resnick resides in San Francisco County and Defendant Walmart.com is headquarted in San

9   Mateo County.

10                          **INTERSTATE TRADE AND COMMERCE**

11       24. Defendants' conduct has taken place within the flow of, and substantially affected the

12  interstate commerce of, the United States. By way of example, Defendants have sold and/or rented

13  DVDs throughout the United States, involving hundreds of millions or billions of dollars in interstate

14  commerce, and used the instrumentalities of interstate commerce, including interstate wires and the

15  U.S. mail, to sell and/or to rent DVDs throughout the United States.

16                                  **RELEVANT MARKET**

17       25. Defendants' market allocation conspiracy is *per se* illegal and requires no allegation of

18  market definition.

19       26. For those claims that may require market definition, the Relevant Market for purposes of

20  these allegations during the Class Period at least is: the Online DVD Rental Market in the United

21  States.

22       27. "DVD," as defined herein, refers to a Digital Video Disc or Blu-ray Disc containing

23  commercially recorded entertainment programs for personal viewing. DVDs are the primary medium

24  by which movies and other recorded entertainment are distributed in the United States. Revenues on

25  DVDs far exceed those generated from box office receipts. In addition, DVDs have become a

26  particularly lucrative means for the distribution of previously aired television programs, surpassing

27

28

**HOWREY LLP**

CLASS ACTION COMPLAINT                        - 7 -
Case No.

1 even television syndication rights as a revenue stream in many instances.  As defined herein, "DVD"

1  even television syndication rights as a revenue stream in many instances.  As defined herein, "DVD"

2  does not refer to blank Digital Video Discs, which are used to store or record data.

3        28. The relevant market is for the rental of DVDs online by subscription for delivery by mail

4  ("Online DVD Rental Market").  At all relevant times, there have been no reasonably interchangeable

5  substitutes for this service, which is differentiated, from both the demand and the supply side, from

6  other methods of DVD distribution channels, as well as other methods of entertainment content

7  delivery.

8        29. In the Online DVD Rental Market, for a monthly subscription fee, a consumer may rent

9  DVDs from an online service provider, such as Netflix, Blockbuster Online, or (prior to May 19, 2005)

10 Walmart DVD Rentals.  There are no late fees and no due dates, but, within any given plan, the

11 consumer pays the subscription fee regardless of how many DVDs he or she rents per month.  Thus,

12 even a consumer who does not rent a DVD for months still is charged the subscription fee; Netflix

13 CEO Reed Hastings calls this the "gym membership effect."

14       30. To rent DVDs, consumers fill out a rental "queue" in their online profile, listing in order of

15 preference the DVDs they wish to rent.  The DVDs are then sent by the provider to the consumer's

16 home via U.S. mail.  To return the DVD and receive the next DVD in the queue, the consumer inserts

17 the DVD in a prepaid envelope provided with the rental and mails it back; the service provider then

18 mails the next movie on the list to the consumer.  The library of titles available from online service

19 providers has grown over time, now ranging near 100,000 DVDs—often twenty to one-hundred times

20 the selection of titles stocked (not to mention available) at any single video rental store.

21       31. From the consumer's perspective, online DVD rentals are a differentiated service that is not

22 reasonably interchangeable with traditional bricks-and-mortar video rental.  In traditional video rental

23 from physical stores, consumers drive to or otherwise arrive at the store, find (or do not find) what they

24 are looking for, and pay on a per-DVD basis for their selection(s).  After the designated rental period

25 of one or more days, usually depending upon the release date of the DVD, the consumer returns his

26 selection or potentially incurs late fees.  During the Class Period as alleged herein, these late fees have

27

28

HOWREY LLP

CLASS ACTION COMPLAINT          - 8 -
Case No.

1    accounted for as much as 20% of the revenues in traditional video rental stores; there are no late fees
2    or due dates in the Online DVD Rental Market.

3        32. There are numerous other practical indicia of the Online DVD Rental Market being a
4    relevant product market, distinct from other forms of DVD rental, including:

5        a. **Price Competition.** No direct price competition exists between online rental and other
6            forms of DVD rental, whether in-store, kiosk, or video downloading, which are not
7            reasonably interchangeable with online DVD rental. For example, online DVD rentals
8            generally are priced on a monthly subscription basis. Within any given plan, the
9            subscription rate is independent of the number of DVDs the customer actually rents in a
10           month. In-store DVD rentals, kiosks, and downloading generally are priced on a pay-
11           per-view basis. Also, changes in the price of online rentals do not closely track changes
12           in the price of in-store rentals. The pricing of online rentals is generally nationwide in
13           scope and is not affected by local in-store prices and competition. As a result, the
14           pricing of online rentals would generally be the same to a customer, regardless of
15           whether the nearest rental store is two minutes or two hours away. Online rentals
16           generally offer additional services, such as movie reviews, customer-specific
17           recommendations based on viewing and preference history, and other metrics of
18           popularity. The cross-elasticity of demand between these products is such that a small
19           but significant non transitory increase in price ("SSNIP") would not cause consumers to
20           switch from online rental to in-store rental or any other arguable method of DVD
21           distribution and *vice versa*.

22       b. **Functional Differences.** Online rentals fundamentally differ from in-store rentals in
23           that (1) they do not require travel to a store (including a second trip to return the DVD
24           and potentially multiple trips if the store does not have the DVD in stock at the right
25           time), (2) are available to anyone with a postal address, regardless of proximity to a
26           store, (3) are primarily subscription-based services, and (4) provide a much wider
27           selection of titles than can a brick-and-mortar store. For these reasons, among others,

28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 9 -
Case No.

1    Online and in-store DVD rentals are not reasonably interchangeable.  Likewise, other

2    modes of content distribution, such as kiosk, video-on-demand, and downloading,

3    among other forms, are not reasonably interchangeable with online DVD rentals for a

4    number of reasons, including relative selection and convenience for consumers, pricing,

5    as well as, from the supply perspective, licensing considerations and technological

6    limitations.

7    c.  **Public and Industry Perceptions.**  The online rental market is recognized as a distinct

8    market by the public and the industry, including by Defendants.

9    d.  **Admissions.**  By word and deed, Defendants have confirmed and recognized the

10    existence of a discrete online rental market.  Admissions of a discrete online rental

11    market abound from Netflix and Walmart.com and Wal-Mart Stores executives alike,

12    including Hastings and Fleming.  Very recently, a Netflix executive told the Wall Street

13    Journal that other types of rental services, such as kiosk and in-store rentals, do not

14    present a direct competitive threat to Netflix.  That same executive acknowledged that

15    while video downloads may be a competitive force in the future, DVD will be the

16    dominant medium for years to come, making the entry of this technology not timely

17    enough to be considered a competitive force in the relevant market.  Netflix CEO Reed

18    Hastings has observed that the competitive threat of internet downloading to online

19    DVD rental during the Class Period is like that of hydrogen powered cars to gasoline

20    powered cars—inconsequential for many years to come.  He has further explained that

21    DVDs will be the dominant medium for movies for perhaps as long as the gasoline

22    engine.

23    33. Online DVD rentals are also a separate market from DVD sales.  The pricing of DVD sales

24    and online DVD rentals is very different.  For example, the price to buy a new DVD depends heavily

25    on how popular it is, including whether it is a new release or how successful the title originally was at

26    the box office or on television.  By contrast, online DVD renters generally charge based on a

27    subscription fee, regardless of whether the consumer is renting popular or obscure DVDs.  The

28

1   industry and the public perceive online DVD rentals as separate from DVD sales, whether in-store or
2   online. The factors motivating a consumer to buy a DVD are different from those that lead to renting a
3   DVD. The former generally applies to DVDs that the consumer intends to view (either personally, or
4   their family or friends) numerous times. The latter generally applies to DVDs that the consumer
5   intends to view once and then return. DVDs sold at retail have other distinguishing characteristics,
6   such as packaging and special features not available with rentals, which are delivered unadorned in
7   envelopes. In addition, the fact of whether a DVD is new or used is not an issue in rental, but is a
8   significant factor in sales, for used DVDs are sold at a significant discount to their new counterparts,
9   due to them being relatively less desirable to consumers. DVD sales and online rentals also are not
10  reasonably interchangeable for consumers intending to collect physical DVDs or to give a DVD as a
11  gift. The cross-elasticity of demand between these products is such that a SSNIP would not cause
12  consumers to switch from online renting to purchasing DVDs and *vice versa*.

