1  Guido Saveri (22349)
   *guido@saveri.com*
2  R. Alexander Saveri (173102)
   *rick@saveri.com*
3  Cadio Zirpoli (179108)
   *cadio@saveri.com*
4  Melissa Shapiro (242724)
   *melissa@saveri.com*
5  SAVERI & SAVERI, INC.
   706 Sansome Street
6  San Francisco, CA  94111
   Telephone:  (415) 217-6810
7  Facsimile: (415) 217-6813

8
   Attorneys for Plaintiff Sarah E. Grime
9

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14  ANDREA RESNICK, GARY BUNKER, JOHN        )
    HALEY, AMY LATHAM, ERIC ROSLANSKY and    )   Case No. 09-0002 PJH
15  KEVIN SIMPSON, on behalf of themselves and all )
    others similarly situated,               )
16                                           )
                                             )   **DECLARATION OF MELISSA**
17              Plaintiffs,                   )   **SHAPIRO IN SUPPORT OF**
                                             )   **ADMINISTRATIVE MOTION TO**
18        v.                                 )   **CONSIDER WHETHER CASE**
                                             )   **NO. 09-0349-EMC SHOULD BE**
19  WALMART.COM USA LLC, WAL-MART            )   **RELATED PURSUANT TO**
    STORES, INC., and NETFLIX, INC.,         )   **CIVIL L.R. 3-12 AND 7-11**
20                                           )
                Defendants.                  )
21                                           )

22

23

24

25

26

27

28

   DECL. OF MELISSA SHAPIRO ISO ADMIN. MOTION TO CONSIDER WHETHER CASES
                    SHOULD BE RELATED -09-0002-PJH

Dockets.Justia.com

I, Melissa Shapiro, declare as follows:

1.     I am a member of the firm of Saveri & Saveri, Inc. and licensed to practice in the Northern District of California.  This declaration is based on personal knowledge, except where specified that information is based on information and belief, and if called to testify, I could and would do so competently as to the matters set forth herein.

2.     Attached hereto as Exhibit A is a true and correct copy of the class action complaint filed on January 2, 2009 in *Resnick, et al. v. Walmart.com USA LLC, et al.*, Case No. 09-0002 PJH, assigned to the Honorable Phyllis J. Hamilton.

3.     Attached hereto as Exhibit B is a true and correct copy of the class action complaint filed on January 26, 2009 in *Grime v. Netflix, Inc., et al.*, Case No. 09-0349 EMC, assigned to the Honorable Edward M. Chen.

4.     The Defendants named in the *Grimes* action have yet to appear.  Local Rule 3-12 requires an Administrative Motion to Consider Whether Cases Should Be Related to be filed promptly.  Therefore, a stipulation could not be reached prior to the filing of the Administrative Motion.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing facts are true and correct.

Executed this 28th day of January, 2009, at San Francisco, California.

_____/s/ Melissa Shapiro_____
Melissa Shapiro

Netflix.004

EXHIBIT A



1  Paul Alexander (Bar No. 49997)
   AlexanderP@howrey.com
2  HOWREY LLP
3  1950 University Avenue
   East Palo Alto, CA 94303
4  650.798.3500
   650.798.3600 (fax)
5
6  Robert G. Abrams
   AbramsR@howrey.com
7  Thomas A. Isaacson
   IsaacsonT@howrey.com
8  Peter A. Barile III
   BarileP@howrey.com
9  HOWREY LLP
10 1299 Pennsylvania Avenue, N.W.
   Washington, DC 20004
11 202.783.0800
   202.383.6610 (fax)
12
13 Emily L. Maxwell (Bar No. 185646)
   MaxwellE@howrey.com
   HOWREY LLP
14 525 Market Street, Suite 3600
15 San Francisco, CA 94105
   415.848.4947
16 415.848.4900 (fax)

**FILED**

JAN - 2 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**E-filing**

**FAXED**

17  Attorneys for Plaintiffs, on behalf of themselves and others similarly situated

18                UNITED STATES DISTRICT COURT

19              NORTHERN DISTRICT OF CALIFORNIA

20  ANDREA RESNICK, GARY BUNKER, JOHN  )   Case No. CV 09    0002
    HALEY, AMY LATHAM, ERIC ROSLANSKY,  )
21  and KEVIN SIMPSON, on behalf of themselves  )
    and others similarly situated,  )
22                                    )   CLASS ACTION COMPLAINT
              Plaintiffs,  )
23                                    )   JURY TRIAL DEMANDED    **MEJ**
          v.  )
24                                    )
    WALMART.COM USA LLC, WAL-MART  )
25  STORES, INC and NETFLIX, INC.,  )
                                    )
26        Defendants.  )
                                    )
27  ────────────────────────────────)

28

1    NOW COME Plaintiffs, ANDREA RESNICK, GARY BUNKER, JOHN HALEY, AMY LATHAM, ERIC

2  ROSLANSKY, and KEVIN SIMPSON, for their Complaint brought under Sections 1 and 2 of the Sherman

3  Antitrust Act of 1890, 15 U.S.C. §§1-2, and Sections 4 and 16 of the Clayton Antitrust Act of 1914, 15

4  U.S.C. §§15 & 29, for treble damages and injunctive relief against Defendants Netflix, Inc. ("Netflix"),

5  Wal-Mart Stores, Inc. ("Wal-Mart Stores"), and Walmart.com USA LLC ("Walmart.com").

6    Based upon personal knowledge, information, and belief, and the investigation of counsel,

7  Plaintiffs allege as follows:

8    ## NATURE OF THE ACTION

9    1. On or about May 19, 2005, Netflix, Wal-Mart Stores, and Walmart.com, a wholly owned

10  subsidiary of Wal-Mart Stores, entered into an agreement to divide the markets for the sales and online

11  rentals of DVDs in the United States ("Market Division Agreement"), with the purpose and effect of

12  monopolizing and unreasonably restraining trade in at least the online DVD rental market.

13    2. The meetings that led to the conspiracy began in January 2005, when Reed Hastings, the

14  CEO of Netflix, and John Fleming, then the CEO of Walmart.com, met with each other for dinner to

15  discuss the online DVD rental and DVD sales markets and how they could reach an agreement that

16  would reduce or eliminate competition in those markets. According to Hastings, having "noticed how

17  low Wal-Mart's prices [for DVDs] were," he "called the CEO [of Walmart.com] in January and asked

18  if he could have dinner." Fleming, who reported directly to Wal-Mart Stores' CEO Lee Scott,

19  accepted Hastings' invitation; the two thereafter met and, as a result of the meetings and exchanges

20  that followed, Defendants entered into the contract, combination, and conspiracy alleged herein. At

21  the time of their initial meeting and prior to entering into the Market Division Agreement, Netflix and

22  Walmart.com were direct competitors in renting DVDs online and all three defendants were potential

23  competitors in selling new DVDs to consumers. However, by no later than May 19, 2005, Netflix,

24  Wal-Mart Stores, and Walmart.com entered into an agreement by which Walmart.com would stop

25  competing with Netflix in the online DVD rental business and Netflix would promote the sales of new

26  DVDs by Wal-Mart Stores and Walmart.com, and not sell new DVDs in competition with them.

27    3. Wal-Mart Stores actively participated in this conspiracy. This is confirmed by, among

28

HOWREY LLP

CLASS ACTION COMPLAINT            - 1 -
Case No.

1  other things, the fact that prior to the announcement of the Market Division Agreement, John Fleming
2  was promoted to Chief Marketing Officer of Wal-Mart Stores. As of the time of the announcement of
3  the Market Division Agreement, Fleming thus was acting in his capacity both as the Chief Marketing
4  Officer of Wal-Mart Stores and the Wal-Mart Stores executive responsible for overseeing the
5  operations of Walmart.com. As Chief Marketing Officer of Wal-Mart Stores, Fleming was responsible
6  for deciding "what the largest, most powerful retailer in history will stock on its shelves, and how
7  much those products will cost. Such decisions, when made at Wal-Mart, can help make or break entire
8  industries."

9       4.  Defendants' conspiracy enabled Netflix to charge its customers higher subscription prices
10  for the rental of DVDs than it otherwise would have. As a result of their contract, combination, and
11  conspiracy as well as Netflix's unlawfully acquired and maintained market and monopoly power,
12  Netflix actually did overcharge Plaintiffs, and millions of other consumers similarly situated, and
13  continues to do so.

14       5.  Under the Market Division Agreement, Netflix, Wal-Mart Stores, and Walmart.com agreed
15  that they would restrain trade and eliminate competition. Wal-Mart Stores and Walmart.com agreed
16  that Walmart.com would stop competing with Netflix in the online rental market. Netflix agreed that it
17  would not sell new DVDs, but instead would promote the DVD sales of Wal-Mart Stores and
18  Walmart.com. In agreeing to promote the sale of DVDs by Wal-Mart Stores and Walmart.com,
19  Netflix provided consideration for the agreement by Wal-Mart Stores and Walmart.com that
20  Walmart.com would exit the online DVD rental market and simultaneously confirmed to Wal-Mart
21  Stores and Walmart.com that Netflix would not enter the market to sell new DVDs, as Netflix was
22  well-positioned and otherwise had the unilateral economic incentive to do. Since entering into the
23  Market Division Agreement, neither Wal-Mart Stores nor Walmart.com have rented DVDs online and
24  Netflix has not sold new DVDs. The Market Division Agreement served to entrench and enhance
25  Defendants' dominant market positions and otherwise cause harm to competition, including enabling
26  Netflix to charge higher subscription prices for online DVD rentals than it would have had they not
27  entered into the agreement. Plaintiffs and all other similarly situated consumers in fact paid the higher

28

HOWREY LLP

CLASS ACTION COMPLAINT          - 2 -
Case No.

