**HENNIGAN, BENNETT & DORMAN LLP**
**RODERICK G. DORMAN (SBN 96908)**
**ALAN P. BLOCK (SBN 143783)**
**KEVIN SHENKMAN (SBN 223315)**
**865 South Figueroa Street, Suite 2900**
**Los Angeles, California 90017**
**Phone: (213) 694-1200**
**Fax: (213) 694-1234**
dormanr@hbdlawyers.com
blocka@hbdlawyers.com
shenkmank@hbdlawyers.com

Attorneys for Plaintiff
ACACIA MEDIA TECHNOLOGIES CORPORATION

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>ACACIA MEDIA TECHNOLOGIES<br>CORPORATION | Case No. 05 CV 01114 JW<br><br>**PLAINTIFF ACACIA MEDIA TECHNOLOGIES CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF CERTAIN CLAIM CONSTRUCTION TERMS CONSTRUED BY THE COURT IN ITS THIRD CLAIM CONSTRUCTION ORDER AND ITS FOURTH CLAIM CONSTRUCTION ORDER**<br><br>DATE:        August 17, 2007<br>TIME:        9:00 a.m.<br>CTRM:      Hon. James Ware |

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

**(Page)**

I.  INTRODUCTION .................................................................................................. 1

II.  SUMMARY OF ARGUMENT ........................................................................... 1

III.  THE COURT SHOULD MODIFY ITS CLAIM CONSTRUCTIONS IN
     THE LIMITED MANNER PROPOSED TO CONFORM TO THE LAW ............... 2

    A.  The Court's Most Recent Constructions of "Transmission System"
     and "Receiving System" Are Erroneous......................................................... 2

        1.  The Phrases "Transmission System" And "Receiving System"
     Are Indisputably Not Coined Terms....................................................... 3

        2.  The Patentees Did Not Act As Their Own Lexicographers
     And They Did Not Define The Terms "Transmission System"
     And "Receiving System" Differently From Their Ordinary
     Meanings.................................................................................................. 4

            a)  The Varied Use In The Specification Of A Disputed
     Claim Term Demonstrates The Breadth Of The Term........... 4

            b)  The Patentees Used The Term "Transmission System"
     In The Patent Specification To Describe Different
     Systems, Thereby Demonstrating That They Did Not
     Set Forth An Explicit Definition For The Term
     "Transmission System" ......................................................... 6

                (1)  The "Transmission System" Described At
     2:25-48 And The "Transmission System"
     Depicted In Figures 2a and 2b Are
     Demonstrably Different Systems................................. 6

                (2)  Elsewhere In The '992 Patent Specification,
     The Patentees Used The Term "Transmission
     System" To Describe Additional, Different
     Systems ...................................................................... 7

            c)  The Patentees Used The Term "Receiving System" In
     The Patent Specification To Describe Different
     Systems, Thereby Demonstrating That They Did Not
     Set Forth An Explicit Definition For The Term
     "Receiving System"............................................................... 8

                (1)  The "Receiving System" Described At 2:61 –
     3:14 And The "Receiving System" Depicted In
     Figure 6 Are Demonstrably Different Systems .......... 9

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

(2) Elsewhere In The '992 Patent Specification, The Patentees Used The Term "Receiving System" To Describe Additional, Different Systems ...................................................................... 9

3. The Court's Purported Application Of The Means-Plus-Function Construction Rules To "Transmission System" and "Receiving System" Is Clearly Erroneous ......................................... 10

a) The Fact That The Patentees Did Not Use The Terms "Means For" Or "Means" In Their Claims Demonstrates That The Patentees Did Not Intend to Invoke § 112, ¶ 6 ................................. 11

b) The Presumption That The Means-Plus-Function Rules Of Construction Do Not Apply Is Not Overcome In This Case ..................................... 11

4. For All Of The Above Reasons, The Terms "Transmission System" and "Receiving System" Should Be Given Their Ordinary Meaning ........................................................... 12

B. The Claim Constructions Given To the Terms "Placing the Formatted Data Into a Sequence of Addressable Data Blocks" and "Ordering the Converted Analog Signals and the Formatted Digital Signals Into a Sequence of Addressable Data Blocks" Are Erroneous ............................... 13

1. The Court's Construction Is Incomplete In That It Does Not Specify How The Addressability Of The Data Blocks Is Achieved .......................................................... 14

a) The Patent Specification *Requires* That *Both* the Relative Time Markers and the Starting Location of the File Be Used to Make the Data Blocks Addressable ...................................................... 14

b) There Are No Methods Unrelated To Time Disclosed Or Suggested In The Patent Specification For Achieving Addressability ......................................... 16

c) The Patent Specification Describes Many Benefits Provided By Time Encoding, Some Of Which Can Only Be Achieved By Time Encoding ................................. 17

d) According to the Specification, Books, Documents, And Photographs Are Time Encoded .................................... 18

HENNIGAN, BENNETT & DORMAN LLP

LAWYERS

LOS ANGELES, CALIFORNIA

**TABLE OF CONTENTS (cont'd)**

e) The Specification's Reference To Time Encoding As The "Preferred" Addressing Scheme Does Not Mean That The Specification Supports Any Other Addressing Scheme Or That The Patentees Contemplated Other Addressing Schemes ........................... 19

C. The Court's Construction Of The Term "Storing" In The Phrase "Storing Items Having Information In A Source Material Library" Is Erroneous .................................................................................... 20

    1. The Term "Storing" Has Multiple Ordinary Meanings ................... 20

    2. The Court's Requirement That Every Step In A Method Claim Be A So-Called Manipulative Step Is Erroneous .................. 21

    3. The Court Should Construe "Storing" Consistent With The Description In The Specification ........................................ 22

    4. The Court Should Construe The Claim Terms "Storing" and "Inputting" Differently ................................................. 23

IV. CONCLUSION.......................................................................................... 24

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# TABLE OF AUTHORITIES

**(Page)**

## CASES

*Abbott Laboratories v. Syntron Bioresearch, Inc.*,
 334 F.3d 1343 (Fed. Cir. 2003) ........................................................................5

*Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*,
 340 F.3d 1298 (Fed. Cir. 2003) ........................................................................5

*Bell Atlantic Network Services, Inc. v. Covad Communications, Inc.*,
 262 F.3d 1258 (Fed. Cir. 2001) ................................................................17, 19

*CAE Screenplates, Inc. v. Heinrich Fiedler GMBH & Co.*,
 224 F.3d 1308 (Fed. Cir. 2000) ......................................................................23

*Daiichi Pharm. Co. v. Apotex, Inc.*,
 441 F. Supp. 2d 672 (D. N.J. 2006) ...............................................................21

*Greenberg v. Ethicon EndoSurgery*,
 91 F.3d 1580, 1583 (Fed. Cir. 1996) ..............................................................12

*Hoechst Celanese Corp. v. BP Chemicals Ltd.*,
 78 F.3d 1575 (Fed. Cir. 1996) ..........................................................................8

*Irdeto Access, Inc. v. EchoStar Satellite Corp.*,
 383 F.3d 1295 (Fed. Cir. 2004) ......................................................................17

*Johnson Worldwide Associate v. Zebco Corp.*,
 175 F.3d 985 (Fed. Cir. 1999) ....................................................................5, 15

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
 382 F.3d 1354 (Fed. Cir. 2004) ................................................................11, 12

