# Exhibit A, Part 1

1    HENNIGAN, BENNETT & DORMAN LLP
RODERICK G. DORMAN (SBN 96908)
2    ALAN P. BLOCK (SBN 143783)
KEVIN I. SHENKMAN (SBN 223315)
3    601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
4    Telephone: (213) 694-1200
Facsimile: (213) 694-1234
5
Attorneys for Plaintiff
6    ACACIA MEDIA TECHNOLOGIES CORPORATION

7

8              **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10                **SOUTHERN DIVISION**

11

| | |
|---|---|
| 12   ACACIA MEDIA TECHNOLOGIES CORPORATION, | Case No. SACV 02-1040 JW (MLGx) |
| 13 | |
| 14           Plaintiff, | **PLAINTIFF ACACIA MEDIA TECHNOLOGIES CORPORATION'S CLAIM CONSTRUCTION BRIEF** |
| 15        vs. | |
| 16   NEW DESTINY INTERNET GROUP, et. al., | **DATE:** February 6, 2004 |
| 17           Defendants. | **TIME:** 10:00 a.m. |
| 18 | **CTRM:** Hon. James Ware |
| 19   AND ALL RELATED CASE ACTIONS. | |

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

(Page)

I.   BACKGROUND TO ACACIA'S U.S. PATENT NO. 5,132,992 .......... 1

      1.   Description Of System Elements And Steps From
         The Disclosed Embodiments Of The '992 Patent ............... 4

      2.   Description Of System Elements And Steps From
         The Figures And A Representative Claim Of The
         '992 Patent ....................................................................... 9

II.  PRINCIPLES OF CLAIM CONSTRUCTION .................................... 11

    A.   Claim Terms Are Presumed To Carry Their Ordinary And
       Customary Meaning .................................................................. 11

    B.   The Presumption That Claim Terms Carry Their Ordinary
       And Customary Meaning May Be Overcome ............................ 13

III. ACACIA'S CONSTRUCTION OF THE EIGHT CLAIM
     PHRASES AT ISSUE ...................................................................... 16

    A.   "Remote Locations" ................................................................. 16

    B.   "Library Means For Storing Items Containing Information" ...... 18

        1.   The Meaning Of The Term "Library" ............................... 19

        2.   The Meaning Of The Term "Storing" ............................... 19

        3.   The Meaning of the Phrase "Items Containing
           Information" ................................................................... 20

        4.   Conclusion -- The Meaning Of The Phrase "Library
           Means For Storing Items Containing Information" ........... 21

    C.   "Storing Items Having Information In A Source Material
       Library" ................................................................................... 22

        1.   The Meaning Of The Term "Storing" ............................... 22

        2.   The Meaning Of The Phrase "Items Having
           Information" ................................................................... 23

3. The Meaning Of The Phrase "Source Material Library" .......................................................... 23

4. Conclusion -- The Meaning Of The Phrase "Storing Items Having Information In A Source Material Library" .............................................................. 23

D. "Unique Identification Code" ....................................... 24

E. "Identification Encoding Means For Retrieving The Information In The Items From The Library Means And For Assigning A Unique Identification Code To The Retrieved Information" ............................................... 25

5. The Two Claimed Functions -- "Retrieving The Information In The Items From The Library Means" And "Assigning A Unique Identification Code To The Retrieved Information" ............................................... 26

6. The Structures Disclosed For Performing The Two Claimed Functions ............................................... 29

F. "Sequence Of Addressable Data Blocks" ....................... 30

G. "Compressed Data Storing Means ... For Storing As Files The Compressed, Sequenced Data Blocks With The Assigned Unique Identification Code" ......................... 34

1. The Claimed Function -- "Storing As Files The Compressed, Sequenced Data Blocks With The Assigned Unique Identification Code" ......................... 34

2. The Structure Disclosed For Performing The Claimed Function ............................................... 37

H. "Storing, As A File, The Compressed, Formatted And Sequenced Data Blocks With The Assigned Unique Identification Code" ...................................................... 38

1. The Meaning Of The Phrase "Compressed, Formatted And Sequenced Data Blocks" ......................... 38

2.     Conclusion -- The Meaning Of The Phrase "Storing, As A File, The Compressed, Formatted And Sequenced Data Blocks With The Assigned Unique Identification Code"........................................................... 39

IV.     CONCLUSION ........................................................ 40

# TABLE OF AUTHORITIES

**(Page)**

**Cases**

Alloc, Inc. v. International Trade Commission,
 342 F.3d 1361 (Fed. Cir. 2003)..................................11, 12, 14, 15