13       34. The Geographic Market for the Online DVD Rental Market is the United States. The
14  practical reality is that, among other things, shipping costs and transglobal differences in DVD data
15  encoding make it neither practical nor feasible for entities located in other countries to rent DVDs to
16  U.S. consumers.

17                          **MARKET AND MONOPOLY POWER**

18       35. At all relevant times, Netflix dominated the Online DVD Rental Market. Netflix has an
19  approximate market share of 75% in the Online DVD Rental Market, and is far and away the market
20  leader in the Online DVD Rental Market. As a result of this market share, Netflix has had and
21  continues to have market and monopoly power in the Online DVD Rental Market; it has the power to
22  control prices or exclude competition in this Relevant Market.

23       36. Netflix's market and monopoly power is strengthened by the significant barriers to entry in
24  this market. There have been no significant market entrants in the more than three years since
25  announcement of the Market Division Agreement, which increased those barriers. Online DVD rental
26  is highly capital intensive. A firm must operate on a large scale to be successful. It requires the
27  possession of a significant number of shipping facilities strategically located throughout the United

28
HOWREY LLP

CLASS ACTION COMPLAINT                    - 11 -
Case No.

1 States to ensure timely delivery. It also requires stocking an extensive inventory of DVDs to maintain
2 the selection of titles that consumers demand. As Netflix CEO Reed Hastings has observed, "When
3 you think about the barriers to entry to this business, it is subtle because it appears easy. A kid can
4 open a website. But the barriers to profitability are very large."

5     37. Since the implementation of the Market Division Agreement, the Online DVD Rental
6 Market has been overwhelmingly comprised of only two firms: Netflix and Blockbuster, which
7 possesses nearly all of the remaining 25% of the Online DVD Rental Market that Netflix does not
8 control. A few minor firms have shares of less than 1-2% of the market. During fiscal years 2005-
9 2007 combined, Netflix earned nearly $4 Billion in revenues and $1.3 Billion in gross profit from
10 renting DVDs to consumers—a margin of more than 33%. As a result of Netflix's abuse of its
11 monopoly power alleged herein, its subscription fees have been higher than they otherwise would have
12 been.

13     38. Wal-Mart Stores and its wholly-owned subsidiary Walmart.com combined have an
14 industry-leading 40% of domestic DVD retail sales. During fiscal years 2005-2008 combined, they
15 earned revenues in excess of $25 Billion by selling DVDs to consumers. Both Wal-Mart Stores and
16 Walmart.com benefit from the Market Division Agreement.

17     39. Further evidence of Netflix's market and monopoly power is reflected in the
18 anticompetitive effects alleged herein.

19                     **THE ILLEGAL AGREEMENT**

20     40. **Pre-Agreement Competition in the Online DVD Rental Market.** In early 2005, Netflix
21 was coming off a year in which competition was growing and its stock price had dropped
22 precipitously. It faced increasing competition from Walmart DVD Rentals and from Blockbuster
23 Online, the latter of which had just entered the online rental market.

24     41. By mid-2004, Netflix was charging $21.99 for its most popular subscription rental plan.
25 Blockbuster entered the online market in earnest in August, at first charging $19.99 but then reducing
26 its price in November to $17.49 for its similar plan. After that, the Walmart DVD Rentals rate was
27 reduced from $18.86 to $17.36. In the wake of these price cuts, Netflix reduced its prices by nearly

28

1  20% (to $17.99 per month) soon thereafter. After that, Blockbuster further decreased its price to

2  $14.99—20% below Netflix's already reduced price and more than 40% below the price Netflix was

3  charging just months earlier.

4      42. Meanwhile, Wal-Mart Stores and its wholly-owned subsidiary Walmart.com, which had

5  established themselves as the leader in new DVD sales, were facing increasing competition from in-

6  store and online channels of distribution in new DVD sales, including competition from Amazon.com.

7  At the time, Netflix was a significant potential additional competitor, since it had a subscriber base of

8  millions of customers who were known in the industry to be prolific DVD buyers, and the sales and

9  profits of Wal-Mart Stores and Walmart.com stood to suffer if Netflix began selling new DVDs to

10  these customers. Conversely, Wal-Mart Stores and Walmart.com stood to gain significant additional

11  sales and profits and to gain further market share in the sale of new DVDs if these customers were to

12  make their purchases of new DVDs from them instead.

13      43. **The Walmart Price Cut.** On January 7, 2005, Walmart DVD Rentals dropped the price on

14  its most popular DVD rental plan significantly—to $12.97 per month—creating further price pressure

15  on Netflix to reduce its DVD rental prices. In order to respond to the increased competition, Netflix

16  would have been forced to lower its prices and thereby reduce its profits.

17      44. **The January Dinner Meeting.** Faced with this increasing competition, Reed Hastings, the

18  Chairman and CEO of Netflix, called John Fleming, then the CEO of Walmart.com, and invited him to

19  dinner to discuss the their companies' DVD sales and rentals businesses. Fleming accepted the

20  invitation; the two met together in January 2005 and embarked upon a scheme that would result in the

21  contract combination, and conspiracy, and agreement reflected in the Market Division Agreement.

22      45. **Hastings' Subsequent "Prediction."** On May 5, 2005, in Netflix's First Quarter earnings

23  call with financial analysts, held after the January dinner but only two weeks prior to the public

24  announcement of the Market Division Agreement, Hastings made plain the motive for Netflix to

25  conspire with Wal-Mart Stores and Walmart.com:

26      In terms of profitability over the coming years, the key issue is the number of major
    competitors. If there are only two major players, Blockbuster and Netflix, the

27      profitability may be substantial like other two-firm entertainment markets. If, on the
    other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major competitors in

28

HOWREY LLP

CLASS ACTION COMPLAINT        - 13 -
Case No.

1    online rental, then the profits would likely be small.

2    Hastings went on to "predict" on that conference call:

3       [T]he likely case is [that] online rental becomes a two-firm market over the coming
4       years.

5       46. **The Public Announcement.** On May 19, 2005, shortly after Fleming had been promoted

6    to Chief Marketing Officer of Wal-Mart Stores, Defendants issued a joint press release that revealed

7    the existence of the Market Division Agreement, by which they unlawfully divided and allocated the

8    markets for DVD sales and rentals, and did, in fact, create the two-firm market that Hastings sought.

9       47. **The Media's Reaction.** The news of the agreement was featured in a number of

10   newspapers and other publications, in articles with aptly colorful titles, such as:

11       • "Wal-Mart and Netflix Scratch Each Other's Backs,"

12       • "Truce in DVD-Rental Wars,"

13       • "Wal-Mart and Netflix: An Alliance," and

14       • "Wal-Mart Loves Netflix: And Vice-Versa."

15      48. **The Execution.** Beginning on May 19, 2005, Walmart.com, as agreed, did in fact exit the

16   online rental business. Walmart.com announced to all of the subscribers to "Walmart DVD Rentals"

17   that it was exiting the online DVD rental business and that those subscribers could be transferred to

18   Netflix. Walmart.com took additional steps to affirmatively implement the Market Division

19   Agreement by adding a prominently placed link to the Netflix website to encourage customers to

20   transfer their subscriptions to Netflix. Since the date of their joint announcement on May 19, 2005

21   (apart from the 30 days that Walmart.com used to wind down its existing online rental business),

22   neither Walmart.com nor Wal-Mart Stores has participated in the Online DVD Rental Market, and

23   Netflix has not sold new DVDs.

24      49. As a result of the Market Division Agreement, downward pricing pressure from

25   Walmart.com was eliminated and the Online DVD Rental Market was reduced to two competitors.

26   Absent the Market Division Agreement, Netflix would have lowered its prices no later than May 19,

27   2005. As a result of the elimination of a competitor in this Relevant Market, Blockbuster was able to

28

HOWREY LLP

CLASS ACTION COMPLAINT          - 14 -
Case No.