1  subscription prices to Netflix.

2      6.  As alleged below, this case is brought as a class action on behalf of all consumers in the

3  United States who, during the period May 19, 2005, to the present (hereinafter, the "Class Period"),

4  paid a subscription fee to rent DVDs from Netflix.  Plaintiffs bring this action under Sections 4 and 16

5  of the Clayton Antitrust Act to seek redress in the form of treble damages and other relief for their

6  injuries resulting from Defendants' violations of law on behalf of themselves and other similarly

7  injured consumers nationwide and to seek a declaration that the Market Division Agreement is null and

8  void.

9                                    **PLAINTIFFS**

10      7.  ANDREA RESNICK ("Resnick") is an individual consumer who resides in San Francisco,

11  California.  During the Class Period, Resnick directly subscribed to Netflix for her personal, non-

12  commercial use.  The subscription fees Resnick paid to Netflix for renting DVDs were greater than she

13  would have paid, but for the antitrust violations alleged herein.

14      8.  GARY BUNKER ("Bunker") is an individual consumer who resides in San Angelo, Texas.

15  During the Class Period, Bunker directly subscribed to Netflix for his personal, non-commercial use.

16  The subscription fees Bunker paid to Netflix for renting DVDs were greater than he would have paid,

17  but for the antitrust violations alleged herein.

18      9.  JOHN HALEY ("Haley") is an individual consumer who resides in Fairfax, Virginia.  During

19  the Class Period, Haley directly subscribed to Netflix for his personal, non-commercial use.  The

20  subscription fees Haley paid to Netflix for renting DVDs were greater than he would have paid, but for

21  the antitrust violations alleged herein.

22      10. AMY LATHAM ("Latham") is an individual consumer, who resides in Bristow, Virginia.

23  During the Class Period, Latham directly subscribed to Netflix for her personal, non-commercial use.

24  The subscription fees Latham paid for renting DVDs were greater than she would have paid, but for

25  the antitrust violations alleged herein.

26      11. ERIC ROSLANSKY ("Roslansky") is an individual consumer who resides in Boulder,

27  Colorado.  During the Class Period, Roslansky directly subscribed to Netflix for his personal, non-

28

HOWREY LLP

CLASS ACTION COMPLAINT                        - 3 -
Case No.

1    commercial use. The subscription fees Roslansky paid to Netflix for renting DVDs were greater than

2    he would have paid, but for the antitrust violations alleged herein.

3         12. KEVIN SIMPSON ("Simpson") is an individual consumer who resides in Washington, DC.

4    During the Class Period, Simpson directly subscribed to Netflix for his personal, non-commercial use.

5    The subscription fees Simpson paid to Netflix for renting DVDs were greater than he would have paid,

6    but for the antitrust violations alleged herein.

7                              **DEFENDANTS**

8                               **NETFLIX**

9         13. Defendant Netflix is a Delaware corporation headquartered at 100 Winchester Circle, Los

10   Gatos, California, 95032. Netflix is publicly traded on the NASDAQ under the symbol NFLX. Its

11   revenues earned from engaging in interstate commerce exceed $1 Billion annually. Through its

12   website, www.netflix.com, Netflix rents DVDs directly to consumers nationwide by charging monthly

13   subscription fees, which entitle customers to rent DVDs pursuant to various subscription plans. Netflix

14   has possessed a market share of at least 75% of the Online DVD Rental Market in the United States, as

15   defined herein, at all times during the Class Period.

16                              **WAL-MART**

17        14. **Wal-Mart Stores.** Defendant Wal-Mart Stores is the largest retailer in the United States.

18   Wal-Mart Stores is a Delaware corporation headquartered at 702 S.W. 8th Street, Bentonville,

19   Arkansas, 72716. Wal-Mart Stores is publicly traded on the New York Stock Exchange under the

20   symbol WMT. Its revenues earned from engaging in interstate and foreign commerce approach $400

21   Billion annually. Through its retail stores and its website, www.walmart.com, Wal-Mart Stores sells

22   DVDs directly to consumers nationwide. Wal-Mart Stores sells far more DVDs than any other retailer

23   in the United States, accounting for about 40% of all new DVDs sold to consumers domestically. Prior

24   to the Market Division Agreement, Wal-Mart Stores' wholly-owned subsidiary Walmart.com

25   competed with Netflix in the Online DVD Rental Market through the "Walmart DVD Rentals" service,

26   which was available on www.walmart.com.

27

28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 4 -
Case No.

1    15. **Walmart.com.** Defendant Walmart.com is a wholly-owned subsidiary of Wal-Mart Stores.

2    Walmart.com is a Delaware company with its headquarters at 7000 Marina Boulevard, Brisbane,

3    California, 94005. It is the online component of Wal-Mart Stores' retail empire that is the leading

4    seller of new DVDs in the United States. Prior to the conspiracy alleged herein, Walmart.com was

5    also a major competitor of Netflix in the Online DVD Rental Market through the "Walmart DVD

6    Rentals" service, which was available on www.walmart.com. While its financials are not publicly

7    reported by Wal-Mart Stores, Walmart.com is ranked as the 14th largest online retailer in the United

8    States. Through the website, www.walmart.com, Walmart.com sells DVDs directly to consumers

9    nationwide. Consumers who purchase DVDs via www.walmart.com may have them either mailed or

10   otherwise delivered to them directly, or may pick them up at a Wal-Mart Stores retail location via

11   Walmart.com's and Wal-Mart Stores' "Site to Store" program.

12   16. **Wal-Mart Stores and Walmart.com.** Walmart.com and Wal-Mart Stores are, in essence,

13   completely integrated and operated as a single commercial enterprise and hold themselves out to the

14   public as such, by which Walmart.com is an internet sales channel for Wal-Mart Stores, rather than

15   being an independent business entity. Wal-Mart Stores is the registrant of the www.walmart.com

16   domain name that is used to sell products and services by Walmart.com. Likewise, Wal-Mart Stores is

17   the registrant of www.walmartdvdrentals.com. Wal-Mart Stores' Chief Marketing Officer John

18   Fleming has explained the relationship between Wal-Mart Stores and Walmart.com as follows: "Wal-

19   Mart Stores set up Walmart.com as a separate company with some outside investors, but within six

20   months Wal-Mart Stores bought back the outside interest and Walmart.com; Walmart.com now serves

21   as a 'marketing channel' for Wal-Mart Stores."

22   17. **Wal-Mart Stores' Active Participation in the Conspiracy.** Wal-Mart Stores was actively

23   involved in the conspiracy alleged herein, as alleged more specifically below. For purposes of these

24   allegations, both Wal-Mart Stores and Walmart.com are active participants in the conspiracy and each

25   is liable for the unlawful conduct alleged herein, with each, among other things, participating in, and

26   benefiting from, the Market Division Agreement. Moreover, Wal-Mart Stores directed, ratified,

27   approved, supported, and otherwise aided and abetted Walmart.com's violations of law.

28

HOWREY LLP

CLASS ACTION COMPLAINT         - 5 -
Case No.

1     18. Wal-Mart Stores had a strong incentive to accomplish the Market Division Agreement. In

2    addition to its interests as the 100% owner of Walmart.com, Wal-Mart Stores had further incentive to

3    enter into this Agreement, since it obtains substantial revenues from sales of new DVDs, as well as

4    store traffic resulting in the sales of other goods, which would have been threatened by Netflix's entry

5    into new DVD sales, and which were enhanced by Netflix's promotion of Wal-Mart Stores and

6    Walmart.com through the Market Division Agreement. In a letter submitted to this Court in

7    connection with a prior antitrust case brought against Netflix by other plaintiffs for other alleged

8    violations of law, an assistant general counsel of Wal-Mart Stores, referring specifically to Wal-Mart

9    Stores, wrote of "Wal-Mart's decision to discontinue renting DVDs." Moreover, it was Wal-Mart

10   Stores that announced in part the Market Division Agreement, which identifies Wal-Mart Stores, in the

11   "About" section of the press release. The announcement quoted John Fleming, who was then Chief

12   Marketing Officer of Wal-Mart Stores, regarding the Agreement. It explained that Walmart.com's

13   DVD sales are in fact Wal-Mart Stores' "online movie sales business," and that, more generally, Wal-

14   Mart Stores' "[o]nline merchandise sales are available at www.walmart.com."

15     19. Whenever reference is made in this Complaint to a statement or transaction of any

16   corporation or entity, the allegation means that the corporation or entity acted by or through its

17   directors, members, partners, officers, employees, affiliates, or agents, while engaged in the

18   management, direction, control, or conduct of the corporation's or entity's business and acting within

19   its scope of authority.

20                              **JURISDICTION AND VENUE**

21     20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 & 1337 and 15

22   U.S.C. §§1-2, 15 & 26.

23     21. Venue is proper in this District pursuant to 28 U.S.C. §§15, 22 & 26 and pursuant to 28

24   U.S.C. §1391(b), (c) & (d), because at all times relevant to the Complaint: (a) Defendants transacted

25   business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial

26   part of Plaintiffs' claims occurred in this District; and (c) a substantial portion of the affected interstate

27   trade and commerce described below has been carried out in this District.

28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 6 -
Case No.