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*,
 395 F.3d 1364 (Fed. Cir. 2005) ...................................................2, 5, 15, 22

*Mymail Ltd. v. America Online, Inc.*,
 476 F.3d 1372 (Fed. Cir. 2007) ........................................................................3

*Northern Telecom, inc. v. Datapoint Corp.*,
 908 F.2d 931 (Fed. Cir. 1990) ..........................................................................7

*In re Paulsen*,
 30 F.3d at 1480 .............................................................................................5, 6

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

**(Page)**

*Personalized Media Communications, LLC v. International Trade Commission*,
    161 F.3d 696 (Fed. Cir. 1998) ................................................................3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .................................................... passim

*Resonate, Inc. v. Alteon Websystems, Inc.*,
    338 F.3d 1360 (Fed. Cir. 2003) ............................................................13

*Teleflex, Inc. v. Ficosa N. America Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ..............................................................2

*Toro Co. v. White Consolidated Industries, Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999) .....................................................16, 17

*Wang Laboratories, Inc. v. America Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999) ...........................................................20

**STATUTES**

35 U.S.C. § 112, ¶1 ...................................................................................20

35 U.S.C. § 112, ¶ 6 ..............................................................................3, 11

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

## I.        INTRODUCTION

Acacia hereby respectfully seeks reconsideration of the Court's constructions set forth in its 3rd and 4th Claim Construction Orders ("CCO") for the terms:  (1) "transmission system" and "receiving system"; (2) "placing the formatted data into a sequence of addressable data blocks" and "ordering the converted analog signals and formatted digital signals into a sequence of addressable data blocks"; and (3) "storing" in the phrase "storing items having information in a source material library."  Pursuant to Local Rule 7-9, the Court granted Acacia leave to file this motion for reconsideration on April 2, 2007 (Document No. 228).

## II.       SUMMARY OF ARGUMENT

The Court's constructions for "transmission system" and "receiving system" are premised on the legally erroneous determinations that the patentees had coined these terms, that the patentees had acted as their own lexicographers in explicitly defining these terms, and that the method claims having these terms in their preambles are to be construed as means-plus-function claims.  These terms should be construed to have their ordinary meanings.  "Transmission system" should be construed to mean "an assembly of elements capable of functioning together to transmit signal waves," and "receiving system" should be construed to mean "an assembly of elements capable of functioning together to receive transmitted signal waves."

The Court's construction for the phrase "sequence of addressable data blocks" is incomplete in that it does not specify how the several addressability functions described in the specification are achieved.  The specification makes clear that the patented invention achieves multiple addressability functionality resulting from using both the address of the item (or file) in which the data blocks are stored and time markers.  The Court's construction should be modified to make clear that the addressability of the data blocks is achieved by the use of both relative time markers assigned to the data blocks and with the starting location of the file.

The Court's construction for the term "storing" is erroneous, because it is inconsistent with the disclosure in the specification and it is premised on the legally incorrect assertion that all steps in a method claim must be "manipulative steps or acts."  The term "storing" in the phrase "storing items having information in a source material library" should be construed to mean "retaining"

consistent with the specification.

## III. THE COURT SHOULD MODIFY ITS CLAIM CONSTRUCTIONS IN THE LIMITED MANNER PROPOSED TO CONFORM TO THE LAW

### A. The Court's Most Recent Constructions of "Transmission System" and "Receiving System" Are Erroneous

In its 1st CCO, the Court construed "transmission system" to mean "an assembly of elements, hardware and software, that function together to convert items of information for storage in a computer compatible form and subsequent transmission to a reception system." (1st CCO, at 27-28). This construction followed argument by the parties that "transmission system" should be given its ordinary meaning. At the first hearing, neither any party nor the Court in its 1st CCO articulated any reason or reference in the intrinsic patent documents for that phrase to be given a special meaning other than its ordinary meaning. *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005) ("When a patentee acts as his own lexicographer in redefining the meaning of particular claim terms, he must clearly express that intent in the written description."); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) ("We hold that claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.")

In the 3rd CCO, the Court re-construed "transmission system" and "receiving system" to be limited to a series of interconnected structures defined as "means" structures. (3rd CCO, at 8:21-24 and 11:16-22). The Court's construction includes numerous "means" elements and states that "[t]he corresponding structure for each means is the structure identified in the specification for performing the recited function."

The Court gave two different rationales for its construction of "transmission system" in the 3rd CCO, both of which are erroneous:

1. The Court stated that the patentees coined the terms "transmission system" and "receiving system" and, acting as their own lexicographers, the patentees defined the term "transmission system" at 2:25-48 and defined the term "receiving system" at 2:61 – 3:14. (3rd

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   CCO, at 6:16-7:7 and 10:6-21).  This statement is based on a factual inaccuracy—these terms

2   demonstrably are not "coined terms."  Further, the patentees did not set forth, with reasonable

3   clarity, deliberateness, and precision, an explicit definition for each term, since the terms were

4   broadly used to describe multiple and different embodiments.  As such, these claim terms must be

5   given their ordinary meanings which are broad enough to describe all the different embodiments of

6   each of the receiving systems and transmission systems, respectively, described in the patent.

7       2.      The Court stated that method claims, such as claim 19 in which the preamble requires

8   that the steps be performed by an apparatus, are limited to that apparatus and any other apparatus

9   identified in the specification for performing the specified step.  (3rd CCO, at 7:13-18).  In other

10  words, the method claim itself is interpreted as a means-plus-function claim pursuant to 35 U.S.C.

11  § 112, ¶ 6.  This rationale is erroneous, because the patentees did not use the terms "means for" or

12  "means" in the claims, thereby creating the presumption that the patentees did not intend for the

13  "transmission system" and "receiving system" to be construed as means-plus-function terms.  This

14  presumption cannot be overcome, because these terms connote structure.

### 1.     The Phrases "Transmission System" And "Receiving System" Are Indisputably Not Coined Terms

        In its 3rd CCO, the Court, ***sua sponte***, held that the "[t]he phrases 'transmission system' and

'reception system' are coined terms."  Although the Court has ***three times*** considered the meaning

of "transmission system" and "reception system," ***no*** party has ever contended that these terms are

"coined terms."

        The Federal Circuit has described a "coined term" as a term or phrase having no meaning

apart from the patent itself, and thus coined terms are terms that would have had absolutely no

meaning to persons of ordinary skill in the art at the time of the filing of the '992 patent.[1]

---

[1] *See Mymail Ltd. v. America Online, Inc.*, 476 F.3d 1372, 1376 (Fed. Cir. 2007) ("Both parties agree that the term NSP is a coined term, without a meaning apart from the patent."); *Personalized Media Communications, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998) ("'Detector' is not a generic structural term such as 'means,' 'element,' or 'device.'  In the patent context, the phrase "coined terms" has been applied to words "lacking clear meaning such as 'widget' and 'ram-a-fram'.")

NO. 05 CV 01114 JW                          PLAINTIFF'S MEMORANDUM OF POINT AND AUTHORITIES
                                            IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

The Court's finding that "transmission system" and "receiving system" are coined terms with no common meaning is plainly wrong, because the terms "transmission system" and "receiving system" had meanings to persons of ordinary skill in the art at the time of the filing of the '992 patent. The term "transmission system" is itself defined in the *IEEE Standard Dictionary of Electrical and Electronic Terms*, Fifth Ed. 1405 (1993) ("*IEEE Dictionary*") to mean "in communication practice, an assembly of elements capable of functioning together to transmit signal waves." (1st CCO at 27:16-19). Indeed, the term "transmission system" was widely used in prior art patents. (Weiss Decl., at ¶¶ 13-14).