Arlington Industries, Inc. v. Bridgeport Fittings, Inc.,
 345 F.3d 1318 (Fed. Cir. 2003)..............................................passim

Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,
 334 F.3d 1294, 1300 (Fed. Cir. 2003).....................................13, 18

Budde v. Harley-Davidson, Inc.,
 250 F.3d 1369 (Fed. Cir. 2001)........................................15, 16, 35

CCS Fitness, Inc. v. Brunswick Corp.,
 288 F.3d 1359 (Fed. Cir. 2002)..............................................passim

Cole v. Kimberly-Clarke Corporation,
 102 F.3d 524 (Fed. Cir. 1196)................................................15, 22

Cordis Corp. v. Medtronic AVE, Inc.,
 339 F.3d 1352 (Fed. Cir. 2003)....................................................14

Dow Chemical Co. v. Sumitomo Chemical Co.,
 257 F.3d 1364, 1372-73 (Fed. Cir. 2001) .....................................13

E.I. Du Pont De Nemours & Co. v. Phillips Petroleum Co.,
 849 F.2d 1430, 1433 (Fed. Cir. 1988)..........................................14

Envirco Corp. v. Clestra Cleanroom, Inc.,
 209 F.3d 1360 (Fed. Cir. 2000)................................................15, 22

E-Pass Technologies, Inc. v. 3Com Corporation,
 343 F.3d 1364 (Fed. Cir. 2003)......................................................2

Hoescht Celanese Corp. v. BP Chemicals, Inc.,
 78 F.3d 1575, 1579 (Fed. Cir. 1996)............................................12

IMS Tech., Inc. v. Haas Automation, Inc.,
 206 F.3d 1422, 1439 (Fed. Cir. 2000).........................................14

In re Ghiron,
 442 F.2d 985 (C.C.P.A. 1971)......................................................16

COMPLAINT FOR PATENT INFRINGEMENT AND PERMANENT INJUNCTION, AND DAMAGES; DEMAND FOR JURY TRIAL

# TABLE OF AUTHORITIES (cont'd)

**(Page)**

Interactive Gift Express, Inc. v. Compuserve Inc.,
231 F.3d 859 (Fed. Cir. 2000)................................................................28

Invitrogen Corp. v. Biocrest Mfg., L.P.,
327 F.3d 1364 (Fed. Cir. 2003)..............................................................11

J.T. Eaton & Co. v. Atlantic Paste & Glue Co.,
106 F.3d 1563, 1568 (Fed. Cir. 1997).....................................................15

Johnson Worldwide Associates, Inc. v. Zebco Corp.,
175 F.3d 985 (Fed. Cir. 2000)..........................................................11, 13

Middleton, Inc. v. Minnesota Mining and Manufacturing Co.,
311 F.3d 1384 (Fed. Cir. 2002)..............................................................14

Multiform Dessicants, Inc. v. Medzam, Ltd.,
133 F.3d 1473 (Fed. Cir. 1998)..............................................................13

North American Vaccine, Inc. v. American Cyanamid Co.,
7 F.3d 1571, 1576 (Fed. Cir. 1993).........................................................15

Pitney Bowes, Inc. v. Hewlett-Packard Co.,
182 F.3d 1298 (Fed. Cir. 1999)..............................................................12

Renishaw PLC v. Marposs Societa' per Azioni,
158 F.3d 1243 (Fed. Cir. 1998)..............................................................16

Rexnord Corp. v. Laitram Corp.,
274 F.3d 1336 (Fed. Cir. 2001)..............................................................14

Rodime PLC v. Seagate Technology, Inc.,
174 F.3d 1294 (Fed. Cir. 1999).........................................................15, 22

Sage Products, Inc. v. Devon Industries, Inc.,
126 F.3d 1420 (Fed. Cir. 1997).........................................15, 26, 34, 37

SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,
242 F.3d 1337, 1345 (Fed. Cir. 2001).....................................................15

Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002)14

Texas Digital Systems, Inc. v. Telegenix, Inc.,
308 F.3d 1193 (Fed. Cir. 2002).........................................................12, 18

<u>(Page)</u>

<u>Vitronics Corp. v. Conceptronic, Inc.,</u>
    90 F.3d 1576 n. 6 ...........................................................................12

**Statutes**

35 U.S.C. § 112 ...........................................................................passim

# I.   BACKGROUND TO ACACIA'S U.S. PATENT NO. 5,132,992

Today, transmitted digital video is taken for granted.  We can view digital video material from many transmission sources, such as the Internet, cable television, and satellite television.  Using those sources, we can now select a movie and watch it at a time of our choosing, without ever leaving our home.