1   raise its subscription price in July to match that of Netflix, from $14.99 per month to $17.99 per

2   month, in accord with Hastings' expectation that "[i]f there are only two major players, Blockbuster

3   and Netflix, the profitability may be substantial like other two-firm entertainment markets." In

4   Netflix's next earnings call, on August 8, 2005, Hastings boasted:

5       Last quarter we said online rental was shaping up to be a two-player market, and that is
        indeed what is happening.

6

7       50. The Market Division Agreement was not in the independent self-interest of Wal-Mart

8   Stores, Walmart.com, or Netflix. Neither Wal-Mart Stores nor Walmart.com would have wanted

9   Walmart.com to withdraw from the online rental market, encourage its subscribers to be transferred to

10  Netflix, and promote Netflix's rental business absent substantial consideration from Netflix, such as an

11  agreement not to compete for new DVD retail sales. But for the Market Division Agreement,

12  Walmart.com would not have exited the Online DVD Rental Market when it did. Likewise, Netflix

13  would not have foreclosed its opportunity to sell DVDs to its millions of subscribers—a base of

14  customers who purchase on average 25 DVDs per year each—and would not have promoted new DVD

15  sales by Wal-Mart Stores and Walmart.com, rather than its own sales, absent an agreement from them

16  not to compete against Netflix's online rental business.

17                          **ANTICOMPETITIVE EFFECTS**

18      51. Defendants' illegal acts and practices have caused anticompetitive effects in the Online

19  DVD Rental Market. The subscription fees charged by Netflix to Plaintiffs, as well as the other

20  members of the Class, were maintained at artificially high and supracompetitive levels. Plaintiffs and

21  the other members of the Class paid higher subscription prices to Netflix than they otherwise would

22  have paid.

23      52. The Market Division Agreement (i) eliminated one of only three significant competitors in

24  the Relevant Market, (ii) eliminated competition between Defendants, and (iii) enabled Netflix to

25  acquire market power and also acquire and maintain monopoly power in the Relevant Market. The

26  Market Division Agreement has enabled Netflix to implement monopolistic and supracompetitive

27  pricing in the Relevant Market.

28

HOWREY LLP

CLASS ACTION COMPLAINT            - 15 -
Case No.

1    53. The Market Division Agreement and Defendants' acts and practices in furtherance thereof

2   have no procompetitive benefits.  They do not create information that consumers need, nor do they

3   create new or better products or services.  Rather, they have served to reinforce the true

4   anticompetitive nature of the Market Division Agreement by assuring, for example, that Walmart.com

5   not only withdrew from the Online DVD Rental Market, but further enhanced Netflix's position in that

6   market.  Even if there were any such benefits, they would not outweigh any of the anticompetitive

7   effects described herein, and, in any event, could be achieved by less restrictive means.

8                                          **CLASS ACTION ALLEGATIONS**

9    54. Plaintiffs bring this action on their own behalf and as class actions under Rules

10   23(a), 23(b)(2), and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the

11   Class, as defined herein.

12   55. Bunker, Haley, Latham, Resnick, Roslansky, and Simpson bring this action on behalf of

13   themselves and the members of the Class, defined as comprising:

14       Any person in the United States that paid a subscription fee to Netflix to rent DVDs, on
         or after May 19, 2005 up to the present.  Excluded from the Class are government
15       entities, Defendants, their co-conspirators and their representatives, parents,
         subsidiaries, and affiliates.
16

17   56. The Class numbers in the millions, the exact number and identities of the members being

18   known by Defendants.

19   57. The Class is so numerous and geographically dispersed that joinder of all members is

20   impracticable.

21   58. There are questions of law and fact common to the Class and the members

22   thereof.  These common questions relate to the existence of the conspiracy alleged, and to the type

23   and common pattern of injuries sustained as a result thereof.  The questions include, but are not

24   limited to:

25           a.      Whether Defendants engaged in a contract, combination, or conspiracy to
                     allocate markets;
26
             b.      Whether Defendants unreasonably restrained trade in the Online DVD Rental
27                   Market;

28

**HOWREY LLP**

CLASS ACTION COMPLAINT                        - 16 -
Case No.

c.   Whether Defendants had the specific intent for Netflix to monopolize the Online DVD Rental Market;

d.   The nature and character of the acts performed by Defendants in the furtherance of the alleged contract, combination, and conspiracy;

e.   Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

f.   Whether the alleged contract, combination, and conspiracy violated Section 2 of the Sherman Act;

g.   The anticompetitive effects of Defendants' violations of law;

h.   Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

i.   Whether the conduct of Defendants, as alleged in this Complaint, caused Netflix subscription fees to be higher than they otherwise would have been and thereby caused injury to the business and property of Plaintiffs and other members of the Class.

59. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including the legal and factual issues relating to liability and damages.

60. Bunker, Haley, Latham, Resnick, Roslansky, and Simpson are members of the Class.  Their claims are typical of the claims of other members of the Class, and they will fairly and adequately protect the interests of the members of the Class.  Their interests are aligned with, and not antagonistic to, those of the other members of the Class.

61. Plaintiffs are represented by competent counsel experienced in class action antitrust litigation.

62. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment will permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate antitrust claims such as are asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

HOWREY LLP

CLASS ACTION COMPLAINT
Case No.

- 17 -

1    **ANTITRUST INJURY AND STANDING**

2    63. During the Class Period, Plaintiffs and the members of the Class have directly paid

3    monthly DVD subscription fees to Netflix in the United States, and many continue to do so.

4    64. Plaintiffs and the members of the Class have suffered, and many continue to suffer, injury

5    of the type that the antitrust laws are designed to punish and prevent. Plaintiffs and the members of

6    the Class have paid, and many continue to pay, more to subscribe to Netflix than they would

7    have, absent the Market Division Agreement. As a direct and proximate result of the unreasonable

8    restraint of trade and market and monopoly power created by the Market Division Agreement,

9    Plaintiffs and the members of the Class were, and many continue to be, injured and financially

10   damaged in their businesses and property, in amounts that are not presently determined. As the

11   direct victims of Defendants' antitrust violations, Plaintiffs are the most efficient enforcers of the

12   antitrust claims made herein.

13   **COUNT ONE**

14   **SHERMAN ACT SECTION ONE (15 U.S.C. §1)**
     **Illegal Market Division**
15   **(Against All Defendants)**

16   65. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

17   66. Defendants have entered into a *per se* illegal market division agreement, in violation of

18   Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1. Even if evaluated under the Rule of Reason, the

19   Market Division Agreement is an unreasonable restraint of trade in violation of Section 1 of the

20   Sherman Antitrust Act, 15 U.S.C. §1.

21   67. Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors

22   in the Online DVD Rental Market. In addition, Netflix, on the one hand, and Wal-Mart Stores and

23   Walmart.com, on the other hand, were potential competitors in new DVD sales. Wal-Mart Stores and

24   Walmart.com were actual participants and Netflix was a potential participant, with the means and

25   economic incentive to sell new DVDs—in the absence of the Market Division Agreement.

26   68. Defendants shared a conscious commitment to a common scheme designed to achieve the

27   unlawful objective of dividing the markets for online DVD rentals and new DVD sales. The Market

28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 18 -
Case No.

1    Division Agreement allocated the Online DVD Rental Market to Netflix, with Wal-Mart Stores and
2    Walmart.com agreeing not to compete in that Relevant Market. The agreement also allocated new
3    DVD sales to Wal-Mart Stores and Walmart.com, with Netflix agreeing to refrain from selling new
4    DVDs in competition with them. In addition to explicitly or *de facto* agreeing not to sell new DVDs,
5    Netflix also obtained the Market Division Agreement by providing potentially valuable promotion to
6    Wal-Mart Stores and Walmart.com. In so doing, Netflix provided significant consideration to Wal-
7    Mart Stores and Walmart.com for their agreement that Walmart.com would withdraw from, and both
8    Walmart.com and Wal-Mart Stores would not compete in, the Online DVD Rental Market.