1      22. This Court has personal jurisdiction over Defendants because, *inter alia*, each of the

2  Defendants is headquartered in this State or has transacted business; maintained continuous and

3  systemic contacts; purposefully availed itself of the benefits of doing business; and committed acts in

4  furtherance of the alleged conspiracy in this State.

5                              **INTRADISTRICT ASSIGNMENT**

6      23. Pursuant to Civil L.R. 3-2, this case should be assigned to the San Francisco Division

7  because a substantial part of the events giving rise to the claims occurred within this division.  Plaintiff

8  Andrea Resnick resides in San Francisco County and Defendant Walmart.com is headquarted in San

9  Mateo County.

10                       **INTERSTATE TRADE AND COMMERCE**

11      24. Defendants' conduct has taken place within the flow of, and substantially affected the

12  interstate commerce of, the United States.  By way of example, Defendants have sold and/or rented

13  DVDs throughout the United States, involving hundreds of millions or billions of dollars in interstate

14  commerce, and used the instrumentalities of interstate commerce, including interstate wires and the

15  U.S. mail, to sell and/or to rent DVDs throughout the United States.

16                                  **RELEVANT MARKET**

17      25. Defendants' market allocation conspiracy is *per se* illegal and requires no allegation of

18  market definition.

19      26. For those claims that may require market definition, the Relevant Market for purposes of

20  these allegations during the Class Period at least is: the Online DVD Rental Market in the United

21  States.

22      27. "DVD," as defined herein, refers to a Digital Video Disc or Blu-ray Disc containing

23  commercially recorded entertainment programs for personal viewing.  DVDs are the primary medium

24  by which movies and other recorded entertainment are distributed in the United States.  Revenues on

25  DVDs far exceed those generated from box office receipts.  In addition, DVDs have become a

26  particularly lucrative means for the distribution of previously aired television programs, surpassing

27

28

1   even television syndication rights as a revenue stream in many instances.  As defined herein, "DVD"

1   even television syndication rights as a revenue stream in many instances. As defined herein, "DVD"

2   does not refer to blank Digital Video Discs, which are used to store or record data.

3       28. The relevant market is for the rental of DVDs online by subscription for delivery by mail

4   ("Online DVD Rental Market"). At all relevant times, there have been no reasonably interchangeable

5   substitutes for this service, which is differentiated, from both the demand and the supply side, from

6   other methods of DVD distribution channels, as well as other methods of entertainment content

7   delivery.

8       29. In the Online DVD Rental Market, for a monthly subscription fee, a consumer may rent

9   DVDs from an online service provider, such as Netflix, Blockbuster Online, or (prior to May 19, 2005)

10  Walmart DVD Rentals. There are no late fees and no due dates, but, within any given plan, the

11  consumer pays the subscription fee regardless of how many DVDs he or she rents per month. Thus,

12  even a consumer who does not rent a DVD for months still is charged the subscription fee; Netflix

13  CEO Reed Hastings calls this the "gym membership effect."

14      30. To rent DVDs, consumers fill out a rental "queue" in their online profile, listing in order of

15  preference the DVDs they wish to rent. The DVDs are then sent by the provider to the consumer's

16  home via U.S. mail. To return the DVD and receive the next DVD in the queue, the consumer inserts

17  the DVD in a prepaid envelope provided with the rental and mails it back; the service provider then

18  mails the next movie on the list to the consumer. The library of titles available from online service

19  providers has grown over time, now ranging near 100,000 DVDs—often twenty to one-hundred times

20  the selection of titles stocked (not to mention available) at any single video rental store.

21      31. From the consumer's perspective, online DVD rentals are a differentiated service that is not

22  reasonably interchangeable with traditional bricks-and-mortar video rental. In traditional video rental

23  from physical stores, consumers drive to or otherwise arrive at the store, find (or do not find) what they

24  are looking for, and pay on a per-DVD basis for their selection(s). After the designated rental period

25  of one or more days, usually depending upon the release date of the DVD, the consumer returns his

26  selection or potentially incurs late fees. During the Class Period as alleged herein, these late fees have

27

28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 8 -
Case No.

1   accounted for as much as 20% of the revenues in traditional video rental stores; there are no late fees

2   or due dates in the Online DVD Rental Market.

3        32. There are numerous other practical indicia of the Online DVD Rental Market being a

4   relevant product market, distinct from other forms of DVD rental, including:

5        a. **Price Competition.** No direct price competition exists between online rental and other

6           forms of DVD rental, whether in-store, kiosk, or video downloading, which are not

7           reasonably interchangeable with online DVD rental. For example, online DVD rentals

8           generally are priced on a monthly subscription basis. Within any given plan, the

9           subscription rate is independent of the number of DVDs the customer actually rents in a

10          month. In-store DVD rentals, kiosks, and downloading generally are priced on a pay-

11          per-view basis. Also, changes in the price of online rentals do not closely track changes

12          in the price of in-store rentals. The pricing of online rentals is generally nationwide in

13          scope and is not affected by local in-store prices and competition. As a result, the

14          pricing of online rentals would generally be the same to a customer, regardless of

15          whether the nearest rental store is two minutes or two hours away. Online rentals

16          generally offer additional services, such as movie reviews, customer-specific

17          recommendations based on viewing and preference history, and other metrics of

18          popularity. The cross-elasticity of demand between these products is such that a small

19          but significant non transitory increase in price ("SSNIP") would not cause consumers to

20          switch from online rental to in-store rental or any other arguable method of DVD

21          distribution and *vice versa*.

22       b. **Functional Differences.** Online rentals fundamentally differ from in-store rentals in

23          that (1) they do not require travel to a store (including a second trip to return the DVD

24          and potentially multiple trips if the store does not have the DVD in stock at the right

25          time), (2) are available to anyone with a postal address, regardless of proximity to a

26          store, (3) are primarily subscription-based services, and (4) provide a much wider

27          selection of titles than can a brick-and-mortar store. For these reasons, among others,

28

Online and in-store DVD rentals are not reasonably interchangeable. Likewise, other modes of content distribution, such as kiosk, video-on-demand, and downloading, among other forms, are not reasonably interchangeable with online DVD rentals for a number of reasons, including relative selection and convenience for consumers, pricing, as well as, from the supply perspective, licensing considerations and technological limitations.

c. **Public and Industry Perceptions.** The online rental market is recognized as a distinct market by the public and the industry, including by Defendants.

d. **Admissions.** By word and deed, Defendants have confirmed and recognized the existence of a discrete online rental market. Admissions of a discrete online rental market abound from Netflix and Walmart.com and Wal-Mart Stores executives alike, including Hastings and Fleming. Very recently, a Netflix executive told the Wall Street Journal that other types of rental services, such as kiosk and in-store rentals, do not present a direct competitive threat to Netflix. That same executive acknowledged that while video downloads may be a competitive force in the future, DVD will be the dominant medium for years to come, making the entry of this technology not timely enough to be considered a competitive force in the relevant market. Netflix CEO Reed Hastings has observed that the competitive threat of internet downloading to online DVD rental during the Class Period is like that of hydrogen powered cars to gasoline powered cars—inconsequential for many years to come. He has further explained that DVDs will be the dominant medium for movies for perhaps as long as the gasoline engine.

33. Online DVD rentals are also a separate market from DVD sales. The pricing of DVD sales and online DVD rentals is very different. For example, the price to buy a new DVD depends heavily on how popular it is, including whether it is a new release or how successful the title originally was at the box office or on television. By contrast, online DVD renters generally charge based on a subscription fee, regardless of whether the consumer is renting popular or obscure DVDs. The

1 industry and the public perceive online DVD rentals as separate from DVD sales, whether in-store or

2 online. The factors motivating a consumer to buy a DVD are different from those that lead to renting a

3 DVD. The former generally applies to DVDs that the consumer intends to view (either personally, or

4 their family or friends) numerous times. The latter generally applies to DVDs that the consumer

5 intends to view once and then return. DVDs sold at retail have other distinguishing characteristics,

6 such as packaging and special features not available with rentals, which are delivered unadorned in

7 envelopes. In addition, the fact of whether a DVD is new or used is not an issue in rental, but is a

8 significant factor in sales, for used DVDs are sold at a significant discount to their new counterparts,

9 due to them being relatively less desirable to consumers. DVD sales and online rentals also are not

10 reasonably interchangeable for consumers intending to collect physical DVDs or to give a DVD as a

11 gift. The cross-elasticity of demand between these products is such that a SSNIP would not cause

12 consumers to switch from online renting to purchasing DVDs and *vice versa*.

13     34. The Geographic Market for the Online DVD Rental Market is the United States. The

14 practical reality is that, among other things, shipping costs and transglobal differences in DVD data

15 encoding make it neither practical nor feasible for entities located in other countries to rent DVDs to

16 U.S. consumers.

17                      **MARKET AND MONOPOLY POWER**

18     35. At all relevant times, Netflix dominated the Online DVD Rental Market. Netflix has an

19 approximate market share of 75% in the Online DVD Rental Market, and is far and away the market

20 leader in the Online DVD Rental Market. As a result of this market share, Netflix has had and

21 continues to have market and monopoly power in the Online DVD Rental Market; it has the power to

22 control prices or exclude competition in this Relevant Market.

23     36. Netflix's market and monopoly power is strengthened by the significant barriers to entry in

24 this market. There have been no significant market entrants in the more than three years since

25 announcement of the Market Division Agreement, which increased those barriers. Online DVD rental

26 is highly capital intensive. A firm must operate on a large scale to be successful. It requires the

27 possession of a significant number of shipping facilities strategically located throughout the United

28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 11 -
Case No.