Although the term "receiving system" is not itself defined in the *IEEE Dictionary*, its meaning was understood by persons of ordinary skill in the art at the time of the filing of the '992 patent. This is evidenced by the widespread use of the term "receiving system" in prior art patents. (Weiss Decl., at ¶¶ 15-16).

**2.  The Patentees Did Not Act As Their Own Lexicographers And They Did Not Define The Terms "Transmission System" And "Receiving System" Differently From Their Ordinary Meanings**

In its 3rd CCO, the Court held that the patentees acted as their own lexicographers in defining the meaning of the terms "transmission system" and "receiving system." (3rd CCO, at 6:16-7:7 and 10:6-21). This legal determination is erroneous, because the patentees used the terms "transmission system" and "receiving system" in the specification to describe many different systems, not a single transmission system and not a single receiving system. This indisputable fact as a matter of law requires that the legally correct construction of those phrases be broad enough to embrace all the different embodiments of each of the transmission systems and receiving systems described in the specification. The ordinary meaning of those phrases encompass every different embodiment described in the specification.

**a)  The Varied Use In The Specification Of A Disputed Claim Term Demonstrates The Breadth Of The Term**

The Federal Circuit has held that a claim term is generally given its ordinary and accustomed meaning to persons of ordinary skill in the art at the time of the filing of the patent, unless the patentee has chosen to be his or her own lexicographer by clearly setting forth, with reasonable

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

clarity, deliberateness, and precision, an explicit definition for a claim term.[2]

But, where the patentee provides more than one definition for a claim term, the Federal Circuit has held that the patentee has ***not*** acted as their own lexicographer and therefore the claim term shall be given its ordinary meaning to persons skilled in the art. *See, Johnson Worldwide*, 175 F.3d at 991. In *Johnson Worldwide,* the accused infringer sought to limit the meaning of the claim term "heading" to the direction of the trolling motor by contending that the patentee had acted as his own lexicographer in defining this term in this manner in the specification. The court disagreed, holding that the specification did not describe "with reasonable clarity, deliberateness, and precision" this definition, because the term "heading" was used in different ways in the specification, which was consistent with a broader definition of "heading." *Johnson Worldwide,* 175 F.3d at 991.

In so holding, the Federal Circuit stated the rule of law that "[v]aried use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition." *Id.* Accordingly, the court held that the district court was correct in construing the term "heading" in accordance with its ordinary meaning. *Id.*, at 992. The Federal Circuit has many other times reached the same conclusion in similar circumstances.[3]

---

[2] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*); *Johnson Worldwide Assoc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999), *citing*, *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) ("Our case law demonstrates two situations where a sufficient reason exists to require the entry of a definition of a claim term other than its ordinary and accustomed meaning. The first arises if the patentee has chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term.")

[3] *See, e.g., Merck.* 395 F.3d at 1370 ("In the present case, the passage cited by the district court from the specification for Merck's definition of 'about' is ambiguous. It fails to redefine 'about' to mean 'exactly' in clear enough terms to justify such a counterintuitive definition of 'about.'"); *Abbott Laboratories v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1355 (Fed. Cir. 2003) ("Because the specification provides two alternative definitions for the term at issue, the specification does not define the claim term in the manner required under *Renishaw*. As correctly construed, therefore the ordinary meaning of 'analyte' as used to instruct the jury is the proper construction. . ."); *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 f.3d 1298, 1309 (Fed. Cir. 2003) ("That the term 'protrusion' is used at various points in the written description to refer to 'protrusions [that] may take any number of shapes' is simply not 'a special and particular definition created by the patent applicant,' [citation omitted], and is thus an insufficient reason to limit the scope of the claim. … Accordingly, we hold that the proper construction of 'protrusion' is something that protrudes."); *In re Paulsen*, 30 F.3d at 1480 ("Here, the specification of the '456 patent does not clearly redefine the term 'computer' such that one of ordinary skill in the art would deem it to be different from its

PLAINTIFF'S MEMORANDUM OF POINT AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

**b)** **The Patentees Used The Term "Transmission System" In The Patent Specification To Describe Different Systems, Thereby Demonstrating That They Did Not Set Forth An Explicit Definition For The Term "Transmission System"**

The patentees did not set forth, with reasonable clarity, deliberateness, and precision, an explicit definition for the claim term "transmission system," and therefore the Court's determination that the patentees acted as their own lexicographers in defining "transmission system" in the specification is error.

This fact is demonstrated by, among other things, the Court's 3rd CCO, wherein the Court cites **three** different purported definitions for "transmission system":

(1)    the components defined at 2:25-48 (3rd CCO, at 6:22 – 7:7);

(2)    the particular assembly of elements depicted in the drawings and described in the specification (3rd CCO, at 8:7-9); and

(3)    the "'transmission system' . . . and methods for using [it] to distribute audio and video information as described in the specification. . . . are not the preferred embodiments; they are inventions themselves." (3rd CCO, at 7:21-23).

**(1)** **The "Transmission System" Described At 2:25-48 And The "Transmission System" Depicted In Figures 2a and 2b Are Demonstrably Different Systems**

The "transmission system" described by the patentees at 2:25-48 (which, in one instance, the Court described as being the patentees' definition of the components of the "transmission system") is **not** the same "transmission system" as that depicted in Figures 2a and 2b (which, in a different instance, the Court described as being the patentees' intended meaning for "transmission system").

In the components for the "transmission system" purportedly defined at 2:25-48 of the '992 patent, the patentees described an embodiment of the "transmission system" whereby the "compression means" is "coupled to"[4] the "ordering means" and the "transmitter means" is "coupled

---

ordinary meaning. The specification merely describes in general fashion certain features and capabilities desirable in a portable computer. This description, however, is far from establishing a specialized definition restricting the claimed invention to a computer having a specific set of characteristics and capabilities.")

[4] The Court emphasized the importance of "coupled to," which it previously construed to mean "directly connected to or attached to." (3rd CCO, at 8:12-18). According to the Court, the fact that

1  to" the "compressed data storing means."  ('992 patent, 2:39-40 and 2:46-47).

2      But, in the assembly of elements depicted in Figures 2a and 2b (described as the "preferred

3  implementations of the transmission system of the present invention" ('992 patent, 3:28-30)), the

4  "compression means 116" is *not* "coupled to" the "ordering means (i.e., time encoders 114)," as

5  defined by the Court.  In the transmission system depicted in Figure 2a, there are audio and video

6  precompression processors 130 and 131 located between the "compression means" and the

7  "ordering means."