This was not the case in early 1990.  Then, if a person wished to view a selected movie at their home at a time of their choosing, they would have to rent or purchase the movie on videotape or a laserdisc.  This required one, and sometimes two, trips from the home to the video store.  While these methods of viewing movies were accepted and widely used in the United States at that time and now, there remained a pressing, long felt need for a system which would permit persons to view movies at their homes at a time of their choosing—without having to leave their homes.

In early 1990, Paul Yurt and H. Lee Browne sought to solve this problem.  Yurt and Browne collaborated to develop a digital communication system that would, among other things, permit a person to receive transmissions of audio, video, and/or audiovisual programs at their home, or other location, which the person could play back as it was being received or which the person could retain for playback at a later time of the person's choosing.

On January 7, 1991, Yurt and Browne filed a patent application with the United States Patent and Trademark Office for their invention entitled: "Audio and Video Transmission and Receiving System."  This application issued as United States Patent No. 5,132,992 on July 21, 1992 (the '992 patent).  (the '992 patent is attached to the Appendix as Exhibit 1; the file history for the '992 patent is attached to the Appendix as Exhibit 2).[1]  Four additional continuation patents have issued thereafter, including

---

[1]   All references to Exhibits in this brief refer to the Exhibits attached to the accompanying Appendix of Exhibits, which is filed concurrently herewith.

U.S. Patent No. 6,144,702, which issued on November 7, 2000 (the '702 patent)[2].

Yurt and Browne invented a comprehensive digital transmission and receiving system with many features[3]:

1.    the user may remotely select audio/video material from any location that has either telephone service or a computer. ('992 patent, 1:62-66[4]);

2.    the system transmits over one or more existing communication channels.[5] ('992 patent, 1:67-2:4; 15:65-16:15; 16:53-68; 19:24-27; Figs. 2b and 6);

3.    the system transmits, receives, and plays back only audio information, only video information, or a combination of audio and video information. ('992 patent, 2:11-15);

4.    the system can transmit information in a fraction of real time to any specified receiver. ('992 patent, 1:67-2:4);

5.    the system permits the user to play back the information at any time selected by the user. ('992 patent, 2:5-8);

---

[2]    In this case, Acacia contends that defendants are infringing claims of the '992 and '702 patents. The '702 patent, being a continuation of the '992 patent, has the same effective filing date as the '992 patent -- January 7, 1991 -- and has the same specification and figures as the '992 patent (although the same text is printed at different columns and line numbers for each patent). This motion relates only to the claims of the '992 patent.

[3]    These features are not limiting with respect to any of the claims of the patents, unless explicitly stated in any claim. Nothing in the specification of the '992 patent requires that every embodiment of the invention include these features. See, E-Pass Technologies, Inc. v. 3Com Corporation, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.")

[4]    Throughout this brief, Acacia shall cite to the '992 patent using the convention of column:line-line or column:line - column:line.

[5]    The '992 patent identifies non-limiting examples of communication channels, such as standard telephone, ISDN, B-ISDN, microwave, DBS (direct broadcast satellite), cable television systems, metropolitan area networks, local area networks, high speed modems, communication couplers, VHF, or UHF broadcasting systems. ('992 patent, Fig. 2b; 4:661-63;15:65-16:15 and 16:53-69).

6.  the system permits the user to retain a copy of the information for multiple playbacks in the future. ('992 patent, 2:8-10);

7.  the system permits the conversion of disparate input source material[6] into a compatible format for ease of transmission, receipt, and playback by many users at many locations. (see, e.g.,'992 patent, 5:66-6:22); and

8.  the system permits the user to play back the program using playback controls similar to those used on a standard recorder, such as play, fast forward, rewind, stop, pause, and play slow. ('992 patent, 17:35-38).

This feature-laden invention of Yurt and Browne is disclosed in the '992 patent, which details how source material programs are formatted and transmitted to remote locations, and how the formatted programs are requested, received and played back.