9        69. The Market Division Agreement has created significant anticompetitive effects and no pro-
10   competitive benefits. It eliminated competition in the Relevant Market, raising prices paid by
11   consumers. To the extent that there are any procompetitive benefits at all resulting from the
12   agreement, they would not outweigh the agreement's anticompetitive effects. In any event, to the
13   extent that there were any, they could have been achieved by less restrictive means.

14       70. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,
15   Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

16                                    **COUNT TWO**

17                       **SHERMAN ACT SECTION TWO (15 U.S.C. §2)**
18                       **Monopolization of Online DVD Rental Market**
                                    **(Against Netflix)**

19       71. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

20       72. Netflix has monopoly power in the Online DVD Rental Market.

21       73. Netflix willfully acquired and maintained its monopoly in the Online DVD Rental Market
22   by its acts and practices described herein, including by executing, implementing, and otherwise
23   complying with the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust
24   Act, 15 U.S.C. §2.

25       74. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,
26   Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

27

28

1  <div align="center">**COUNT THREE**</div>

2  <div align="center">**SHERMAN ACT SECTION TWO (15 U.S.C. §2)**
3  **Attempt to Monopolize Online DVD Rental Market**
   **(Against Netflix)**</div>

4  75. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

5  76. If Netflix does not already have monopoly power, then Netflix has a dangerous probability

6  of success in achieving monopoly power in the Online DVD Rental Market.

7  77. With the specific intent to achieve a monopoly, Netflix, by its acts and practices described

8  herein, including by executing, implementing, and otherwise complying with the Market Division

9  Agreement, has attempted to monopolize the Online DVD Rental Market, in violation of Section 2 of

10  the Sherman Antitrust Act, 15 U.S.C. §2.

11  78. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,

12  Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

13  <div align="center">**COUNT FOUR**</div>

14  <div align="center">**SHERMAN ACT SECTION TWO (15 U.S.C. §2)**
   **Conspiracy to Monopolize Online DVD Rental Market**
15  **(Against All Defendants)**</div>

16  79. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

17  80. Defendants shared a conscious commitment to a common scheme designed to achieve the

18  unlawful objective of the monopolization of the Online DVD Rental Market. Prior to and at the time of

19  the agreement, Netflix and Walmart.com were actual competitors in the Online DVD Rental Market.

20  Defendants conspired with the specific intent, knowledge and purpose that their anticompetitive

21  agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Relevant

22  Market. Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the

23  Market Division Agreement would be the monopolization of the Relevant Market by Netflix.

24  Defendants have committed overt acts in furtherance of their conspiracy, including entering into,

25  complying with, and implementing the Market Division Agreement, in violation of Section 2 of the

26  Sherman Antitrust Act, 15 U.S.C. §2.

27  81. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,

28
**HOWREY LLP**

CLASS ACTION COMPLAINT                    - 20 -
Case No.

1  Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

2  <center>**PRAYER FOR RELIEF**</center>

3  WHEREFORE, Plaintiffs respectfully request that:

4
5
6  A.    The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class.

7
8  B.    Defendants be adjudged to violate Sections 1 and 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. §§1-2.

9  C.    The Court declare the Market Division Agreement between Defendants announced May 19, 2005, to be unlawful and null and void.

10
11
12
13  D.    Judgment be entered for Plaintiffs and the members of the Class against Defendants, jointly and severally, for three times the amount of damages sustained by Plaintiff and the Class, under Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. §15, together with the costs of the action, including reasonable attorneys' fees, and such other relief as is appropriate.

14
15
16
17
18  E.    Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect, pursuant to Section 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §29.

19
20  F.    Plaintiffs and the members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

21

22

23

24

25

26

27

28

1

## JURY DEMAND

2      Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of

3   all issues triable by jury.

4   Dated:  January 2, 2009

5                                        Respectfully submitted,

6

7                                        By:  _____

8                                              Paul Alexander
                                             HOWREY LLP
9                                            1950 University Avenue
                                             East Palo Alto, CA  94303
10                                           650.798.3500
                                             650.798.3600 (fax)
11

12                                           Robert G. Abrams
                                             Thomas A. Isaacson
13                                           Peter A. Barile III
                                             HOWREY LLP
14                                           1299 Pennsylvania Avenue, N.W.
                                             Washington, DC  20004
15                                           202.783.0800
                                             202.383.6610 (fax)
16

17                                           Emily L. Maxwell
                                             HOWREY LLP
18                                           525 Market Street, Suite 3600
                                             San Francisco, CA  94105
19                                           415.848.4947
                                             415.848.4999 (fax)
20

21                                           *Attorneys for Plaintiffs and others similarly situated*

22

23

24

25

26

27

28

**HOWREY LLP**

CLASS ACTION COMPLAINT                          - 22 -
Case No.

EXHIBIT B

ORIGINAL
FILED

JAN 1 2 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

1  Daniel C. Girard  (State Bar No. 114826)
2  Elizabeth C. Pritzker (State Bar No. 146267)
   Alex C. Turan (State Bar No. 227273)
3  **GIRARD GIBBS LLP**
   601 California Street, Suite 1400
4  San Francisco, California 94104
   Telephone: (415) 981-4800
5  Facsimile: (415) 981-4846

6
7  Bryan L. Clobes *(pro hac vice)*
   Ellen Meriwether *(pro hac vice)*
8  Timothy Fraser *(pro hac vice)*
   **CAFFERTY FAUCHER LLP**
9  1717 Arch Street, Ste. 3610
   Philadelphia, PA  19103
10
11 Nyran Rose Pearson *(pro hac vice)*
   **CAFFERTY FAUCHER LLP**
12 30 N. LaSalle Street, Suite 3200
   Chicago, IL 60602
13
14 Attorneys for Plaintiffs Jonathan Groce
   And Susan Horowitz
15

E-filing

MEJ

16              **UNITED STATES DISTRICT COURT**

17              **NORTHERN DISTRICT OF CALIFORNIA**

18

19 JONATHAN GROCE AND SUSAN            CV 09      0139
20 HOROWITZ ON BEHALF OF THEMSELVES
   AND OTHERS SIMILARLY SITUATED,      Case No._____
21
                                       CLASS ACTION COMPLAINT
22         Plaintiff,
      vs.
23                                      DEMAND FOR JURY TRIAL
   NETFLIX, INC., WAL-MART STORES, INC.,
24 and WALMART. COM USA LLC
25         Defendant.
26
27
28

                    CLASS ACTION COMPLAINT

|    |    |
|----|----|
| 1  | Plaintiffs Jonathan Groce and Susan Horowitz, on behalf of themselves and all others similarly |
| 2  | situated (the "Class", defined below), bring this action under the federal antitrust laws against the above- |
| 3  | captioned Defendants.  Plaintiffs make the following allegations on information and belief, except as to |
| 4  | those paragraphs that pertain to Plaintiffs, which are based on personal knowledge.  Plaintiffs' |
| 5  | information and belief are based upon, *inter alia*, the investigation conducted by their attorneys. |