1  States to ensure timely delivery. It also requires stocking an extensive inventory of DVDs to maintain

2  the selection of titles that consumers demand. As Netflix CEO Reed Hastings has observed, "When

3  you think about the barriers to entry to this business, it is subtle because it appears easy. A kid can

4  open a website. But the barriers to profitability are very large."

5      37. Since the implementation of the Market Division Agreement, the Online DVD Rental

6  Market has been overwhelmingly comprised of only two firms: Netflix and Blockbuster, which

7  possesses nearly all of the remaining 25% of the Online DVD Rental Market that Netflix does not

8  control. A few minor firms have shares of less than 1-2% of the market. During fiscal years 2005-

9  2007 combined, Netflix earned nearly $4 Billion in revenues and $1.3 Billion in gross profit from

10 renting DVDs to consumers—a margin of more than 33%. As a result of Netflix's abuse of its

11 monopoly power alleged herein, its subscription fees have been higher than they otherwise would have

12 been.

13     38. Wal-Mart Stores and its wholly-owned subsidiary Walmart.com combined have an

14 industry-leading 40% of domestic DVD retail sales. During fiscal years 2005-2008 combined, they

15 earned revenues in excess of $25 Billion by selling DVDs to consumers. Both Wal-Mart Stores and

16 Walmart.com benefit from the Market Division Agreement.

17     39. Further evidence of Netflix's market and monopoly power is reflected in the

18 anticompetitive effects alleged herein.

19                          **THE ILLEGAL AGREEMENT**

20     40. **Pre-Agreement Competition in the Online DVD Rental Market.** In early 2005, Netflix

21 was coming off a year in which competition was growing and its stock price had dropped

22 precipitously. It faced increasing competition from Walmart DVD Rentals and from Blockbuster

23 Online, the latter of which had just entered the online rental market.

24     41. By mid-2004, Netflix was charging $21.99 for its most popular subscription rental plan.

25 Blockbuster entered the online market in earnest in August, at first charging $19.99 but then reducing

26 its price in November to $17.49 for its similar plan. After that, the Walmart DVD Rentals rate was

27 reduced from $18.86 to $17.36. In the wake of these price cuts, Netflix reduced its prices by nearly

28

HOWREY LLP

CLASS ACTION COMPLAINT          - 12 -
Case No.

1 | 20% (to $17.99 per month) soon thereafter. After that, Blockbuster further decreased its price to
2 | $14.99—20% below Netflix's already reduced price and more than 40% below the price Netflix was
3 | charging just months earlier.

4 |      42. Meanwhile, Wal-Mart Stores and its wholly-owned subsidiary Walmart.com, which had
5 | established themselves as the leader in new DVD sales, were facing increasing competition from in-
6 | store and online channels of distribution in new DVD sales, including competition from Amazon.com.
7 | At the time, Netflix was a significant potential additional competitor, since it had a subscriber base of
8 | millions of customers who were known in the industry to be prolific DVD buyers, and the sales and
9 | profits of Wal-Mart Stores and Walmart.com stood to suffer if Netflix began selling new DVDs to
10 | these customers. Conversely, Wal-Mart Stores and Walmart.com stood to gain significant additional
11 | sales and profits and to gain further market share in the sale of new DVDs if these customers were to
12 | make their purchases of new DVDs from them instead.

13 |      43. **The Walmart Price Cut.** On January 7, 2005, Walmart DVD Rentals dropped the price on
14 | its most popular DVD rental plan significantly—to $12.97 per month—creating further price pressure
15 | on Netflix to reduce its DVD rental prices. In order to respond to the increased competition, Netflix
16 | would have been forced to lower its prices and thereby reduce its profits.

17 |      44. **The January Dinner Meeting.** Faced with this increasing competition, Reed Hastings, the
18 | Chairman and CEO of Netflix, called John Fleming, then the CEO of Walmart.com, and invited him to
19 | dinner to discuss the their companies' DVD sales and rentals businesses. Fleming accepted the
20 | invitation; the two met together in January 2005 and embarked upon a scheme that would result in the
21 | contract combination, and conspiracy, and agreement reflected in the Market Division Agreement.

22 |      45. **Hastings' Subsequent "Prediction."** On May 5, 2005, in Netflix's First Quarter earnings
23 | call with financial analysts, held after the January dinner but only two weeks prior to the public
24 | announcement of the Market Division Agreement, Hastings made plain the motive for Netflix to
25 | conspire with Wal-Mart Stores and Walmart.com:

26 |      In terms of profitability over the coming years, the key issue is the number of major
   |      competitors. If there are only two major players, Blockbuster and Netflix, the
27 |      profitability may be substantial like other two-firm entertainment markets. If, on the
   |      other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major competitors in
28 |

1    online rental, then the profits would likely be small.

2    Hastings went on to "predict" on that conference call:

3    [T]he likely case is [that] online rental becomes a two-firm market over the coming
4    years.

5    **46. The Public Announcement.** On May 19, 2005, shortly after Fleming had been promoted

6    to Chief Marketing Officer of Wal-Mart Stores, Defendants issued a joint press release that revealed

7    the existence of the Market Division Agreement, by which they unlawfully divided and allocated the

8    markets for DVD sales and rentals, and did, in fact, create the two-firm market that Hastings sought.

9    **47. The Media's Reaction.** The news of the agreement was featured in a number of

10    newspapers and other publications, in articles with aptly colorful titles, such as:

11    •    "Wal-Mart and Netflix Scratch Each Other's Backs,"

12    •    "Truce in DVD-Rental Wars,"

13    •    "Wal-Mart and Netflix:  An Alliance," and

14    •    "Wal-Mart Loves Netflix:  And Vice-Versa."

15    **48. The Execution.** Beginning on May 19, 2005, Walmart.com, as agreed, did in fact exit the

16    online rental business.  Walmart.com announced to all of the subscribers to "Walmart DVD Rentals"

17    that it was exiting the online DVD rental business and that those subscribers could be transferred to

18    Netflix.  Walmart.com took additional steps to affirmatively implement the Market Division

19    Agreement by adding a prominently placed link to the Netflix website to encourage customers to

20    transfer their subscriptions to Netflix.  Since the date of their joint announcement on May 19, 2005

21    (apart from the 30 days that Walmart.com used to wind down its existing online rental business),

22    neither Walmart.com nor Wal-Mart Stores has participated in the Online DVD Rental Market, and

23    Netflix has not sold new DVDs.

24    **49.** As a result of the Market Division Agreement, downward pricing pressure from

25    Walmart.com was eliminated and the Online DVD Rental Market was reduced to two competitors.

26    Absent the Market Division Agreement, Netflix would have lowered its prices no later than May 19,

27    2005.  As a result of the elimination of a competitor in this Relevant Market, Blockbuster was able to

28

CLASS ACTION COMPLAINT                    - 14 -
Case No.

1   raise its subscription price in July to match that of Netflix, from $14.99 per month to $17.99 per

2   month, in accord with Hastings' expectation that "[i]f there are only two major players, Blockbuster

3   and Netflix, the profitability may be substantial like other two-firm entertainment markets." In

4   Netflix's next earnings call, on August 8, 2005, Hastings boasted:

5         Last quarter we said online rental was shaping up to be a two-player market, and that is
        indeed what is happening.
6

7        50. The Market Division Agreement was not in the independent self-interest of Wal-Mart

8   Stores, Walmart.com, or Netflix. Neither Wal-Mart Stores nor Walmart.com would have wanted

9   Walmart.com to withdraw from the online rental market, encourage its subscribers to be transferred to

10   Netflix, and promote Netflix's rental business absent substantial consideration from Netflix, such as an

11   agreement not to compete for new DVD retail sales. But for the Market Division Agreement,

12   Walmart.com would not have exited the Online DVD Rental Market when it did. Likewise, Netflix

13   would not have foreclosed its opportunity to sell DVDs to its millions of subscribers—a base of

14   customers who purchase on average 25 DVDs per year each—and would not have promoted new DVD

15   sales by Wal-Mart Stores and Walmart.com, rather than its own sales, absent an agreement from them

16   not to compete against Netflix's online rental business.

17                  **ANTICOMPETITIVE EFFECTS**

18        51. Defendants' illegal acts and practices have caused anticompetitive effects in the Online

19   DVD Rental Market. The subscription fees charged by Netflix to Plaintiffs, as well as the other

20   members of the Class, were maintained at artificially high and supracompetitive levels. Plaintiffs and

21   the other members of the Class paid higher subscription prices to Netflix than they otherwise would

22   have paid.

23        52. The Market Division Agreement (i) eliminated one of only three significant competitors in

24   the Relevant Market, (ii) eliminated competition between Defendants, and (iii) enabled Netflix to

25   acquire market power and also acquire and maintain monopoly power in the Relevant Market. The

26   Market Division Agreement has enabled Netflix to implement monopolistic and supracompetitive

27   pricing in the Relevant Market.

28

1     53. The Market Division Agreement and Defendants' acts and practices in furtherance thereof

2   have no procompetitive benefits. They do not create information that consumers need, nor do they

3   create new or better products or services. Rather, they have served to reinforce the true

4   anticompetitive nature of the Market Division Agreement by assuring, for example, that Walmart.com

5   not only withdrew from the Online DVD Rental Market, but further enhanced Netflix's position in that

6   market. Even if there were any such benefits, they would not outweigh any of the anticompetitive

7   effects described herein, and, in any event, could be achieved by less restrictive means.