8      The same is true for the "compressed data storing means" (i.e., the "compressed data library

9  118") and the "transmitter means 122," as Figure 2b depicts a transmission format conversion CPU

10 119 located between the "compressed data storing means" and the "transmitter means."[5, 6]

   **(2)    Elsewhere In The '992 Patent Specification, The Patentees
11          Used The Term "Transmission System" To Describe
12          Additional, Different Systems**

13     In its originally-filed application for the '992 patent, the patentees included thirty-two

14 claims.[7]  Seventeen of those originally-filed claims each specifically describes a ***different***

15 transmission system.[8]

16

17 _____

   one component is "coupled to" another component: (1) "is significant because it means that in order
18 for information to proceed from one component to another, it must follow the same sequence"; and
   (2) "means that each interconnected component is essential because information can only be
19 transferred to an interconnected component."  *Id.*

20  [5] Other differences exist between the transmission system described at 2:25-48 and the
    transmission system depicted in Figures 2a and 2b, such as the fact that Figures 2a and 2b depict the
21  following, which are not described at 2:25-48: (1) separate components for audio and video
    information, (2) a line from the identification encoding means to the compressed data formatting
22  section, (3) a library system control computer, and (4) a library access interface.

23  [6] The fact that the transmission system described at 2:25-48 and the transmission system
    depicted in Figures 2a and 2b do not include the same components (i.e., the transmission system in
24  Figures 2a and 2b include precompression processors and transmission format conversion CPU's
    whereas the transmission system at 2:25-48 does not) is consistent with the patentees' statement in
25  the specification that "[a] preferred embodiment of transmission system 100 may preferably include
    only some of the elements shown in FIGS. 2a and 2b." ('992 patent, 5:63-65).

26  [7] All thirty-two original claims from the originally-filed specification for the '992 patent
27  application are attached as Exhibit 1 to the accompanying Block Decl.

28  [8] The originally-filed claims are part of the '992 patent specification and may be relied on as
    disclosure of additional embodiments.  *See, e.g., Northern Telecom, inc. v. Datapoint Corp.,* 908

                                        -7-

PLAINTIFF'S MEMORANDUM OF POINT AND AUTHORITIES
                                        IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Original claim 2, which depends from original claim 1, is exemplary of one of the additional definitions for "transmission system" described by the patentees in the '992 patent specification. Original claim 2 describes a "transmission system" having all of the features of original claim 1, but including a "transmission format means for placing the composite formatted-data block [sic] onto a communication path."

This "transmission system" described in original claim 2: (1) is different from the "transmission system" described at 2:25-48, because the "transmission system" described at 2:25-48 does not include the "transmission format means"; (2) is different from the "transmission system" depicted in Figures 2a and 2b, because the "transmission system" in original claim 2 does not include precompression processors, among other things; and (3) is different from the "transmission systems" described in original claims 1 and 3-17, because none of the "transmission systems" in original claims 1 and 3-17 include a transmission format means.[9]

      **c)**      **The Patentees Used The Term "Receiving System" In The Patent Specification To Describe Different Systems, Thereby Demonstrating That They Did Not Set Forth An Explicit Definition For The Term "Receiving System"**

As with "transmission system," the patentees also did not set forth, with reasonable clarity, deliberateness, and precision, an explicit definition for the claim term "receiving system." In the Court's 3rd CCO, the Court cites *three* different definitions for "receiving system," none of which describe the same "receiving system":

      (1)     the components defined at 2:61 – 3:14 (3rd CCO, at 2:25-48);

---

F.2d 931, 938 (Fed. Cir. 1990) ("The original claims as filed are part of the patent specification.")

[9] the fact that the patentees sought to specifically claim these seventeen different "transmission systems" is further evidence that the patentees would ***not*** have intended that the term "transmission system" be specifically defined in the specification to refer to a "transmission system" having only the specific components, as defined by the Court, or that persons of ordinary skill in the art would read the specification in such a way. *See, e.g., Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1581 (Fed. Cir. 1996) ("We share the district court's view that it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way.") Indeed, the patentees included many claims in the other patents of the Yurt family of patents which specifically claimed "transmission systems" differently than that defined by the Court. (*See,* claims 1-18 of the '992 patent, claims 1, 4, and 7 of the '275 patent; claims 1-2 of the '863 patent; claims 1-3 of the '720 patent; and claims 1-42 of the '702 patent).

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-8-

PLAINTIFF'S MEMORANDUM OF POINT AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

(2)    the "receiving system" depicted in Figure 6, which is "a block diagram illustrating an embodiment of a reception system which has the necessary components to perform the method disclosed in claim 19." (3rd CCO, at 8:7-9); and

(3)    the ". . . 'receiving system' and methods for using [it] to distribute audio and video information as described in the specification. . . . are not the preferred embodiments; they are inventions themselves." (3rd CCO, at 7:21-23).

### (1)    The "Receiving System" Described At 2:61 – 3:14 And The "Receiving System" Depicted In Figure 6 Are Demonstrably Different Systems

The "receiving system" described by the patentees at 2:61 – 3:14 (which, in one instance, the Court described as being the meaning intended by the patentees for the "receiving system") is ***not*** the same "receiving system" as that depicted in Figure 6 (which, in a different instance, the Court described as being an embodiment of a "reception system").

In describing a "receiving system" at 2:61 – 3:14 of the '992 patent, the patentees described an embodiment of the "receiving system" whereby the "decompressing means" is "coupled to" the "receiver format conversion means." ('992 patent, 2:39-40 and 2:46-47).  But, in the assembly of elements depicted in Figure 6 (described as a "preferred implementation of the receiving system of the present invention" ('992 patent, 3:39-40)), the "decompressing means" is ***not*** "coupled to" the "receiver format conversion means."  In the receiving system depicted in Figure 6, the "storage means" and the "data formatter" are located between the "decompressing means" and the "receiver format conversion means."

### (2)    Elsewhere In The '992 Patent Specification, The Patentees Used The Term "Receiving System" To Describe Additional, Different Systems

Each of originally-filed claims 22-32 of the originally-filed patent application describe and claim ***different*** receiving systems.  Original claim 23, which depends from original claim 22, is exemplary of one of the additional definitions for "receiving system" described by the patentees in the '992 patent specification.  Original claim 23 describes a "receiving system" having all of the features of original claim 22, but including a "user interface means for translating the input into a request for sending the requested information from the transmitter to the receiving system."  In

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   original claim 23, the decompressing means is coupled to the receiver format conversion means.

2       This "receiving system" described in original claim 23: (1) is different from the "receiving

3   systems" described in the specification at 2:61 – 3:14, because the receiving system at 2:61 – 3:14

4   does not include the "user interface means"; (2) is different from the "receiving system" depicted in

5   Figure 6, because the receiving system in Figure 6 includes a "data formatter," but no "data

6   formatter" is included in original claim 23; and (3) is different from the other receiving systems

7   described in claims 22 and 24-32, none of which includes a "user interface means."[10]

8       ### 3.   The Court's Purported Application Of The Means-Plus-Function
            Construction Rules To "Transmission System" and "Receiving System"
9            Is Clearly Erroneous

10      In its 3rd CCO, the Court made the observation that the patentees, in their purported

11  definition of the components of the "transmission system" at 2:25-48, used a "structural tag plus

12  means" format.  (3rd CCO, at 7:8-9).  The Court then made what appears to be a statement of law,

13  that: "[a] method claim containing a preamble which requires that the steps be performed by an

14  apparatus, is limited to that apparatus and any other apparatus identified in the specification for

15  performing the specified step."  (3rd CCO, at 7:15-17).  The Court then appears to have applied this

16  purported rule of law in holding that: "[c]laim 19 is limited to the 'transmission system' and

17  'receiving system' disclosed in the specification."  (3rd CCO, at 17-18).