There are 58 claims in the '992 patent, comprising six categories of system and method claims [transmission system claims (1-18); distribution method claims (19-24); receiving system claims (25-40); method of transmission claims (41-46); distribution system claims (47-53); and method of receiving information claims (54-58)]. To best introduce the Court to the novel technology invented by Yurt and Browne and to explain the way it works in an understandable manner, it is desirable that we examine a disclosed embodiment of their invention which is relevant to the claims-at-issue in this case,[7] and, more particularly, examine in that embodiment the

---

[6] The '992 patent identifies non-limiting examples of different types of source material items of information: "television programs, movies, audio recordings, still pictures, files, books, computer tapes, computer disks, documents of various sorts, musical instruments, and other physical objects [musical instruments and physical objects are meant to refer to live events, which can be recorded]. . . The different media formats preferably include digital or analog audio and video tapes, laser disks, film images, optical disks, magnetic disks, computer tapes, disks, and cartridges." ('992 patent, 6:12-15 and 6:19-22).

[7] In this case, Acacia contends that all of the defendants are involved with streaming video and therefore are infringing claims 1, 2, 4, 6, 8, 9, 10, 18, 41, 42, 43, 44, 45, and 46 of the '992 patent and claims 14 and 41 of the '702 patent. Additionally, Acacia contends that defendants Game Link, Inc. and AEBN, Inc. also infringe claims 19, 22, and 24 of the '992 patent and claims 1-4, 6, 8-13, 15, 17-32, and 34-40, because these are the only defendants who, in addition to providing users with streaming videos, also permit users to store a copy of the selected video.

described system elements and steps to: (1) store source material programs (e.g. items of information) in a library; (2) assign each item of information a unique identification code so that the program can be located and accessed later; (3) convert and format separate items into a compatible digital format, (4) place the formatted material in an order or sequence (i.e., using time codes); (5) compress the formatted, ordered data blocks; (6) store the formatted, ordered, and compressed data blocks as a file in a storage library; (7) transmit at least a portion of the file to a remote location; (8) receive the compressed, digital information; (9) store (temporarily or for longer periods of time) at least a portion of the information; (10) decompress the information; and (11) play back the information using playback controls. Notably, this description of embodiment does not limit the scope of the claims, which are broader. This description is provided for illustrative purposes only.

### 1. Description Of System Elements And Steps From The Disclosed Embodiments Of The '992 Patent

#### a) Store Source Material Programs (e.g., Items Of Information) In A Library

Like the local Blockbuster outlet "stores" videos, the source material library (111) of the '992 patent stores "items of information [which] may include analog and digital audio and video information as well as physical objects such as books and records." ('992 patent, 6:2-4). The source material library (111) stores "different types of materials including television programs, movies, audio recordings, still pictures, files, books, computer tapes, computer disks, documents of various sorts, musical instruments, and other physical objects."[8] ('992 patent, 6:12-15). Items of information may be in different media formats, such as digital or analog video tapes, laser disks, film images, optical disks, magnetic disks, computer tapes, disks, and

---

[8] This storage may be permanent or temporary: ". . . a preferred embodiment of the present invention preferably includes source material library means for temporary storage of items prior to conversion." ('992 patent, 5:66 - 6:1).

cartridges. ('992 patent, 6:19-22).

#### b) Assign Each Item Of Information A Unique Identification Code So That The Program Can Be Located And Accessed Later

Just as a librarian uses the Dewey Decimal System to separately identify each book in a library, each item of information is separately assigned a unique identification code which may be used to identify, request, locate, and access the item throughout the system. ("Prior to being made accessible to a user of the transmission and receiving system of the present invention, the item must be . . . given a unique identification code by identification encoder 112.") ('992 patent, 6:35-39; See also, 6:40-54; 10:58-65; 11:22-28; 14:22-28; 18:53-68).

Individual items of information are also separately retrieved from the source material library. Retrieving the information in the items is "analogous to taking books off of a shelf at the local public library after the person has decided that he or she would like to read them." ('992 patent, 18:53-59). An example of retrieved information from the source material library is a motion picture film. ('992 patent, 7:35-37).

#### c) Convert And Format Separate Source Material Programs Into A Compatible Digital Format

The items of information in the source material library may be in many different analog or digital formats. In order to be transmitted in a form that can be transmitted, received and played back, the items of information need to be converted to a predetermined, compatible digital format for further processing by the converter (113), which includes input receivers (124 and 127) (for analog or digital items) and formatters (123 and 125). ('992 patent, 6:55 - 7:58).

#### d) Order The Formatted Material (i.e., Assign Time Codes)

Because audio/video content has a time element (i.e., frames/second or samples/second), the time relationship of data blocks within the audio/video content

must be preserved throughout the system. Each data block is time encoded, using a time encoder, so that a relative relationship of one addressable data block to another is created. By this process, each item of information, previously transmitted, is now placed into a sequence of addressable data blocks, i.e., it is time encoded by a time encoder (114): "Time encoding by time encoder 114 is achieved by assigning relative time markers to the audio and video data." ('992 patent, 8:16-19; See also, 7:59 - 8:15 and 8:20-56). Time encoding of the data blocks is important, because "[r]ealignment of audio and video data, system addressing of particular data bytes, and user addressing of particular portions of items are all made possible through time encoding."[9] ('992 patent, 8:20-23).