<div align="center">

**NATURE OF THE ACTION**

</div>

|    |    |
|----|----|
| 7  | 1.      On or about May 19, 2005, Netflix, Inc. ("Netflix"), Wal-Mart Stores, Inc. ("Wal-Mart |
| 8  | Stores"), and Walmart.com USA LLC ("Walmart.com"), a wholly owned subsidiary of Wal-Mart |
| 9  | Stores, entered into a contract, combination, and conspiracy (the "Market Division Agreement") to |
| 10 | divide and allocate the market for the online rentals of Digital Video Discs ("DVDs") and for the sale of |
| 11 | new DVDs in the United States.  The purpose and effect of Defendants' illegal conduct and agreement |
| 12 | was to divide and allocate the market, and to monopolize and unreasonably restrain trade for online |
| 13 | DVD rentals. |
| 14 | 2.      The meetings that culminated in the illegal agreement began in early 2005, when the |
| 15 | CEO of Netflix and the then CEO of Walmart.com met to discuss the online DVD rental business and |
| 16 | the new DVD sales business.  The CEOs wanted to discuss ways in which they could reduce or |
| 17 | eliminate competition and thereby increase their profits.  Reed Hastings, the CEO of Netflix, having |
| 18 | "noticed how low Wal-Mart's prices [for DVDs] were," has admitted that he "called the CEO [of |
| 19 | Walmart.com] in January and asked if he could have dinner."  John Fleming, then the CEO of |
| 20 | Walmart.com, who reported directly to Wal-Mart Stores' CEO Lee Scott, accepted Hastings' invitation. |
| 21 | As a result of this dinner meeting, as well as other meetings and exchanges, Defendants entered into the |
| 22 | contract, combination, and conspiracy alleged here. |
| 23 | 3.      At the time of their initial meeting and prior to entering into to the Market Division |
| 24 | Agreement, Netflix and Walmart.com were direct competitors in the online rental DVD market and were |
| 25 | potential competitors in selling new DVDs to customers.  Wal-Mart Stores and Walmart.com were |
| 26 | already selling new DVDs and Netflix was preparing to enter that market.  No later than May 19, 2005 |
| 27 | however, Netflix, Wal-Mart Stores, and Walmart.com entered into an agreement whereby Walmart.com |
| 28 | would stop competing with Netflix in the online DVD rental market, and in return, Netflix would |

1  promote the sales of new DVDs by Wal-Mart Stores and Walmart.com. Netflix also agreed not to sell

2  new DVDs that would have been in direct competition with Wal-Mart Stores and Walmart.com.

3        4.     Wal-Mart Stores actively participated in this conspiracy. This is confirmed by, among

4  other things, the fact that prior to the announcement of the Market Division Agreement, John Fleming

5  was promoted to Chief Marketing Officer of Wal-Mart Stores. As of the time of the announcement of

6  the Market Division Agreement, Fleming was acting in his capacity both as the Chief Marketing Officer

7  of Wal-Mart Stores and the Wal-Mart Stores executive responsible for overseeing the operations of

8  Walmart.com. As Chief Marketing Officer of Wal-Mart Stores, Fleming was responsible for deciding

9  "what the largest, most powerful retailer in history will stock on its shelves, and how much those

10 products will cost. Such decisions, when made at Wal-Mart, can help make or break entire industries."

11       5.     As a result of the Defendants' contract, combination, and conspiracy, as well as Netflix's

12 unlawfully acquired and maintained market and monopoly power, Netflix was able to charge its

13 customers higher subscription prices for the rental of DVDs than it otherwise would have been able to

14 charge.

15       6.     Under the Market Division Agreement, Netflix, Wal-Mart Stores, and Walmart.com

16 agreed that they would restrain trade and eliminate competition. Wal-Mart Stores and Walmart.com

17 agreed that Walmart.com would stop competing with Netflix in the online DVD rental market and

18 Netflix agreed that it would not sell new DVDs and instead would promote the DVD sales of Wal-Mart

19 Stores and Walmart.com. In agreeing to promote the sale of DVDs by Wal-Mart Stores and

20 Walmart.com, Netflix provided consideration for the agreement by Wal-Mart Stores and Walmart.com

21 to exit the online DVD rental market and simultaneously confirmed to Wal-Mart Stores and

22 Walmart.com that Netflix would not enter the market to sell new DVDs. Netflix was well-positioned to

23 enter the new DVD sales market, and had the unilateral economic incentive to do so, but refrained from

24 doing so as a result of the Market Division Agreement. Since entering into the Market Division

25 Agreement, neither Wal-Mart Stores nor Walmart.com has rented DVDs online and Netflix has not sold

26 new DVDs. The Market Division Agreement served to entrench and enhance Defendants' dominant

27 market positions and otherwise harmed competition, by, among other things, enabling Netflix to charge

28 higher subscription prices for online DVD rentals than it would have charged had it not entered into the

1  agreement. In fact, Plaintiffs and all other similarly situated customers paid the higher subscription
2  prices to Netflix than they otherwise would have paid.

3        7.        As alleged below, this case is brought as a class action on behalf of all persons in the
4  United States who, during the period May 19, 2005 to the present (hereinafter, the "Class Period"), paid
5  a subscription fee to rent DVDs from Netflix. Plaintiffs bring this action under Sections 4 and 16 of the
6  Clayton Antitrust Act to seek redress in the form of treble damages and other relief for their injuries
7  resulting from Defendants' violations of law on behalf of themselves and other similarly injured persons
8  nationwide and to seek a declaration that the Market Division Agreement is null and void.

9                                  **PLAINTIFFS**

10       8.        Jonathan Groce ("Groce") is an individual customer who resides in Brooklyn, New York.
11 During the Class Period, Groce directly subscribed to Netflix for his personal, non-commercial use. The
12 subscription fees he paid to Netflix for renting DVDs were greater than he would have paid, but for the
13 antitrust violations alleged here.

14       9.        Susan Horowitz ("Horowitz") is an individual customer who resides in Montclair, New
15 Jersey. During the Class Period, Horowitz directly subscribed to Netflix for her personal, non-
16 commercial use. The subscription fees she paid to Netflix for renting DVDs were greater than she
17 would have paid, but for the antitrust violations alleged here.

18                                  **DEFENDANTS**

19       10.       Defendant Netflix is a publicly traded Delaware corporation with its headquarters located
20 at 100 Winchester Circle, Los Gatos, California, 95032. Netflix' revenues exceed $1 billion annually.
21 Netflix, through the internet, rents DVDs directly to customers nationwide by charging monthly
22 subscription fees, which entitle customers to rent DVDs pursuant to various subscription plans. At all
23 times during the Class Period, Netflix has had a market share of at least 75% of the online DVD rental
24 market in the United States, as defined here.

25       11.       Defendant Wal-Mart Stores is the largest retailer in the United States. Wal-Mart Stores is
26 a publicly traded Delaware corporation with its headquarters located at 702 S.W. 8th Street, Bentonville,
27 Arkansas, 72716. Wal-Mart Stores' revenues are approximately $400 billion annually. Through its
28 retail stores and the internet, Wal-Mart Stores sells DVDs directly to customers nationwide. Wal-Mart

Stores sells far more DVDs than any other retailer in the United States, accounting for about 40% of all new DVDs sold to customers domestically. Prior to the Market Division Agreement, Wal-Mart Stores' wholly-owned subsidiary Walmart.com competed with Netflix in the online DVD rental market through the "Walmart DVD Rentals" service, which was available on www.walmart.com.

12. Defendant Walmart.com is a wholly-owned subsidiary of Wal-Mart Stores. Walmart.com is a Delaware corporation with its headquarters located at 7000 Marina Boulevard, Brisbane, California, 94005. It is the online component of Wal-Mart Stores' retail empire that is the leading seller of new DVDs in the United States. Prior to the conspiracy alleged here, Walmart.com was also a major competitor of Netflix in the online DVD rental market through the "Walmart DVD Rentals" service, which was available on www.walmart.com. While its financials are not publicly reported by Wal-Mart Stores, Walmart.com is ranked as the 14th largest online retailer in the United States. Through the website www.walmart.com, Walmart.com sells DVDs directly to customers nationwide. Customers who purchase DVDs via www.walmart.com may have them either mailed or otherwise delivered to them directly, or may pick them up at a Wal-Mart Stores retail location via Walmart.com's and Wal-Mart Stores' "Site to Store" program.