8                                          **CLASS ACTION ALLEGATIONS**

9     54. Plaintiffs bring this action on their own behalf and as class actions under Rules

10   23(a), 23(b)(2), and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the

11   Class, as defined herein.

12     55. Bunker, Haley, Latham, Resnick, Roslansky, and Simpson bring this action on behalf of

13   themselves and the members of the Class, defined as comprising:

14         Any person in the United States that paid a subscription fee to Netflix to rent DVDs, on
           or after May 19, 2005 up to the present. Excluded from the Class are government
15         entities, Defendants, their co-conspirators and their representatives, parents,
           subsidiaries, and affiliates.
16

17     56. The Class numbers in the millions, the exact number and identities of the members being

18   known by Defendants.

19     57. The Class is so numerous and geographically dispersed that joinder of all members is

20   impracticable.

21     58. There are questions of law and fact common to the Class and the members

22   thereof. These common questions relate to the existence of the conspiracy alleged, and to the type

23   and common pattern of injuries sustained as a result thereof. The questions include, but are not

24   limited to:

25         a.    Whether Defendants engaged in a contract, combination, or conspiracy to
                 allocate markets;
26
           b.    Whether Defendants unreasonably restrained trade in the Online DVD Rental
27               Market;

28

HOWREY LLP

CLASS ACTION COMPLAINT                           - 16 -
Case No.

c.     Whether Defendants had the specific intent for Netflix to monopolize the Online DVD Rental Market;

d.     The nature and character of the acts performed by Defendants in the furtherance of the alleged contract, combination, and conspiracy;

e.     Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

f.     Whether the alleged contract, combination, and conspiracy violated Section 2 of the Sherman Act;

g.     The anticompetitive effects of Defendants' violations of law;

h.     Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

i.     Whether the conduct of Defendants, as alleged in this Complaint, caused Netflix subscription fees to be higher than they otherwise would have been and thereby caused injury to the business and property of Plaintiffs and other members of the Class.

59. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including the legal and factual issues relating to liability and damages.

60. Bunker, Haley, Latham, Resnick, Roslansky, and Simpson are members of the Class. Their claims are typical of the claims of other members of the Class, and they will fairly and adequately protect the interests of the members of the Class. Their interests are aligned with, and not antagonistic to, those of the other members of the Class.

61. Plaintiffs are represented by competent counsel experienced in class action antitrust litigation.

62. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate antitrust claims such as are asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

1

## ANTITRUST INJURY AND STANDING

2   63. During the Class Period, Plaintiffs and the members of the Class have directly paid

3   monthly DVD subscription fees to Netflix in the United States, and many continue to do so.

4   64. Plaintiffs and the members of the Class have suffered, and many continue to suffer, injury

5   of the type that the antitrust laws are designed to punish and prevent. Plaintiffs and the members of

6   the Class have paid, and many continue to pay, more to subscribe to Netflix than they would

7   have, absent the Market Division Agreement. As a direct and proximate result of the unreasonable

8   restraint of trade and market and monopoly power created by the Market Division Agreement,

9   Plaintiffs and the members of the Class were, and many continue to be, injured and financially

10  damaged in their businesses and property, in amounts that are not presently determined. As the

11  direct victims of Defendants' antitrust violations, Plaintiffs are the most efficient enforcers of the

12  antitrust claims made herein.

13

## COUNT ONE

14

15  ### SHERMAN ACT SECTION ONE (15 U.S.C. §1)
### Illegal Market Division
### (Against All Defendants)

16  65. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

17  66. Defendants have entered into a *per se* illegal market division agreement, in violation of

18  Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1. Even if evaluated under the Rule of Reason, the

19  Market Division Agreement is an unreasonable restraint of trade in violation of Section 1 of the

20  Sherman Antitrust Act, 15 U.S.C. §1.

21  67. Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors

22  in the Online DVD Rental Market. In addition, Netflix, on the one hand, and Wal-Mart Stores and

23  Walmart.com, on the other hand, were potential competitors in new DVD sales. Wal-Mart Stores and

24  Walmart.com were actual participants and Netflix was a potential participant, with the means and

25  economic incentive to sell new DVDs—in the absence of the Market Division Agreement.

26  68. Defendants shared a conscious commitment to a common scheme designed to achieve the

27  unlawful objective of dividing the markets for online DVD rentals and new DVD sales. The Market

28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 18 -
Case No.

1  Division Agreement allocated the Online DVD Rental Market to Netflix, with Wal-Mart Stores and

2  Walmart.com agreeing not to compete in that Relevant Market. The agreement also allocated new

3  DVD sales to Wal-Mart Stores and Walmart.com, with Netflix agreeing to refrain from selling new

4  DVDs in competition with them. In addition to explicitly or *de facto* agreeing not to sell new DVDs,

5  Netflix also obtained the Market Division Agreement by providing potentially valuable promotion to

6  Wal-Mart Stores and Walmart.com. In so doing, Netflix provided significant consideration to Wal-

7  Mart Stores and Walmart.com for their agreement that Walmart.com would withdraw from, and both

8  Walmart.com and Wal-Mart Stores would not compete in, the Online DVD Rental Market.

9      69. The Market Division Agreement has created significant anticompetitive effects and no pro-

10  competitive benefits. It eliminated competition in the Relevant Market, raising prices paid by

11  consumers. To the extent that there are any procompetitive benefits at all resulting from the

12  agreement, they would not outweigh the agreement's anticompetitive effects. In any event, to the

13  extent that there were any, they could have been achieved by less restrictive means.

14      70. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,

15  Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

16  **COUNT TWO**

17  **SHERMAN ACT SECTION TWO (15 U.S.C. §2)**
18  **Monopolization of Online DVD Rental Market**
    **(Against Netflix)**

19      71. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

20      72. Netflix has monopoly power in the Online DVD Rental Market.

21      73. Netflix willfully acquired and maintained its monopoly in the Online DVD Rental Market

22  by its acts and practices described herein, including by executing, implementing, and otherwise

23  complying with the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust

24  Act, 15 U.S.C. §2.

25      74. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,

26  Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

27

28

HOWREY LLP

CLASS ACTION COMPLAINT          - 19 -
Case No.

## COUNT THREE

### SHERMAN ACT SECTION TWO (15 U.S.C. §2)
**Attempt to Monopolize Online DVD Rental Market**
**(Against Netflix)**

75. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

76. If Netflix does not already have monopoly power, then Netflix has a dangerous probability of success in achieving monopoly power in the Online DVD Rental Market.

77. With the specific intent to achieve a monopoly, Netflix, by its acts and practices described herein, including by executing, implementing, and otherwise complying with the Market Division Agreement, has attempted to monopolize the Online DVD Rental Market, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2.

78. As a result of this violation of law, Netflix's subscription prices charged to, and paid by, Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

## COUNT FOUR

### SHERMAN ACT SECTION TWO (15 U.S.C. §2)
**Conspiracy to Monopolize Online DVD Rental Market**
**(Against All Defendants)**

79. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

80. Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the Online DVD Rental Market. Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the Online DVD Rental Market. Defendants conspired with the specific intent, knowledge and purpose that their anticompetitive agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Relevant Market. Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the Market Division Agreement would be the monopolization of the Relevant Market by Netflix. Defendants have committed overt acts in furtherance of their conspiracy, including entering into, complying with, and implementing the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2.

81. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,

1    Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

2                                    **PRAYER FOR RELIEF**

3          WHEREFORE, Plaintiffs respectfully request that:

4          A.    The Court determine that this action may be maintained as a class action under
5                Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed
                 class representatives, and that Plaintiffs' counsel be appointed as counsel for the
6                Class.

7          B.    Defendants be adjudged to violate Sections 1 and 2 of the Sherman Antitrust Act
                 of 1890, 15 U.S.C. §§1-2.
8

9          C.    The Court declare the Market Division Agreement between Defendants
                 announced May 19, 2005, to be unlawful and null and void.
10

11         D.    Judgment be entered for Plaintiffs and the members of the Class against
                 Defendants, jointly and severally, for three times the amount of damages
12               sustained by Plaintiff and the Class, under Section 4 of the Clayton Antitrust Act
                 of 1914, 15 U.S.C. §15, together with the costs of the action, including
13               reasonable attorneys' fees, and such other relief as is appropriate.

14         E.    Defendants, their affiliates, successors, transferees, assignees, and the officers,
                 directors, partners, agents and employees thereof, and all other persons acting or
15               claiming to act on their behalf, be permanently enjoined and restrained from, in
                 any manner, continuing, maintaining or renewing the contract, combination or
16               conspiracy alleged herein, or from engaging in any other contract, combination
                 or conspiracy having similar purpose or effect, and from adopting or following
17               any practice, plan, program or device having a similar purpose or effect,
18               pursuant to Section 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §29.

19         F.    Plaintiffs and the members of the Class have such other, further, and different
                 relief as the case may require and the Court may deem just and proper under the
20               circumstances.

21

22

23

24

25

26

27

28

**HOWREY LLP**

CLASS ACTION COMPLAINT                          - 21 -
Case No.

1     **JURY DEMAND**

2         Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of

3     all issues triable by jury.