18      Acacia is not aware of any case or statute which requires that: "[a] method claim containing

19  a preamble which requires that the steps be performed by an apparatus, is limited to that apparatus

20  and any other apparatus identified in the specification for performing the specified step."  No

21  defendant has ever set forth such a rule of law, even though this is the third time that the Court has

22  addressed the meaning of "transmission system" and "receiving system."  The Court itself cites no

_____

24      [10] As is true with the multiple, original "transmission system" claims described above and in fn.
9, the fact that the patentees sought to specifically claim these eleven different "receiving systems"
25  is further evidence that the patentees would *not* have intended that the term "receiving system" be
specifically defined in the specification to refer to a "receiving system" having only the specific
26  components, as defined by the Court, or that persons of ordinary skill in the art would read the
specification in such a way.  The patentees included many claims in the Yurt family of patents
27  which specifically claimed "receiving systems" differently than that defined by the Court.  (*See,*
claims 25-40 of the '992 patent, claims 3 and 6 of the '275 patent, and claims 1-42 of the '702
28  patent).

NO. 05 CV 01114 JW                    PLAINTIFF'S MEMORANDUM OF POINT AND AUTHORITIES
                                      IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

case or statute which would support this purported statement of law.

          **a)**      **The Fact That The Patentees Did Not Use The Terms "Means For" Or "Means" In Their Claims Demonstrates That The Patentees Did Not Intend to Invoke § 112, ¶ 6**

The words "means for" and "means" do not appear together with the terms "transmission system" and "receiving system" *in any claim* of the Yurt family of patents, including method claims 19 and 41 of the '992 patent. There is thus a rebuttable presumption that the means-plus-function claim construction rules of 35 U.S.C. § 112, ¶ 6 do *not* apply at all to the claim terms "transmission system" and "receiving system"; i.e., the patentees did *not* intend that either of these claim terms would be construed according to the means-plus-function rules of 35 U.S.C. § 112, ¶ 6.[11] The Court's determination that the patentees "intended 'transmission system' to mean a particular assembly or elements depicted in the drawings and described in the specification," (3rd CCO, at 8:7-9) to the exclusion of other transmission system assemblies also disclosed in the same specification is simply wrong.[12]

          **b)**      **The Presumption That The Means-Plus-Function Rules Of Construction Do Not Apply Is Not Overcome In This Case**

There is a presumption that the means-plus-function rules of claim construction do not apply if the claim term at issue would have been recognized by persons of ordinary skill in the art as a "structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *See Lighting World*, 382 F.3d at 1360.

It is indisputable that the terms "transmission system" and "receiving system" would have been recognized by persons of ordinary skill in the art as nouns denoting structures. As discussed

---

[11] The Court is already familiar with the application of this rule of law. Defendants have twice asked the Court to construe a claim term as a means-plus-function term even though the words "means for" and "means" were not used ("sequence encoder" and "identification encoder"). In both cases, the Court refused to apply the Section 112, ¶ 6 to these claim terms. (1st CCO, at 32:1-2; and 35:4-5 and n. 26); *See, Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354, 1358, 1368 (Fed. Cir. 2004) ("the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome" and further describing such a situation as "unusual").

[12] The patentees certainly knew how to invoke 35 U.S.C. § 112, ¶ 6 by using the terms "means for" and "means," as they did for many other claim terms, yet they did not invoke Section 112, ¶ 6 for "transmission system" or "receiving system."

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

above in Section II.A.1., the term "transmission system" appears in dictionaries and prior art and the term "receiving system" appears in the prior art to describe **_structures_**, thereby demonstrating that these terms would have had meaning to those skilled in the art as being structures.[13] The terms "transmission system" and "receiving system" are also used in the specification to describe structures (See, e.g., Figures 2a, 2b, and 6).[14]

### 4. For All Of The Above Reasons, The Terms "Transmission System" and "Receiving System" Should Be Given Their Ordinary Meaning

The Federal Circuit has stated on many occasions that the words of a claim are generally given their ordinary and customary meaning to persons of ordinary skill in the art at the time of the filing of the patent application.[15]  As demonstrated above, none of the exceptions to this rule are applicable.

The Court should therefore construe the terms "transmission system" and "receiving system" according to their ordinary meaning to persons of ordinary skill in the art in 1991.  At that time, the term "transmission system" would have had an ordinary meaning to persons of ordinary skill in the art as defined in the *IEEE Dictionary*: "An assembly of elements capable of functioning together to transmit signal waves."[16]  (Weiss Decl., at ¶¶ 13-14).

---

[13] *See, Lighting World*, 382 F.3d 1354,1361 (Fed. Cir. 2004) ("Dictionary definitions in this case disclose that the term 'connector' has a reasonably well-understood meaning as a name for a structure, even though the structure is defined in terms of the function it performs."); *Greenberg v. Ethicon EndoSurgery*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("Dictionary definitions make clear that the noun 'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms.").

[14] *See, Lighting World*, 382 F.3d at 1361 ("the fact that more than one structure may be described by that term, or even that the term may encompass a multitude of structures, does not make the term 'connector assembly' any less a name for structure.")

[15] *Phillips*, 415 F.3d at 1312-13.

[16] In its first construction for "transmission system," the Court added the limitation that the elements must be "hardware and software," presumably so as to exclude a system operator from being part of the transmission system.  In its 3rd CCO, the Court, in construing the meaning of "user," specifically stated that the system operator acts as part of the transmission system.  (3rd CCO, at 13:10-14 and 14:5-6).  The ordinary meaning of "transmission system," set forth above, neither claims the operator as a part of the "transmission system," nor does it exclude the system operator.  By not excluding the system operator from the transmission system, this construction is consistent with the disclosure in the specification that the system operator is part of the transmission system.

PLAINTIFF'S MEMORANDUM OF POINT AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Although the term "receiving system" is not itself separately defined in the *IEEE Dictionary*, as evidenced by the repeated use of that term in the prior art, the term "receiving system" would have been understood by persons of ordinary skill in the art as a system that receives the transmitted information from the "transmission system," i.e., persons of ordinary skill in the art would have understood "receiving system" to mean: "An assembly of elements capable of functioning together to receive transmitted signal waves."[17, 18] (Weiss Decl., at ¶¶ 15-16).

**B.  The Claim Constructions Given To the Terms "Placing the Formatted Data Into a Sequence of Addressable Data Blocks" and "Ordering the Converted Analog Signals and the Formatted Digital Signals Into a Sequence of Addressable Data Blocks" Are Erroneous**

In the 3rd CCO, the Court construed the phrase, "placing the formatted data into a sequence of addressable data blocks" to mean:

> placing the formatted information into a sequence of data blocks, such that the ordering of the data blocks permits the retrieval of portions of information from items.  Addressable does not refer to physical storage locations, but rather to positions relative to the beginning of a file containing information."[19]

(3rd CCO, p. 31).

No party proposed the construction adopted by the Court; the Court fashioned this

---

[17] This construction for "receiving system" does not include the Court's finding that the "receiving system" is not the "receiving device."  Acacia submits that the reference to "receiving device" in the specification at 18:41 is an error and that this portion of the specification should have referred to the "receiving system," rather than to a "receiving device."  The sentence relied on by the Court refers  to the "receiving *system*" and to the playback controls. ('992 patent, at 18:38-41).  The patent specification makes clear that these playback controls are part of the "reception system," not a "receiving device."  ('992 patent, at 17:35-37).