### e) Compress The Formatted, Ordered Data Blocks

Bandwidth limits transmission capabilities. Therefore, to facilitate transmission, the addressable, time encoded data blocks are data compressed in compressor 116 (audio data may be compressed separately (128) from the video data (129)). ('992 patent, 9:41 - 10:16). No specific compression algorithm is required, although the '992 patent discloses that "video data compression preferably involves applying two processes: a discrete cosine transform, and motion compensation."[10] ('992 patent, 10:7-9). Further, the compression algorithm operates on blocks of data: "Audio and video information is preferably converted into blocks of data organized in groups for compression processing by audio compressor 128 and video compressor 129, respectively. These blocks are organized as frames, and a number of frames are

---

[9] After being placed into a sequence of addressable data blocks, the sequenced data blocks may then be sent to a precompression processor 115. In the precompression processor, the data blocks are buffered prior to being compressed and they may be undergo additional formatting, e.g., aspect ratio conversion. ('992 patent, 8:57 - 9:40). The precompression processor is shown in Figure 2a, but it is not part of either claim 1 or claim 41 of the '992 patent.

[10] Discrete cosine transform and motion compensation are utilized in most of the popular compressors in use today, particularly MPEG-2, Windows Media, Real, and Apple.

contained respectively in the buffers 130 and 131. By analyzing a series of frames it is possible to optimize the compression process." ('992 patent, 9:50-57).

### f) Store The Formatted, Ordered, And Compressed Data Blocks As A File In A Storage Library

Following compression, the addressable, time encoded data blocks of one of the items may be formatted into a single file (i.e., the audio and video data is recombined) in the compressed data formatting section (117). ('992 patent, 10:17-30). The file may then be stored in a compressed data library (Figure 2b) (118). The compressed data library is preferably a mass storage device for storing multiple files. ('992 patent, 10:31-45).

Each file stored in the compressed data library is addressable by the unique identification code assigned to that item. ('992 patent, 10:28-30; 11:22-25). The system operates on multiple items by executing on each item individually. This is apparent from the methodology taught in the patent: each item of information is given a unique identification code; each item, following compression, is placed in a file; each file is addressable through the unique identification code; and users may access and request the file using the unique identification code. In other words, when items are to be made available for transmission, a first item is retrieved from the source material library, it is assigned a unique identification code, it is converted, ordered, compressed, and placed into a file and stored in the compressed data library with the assigned unique identification. Additional items are then individually processed in this same manner.

### g) Transmit At Least A Portion Of The File To A Remote Location

The file (or at least a portion of the file) is then transmitted to a remote location using a transmitter (112). A transmission data converter (119) may encode data for the transmitter. ('992 patent, 15:55-60). The transmitter places the formatted data onto a communications channel, i.e. standard telephone, ISDN, B-ISDN, microwave,

DBS (direct broadcast satellite), cable television systems, metropolitan area networks, local area networks, high speed modems, communication couplers, VHF, or UHF broadcasting systems. ('992 patent, Fig. 2b; 4:61-63;15:65-16:15 and 16:53-69). The type of transmitter used will depend upon the particular communication channel being utilized for transmission. ('992 patent, 16:53-61).

<strong>h)     Receive The Compressed, Digital Information</strong>

A reception system is located at the remote location. One example of the reception system is depicted in Figure 6 of the '992 patent. The reception system includes a transceiver (201) which may receive the information in the file transmitted by the transmitter as compressed, formatted data blocks (122, Figure 2b). ('992 patent, 4:64-69; 17:67 - 18:8). A receiver format converter (202) may convert the compressed formatted data blocks into a format suitable for playback by the user in real time. ('992 patent, 18:9-13).

<strong>i)     Store (Temporarily Or For Longer Periods Of Time) At Least A Portion Of The Received Information</strong>

The received, converted information may then be stored prior to decompression and prior to playback. The user may chose to play back the information at a later time, and, if so, all of the received information is stored in storage 203 ('992 patent, 18:14-21). In the alternative, the information may be decompressed in real time as it is distributed by the transmission system, in which case, a portion of the received information is buffered (temporarily stored) while another portion is decompressed for immediate viewing as it is distributed by the transmission system. ('992 patent, 4:68 - 5:9).