13. Walmart.com is the internet sales channel for Wal-Mart Stores, rather than an independent business entity. They are, in essence, completely integrated, operating as a single commercial enterprise and holding themselves out as such to the public. Wal-Mart Stores is the registrant of the www.walmart.com domain name that is used to sell products and services by Walmart.com. Likewise, Wal-Mart Stores is the registrant of www.walmartdvdrentals.com. Wal-Mart Stores' Chief Marketing Officer John Fleming explained the relationship between Wal-Mart Stores and Walmart.com as follows: "Wal-Mart Stores set up Walmart.com as a separate company with some outside investors, but within six months Wal-Mart Stores bought back the outside interest and Walmart.com; Walmart.com now serves as a 'marketing channel' for Wal-Mart Stores."

14. Wal-Mart Stores was actively involved in the conspiracy alleged here. For purposes of these allegations, both Wal-Mart Stores and Walmart.com are active participants in the conspiracy and each is liable for the unlawful conduct alleged here, with each, among other things, participating in, and

benefiting from, the Market Division Agreement.  Moreover, Wal-Mart Stores directed, ratified, approved, supported, and otherwise aided and abetted Walmart.com's violations of law.

15.      Wal-Mart Stores had a strong incentive to accomplish the Market Division Agreement. In addition to its interests as the 100% owner of Walmart.com, Wal-Mart Stores had further incentive to enter into this Agreement, since it obtains substantial revenues from sales of new DVDs, as well as in-store traffic resulting in the sales of other goods.  These revenues would have been threatened by Netflix's entry into the market for new DVD sales but instead, they were enhanced by Netflix's promotion of Wal-Mart Stores and Walmart.com through the Market Division Agreement.

16.      Whenever reference is made in this Complaint to a statement or transaction of any corporation or entity, the allegation means that the corporation or entity acted by or through its directors, members, partners, officers, employees, affiliates, or agents, while engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within its scope of authority.

## JURISDICTION AND VENUE

17.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, to receive treble damages and costs of suit, including reasonable attorneys' fees, against the Defendants for the injuries sustained by Plaintiff and the members of the Class by reasons of the violations, as alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

18.      This action is also instituted to secure injunctive relief against the Defendants to prevent them from further violations of the antitrust laws.

19.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 & 1337 and 15 U.S.C. §§ 1-2, 15 & 26, as the case arises under the laws of the United States.

20.      Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 & 26 and pursuant to 28 U.S.C. § 1391(b), (c) & (d).  Venue is proper in this judicial district because during the Class Period the Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

21.     This court has *in personam* jurisdiction over Defendants because they engaged in illegal schemes that were directed at and had the intended effect of causing injury to persons or entities residing in, located in, or doing business throughout the United States.

## CO-CONSPIRATORS

22.     Various other persons, firms and corporations, not named as a defendant in this Complaint, may have participated as co-conspirators with the Defendants in the violations alleged here, and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

## INTRADISTRICT ASSIGNMENT

23.     Pursuant to Civil L.R. 3-2, this case should be assigned to the San Francisco Division because a substantial part of the events giving rise to the claims occurred within this division. Defendant Walmart.com is headquartered in San Mateo County.

## RELEVANT MARKET

24.     Defendants' market allocation conspiracy is *per se* illegal and requires no allegation of market definition.

25.     To the extent applicable to the claims alleged here, the relevant product market is the market for the rental of DVDs online, by subscription, for delivery by mail ("online DVD Rental Market"). The relevant geographic market is the United States and its territories. During the Class Period, Netflix's share of the online DVD rental market in the United States and its territories was approximately 75%.

26.     DVDs contain commercially recorded entertainment programs for personal viewing, normally movies or previously aired television programs. At all relevant times, there have been no reasonably interchangeable substitutes for the service of online DVD rentals, which is differentiated, on both the demand and the supply side, from other methods of DVD distribution, as well as other methods of entertainment content delivery.

## FACTUAL ALLEGATIONS

27.     In the online DVD Rental Market, in return for a monthly subscription fee, a customer may rent DVDs from an online service provider, such as Netflix, Blockbuster Online, or prior to the Market Division Agreement, Walmart DVD Rentals. The subscription fee determines the number of

DVDs customers can rent in a given month and how many DVDs they may rent at one time. Thus, customers with the same subscription plan pay the same amount, irrespective of whether they rent one DVD or more than one DVD in a given month.

28. The entire transaction is completed over the internet and through the United States postal service. To rent DVDs, customers log onto a company's website, such as Netflix.com, and select which DVDs they would like to receive. Customers can then rank the DVDs in order of preference. The rental company then ships the DVDs to the customer's home by first class mail. After watching the DVD the customer simply returns it in a prepaid envelope provided by the rental company. Upon receipt the rental company would then mail the next DVD to the customer based on the rankings previously provided by the customer.

29. The online DVD rental business is a differentiated service that is not reasonably interchangeable with traditional brick-and-mortar video rental. The traditional brick-and-mortar stores differ in significant respects from online DVD rentals, including the way in which the rentals are priced, and the method for obtaining the rental. In a traditional video rental from physical stores, customers must drive to the store and pay for each DVD rental and potentially pay late fees if the DVD is not returned within a predetermined number of days - usually one to three. In addition, the selection offered by a brick-and-mortar store is significantly smaller than the selection available from an online DVD rental company. Netflix's catalog of DVDs, for example, now includes in excess of 100,000 titles and is continuing to grow.

30. Even the Defendants recognize that the online DVD market differs substantially from other methods for renting DVDs. Executives from Netflix and Walmart.com and Wal-Mart Stores executives alike, including Hastings and Fleming, have admitted as such. A Netflix executive stated that other types of rental services, such as kiosk and in-store rentals, do not present a direct competitive threat to Netflix and that while video downloads may be a competitive force in the future, DVD will be the dominant medium for years to come.

31. Online DVD rentals are also a separate market from DVD sales. First, the pricing of DVD sales and online DVD rentals is very different. The price to buy a new DVD fluctuates depending on how popular the DVD is, whether it is a new release, and how successful the title originally was at

the box office or on television. By contrast, online DVD rental customers are charged a flat subscription
fee that does not change regardless which DVD is rented. Second, once customers purchase a DVD it is
theirs to keep and do with as they please. An online DVD rental, on the other hand, still belongs to the
rental company and must be returned at some point. Third, whether a DVD is new or used is not an
issue in the rental market (customers actually expect and understand that they are obtaining a used
DVD), but is a significant factor in sales because used DVDs are sold at a significant discount to their
new counterparts.

## MARKET AND MONOPOLY POWER

32.     At all times during the Class Period, Netflix had monopoly or market power and/or
economic power in the relevant online DVD Rental Market. Netflix has a market share of
approximately 75% in the online DVD Rental Market, and is the market leader in the online DVD
Rental Market. Its closest competitor is Blockbuster Online which controls approximately 20-25% of
the market. As a result of its market share, Netflix had and continues to have market and monopoly
power because it has the power to control prices and/or exclude competition in the online DVD rental
market.

33.     There are significant barriers to entry that prevent potential rivals from entering and
successfully competing in the online DVD rental market, including having a large catalog of DVD titles
available to customers and numerous shipping facilities located throughout the United States. These
barriers have prevented the entry of new competitors and have forced the withdrawal of some companies
who tried to enter the market. As Netflix CEO Reed Hastings observed, "[w]hen you think about the
barriers to entry to this business, it is subtle because it appears easy. A kid can open a website. But the
barriers to profitability are very large."

34.     Since the implementation of the Market Division Agreement, the online DVD Rental
Market has been overwhelmingly comprised of only two firms: Netflix and Blockbuster Online
("Blockbuster"). Blockbuster possesses nearly all of the remaining 25% of the online DVD Rental
Market that Netflix does not control. A few minor firms have shares of less than 1-2% of the market
and the number of these minor firms is dwindling. During fiscal years 2005-2007 combined, Netflix

1    earned nearly $4 billion in revenues and $1.3 billion in gross profit from renting DVDs to customers – a

2    margin of more than 33%. As a result of Netflix's anticompetitive agreement and its abuse of its

3    monopoly power alleged here, the subscription fees it charged to customers, including Plaintiffs and the

4    Class, have been higher than they otherwise would have been.

5         35.   Wal-Mart Stores and its wholly-owned subsidiary Walmart.com combined have an

6    industry-leading 40% of domestic DVD retail sales. During fiscal years 2005-2008 combined, they

7    earned revenues in excess of $25 billion by selling DVDs to customers. Both Wal-Mart Stores and

8    Walmart.com benefit from the Market Division Agreement.

9         36.   Further evidence of Netflix's market and monopoly power is reflected in the

10   anticompetitive effects alleged here.