4     Dated:  January 2, 2009

5                                         Respectfully submitted,

6

7                                         By: _____

8                                         Paul Alexander
                                          HOWREY LLP
9                                         1950 University Avenue
                                          East Palo Alto, CA  94303
10                                        650.798.3500
                                          650.798.3600 (fax)
11
                                          Robert G. Abrams
12                                        Thomas A. Isaacson
                                          Peter A. Barile III
13                                        HOWREY LLP
                                          1299 Pennsylvania Avenue, N.W.
14                                        Washington, DC  20004
                                          202.783.0800
15                                        202.383.6610 (fax)
16
                                          Emily L. Maxwell
17                                        HOWREY LLP
                                          525 Market Street, Suite 3600
18                                        San Francisco, CA  94105
                                          415.848.4947
19                                        415.848.4999 (fax)
20
21                                        *Attorneys for Plaintiffs and others similarly situated*

22

23

24

25

26

27

28

HOWREY LLP

CLASS ACTION COMPLAINT                    - 22 -
Case No.

EXHIBIT B

Guido Saveri (22349)
*guido@saveri.com*
R. Alexander Saveri (173102)
*rick@saveri.com*
Cadio Zirpoli (179108)
*cadio@saveri.com*
Melissa Shapiro (242724)
*melissa@saveri.com*
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

Attorneys for Plaintiff Sarah E. Grime

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH E. GRIME, on behalf of herself and all others similarly situated, | ) Case No. |
| Plaintiff, | ) |
| v. | ) **CLASS ACTION COMPLAINT** |
| NETFLIX, INC., WAL-MART.COM USA LLC, and WAL-MART STORES, INC. | ) **JURY TRIAL DEMANDED** |
| Defendants. | ) |

CV 09 0349

EMC

CLASS ACTION COMPLAINT

Plaintiff Sarah E. Grime, individually and on behalf of all those similarly situated, brings this action for treble damages under the antitrust laws of the United States against Defendants, and demands a trial by jury.

## NATURE OF THE ACTION

1.     This suit is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a plaintiff Class, defined more fully below, consisting of all persons and entities that paid a subscription fee to Defendant Netflix, Inc. to rent DVDs between May 19, 2005 and the present (the "Class Period").

2.     Plaintiff alleges that on or about May 19, 2005, the named Defendants entered into an illegal anticompetitive agreement (the "Agreement") to divide the markets for sales and online rentals of DVDs in the United States, with the purpose and effect of unreasonably restraining trade, in at least the market for online DVD rentals. The mechanics of the Agreement, as set forth herein, allowed Defendant Netflix to charge supra-competitive prices to Plaintiff and other Class members.

3.     The discussions that ultimately led to the Agreement began in early 2005. At that time, Defendants Netflix and Wal-Mart.com were competing directly in the market for online DVD rentals. In addition, the companies were potential competitors in the retail market for sales of new DVDs. Netflix, the leader in the online DVD rental market, was preparing to enter the retail DVD market and would have direct marketing access to its substantial subscriber base. In short, Netflix viewed Defendant Wal-Mart.com as a significant competitive threat in the online DVD rental market while Wal-Mart Stores and Wal-Mart.com, together the clear leader in the retail DVD market, viewed Netflix as a significant competitive threat. To address these concerns, the Defendants entered into the Agreement, pursuant to which Wal-Mart.com agreed to exit the online DVD rental market and Netflix agreed not to enter the retail DVD market, but instead to actively promote DVD sales by Wal-Mart.

4.     Defendant Wal-Mart Stores participated directly in the Agreement described herein. Indeed, the former Chief Marketing Officer of Wal-Mart.com was named as the Chief Marketing Officer of Wal-Mart Stores prior to the Agreement being publicly disclosed. At the time of the

1

public announcement, that executive, John Fleming, was acting both at Chief Marketing Officer of Wal-Mart Stores and had oversight responsibility for Wal-Mart.com.

5.    Since entering into the Agreement, Wal-Mart has refrained from renting DVDs online and Netflix has refrained from selling DVDs. As a result, the Agreement strengthened the already dominant respective market positions of Netflix and Wal-Mart in the online rental and retail markets. In turn, Netflix was able to charge higher subscription fees for online DVD rentals than it would have in the absence of the Agreement.

6.    The impact on the Class has been and continues to be substantial. As a result of the Agreement, purchasers of Netflix's subscription service, including Plaintiff, paid significantly more for online DVD rentals during the Class Period than they would have paid in a competitive market.

## JURISDICTION AND VENUE

7.    This action is instituted under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26 to recover treble damages and injunctive relief, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2.

8.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15(a) and 26.

9.    Venue is appropriate in this District under Sections 4, 12 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted business in this District, because the Defendants are licensed to do business or are doing business in this District, because a substantial part of Plaintiff's claims occurred in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

## PARTIES

10.    Plaintiff Sarah E. Grime is a resident of Cook County, Illinois. During the Class Period, Plaintiff subscribed to Netflix and paid subscription fees to rent DVDs for personal use. Plaintiff suffered injury as a result of the illegal conduct described herein.

2

11.     Defendant Netflix, Inc. ("Netflix") is a Delaware corporation headquartered at 100 Winchester Circle, Los Gatos, California, 95032. Netflix's revenues exceed $1 billion annually. Through www.netflix.com, Netflix rents DVDs directly to consumers throughout the United States. Throughout the Class Period, Netflix has dominated the online DVD rental market, accounting for approximately 75 percent of all such rentals in the United States.

12.     Defendant Wal-Mart Stores, Inc. ("Wal-Mart Stores") is a Delaware corporation headquartered at 702 S.W. Eighth Street, Bentonville, Arkansas, 72716. Wal-Mart Stores' revenues exceed $300 billion annually and Wal-Mart Stores is the largest retailer in the United States. Wal-Mart Stores is also the largest seller of new DVDs in the United States, accounting for over one-third of all such sales through both its brick-and-mortar stores and online via www.walmart.com. From 2002-2005, Wal-Mart Stores' wholly-owned subsidiary Wal-Mart.com, USA, LLC competed with Netflix in the online DVD rental market through the Wal-Mart DVD rental service.

13.     Defendant Wal-Mart.com, USA, LLC ("Wal-Mart.com"), a subsidiary of Wal-Mart Stores, Inc., is a Delaware company with its headquarters at 7000 Marina Boulevard, Brisbane, California, 94005. Wal-Mart.com is the online component of Wal-Mart Stores. Prior to the conspiracy alleged herein, Wal-Mart.com was a leading competitor of Netflix in the online DVD rental market through the Wal-Mart DVD Rentals service. Wal-Mart.com is ranked as the 14th largest online retailer in the United States and sells DVDs directly to consumers nationwide.

14.     Wal-Mart Stores and Wal-Mart.com operate as a single commercial enterprise. The Chief Marketing Officer of Wal-Mart Stores explained the relationship as follows: "Wal-Mart stores set up Wal-Mart.com as a separate company with some outside investors, but within six months Wal-Mart Stores bought back the outside interest and Wal-Mart.com now serves as a 'marketing channel' for Wal-Mart Stores." Wal-Mart Stores is the registrant of the www.walmart.com and www.walmartdvdrentals.com domain names.

15.     Wal-Mart Stores was actively involved in the conspiracy alleged herein, as set forth further below. Both Wal-Mart Stores and Wal-Mart.com are liable for the unlawful conduct alleged herein. Indeed, among other things, both Wal-Mart Stores and Wal-Mart.com participate in and

1   benefited from the Agreement. Additionally, Wal-Mart Stores directed, ratified, approved,

2   supported, or otherwise aided and abetted Wal-Mart.com's unlawful acts.

3       16.    Wal-Mart Stores had a clear incentive to enter into the Agreement alleged herein. In

4   addition to its position as full owner of Wal-Mart.com, Wal-Mart Stores obtains substantial revenues

5   from its sales of new DVDs, as well as store traffic resulting sales of other retail goods, which would

6   have been threatened by Netflix's entry into the market for new DVD sales, and which were

7   enhanced by Netflix's promotion of Wal-Mart Stores and Wal-Mart.com through the Agreement.

8   Indeed, it was Wal-Mart Stores that announced the Agreement with Netflix (in a press release

9   identifying Wal-Mart Stores in the "About" section). That announcement quoted John Fleming, then

10  Chief Marketing Officer of Wal-Mart Stores, and explained that Wal-Mart.com's DVD sales are in

11  fact Wal-Mart Stores' "online movie sales business."

12      17.    Whenever in this Complaint an allegation refers to any act, deed or transaction of any

13  corporation, the allegation means that the corporation engaged in the act, deed or transaction by or

14  through its officers, directors, agents, employees or representatives while actively engaged in the

15  management, direction, control, or transaction of the corporation's business or affairs.

16                          **CLASS ACTION ALLEGATIONS**

17      18.    Plaintiff brings this action on behalf of herself and as a class action under the

18  provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all

19  members of the following Class:

20          All persons and entities in the United States that paid a subscription fee to
            Netflix to rent DVDs between May 19, 2005 and the present. Excluded
21          from the Class are Defendants, their representatives, and any present and
22          former parents, subsidiaries, and affiliates.

23      19.    Due to the nature of the trade and commerce involved, Plaintiff believes that there are

24  millions of Class members as above described, the exact number and their identities being known to

25  Defendants.

26      20.    The Class is so numerous and geographically dispersed that joinder of all members is

27  impracticable.