[18] This construction for "receiving system" does not include the limitation, added by the Court, that the "receiving system" must be limited to receiving information transmitted *directly* to receiving systems with no intermediary.  (3rd CCO, at 11:13-15).  Nothing in the specification, the claims, or the ordinary meaning for "receiving system" *requires* or even discloses that the "receiving system" only receive information transmitted directly to the "receiving system."  Indeed, the types of communication channels described in the patent – telephone, cable, satellite, and computer networks – would have been known by persons skilled in the art as requiring transmission that includes intermediaries.  *See, Resonate, Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1365 (Fed. Cir. 2003) (specifically reversing inclusion of "direct" limitation in transmission claim: "Courts may not rewrite claim language based on what has been omitted from the claim, and the district court's attempt to do so here was legal error.")

[19] The Court has similarly revisited the related phrase "ordering the … signals … into a sequence of addressable data blocks."  (3rd CCO, at 28:9-12)

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

PLAINTIFF'S MEMORANDUM OF POINT AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

construction on its own.

### 1. The Court's Construction Is Incomplete In That It Does Not Specify How The Addressability Of The Data Blocks Is Achieved

In considering the meaning of the phrase "ordering into . . . a sequence of addressable data blocks," the Court stated that this "is a very broad limitation which could include time encoding, as well as other ways of generating addressable data blocks." (3rd CCO, 27:19-22). The Court quoted the specification of the '992 patent, at 10:46-57, with respect to the phrases "address" and "addressability" and concluded that the "term 'addressable' in the context of Claim 20 refers to the addressability of portions of the information within a file, and is not physical storage addresses." (3rd CCO, at 27:23 – 28:6).

In its construction, the Court states that "[a]ddressability does not refer to physical storage locations, but rather to positions relative to the beginning of a file containing information." The Court's construction thus recognizes that "addressability" in this phrase requires that the starting location of where the file will be stored be known. Nowhere does the Court's construction indicate what makes the order of the data blocks or the positions of data blocks relative to the beginning of a file determinable.

The patent specification makes clear to persons of ordinary skill in the art that it is not the "order of the data blocks" or their "positions relative to the beginning of a file" alone that make the data blocks retrievable, but rather it is this information *together* with the *relative time markers* that are assigned to each data block that makes the data blocks addressable.

### a) The Patent Specification *Requires* That *Both* the Relative Time Markers and the Starting Location of the File Be Used to Make the Data Blocks Addressable

The phrase "sequence of addressable data blocks" is used in the specification to describe an addressing scheme which utilizes time encoding. ('992 Patent, 8:1-2). Time encoding is defined in the specification as the assignment of relative time markers to the data blocks. ('992 patent, 8:16-19). Through the use of both the address of the item (or file) in which the data blocks are stored *and* the time markers, the specification states that it is possible to address any particular data block. ('992 patent, 8:24-26 and 10:46-57). Thus, the specification requires that *both* the time markers and

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1    the starting address of the file be used to address the data blocks.

2         The error in the Court's construction can be traced to the fact that the Court has not fully

3    considered the entire patent specification to understand the meaning given by the patentees to the

4    phrase "sequence of addressable data blocks."  In its Order, the Court only refers to the portion of

5    the specification at 10:46-57.  Although this portion of the specification describes addressability,

6    and in fact describes the use of the "file address, combined with the frame number," this section of

7    the specification does not use the phrase "sequence of addressable data blocks."  Other portions of

8    the specification, which do use the term "sequence of addressable data blocks," make clear that *both*

9    the time markers and the starting address of the file are used to address the data blocks.  ('992

10   patent, 8:1-26 and 10:46-57).  *See, Phillips,* 415 F.3d at 1315, 1316; *Merck,* 347 F.3d at 1371;

11   *Johnson Worldwide,* 175 F.3d at 990, *quoting, J.T. Eaton,* 106 F.3d 1563, 1568 (Fed. Cir. 1997)

12   (Because "[the disputed claim term] is a term with no previous meaning to those of ordinary skill in

13   the prior art[,] its meaning then must be found [elsewhere] in the patent.")

14        The Round 3 defendants agree that the specification requires that both the time markers and

15   the starting address of the file be used to address data blocks.  In their Claim Construction

16   Memorandum Regarding the Asserted '863 Claims and the Previously-Construed Terms (Filed

17   August 11, 2006, Document No. 198), the Round 3 defendants instructed the Court that the

18   specification teaches that it is the time encoder that makes the data blocks addressable by assigning

19   time codes.  (Round 3 Def's Brief, at 42:10-14).

20        The Round 3 defendants further explained how the specification *requires* that *both* the time

21   markers and the starting address where the file will be stored are used *together* to provide the

22   addressability of the data blocks:

23            Although the specification teaches that time encoding makes the sequence of
             data blocks "addressable," *the specification is equally clear that time*
24           *encoding only achieves this result because the starting address where the*
             *file be stored has already been assigned by the identification/storage*
25           *encoder.  That is, the two must be used together*:

26   (Round 3 Def's Brief, at 38:19-39:3; emphasis added).[20]

27   ───────────────────────

28       [20] In two other places in their brief, the Round 3 defendants made similar statements regarding

**b)**      **There Are No Methods Unrelated To Time Disclosed Or Suggested In The Patent Specification For Achieving Addressability**

In their Claim Construction Brief, the Round 3 defendants, in a footnote, attempt to qualify the requirement that the time markers, together with the starting address, be used for addressability of the data blocks. The Round 3 defendants state that there are other methods for achieving addressability that are unrelated to time, but they do not describe any such alternative method, either from the specification or in the prior art. (Round 3 Def's Brief, at 40, n 20).

The patent specification does not disclose any method other than time encoding (in connection with the starting location) for achieving addressability. Indeed, Mr. S. Merrill Weiss, Acacia's technical expert, testified at the September 8, 2005 Markman Hearing regarding the "sequence encoder," that time encoding is the only scheme for addressing data blocks that is disclosed in the specification:

> Q:      Are there any other addressing schemes other than time encoding disclosed in the patent specification for addressing data blocks?
>
> A:      No.

(Weiss, Sept. 8, 2005, at 168:4-7; Exhibit 2 to Block Decl.).

Not only are no addressing schemes, other than time encoding, described in the patent, the only structure disclosed in the specification for placing the data blocks into a sequence of addressable data blocks is a time encoder, as the Court itself found in its 1st CCO when construing the "ordering means for placing the formatted data into a sequence of addressable data blocks." (1st CCO, at 22:16-20). In fact, the only addressing scheme or structure for placing data into a "sequence of addressable data blocks" that is illustrated in the patent specification is "time encoding," which is depicted in Figure 2a by clocks.

The facts of the present case are similar to those in *Toro Co. v. White Consolidated Industries, Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999). In *Toro,* the court construed the claim terms

---

the necessity to have both the time markers and the starting location of the file in order to address the data blocks. (Round 3 Def's Brief, at 38:19-24 and 49:9-12).