<strong>j)     Decompress The Information</strong>

When the user requests playback, the information may be sent to the data formatter (204) which distinguishes audio information from video information. ('992 patent, 18:22-26). The separated audio and video information may then be decompressed by the decompressor (208 for video information and 209 for audio

information).  ('992 patent, 18:27-29).  The time encoding of the data blocks, prior to compression, allows for the realignment of the audio and video prior to playback. ('992 patent, 8:20-23).

### k)      Playback The Information Using Playback Controls

The decompressed information may then be sent to output converters (211-214) where the information is output in real time in a format compatible with a playback device (i.e., a computer monitor, a television, or audio speakers).  ('992 patent, 18:29-35).  Additionally, the receiving system may include playback controls, which permit the user, for example, to play, fast forward, rewind, stop, pause, and play slow the output information.  ('992 patent, 17:35-43 and 18:36-45).

### 2.      Description Of System Elements And Steps From The Figures And A Representative Claim Of The '992 Patent

The systems and methods described above are reinforced by Figure 2a of the '992 patent, which Acacia has reproduced below.[11]  For the convenience of the Court, Acacia has color-coded Figure 2a and the elements of representative claim 1 of the '992 patent to show the correspondence between the elements of the claim and Figure 2b.

///
///
///
///
///
///
///

---

[11]  Acacia has added the "transmitter" (shown in red in the lower right corner of the Figure).  The transmitter and the compressed data library are shown in Figure 2b of the '922 patent.  Figure 2b is a continuation of the exemplary system shown in Figure 2a.

## Figure 2a Of The '992 Patent



## Claim 1 Of The '992 Patent

1.      A transmission system for providing information to be transmitted to remote locations, the transmission system comprising:

library means for storing items containing information;

identification encoding means for retrieving the information in the items from the library means and for assigning a unique identification code to the retrieved information;

conversion means, coupled to the identification encoding means, for placing the retrieved information into a predetermined format as formatted data;

ordering means, coupled to the conversion means, for placing the formatted data into a sequence of addressable data blocks;

compression means, coupled to the ordering means, for compressing the formatted and sequenced data blocks;

compressed data storing means, coupled to the data compression means, for storing as files the compressed, sequenced data blocks received from the data compression means with the unique identification code assigned by the identification encoding means; and

transmitter means, coupled to the compressed data storing means,

1  for sending at least a portion of one of the files to one of the remote
2  locations.

3  **II.    PRINCIPLES OF CLAIM CONSTRUCTION**

4       As this Court is aware, the Federal Circuit has established well-settled
5  principles for construing patent claims in order to achieve a proper construction.
6  Acacia has provided the case law most relevant to the claim construction issues
7  presented in this case.

8       The claims of the patent define the scope of an invention and therefore courts
9  begin the construction process by examining the language of the claim itself.  Alloc,
10 Inc. v. International Trade Commission, 342 F.3d 1361, 1368 (Fed. Cir. 2003);
11 Johnson Worldwide Associates, Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir.
12 2000).

13      **A.    Claim Terms Are Presumed To Carry Their Ordinary And**
14      **Customary Meaning**

15      Courts indulge a "heavy presumption" that a claim term carries its ordinary and
16 customary meaning.  CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366
17 (Fed. Cir. 2002); Johnson Worldwide, 175 F.3d at 989 ("a court must presume that the
18 terms in the claim mean what they say, and, unless otherwise compelled, give full
19 effect to the ordinary and accustomed meaning of claim terms."); Alloc, 342 F.3d at
20 1368, quoting Invitrogen Corp. v. Biocrest Mfg., L.P., 327 F.3d 1364, 1367 (Fed. Cir.
21 2003) ("'Claim language generally carries the ordinary meaning of the words in their
22 normal usage in the field of the invention' at the time of the invention.")

23      In determining what the ordinary and customary meaning of a claim term is,
24 "the context of the surrounding words in a claim also must be considered."  Arlington
25 Industries, Inc. v. Bridgeport Fittings, Inc., 345 F.3d 1318, 1325 (Fed. Cir. 2003).  A
26 court may "immerse itself in the specification, the prior art, and other evidence, such
27 as the understanding of skilled artisans at the time of invention, to discern the context
28 and normal usage of the words in the patent claim."  Alloc, 342 F.3d at 1368, citing,

1  Hoescht Celanese Corp. v. BP Chemicals, Inc., 78 F.3d 1575, 1579 (Fed. Cir. 1996).

2      Courts are cautioned, however, not to import limitations from the specification

3  or prosecution history when discerning the ordinary and customary meaning of a

4  claim term. Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201 (Fed.