11                              **THE ILLEGAL AGREEMENT**

12        37.   In early 2005, Netflix faced increasing competition from Walmart DVD Rentals and from

13   Blockbuster Online, the latter of which had just entered the online rental market.

14        38.   As a result of new entrants in the online DVD Rental Market, Netflix, in order to remain

15   competitive was required to undertake price cuts. In 2004, Netflix's most popular service cost $21.99.

16   When Blockbuster entered the online DVD Rental Market at that time, it started charging customers

17   $19.99 but proceeded to reduce its price in late 2004 to $17.49. Walmart.com responded to these cuts

18   by lowering the pricing on its most popular plan from $18.86 to $17.36. In the wake of these price cuts,

19   Netflix soon reduced its prices by nearly 20% (to $17.99 per month). After that, Blockbuster further

20   decreased its price to $14.99 – 20% below Netflix's already reduced price and more than 40% below the

21   price that Netflix had been charging in the beginning of 2004.

22        39.   Meanwhile, Wal-Mart Stores and its wholly-owned subsidiary Walmart.com, which had

23   established themselves as the leader in new DVD sales, were facing increasing competition from in-

24   store and online channels of distribution in new DVD sales, including competition from Amazon.com.

25   At the time, Netflix was a significant potential additional competitor, since it had a subscriber base of

26   millions of customers who were known in the industry to be prolific DVD buyers, and the sales and

27   profits of Wal-Mart Stores and Walmart.com stood to suffer if Netflix began selling new DVDs to these

28   customers. Conversely, Wal-Mart Stores and Walmart.com stood to gain significant additional sales and

profits and to gain further market share in the sale of new DVDs if these customers were to make their purchases of new DVDs from them instead.

40.     On January 7, 2005, Walmart DVD Rentals dropped the price on its most popular DVD rental plan significantly – to $12.97 per month – creating further price pressure on Netflix to reduce its DVD rental prices. In order to respond to the increased competition, Netflix would have been forced to lower its prices even further and thereby reduce its profits.

41.     Faced with this increased competition, Reed Hastings, the Chairman and CEO of Netflix, called John Fleming, then the CEO of Walmart.com, and invited him to dinner to discuss their companies' DVD sales and rentals business. Fleming accepted the invitation, and during the dinner meeting, the two embarked on a scheme that would eventually result in execution of the illegal Market Division Agreement.

42.     On May 5, 2005, during Netflix' First Quarter earnings call with financial analysts, held after the January dinner but before to the public announcement of the Market Division Agreement, Hastings made plain the motive for Netflix to conspire with Wal-Mart Stores and Walmart.com:

> In terms of profitability over the coming years, **the key issue is the number of major competitors.** If there are only two major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment markets. If, on the other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major competitors in online rental, then the profits would likely be small.

Hastings went on to "predict" that "online rental [would] become[] a two-firm market over the coming years." (Emphasis added.)

43.     On May 19, 2005, shortly after Fleming had been promoted to Chief Marketing Officer of Wal-Mart Stores, Defendants issued a joint press release that revealed the existence of the Market Division Agreement, by which they unlawfully created the two-firm market that Hastings sought and had "predicted."

44.     Beginning on May 19, 2005, Walmart.com, as agreed, did in fact exit the online rental business. Walmart.com announced to all of the subscribers to "Walmart DVD Rentals" that it was exiting the online DVD rental business and that those subscribers could be transferred to Netflix. Walmart.com took additional steps to affirmatively implement the Market Division Agreement by adding a prominently placed link to the Netflix website to encourage customers to transfer their

subscriptions to Netflix. Since the date of their joint announcement on May 19, 2005 (apart from the 30 days that Walmart.com used to wind down its existing online rental business), neither Walmart.com nor Wal-Mart Stores has participated in the Online DVD Rental Market, and Netflix has not sold new DVDs.

45. As a result of the Market Division Agreement, downward pricing pressure from Walmart.com was eliminated and the Online DVD Rental Market was reduced to two competitors. Absent the Market Division Agreement, Netflix would have lowered its prices no later than May 19, 2005. As a result of the elimination of a competitor in this relevant market, Blockbuster was able to raise its subscription price in July to match that of Netflix, from $14.99 per month to $17.99 per month, in accordance with Hastings' expectation that "[i]f there are only two major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment markets." In Netflix's next earnings call, on July 25, 2005, Hastings boasted: "Last quarter we said online rental was shaping up to be a two-player market, and that is indeed what is happening."

46. The Market Division Agreement was not in the independent self-interest of Wal-Mart Stores, Walmart.com, or Netflix. Neither Wal-Mart Stores nor Walmart.com would have wanted Walmart.com to withdraw from the online rental market, encourage its subscribers to be transferred to Netflix, and promote Netflix's rental business absent substantial consideration from Netflix, such as an agreement not to compete for new DVD retail sales. But for the Market Division Agreement, Walmart.com would not have exited the online DVD Rental Market when it did. Likewise, Netflix would not have foreclosed its opportunity to sell DVDs to its millions of subscribers – a base of customers who purchase an average 25 DVDs per year each – and would not have promoted new DVD sales by Wal-Mart Stores and Walmart.com, rather than its own sales, absent an agreement from Wal-Mart and Walmart.com not to compete for Netflix's online DVD rental business.

## ANTICOMPETITIVE EFFECTS

47. Defendants' illegal acts and practices caused anticompetitive effects in the online DVD Rental Market. The subscription fees charged by Netflix to Plaintiffs, as well as the other members of the Class, were maintained at artificially high and supracompetitive levels. Plaintiffs and the other

1 members of the Class paid higher subscription prices to Netflix than they otherwise would have paid in

2 the absence of the Market Division Agreement.

3     48.    The Market Division Agreement (i) eliminated one of only three significant competitors

4 in the Relevant Market, (ii) eliminated competition between Defendants, and (iii) enabled Netflix to

5 acquire market power and also acquire and maintain monopoly power in the relevant market. The

6 Market Division Agreement enabled Netflix to implement monopolistic and supracompetitive pricing in

7 the relevant market.

8     49.    The Market Division Agreement and Defendants' acts and practices in furtherance

9 thereof have no procompetitive benefits. They do not create information that customers need, nor do

10 they create new or better products or services. Rather, they have served to reinforce the true

11 anticompetitive nature of the Market Division Agreement by assuring, for example, that Walmart.com

12 would withdraw from the online DVD Rental Market, further enhancing Netflix's power in that market.

13 Even if there were any such benefits, those benefits would not outweigh the anticompetitive effects

14 described here, and, in any event, could have been achieved by less restrictive means.

15 ### CLASS ACTION ALLEGATIONS

16     50.    Plaintiffs bring this action on their own behalf and on behalf of a Class of similarly

17 situated individuals as defined below, pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3)

18 of the Federal Rules of Civil Procedure.

19     51.    The "Class" on behalf of whom Plaintiffs bring these claims is defined as:

20     Any person in the United States who paid a subscription fee to Netflix to rent DVDs, on

21     or after May 19, 2005 up to the present. Excluded from the Class are governmental

22     entities, Defendants, their co-conspirators and their representatives, their parents,

23     subsidiaries, and other affiliated entities.

24     52.    The Class numbers in the millions, the exact number and identities of the members being

25 known by Defendants.

26     53.    The Class is so numerous and geographically dispersed that joinder of all members is

27 impracticable.