28      21.    There are questions of law and fact common to the Class, including:

a. Whether Defendants engaged in a combination and conspiracy among themselves to allocate markets;

b. The identity of the participants of the conspiracy;

c. The duration of the conspiracy alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

d. Whether the alleged conspiracy violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2;

e. Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and the other members of the Class;

f. The effect of Defendants' conspiracy on the sales and/or rentals of DVDs in the United States during the Class Period; and

g. The appropriate class-wide measure of damages.

22. Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a direct purchaser of Netflix's subscription rental service and its interests are aligned with, and not antagonistic to, those of the other members of the Class.

23. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

24. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

25. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

26. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common

claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

27. The activities of Defendants described herein were within the flow of and substantially affected interstate commerce.

28. During the Class Period, Defendants sold and/or rented DVDs throughout the United States.

29. During the Class Period, Defendants sold and/or rented DVDs in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which the Defendants sold and/or rented DVDs.

30. The conspiracy in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## INTRADISTRICT ASSIGNMENT

31. Pursuant to Civil L.R. 3-2, this case should be assigned to the San Francisco Division because a substantial part of the events giving rise to the claims occurred within this division and Defendant Wal-Mart.com is based in San Mateo County.

## RELEVANT MARKET

32. For purposes of Plaintiff's claim under Section 1 of the Sherman Act, the Agreement alleged herein is *per se* illegal and therefore requires no definition of the relevant market.

33. For purposes of Plaintiff's claims under Section 2 of the Sherman Act, the Relevant Market is the "Online DVD Rental Market" in the United States.

34. "DVD" refers to a Digital Video Disc or Blu-ray Disc containing commercially recorded content for personal viewing. DVDs are the primary medium through which movies and other recorded entertainment are distributed in the United States. Revenues derived from DVDs far exceed those from box office receipts. Moreover, DVDs have become a particularly lucrative means of distributing previously aired television programs, surpassing even television syndication rights as

a source of revenue stream in many cases. For purposes of the allegations herein, "DVD" does not refer to blank Digital Video Discs used to store or record data.

35.    The Online DVD Rental Market includes all rentals of DVDs made online via subscription for delivery by mail. Throughout the Class Period, there have been no reasonably interchangeable substitutes for this service.

36.    Consumers participating in the Online DVD Rental Market typically pay a monthly subscription fee to rent DVDs from an online service provider, such as Netflix, Blockbuster Online, or (prior to May 19, 2005) Wal-Mart DVD Rentals. There are generally no late fees or due dates for returning the rented DVDs, but the consumer pays the set subscription fee regardless of how many DVDs are rented each month.

37.    To rent DVDs, subscribing consumers indicate their rental preferences by completing an online profile that lists the movies they wish to rent in order of preference. Netflix calls this a subscriber's "Queue." The subscriber's top ranked available DVDs are then sent by the provider to the subscriber's home via U.S. mail. To return the DVD, the subscriber uses a postage prepaid envelope provided with the rental and mails it back. The service provider then mails the next movie on the costumer's list of preferred titles. The range of titles available from online service providers has grown over time and far surpasses the range available at any single video rental store.

38.    From the consumer's perspective, online DVD rentals are a unique service not reasonably interchangeable with traditional video store rentals. To rent DVDs from stores, a customer must travel to the rental location, determine which titles are available, pay a rental fee for each DVD selected, and then return each rented DVD within the set rental period or potentially incur a late fee. During the Class Period, late fees accounted for as much as 20 percent of all revenues for traditional video rental stores.

39.    There is no direct price competition between online DVD rental providers and other forms of DVD rental, including in-store, kiosk, or video downloading. In addition, changes in the price of online rentals do not closely track changes in the price of in-store rentals. The pricing of online rentals is generally nationwide in scope and is not affected by local in-store prices and

competition. Consequently, the price of online rentals is generally the same for each customer, regardless of that customer's proximity to a video rental store.

40.     Online DVD rental providers generally offer additional services, such as movie reviews and customer specific recommendations based on viewing and preference history. The cross-elasticity of demand across various DVD rental providers is such that a small but significant non-transitory increase in price would not cause consumers to switch from online rental to in-store rental (or any other method of DVD distribution) and *vice versa*. The online DVD rental market is recognized as a distinct market by the public and the industry, and by the Defendants. Indeed, Defendants have confirmed and recognized the existence of a discrete online rental market. Recently, a Netflix executive told the Wall Street Journal that other types of rental services, such as kiosk and in-store rentals, do not present a direct competitive threat to Netflix. The same executive acknowledged that while video downloads may eventually become a more viable source of competition, DVD is likely to be the dominant medium for years to come.

41.     Online DVD rentals are also a market distinct from DVD sales. The pricing of DVD sales and online DVD rentals are very different. For example, the price to buy a new DVD depends heavily on how popular it is, including whether it is a new release or how successful the title originally was at the box office or on television. By contrast, online DVD rental providers generally charge based on a subscription fee, regardless of whether the consumer is renting popular or obscure DVDs. The factors leading a consumer to purchase a DVD are much different from those that lead to renting a DVD. For example, a customer may intend to view a particular DVD numerous times and another DVD only once. Whether a DVD is new or used is not an issue in rental, but is a significant factor in sales since used DVDs are typically sold at a significant discount as compared to new DVDs

42.     The Geographic Market for the Online DVD Rental Market is the United States. Among other things, shipping costs and international differences in DVD data encoding make it neither practical nor feasible for rental providers located in other countries to rent DVDs to consumers in the United States.

## MARKET POWER

43.     Throughout the Class Period, Netflix dominated the Online DVD Rental Market, accounting for approximately 75 percent of all online DVD rentals in the United States. Netflix has achieved monopoly power in the Online DVD Rental Market in that it has the power to control price or exclude competition.

44.     Netflix's monopoly power is strengthened by significant barriers to entry in the Online DVD Rental Market. Notably, there have been no significant market entrants in the more than three years since announcement of the Agreement. Online DVD rental is highly capital intensive and rental providers must operate on a large scale to be successful. To ensure timely delivery, it is necessary to have a significant number of shipping facilities strategically located throughout the United States. In addition, rental providers must maintain extensive inventories of DVDs to meet customer demand. As Netflix CEO Reed Hastings stated, "[w]hen you think about the barriers to entry to this business, it is subtle because it appears easy. A kid can open a website. But the barriers to profitability are very large."

45.     Since the Agreement was implemented, the Online DVD Rental Market has effectively included two competing firms: Netflix and Blockbuster Inc. ("Blockbuster"). Indeed, Blockbuster accounts for substantially all of the remaining 25 percent of online DVD rentals in the United States not controlled by Netflix. Some small entities account for less than two percent of the market. During fiscal years 2005-2007 combined, Netflix earned nearly $4 billion in revenues and $1.3 billion in gross profit from online DVD rentals—a gross profit margin of over 33 percent. As a result of Netflix's abuse of its monopoly power, as alleged herein, its subscription fees have been higher than they otherwise would have been.

46.     Wal-Mart Stores, and its wholly-owned subsidiary Wal-Mart.com, combined account for an industry-leading 40 percent of domestic DVD retail sales. During fiscal years 2005-2008 combined, the Wal-Mart entities earned revenues in excess of $25 billion from retail sales of DVDs. As set forth above, both Wal-Mart Stores and Wal-Mart.com benefit from the Agreement alleged herein.

## THE UNLAWFUL AGREEMENT

47.     In early 2005, Netflix faced increasing competition from Wal-Mart DVD Rentals and from Blockbuster Online and its stock price had dropped significantly.

48.     In mid-2004, Netflix was charging $21.99 for its most popular subscription rental plan. Blockbuster entered the Online Rental Market in August 2004, initially charging $19.99, but subsequently reducing its price to $17.49 in November 2004 for its competing plan. Then Wal-Mart DVD Rentals reduced its subscription rate from $18.86 to $17.36. In reaction to these price cuts, Netflix reduced its subscription rate to $17.99 per month. Blockbuster then further decreased its price to $14.99.

49.     During this same time period, Wal-Mart was facing growing competition from in-store and online channels of distribution in new DVD sales, including competition from Amazon.com. Netflix, with its subscriber base of millions of DVD renters (also potential purchasers of new DVDs), represented a substantial competitive threat to Wal-Mart. Sales and profits of Wal-Mart Stores and Wal-Mart.com stood to suffer if Netflix began selling new DVDs to its subscriber base. Conversely, Wal-Mart obviously stood to gain further market share (and profits) in the sale of new DVDs if the Netflix subscribers were to make their purchases of new DVDs from Wal-Mart.

50.     On January 7, 2005, Wal-Mart DVD Rentals dropped the subscription rate for its most popular DVD rental plan yet again, this time to $12.97 per month, creating further price pressure on Netflix.

51.     In the face of this growing competition, Reed Hastings, the Chairman and CEO of Netflix, called John Fleming, then the CEO of Wal-Mart.com, and invited him to dinner. Fleming accepted the invitation and the two met together in January 2005 and initiated discussions that ultimately resulted in the unlawful Agreement alleged herein. *See* "Netflix 1, Wal-Mart 0," May 20, 2005 *BusinessWeek* article, available at http://www.businessweek.com/technology/content/may2005/tc20050520_3983_tc024.htm; "Netflix Makes It Big In Hollywood," June 13, 2005 *Fortune Magazine* article, available at http://money.cnn.com/magazines/fortune/fortune_archive/2005/06/13/8262553/index.htm.