"cover" and "including" to require that the claim elements, the cover and the ring, be attached to one another. In consulting the specification to determine the context in which these claim terms were used, the court held that the only description in the specification of the cover and ring showed that the cover was attached to the ring, and therefore the specification could not support a broader construction for these terms.[21]

### c) The Patent Specification Describes Many Benefits Provided By Time Encoding, Some Of Which Can Only Be Achieved By Time Encoding

The patent specification describes many different addressability functions that are achieved using time encoding. Not only is there is no statement or suggestion in the specification that all of these functions (let alone any of these functions) could be achieved using a method for addressability other than time encoding, the language of the specification indicates time coding is required:

- "Time encoding allows realignment of the audio and video information in the compressed data formatting section 117 after separate audio and video compression processing by precompression processing 115 and compressor 116."[22] ('992 patent, 8:2-6).

- "Realignment of audio and video data, system addressing of particular data bytes, and user addressing of particular portions of items are all made possible through time encoding." ('992 patent, 8:20-23).

- "Time encoding by time encoder 114 makes items and subsets of items retrievable and addressable throughout the transmission system 100." ('992

---

[21] *Toro*, 199 F.3d at 1301 ("The specification does not describe an invention broader than this description of the cover and the restriction ring "automatically" inserted and removed together. Nowhere in the specification, including its twenty-one drawings, is the cover shown without the restriction ring attached to it."); *See also, Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004) ("Indeed, the specification consistently uses the term 'group' to refer to a subset of all subscribers. . . . Nowhere does the specification contemplate a single group made up of the entire subscriber base."); *Bell Atlantic Network Services, Inc. v. Covad Communications, Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) ("When a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined the term 'by implication.'")

[22] When considering the problem of the realignment of audio and video data blocks, the Court should keep in mind the difficulties presented by the fact that there may be *unequal* numbers of audio samples and video frames, as depicted in Figure 8b. There is no evidence in the record that both addressability and realignment of audio and video data blocks could be achieved by using anything other than time encoding.

PLAINTIFF'S MEMORANDUM OF POINT AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

patent, 8:50-52).

- "Time encoding enables subsequent compression to of the information to be improved because data reduction processes may be performed in the time dimension." ('992 patent, 8:53-55).

The Round 3 defendants themselves recognize the importance of the fact that time encoding provides the function of the ability to realign audio and video information after compression:

One of the reasons for time encoding is that the compressor 116 might change the order. ***The time codes allow the compressed data formatting section to restore the order before the compressed information is stored***:

(Round 3 Def's Br., at 45:17 – 19; emphasis added).

The fact that time codes allow the order of the data blocks to be restored following compression is another reason why time encoding (i.e., the assignment of relative time markers to the data blocks) is required. Under the Court's construction, which does not require time encoding and therefore does not require the assignment of time markers, if the order of the data blocks is changed following the compression step, the pre-compression order of the data blocks ***cannot*** be restored. This fact demonstrates the error in the Court's construction.

### d) According to the Specification, Books, Documents, And Photographs Are Time Encoded

The specification of the '992 patent states that, in addition to audio and video information, books, documents, and photographs may be stored in the source material library. The Round 3 defendants previously contended that books, documents, and photographs are "incompatible" with time and therefore they must be addressed by some scheme other than time. The pages of a book can be easily ***addressed*** with ***relative*** time markers, just like the frames of video and samples of audio, in accordance with the description in the specification, and the patentees disclosed in the specification that materials, such as books, would be time encoded, just like audio and video information. ('992 patent, at 8:45-52). The pages of a book can be digitized and sequenced through time encoding.

Notably, the issue of whether books, documents, and photographs are addressed using a scheme other than time encoding is ***irrelevant*** to claims 14-19 of the '863 patent. Each of claims 14-19 of the '863 includes the limitation in their preamble that the methods are for the transmission

1  of "audio/video information," thereby explicitly excluding hard copies or non-video images of

2  books, documents, and photographs from the scope of these claims. The phrase "sequence of

3  addressable data blocks," used in claims 14-19 of the '863, therefore must be limited to time

4  encoding, regardless of the disclosure in the specification of books, documents, and photographs.

5      As discussed above, no addressing scheme other than time is disclosed in the '992 patent

6  specification. Further, according to the specification, the purpose of the invention of the '992 patent

7  is to create an ***audio and video*** transmission and receiving system and method. The title of the

8  patents is "Audio and Video Transmission and Receiving System." When describing the "objects of

9  the invention," the patentees referred to the invention as a "picture and sound system" which

10  provides audio/video information to remote locations. (*See,* '992 patent, 1:57-2:15).

11      The Court itself recognized in the 3rd CCO that the invention is limited to the transmission of

12  ***audio and video information***, i.e., the invention did not require any addressing scheme for books,

13  documents, and photographs that is different than the addressing scheme for the transmission of

14  books, documents, or photographs. (3rd CCO, at 7:21-25). For this reason, the Court held that the

15  claims could not be given a broader scope than the transmission of audio and video information. *Id.*

16  Based upon this reason, the Court construed the term "transmission system" to be limited to a time

17  encoder.[23]

18          **e)**    **The Specification's Reference To Time Encoding As The**
**"Preferred" Addressing Scheme Does Not Mean That The**
19                 **Specification Supports Any Other Addressing Scheme Or That**
**The Patentees Contemplated Other Addressing Schemes**
20

21      Defendants may assert that because the patentees referred to time encoding in the

22  specification as "the preferred addressing scheme," the patentees necessarily contemplated

23  addressing schemes other than time encoding. This is wrong for two reasons. First, the Federal

24  Circuit has held that the use of the word "preferred" in the specification does not, by itself, broaden

25

26     **23** The Court's construction for "transmission system" included an "ordering means" and the
Court stated that the "corresponding structure for each means is the structure identified in the
27  specification for performing the recited function." (3rd CCO, at 8:21-24). The Court has already
held that the structure for performing the function of the "ordering means" is the "time encoder."
28  (1st CCO, at 22:16-21).

NO. 05 CV 01114 JW          PLAINTIFF'S MEMORANDUM OF POINT AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

the claims beyond their support in the specification.  *See, Wang Laboratories, Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) (holding that the claim term "frame" is limited to a "character-based protocol," because this was the only embodiment disclosed in the specification: "The usage 'preferred' does not of itself broaden the claims beyond their support in the specification.…  The only embodiment disclosed in the '669 patent specification is the character-based protocol, and the claims were correctly interpreted as limited thereto.")  Second, the word "preferred," when used in a patent specification, has a special meaning that has nothing to do with indicating that other embodiments are possible or are contemplated.  The word "preferred" when used in a patent specification refers to the "best mode," which is the statutory requirement pursuant to 35 U.S.C. § 112, ¶1 that the patentee disclose the best mode known to him or her of carrying out the invention.  A patentee, who has just one embodiment for his or her invention, can refer to that embodiment as being the "preferred" embodiment (to show compliance with § 112), without the word "preferred" meaning that other embodiments are possible or contemplated.  Defendants cannot demonstrate that the specification supports any other addressing scheme, other than time encoding, because there is no other addressing scheme disclosed or suggested in the specification.