5  Cir. 2002) ("Consulting the written description and prosecution history as a threshold

6  step in the claim construction process, before any effort is made to discern the

7  ordinary and customary meanings attributed to the words themselves, invites a

8  violation of our precedent counseling against importing limitations into the claims.")

9      Dictionaries and scientific treatises may also help supply the pertinent context

10  and usage for claim construction. Alloc, 342 F.3d at 1368, citing, Texas Digital, 308

11  F.3d at 1201 and Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309

12  (Fed. Cir. 1999).[12] Dictionary definitions may even be used by a court to establish a

13  claim term's ordinary meaning, so long as the dictionary definition does not

14  contradict any definition found in or ascertained by a reading of the patent documents.

15  CCS Fitness, 288 F.3d at 1366; Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576,

16  1584 n. 6; and so long as the dictionary definition is consistent with the use of the

17  words by the inventor. Texas Digital, 308 F.3d at 1204, citing, Dow Chemical Co. v.

_____

19      [12] Dictionaries may even be the most meaningful sources of information to aid the
20  court in better understanding the technology and the terminology used by those skilled
    in the art:

21          When a patent is granted, prosecution is concluded, the intrinsic record is
22          fixed, and the public is placed on notice of its allowed claims.
            Dictionaries, encyclopedias and treatises, publicly available at the time
23          the patent is issued, are objective resources that serve as reliable sources
            of information on the established meanings that would have been
24          attributed to the terms of the claims by those of skill in the art. Such
            references are unbiased reflections of common understanding not
25          influenced by expert testimony or events subsequent to the fixing of the
            intrinsic record by the grant of the patent, not colored by the motives of
26          the parties, and not inspired by litigation. Indeed, these materials may be
            the most meaningful sources of information to aid judges in better
27          understanding both the technology and the terminology used by those
            skilled in the art to describe the technology.

28  Texas Digital, 308 F.3d at 1202-03.

Sumitomo Chemical Co., 257 F.3d 1364, 1372-73 (Fed. Cir. 2001) and Multiform Dessicants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1433 (Fed. Cir. 1998); See also, Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1300 (Fed. Cir. 2003).

**B.     The Presumption That Claim Terms Carry Their Ordinary And Customary Meaning May Be Overcome**

While a court begins with the ordinary and customary meaning of the claim term, it must also examine the intrinsic record to determine whether anything in the record overcomes the presumption that the term has the ordinary meaning. Arlington Industries, 345 F.3d at 1326.

There are limited circumstances where the "heavy presumption" that a claim term is given its ordinary and accustomed meaning may be overcome and the court may supply a definition of a claim term or phrase different than its ordinary and accustomed meaning. CCS Fitness, 288 F.3d at 1366. In each circumstance there must be textual language from the patent specification that is clearly associated with a claim term and its proffered construction. Johnson Worldwide, 175 F.3d at 989.

First, a claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history. Id.; Johnson Worldwide, 175 F.3d at 990.

Second, a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee (i) distinguished that term from prior art on the basis of a particular embodiment, (ii) expressly disclaimed subject matter, or (iii) described a particular embodiment as important to the invention. CCS Fitness, 288 F.3d at 1366-67.

In evaluating whether this second situation exists sufficient to depart from the ordinary means of a term, a court must proceed with caution—on the one hand, a court must interpret the claims in light of the specification, however, on the other

hand, a court must avoid impermissibly importing limitations from the specification into the claims. Alloc, 342 F.3d at 1370. Only statements which evince a "clear and unmistakable surrender of subject matter" or a "clear disavowal of claim scope" will cause a claim term to be given a meaning different than its ordinary meaning. Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("We hold that claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."); Cordis Corp. v. Medtronic AVE, Inc., 339 F.3d 1352, 1363 (Fed. Cir. 2003) ("To invoke argument-based estoppel, the prosecution history must evince a 'clear and unmistakable surrender of subject matter.'"); See also, IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1439 (Fed. Cir. 2000); Middleton, Inc. v. Minnesota Mining and Manufacturing Co., 311 F.3d 1384, 1388 (Fed. Cir. 2002).