28

54.   There are questions of law and fact common to the Class and the members thereof. These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injuries sustained as a result thereof.  The questions include, but are not limited to:

    a.   Whether Defendants engaged in a contract, combination, or conspiracy to allocate markets;

    b.   Whether Defendants unreasonably restrained trade in the online DVD rental market;

    c.   Whether Defendant Netflix attempted to monopolize the online DVD rental market;

    d.   The nature and character of the acts performed by Defendants in the furtherance of the alleged contract, combination, and conspiracy;

    e.   Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

    f.   Whether the alleged contract, combination, and conspiracy violated Section 2 of the Sherman Act;

    g.   The anticompetitive effects of Defendants' violations of law;

    h.   Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

    i.   Whether the conduct of Defendants, as alleged in this Complaint, caused Netflix subscription fees to be higher than they otherwise would have been and thereby caused injury to the business and property of Plaintiffs and other members of the Class.

55.   The questions of law and fact common to the members of the Class, including those described above, predominate over questions affecting only individual class members.

56.   Plaintiffs' claims are typical of the claims of the class and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are direct purchasers of subscriptions to rent DVDs online from Netflix and their interests are coincident with, and not antagonistic to, those of the

other members of the Class. In addition, Plaintiffs are represented by competent counsel experienced in class action antitrust litigation.

57.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct of Defendants.

58.   Defendants have acted, and refused to act, on ground generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

59.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist in the files of Defendant. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## ANTITRUST INJURY AND STANDING

60.   During the Class Period, Plaintiffs and the members of the class have directly paid monthly DVD subscription fees to Netflix in the United States, and many continue to do so.

61.   Plaintiffs and the members of the class have suffered, and many continue to suffer, injury of the type that the antitrust laws are designed to punish and prevent. Plaintiffs and the members of the Class have paid, and many continue to pay, more to subscribe to Netflix than they would have paid, absent the Market Division Agreement. Plaintiffs and the members of the Class were, and many continue to be, injured and financially damaged in their businesses and property, on account of Defendants' wrongful conduct. As the direct victims of Defendants' antitrust violations, Plaintiffs are the most efficient enforcers of the antitrust claims made herein.

## COUNT ONE

### SHERMAN ACT SECTION ONE (15 U.S.C. § 1)

### Market Allocation of Online DVD Rental Market

### (Against All Defendants)

62.     Plaintiffs incorporate and reallege their allegations contained in paragraphs 1 through 61 above.

63.     Defendants have entered into a *per se* illegal market division agreement, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Even if evaluated under the rule of reason, the Market Division Agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

64.     Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the online DVD Rental Market.  In addition, Netflix, on the one hand, and Wal-Mart Stores and Walmart.com, on the other hand, were potential competitors in the new DVD sales market. Wal-Mart Stores and Walmart.com were actual participants and Netflix was a potential participant, with the means and economic incentive to sell new DVDs in the absence of the Market Division Agreement.

65.     Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of dividing the markets for online DVD rentals and new DVD sales.  The Market Division Agreement allocated the online DVD Rental Market to Netflix, with Wal-Mart Stores and Walmart.com agreeing not to compete in that relevant market.  The agreement also allocated new DVD sales to Wal-Mart Stores and Walmart.com, with Netflix agreeing to refrain from selling new DVDs in competition with them.  In addition to explicitly or *de facto* agreeing not to sell new DVDs, Netflix also obtained the Market Division Agreement by providing potentially valuable promotion to Wal-Mart Stores and Walmart.com.  In so doing, Netflix provided significant consideration to Wal-Mart Stores and Walmart.com for their agreement to withdraw from, and not compete in, the online DVD Rental Market.

66.     The Market Division Agreement created significant anticompetitive effects with no corresponding procompetitive benefits.   It eliminated competition in the relevant market, raising prices paid by customers.  To the extent that there are any procompetitive benefits at all resulting from the

1  agreement, they do not outweigh the agreement's anticompetitive effects. In any event, to the extent

2  that there are any, they could have been achieved by less restrictive means.

3      67.    As a result of this violation of law, Netflix' subscription prices charged to, and paid by,

4  Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

<div align="center">

**COUNT TWO**

**SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**

**Monopolization of Online DVD Rental Market**

**(Against Netflix)**

</div>

9      68.    Plaintiffs incorporate and reallege their allegations contained in paragraphs 1 through 67

10  above.

11      69.    Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits the willful monopolization of any

12  part of the trade or commerce among the states.

13      70.    The market for online rentals of DVDs constitutes a valid antitrust market. At all times

14  relevant here, Netflix had monopoly or market power and/or economic power in the online DVD rental

15  market.

16      71.    Netflix has willfully acquired and maintained its monopoly in the online DVD Rental

17  Market by its acts and practices described here, including by executing, implementing, and otherwise

18  complying with the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act,

19  15 U.S.C. § 2

20      72.    Netflix's monopolistic and exclusionary conduct in the relevant market cannot be

21  tempered through normal market forces. There are significant barriers to entry that prevent competing

22  companies from entering the online DVD rental market, including having a large catalog of DVD titles

23  available to consumers and numerous shipping facilities located throughout the United States.

24      73.    As a result of the unlawful conduct alleged herein, Netflix has been able to charge

25  supracompetitive prices and Plaintiffs and the Class paid subscription prices higher than they would

26  have paid but for the anticompetitive conduct.

27

28

## COUNT THREE

### SHERMAN ACT SECTION TWO (15 U.S.C. § 2.)

### Attempt to Monopolize Online DVD Rental Market

### (Against Netflix)

74.    Plaintiffs incorporate and reallege their allegations contained in paragraphs 1 through 73 above.

75.    Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the online DVD Rental Market.  Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the online DVD Rental Market. Defendants conspired with the specific intent, knowledge and purpose that their anticompetitive agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Relevant Market.  Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the Market Division Agreement would be the monopolization of the Relevant Market by Netflix. Defendants have committed overt acts in furtherance of their conspiracy, including entering into, complying with, and implementing the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

76.    As a result of this violation of law, Netflix' subscription prices charged to, and paid by Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

### COUNT FOUR

### SHERMAN ACTION SECTION TWO (15 U.S.C. § 2)

### Conspiracy to Monopolize Online DVD Rental Market

### (Against All Defendants)

77.    Plaintiffs incorporate and reallege their allegations contained in paragraphs 1 through 76 above.

78.    Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the online DVD Rental Market.  Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the online DVD Rental Market. Defendants conspired with the specific intent, knowledge and purpose that their anticompetitive

agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Relevant Market. Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the Market Division Agreement would be the monopolization of the relevant market by Netflix. Defendants have committed overt acts in furtherance of their conspiracy, including entering into, complying with, and implementing the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

79.     As a result of this violation of law, Netflix's subscription prices charged to, and paid by Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class;

B.     Defendants be adjudged to violate Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2;

C.     The Court declare the Market Division Agreement between Defendants announced May 19, 2005, to be unlawful and null and void;

D.     Judgment be entered for Plaintiffs and members of the Class against Defendants, jointly and severally, for three times the amount of damages sustained by Plaintiff and the Class, under Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15, together with the costs of the action, including reasonable attorneys' fees, and such other relief as is appropriate;

E.     Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claims to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract,

combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect, pursuant to Section 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 29;

F.     That Plaintiffs and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.     That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.     Plaintiffs and the members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of all issues triable by Jury.

Dated: January 12, 2009

Respectfully Submitted,

Daniel Girard
Elizabeth C. Pritzker
Alex C. Turan
**GIRARD GIBBS LLP**
601 California Street, Ste. 1400
San Francisco, CA 94108

Bryan L. Clobes
Ellen Meriwether
Timothy Fraser
**CAFFERTY FAUCHER LLP**
1717 Arch Street, Ste. 3610
Philadelphia, PA 19103

Nyran Rose Pearson
**CAFFERTY FAUCHER LLP**
30 N. LaSalle Street, Suite 3200
Chicago, IL 60602

*Attorneys for Plaintiffs Jonathan Groce and Susan Horowitz*