1   52.    On April 21, 2005, during Netflix's first quarter earnings call with financial analysts,

2   only weeks before publicly announcing the Agreement, Hastings made clear the motive for Netflix

3   to conspire with Wal-Mart Stores and Wal-Mart.com:

> In terms of profitability over the coming years, the key issue is the number of
> major competitors. If there are only two major players, Blockbuster and Netflix,
> the profitability may be substantial like other two-firm entertainment markets. If,
> on the other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major
> competitors in online rental, then the profits would likely be small.

8   Hastings went on to "predict" on the conference call that "the likely case is [that] online rental

9   becomes a two-firm market over the coming years." *See* Q1 2005 Netflix.com Earnings Conference

10  Call – Final, available at http://www.accessmylibrary.com/coms2/summary_0286-6536235_ITM,

11  Publication Date: 21-Apr-05.

12  53.    On May 19, 2005, shortly after Fleming had been promoted to Chief Marketing

13  Officer of Wal-Mart Stores, Defendants issued a joint statement announcing the Agreement, which

14  unlawfully divided and allocated the markets for DVD sales and rentals, and in fact created the two-

15  firm market Hastings envisioned. *See* "Wal-Mart, Netflix agree on DVD deal," May 19, 2005

16  *Reuters* article, available at http://news.zdnet.com/2100-9595_22_195757.html.

17  54.    Pursuant to the Agreement, Wal-Mart.com announced to all Wal-Mart DVD Rentals'

18  subscribers that it was exiting the online DVD rental business and that those subscribers could be

19  transferred to Netflix. Wal-Mart.com took additional steps to affirmatively implement the

20  Agreement by adding on its own Internet site a prominently placed hyperlink to the Netflix website.

21  Since the date of their joint announcement on May 19, 2005 (apart from the 30 days that Wal-

22  Mart.com took to wind down its existing online rental business), neither Wal-Mart.com nor Wal-

23  Mart Stores has participated in the Online DVD Rental Market, and Netflix has not sold new DVDs.

24  55.    As a result of the Agreement, downward pricing pressure from Wal-Mart.com was

25  eliminated and the Online DVD Rental Market was reduced to two competitors. Absent the

26  Agreement, Netflix would have been forced to lower its subscription rate further in response to price

27  pressure from Wal-Mart. With a key competitor in the Online DVD Rental Market eliminated,

28  Blockbuster raised its subscription price in July 2005 from $14.99 per month to $17.99 per month,

matching Netflix. This was consistent with Hastings' expectation that "[i]f there are only two major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment markets." In his next earnings call with financial analysts on July 25, 2005, Netflix CEO Hastings boasted about his apparent "prescience," noting that "[l]ast quarter we said online rental was shaping up to be a two-player market, and that is indeed what is happening." *See* Netflix Q2 2005 Earnings Conference Call Transcript, at p. 4, available at http://www.streetevents.com, Publication Date: July 25, 2005.

56.     The Agreement was not made in the independent self-interest of Wal-Mart Stores, Wal-Mart.com, or Netflix. But for Netflix's agreement not to compete in the market for new DVD retail sales, there was simply no reasonable basis for Wal-Mart to withdraw from the online rental market and promote Netflix. Similarly, but for Wal-Mart's agreement to exit the Online DVD Rental Market, there was no rational basis for Netflix to foreclose the opportunity to sell DVDs to its millions of subscribers, a base of customers who reportedly purchase an average of 25 DVDs each, per year, and instead promote new DVD sales by Wal-Mart Stores and Wal-Mart.com.

## ANTITRUST INJURY AND DAMAGES

57.     The unlawful conspiracy alleged herein had at least the following effects:

   (a)     Prices charged by Netflix to Plaintiff and the members of the Class for online DVD subscription services were artificially fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

   (b)     Plaintiff and the other members of the Class had to pay more for online DVD subscription services than they would have paid in a competitive marketplace, that was unfettered by Defendants' collusive and unlawful activities;

   (c)     Competition in the sale of online DVD subscription services was restrained, suppressed and eliminated in the United States; and

   (d)     As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.

## COUNT ONE
### SHERMAN ACT SECTION 1 (15 U.S.C. § 1)
### ILLEGAL MARKET ALLOCATION
#### (Against All Defendants)

58.     Plaintiff incorporates and realleges each allegation set forth above, as if fully set forth herein.

59.     Defendants have entered into a *per se* illegal market allocation agreement, in violation of Section 1 of the Sherman Antitrust Act, 15. U.S.C. § 1. Even if evaluated under the rule of reason, the Agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

60.     Leading up to the Agreement, Netflix and Wal-Mart.com were actual competitors in the Online DVD Rental Market. In addition, Netflix was a potential competitor to Wal-Mart Stores and Wal-Mart.com in the new DVD sales market. Wal-Mart Stores and Wal-Mart.com were actual participants and Netflix was a potential participant, with the means and economic incentive to sell new DVDs in the absence of the Agreement.

61.     Defendants shared a conscious commitment to a scheme designed to achieve the unlawful objective of dividing the markets for online DVD rentals and new DVD sales. The Agreement allocated the Online DVD Rental Market to Netflix, with Wal-Mart Stores and Wal-Mart.com agreeing not to compete in that relevant market. The agreement also allocated new DVD sales to Wal-Mart Stores and Wal-Mart.com, with Netflix agreeing to refrain from selling new DVDs in competition with them. In addition to agreeing not to sell new DVDs, Netflix also agreed to provide valuable promotional services for Wal-Mart Stores and Wal-Mart.com. In so doing, Netflix provided significant consideration to Wal-Mart Stores and Wal-Mart.com for their agreement to withdraw from, and not to compete in, the Online DVD Rental Market.

62.     The Agreement created significant anticompetitive effects with no corresponding precompetitive benefits. It eliminated competition in the relevant market, raising prices paid by customers. To the extent that there are any precompetitive benefits at all resulting from the agreement, they do not outweigh the agreement's anticompetitive effects. In any event, to the extent that there are any, they could have been achieved by less restrictive means.

63. As a result of this violation of law, Netflix's subscription prices charged to, and paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have been.

## COUNT TWO
### SHERMAN ACT SECTION 2 (15 U.S.C. § 2)
#### Monopolization of Online DVD Rental Market
#### (Against Netflix)

64. Plaintiff incorporates and realleges the allegations set forth above, as if fully set forth herein.

65. Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits the willful monopolization of any part of the trade or commerce among the states.

66. Netflix has monopoly power in the Online DVD Rental Market.

67. Netflix has willfully acquired and maintained its monopoly power in the Online DVD Rental Market by its acts and practices described here, including by executing, implementing, and otherwise complying with the Agreement, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

68. As a result of the unlawful conduct alleged here, Netflix's subscription prices charge to, and paid by, Plaintiff and the Class, are, and have been, higher than they otherwise would have been.

## COUNT THREE
### SHERMAN ACT SECTION 2 (15 U.S.C. § 2)
#### Attempt to Monopolize Online DVD Rental Market
#### (Against Netflix)

69. Plaintiff incorporates and realleges the allegations set forth above, as if fully set forth herein.

70. If Netflix does not already have monopoly power, then Netflix has a dangerous probability of success in achieving monopoly power in the Online DVD Rental Market.

71. With the specific intent to achieve a monopoly, Netflix, by its acts and practices described herein, including by executing, implementing, and otherwise complying with the Agreement, has attempted to monopolize the Online DVD Rental Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

72.     As a result of this violation of law, Netflix's subscription prices charged to, and paid by Plaintiff and the Class are, and have been, higher than they otherwise would have been.

## COUNT FOUR
### SHERMAN ACT SECTION TWO (15 U.S.C. § 2)
### Conspiracy to Monopolize Online DVD Rental Market
### (Against All Defendants)

73.     Plaintiff incorporates and realleges the allegations set forth above, as if fully set forth herein.

74.     Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the Online DVD Rental Market. Prior to and at the time of the agreement, Netflix and Wal-Mart.com were actual competitors in the Online DVD Rental Market. Defendants conspired with the specific intent, knowledge, and purpose that their anticompetitive agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Relevant Market. Wal-Mart Stores and Wal-Mart.com knew that the natural and probable consequence of the Agreement would be the monopolization of the relevant market by Netflix. Defendants have committed overt acts in furtherance of their conspiracy, including entering into, complying with, and implementing the Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15. U.S.C. § 2.

75.     As a result of this violation of law, Netflix's subscription prices charged to, and paid by Plaintiff and the Class are, and have been, higher than they otherwise would have been.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.     That the Court determine this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants, be adjudged *per se* violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2.

C.     That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the members of the

1  Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees,

2  pursuant to Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

3         D.     That Plaintiff and the Class be awarded pre-judgment and post-judgment

4  interest at the highest legal rate, from and after the date of service of this Complaint, to the extent

5  provided by law;

6         E.     That the Court awards such other, further or different relief, including

7  appropriate injunctive relief, as the case may require and as the Court may deem just and proper

8  under the circumstances.

9  **JURY DEMAND**

10      Plaintiff demands a jury trial, pursuant to Federal Rules of Civil Procedure, Rule 38(b), of

11  all triable issues.

12  Dated:  January 26, 2009.

                    Guido Saveri (22349)
13                      R. Alexander Saveri (173102)
                    Cadio Zirpoli (179108)
14                      Melissa Shapiro (242724)
                    SAVERI & SAVERI, INC.
15                      706 Sansome Street
                    San Francisco, CA  94111-5619
16                      Telephone:  (415) 217-6810

17                      *Attorneys for Plaintiff Sarah E. Grime*

18

19

20
Netflix.001
21

22

23

24

25

26

27

28

16
CLASS ACTION COMPLAINT