**C.     The Court's Construction Of The Term "Storing" In The Phrase "Storing Items Having Information In A Source Material Library" Is Erroneous**

In its 3rd CCO, the Court revisited its construction of the phrase "storing items having information in a source material library."  The Court separately addressed and construed each of the constituent terms of this phrase.  Acacia only seeks reconsideration of the Court's construction of the term "storing" in this phrase, which the Court construed as meaning "placing" or "putting."  (3rd CCO, at 30:11-25).  To be consistent with the patent specification, the term "storing" in this phrase should mean "retaining."[24]

**1.     The Term "Storing" Has Multiple Ordinary Meanings**

In construing the term "storing," the Court did not state whether it considered the definitions

---

[24] In an earlier brief, Acacia used the word "maintaining" which is a perfect synonym for the word "retaining" when used in the phrase "retaining items having information in a source material library."

of the term "store" from the IEEE Dictionary.  In the IEEE Dictionary, the term "store" is defined as having multiple meanings:

1.   To place data into a device [into which data can be placed, in which they can be retained, and from which they can be retrieved];

2.   To retain data in a device [into which data can be placed, in which they can be retained, and from which they can be retrieved]; and

3.   To place or retain data in a storage device.  (Block Decl., Exh. 3)  (See also, (Weiss Decl., at ¶¶ 17-19).

From the Court's 3rd CCO, we do not know whether the Court considered one of the ordinary meanings of "store" – "to retain data."

**2.    The Court's Requirement That Every Step In A Method Claim Be A So-Called Manipulative Step Is Erroneous**

In its 3rd CCO, the Court stated that "a step in a method claim must be a manipulative step or act."  (3rd CCO, at 30:13; *see also*, 25:15-16).  Although this statement appears to be a statement of law, the Court cites to no statute or case authority for this being a legal requirement of a method step.  Acacia is not aware of any statute or Federal Circuit case which has ever set forth the legal requirement that every step in method claim be a "manipulative step or act."

In a search of the relevant phrase, Acacia found a single district court case, *Daiichi Pharm. Co. v. Apotex, Inc.*, 441 F.Supp.2d 672, 677 (D. N.J. 2006) which used the phrase "manipulative step," and it did so in a footnote.  That footnote in its entirety read:

As its title indicates, the '741 patent is a "method" patent, as compared to a machine, composition, or manufacture patent.  One treatise explains:  "the 'elements' of a method claim, instead of being structural parts, are, and must be, acts or manipulative steps that are performed upon an article, workpiece, or chemical substance.  It is the transformation or reduction of the article, workpiece, or chemical substance to a different state or thing that is the essence of a method claim – and the key to its patentability."

*Id.* fn. 9  If this quote is the source of this Court's statement of the law that "a step in a method claim must be a manipulative step or act," the Court misreads the legal importance of the quote.  It nowhere says in that quote that each and every step in a method must be a "manipulative" step, only that method claims must include manipulative steps sufficient to transform or reduce "an article,

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1   workpiece, or chemical substance to a different state or thing."  A method claim for baked bread is a

2   good example.  The manipulative steps of (1) adding ingredients, (2) placing ingredients in a

3   buttered baking pan and (3) placing the buttered pan including the ingredients in a preheated oven at

4   350° would precede the "non-manipulative" step of leaving (retaining) that pan in the oven for 45

5   minutes before the final manipulative step of removing the pan from the oven.  The inclusion of that

6   non-manipulative step in the method does not cause the method claim to be invalid or ineffectual, as

7   this Court's legal pronouncement would require.  In fact, it is central to the method being practiced,

8   otherwise you would burn the bread.

9        The same is true in the method claims in this case.  Claim 41 claims a method for

10  transmitting information.  The first step of the method is "storing items having information in a

11  source material library" and the second step of the method is "retrieving the information in the items

12  from the source material library."  The steps thereafter describe the transmission of the items.  Thus,

13  for the second step of retrieving to take place, the items having information must first be ***retained*** in

14  the source material library.  The steps thereafter describe the transmission of the items.  There is no

15  question that Claim 41 contains so-called manipulative steps, even when the word "storing" is

16  construed to mean "retaining," and there is no question that Claim 1 describes a method that

17  achieves "a different state," i.e., the transmission of items having information.  ('992 patent, 5:66-

18  6:2).

19        **3.    The Court Should Construe "Storing" Consistent With The Description
              In The Specification**

20

21       The Federal Circuit instructs that claims are to be construed ***consistent*** with the

22  specification.[25]  Construing "storing" to mean "placing" is, however, inconsistent with the

23  specification.

24       Here, the specification describes the source material library as retaining (not placing) the

25  items, and thus the term "storing" should be construed to mean "retaining."  The specification

26  describes the purpose of the "source material library" as being "storage."  ('992 patent, 5:66 – 6:2).

27

28       [25] *See, e.g., Phillips*, 415 F.3d at 1314-1316; *Merck*, 347 F.3d at 1371.

1   In fact, when describing and depicting an embodiment of the distribution method (claim 41 is a

2   method claim), the patentees state that the first step of the method "involves retrieving the

3   information for selected items in the source material library 111" ('992 patent, 18:53-55).  The

4   patentees depicted this method in the flow chart of Figure 7, in which the first step shown is

5   "retrieve information for selected items."  In other words, according to the patent specification, the

6   method does not begin with the placement of any item into the source material library, because, for

7   this particular claim, it is assumed that the items having information are already stored in the source

8   material library and thus are accessible for retrieval.  The Court itself recognized this when it stated

9   that the specification is "silent as to any capabilities of the source material library to do any function

10  other than to hold items having information."[26] (3rd CCO, at 30:11-13).

### 4.    The Court Should Construe The Claim Terms "Storing" and "Inputting" Differently

In its 4th CCO, the Court construed the phrase "inputting an item having information into the

transmission system" of claim 14 of the '863 patent (which is a continuation patent claiming priority

from the '992 patent) to mean "putting physical items containing audio information or video

information or both into the transmission system."  (4th CCO, at 11-12).  The Court's construction

for the term "inputting" in this related patent is the same as that for "storing" in the '992 patent.

The Court should not give different claim terms in related patents the same construction,

because there is a presumption that different claim terms have different meanings.[27]  Here, the term

"inputting" means "putting in;" it has no other meaning.  "Storing," on the other hand, has another

meaning – "retaining" – which is consistent with the specification.  Therefore, the Court should give

---

[26] The fact that the specification only describes the source material library as retaining data is
not fatal to the validity of the '992 patent.  Persons of ordinary skill in the art would have inferred
from the specification that the items having information (construed to be physical items) were first
placed into the source material (construed to be a collection of original sources of information)
before they could be stored there.  These persons would also have known how such physical items
are placed into a collection of such items, without the need for the patentees to have described in
detail how this would have occurred.

[27] *See, CAE Screenplates, Inc. v. Heinrich Fiedler GMBH & Co.*, 224 F.3d 1308, 1317 (Fed.
Cir. 2000) ("In the absence of evidence to the contrary, we must presume that the use of these
different terms in the claims connotes different meanings.").

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

the term "storing" a meaning different than that given to the term "inputting." This is an additional reason why the Court should construe "storing" in the phrase "storing items having information in a source material library" to mean "retaining physical items containing audio information or video information or both in a collection of original sources of information."

## IV.    CONCLUSION

For all these reasons and authorities, Acacia's Motion for Reconsideration should be granted.

DATED: May 18, 2007                               HENNIGAN BENNETT & DORMAN LLP


By _____/S/ Roderick G. Dorman_____
                 Roderick G. Dorman

Attorneys for Plaintiff, ACACIA MEDIA
TECHNOLOGIES CORPORATION