Further, although it is proper to use the specification to interpret what the patentee meant by a word or a phrase in the claim, a court cannot give a claim term a meaning different than its ordinary meaning simply because the specification describes a certain embodiment as being preferred or only describes one or a few embodiments. E.I. Du Pont De Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir. 1988) ("It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim. But this is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.");[13] If, however, the specification makes clear that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to

---

[13] A patentee need not "describe in the specification every conceivable and possible future embodiment of his invention." CCS Fitness, 288 F.3d at 1366, quoting, Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001).

limit the claims. Alloc, 342 F.3d at 1366, citing, SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1345 (Fed. Cir. 2001).

Next, a claim term will not have its ordinary and accustomed meaning if the term "chosen by the patentee so deprives the claim of clarity." CCS Fitness, 288 F.3d at 1367. In such cases, the court must construe the claim term consistent with the meaning found in the intrinsic patent record. J.T. Eaton & Co. v. Atlantic Paste & Glue Co., 106 F.3d 1563, 1568 (Fed. Cir. 1997) (Because "[the disputed claim term] is a term with no previous meaning to those of ordinary skill in the prior art[,] its meaning, then, must be found [elsewhere] in the patent."); North American Vaccine, Inc. v. American Cyanamid Co., 7 F.3d 1571, 1576 (Fed. Cir. 1993) (using the specification for guidance "when the meaning of a claim term is in doubt.")

Lastly, claim terms which are phrased using the word "means" give rise to a presumption that the inventor used the term advisedly to invoke the statutory mandates for means-plus-function clauses set forth in 35 U.S.C. § 112, ¶ 6. Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d 1420, 1427 (Fed. Cir. 1997). This presumption is not conclusive. Where "a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in a means-plus-function format." Envirco Corp. v. Clestra Cleanroom, Inc., 209 F.3d 1360, 1365 (Fed. Cir. 2000), quoting, Sage Products, 126 F.3d at 1427-28; Cole v. Kimberly-Clarke Corporation, 102 F.3d 524, 531 (Fed. Cir. 1196); Rodime PLC v. Seagate Technology, Inc., 174 F.3d 1294, 1302-03 (Fed. Cir. 1999).

In construing means-plus-function claim limitations, a court must first define the particular function claimed, and thereafter identify "the corresponding structure, material, or acts described in the specification." Sage Products, 126 F.3d at 1428.[14]

---

[14] Whether or not the specification adequately sets forth structure corresponding to the claimed function necessitates consideration of that disclosure from the viewpoint of one skilled in the art. Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001), citing, North American Vaccine, 7 F.3d 1579; In re Ghiron,

1 Means-plus-function claim limitations are construed, pursuant to 35 U.S.C. § 112, ¶ 6,
2 as covering "the corresponding structure, material, or acts described in the
3 specification and equivalents thereof."

4     In the end, a persuasive claim construction is one which defines terms in the
5 context of the whole patent:

6     Ultimately, the interpretation to be given a term can only be determined
and confirmed with a full understanding of what the inventors actually
7     invented and intended to envelop with the claim. [citation omitted]. The
construction that stays true to the claim language and most naturally
8     aligns with the patent's description of the invention will be, in the end,
the correct construction. [citations omitted]. A claim construction is
9     persuasive, not because it follows a certain rule, but because it defines
terms in the context of the whole patent.
10

11 Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

12 **III.   ACACIA'S CONSTRUCTION OF THE EIGHT CLAIM PHRASES AT
13 ISSUE[15]**

14     **A.   "REMOTE LOCATIONS"**

15     The phrase "remote locations" is found in claims 1, 19, 22, 25, 41, 47, and 54
16 of the '992 patent. (Exhibit 4 shows the use of this phrase throughout the '992
17 patent). The phrase "remote locations" should be construed to mean "positions or
18 sites distant in space from the position(s) or site(s) of the transmission system."

19     In claim 1, the phrase "remote locations" is used in the phrases:
20

21

22 442 F.2d 985, 991 (C.C.P.A. 1971) (stating that "if such selection would be 'well
within the skill of persons skilled in the art', such functional-type block diagrams may
23 be acceptable and, in fact, preferable if they serve in conjunction with the rest of the
specification to enable a person skilled in the art to make such a selection and practice
24 the claimed invention with only a reasonable degree of routine experimentation.")
Failure to disclose adequate structure corresponding to the recited function results in
25 the claim being of indefinite scope and thus invalid under 35 U.S.C. § 112 (1). Thus,
such a challenge to the patent requires a finding by clear and convincing evidence that
26 the specification lacks disclosure of sufficient structure to be understood by one
skilled in the art as being adequate to perform the recited function. Budde, 250 F.3d
27 at 1376-77.

28 [15] Exhibit 3 to Acacia's Appendix shows Acacia's construction for each of these
initial eight phrases at issue in this brief.