# EXHIBIT A

Dockets.Justia.com

Mr. Lee Browne,
Greenwich Technologies
2 Soundview Drive
Greenwich, CT 06830

April 20, 1992

Dear Mr. Browne,

       Enclosed please find a summary technical evaluation of your patent document entitled "Audio and Video Transmission and Receiving System". This report provides a summary of Sarnoff's evaluation of the video-on-demand system outlined in the Greenwich document, and is accompanied by a reference list and copies of selected papers.

The attached report represents the final deliverable responsive to the Sarnoff/Greenwich technical services agreement dated 3/6/92. Note that the scope of our evaluation was limited to technical issues, including identification of promising technology areas for further development. Business considerations and strategic planning mentioned in your letter of 3/13 are beyond the scope of my activity; please talk to Jeff Wojnar and/or Len Schiff if you wish to pursue these topics further.

If there are any questions re: the technical evaluation, please feel free to call me at (609) 734-2311. It has been a pleasure working with you and Susan. Best regards.

Sincerely,

*(D. Raychaudhuri)*
Head, Broadband Communications Research

cc:    L. Schiff
       J. Wojnar
       N. Wilson
       S. Hinrichs (Greenwich)

Brief Technical Review of:


# Audio and Video Transmission and Receiving System


Prepared for:
Greenwich Technologies, Inc.


Prepared by:
Communications Research Laboratory
David Sarnoff Research Center
Princeton, NJ 88543-5300.


April 17, 1992

AMTC040319

**Scope:**

This is a summary report of Sarnoff's technical review of the video-on-demand patent document entitled "Audio and Video Transmission and Receiving System" by Yurt and Browne. As discussed at the 3/12/92 meeting, our review of the material provided by Greenwich Technologies is at a general technical level, and is not intended as an expert evaluation of patentability. Rather, we have focused on the novelty and technical validity of the proposed system in the context of published material on this subject, and have then tried to identify promising areas for possible further development.

**Summary:**

The patent document supplied by Greenwich Technologies outlines a generic set of technologies necessary for a video-on-demand system. The general principles of the system described in the patent are believed to be technically correct, though significant additional design detail will have to be developed before a proof-of-concept prototype can be implemented. Based on our review of published material (see references) in the area of video-on-demand, interactive multimedia, etc., we do not consider the overall system architecture to be novel in a scientific/technological sense. Similar concepts for storing, accessing, transmitting and displaying compressed video and audio information are widely understood by researchers in the telecommunication and multimedia fields. In some cases, these concepts have also been demonstrated in practice, such as the video-on-demand prototype currently being shown at Bell Communications Research, Morristown by Dr. A. Gelman [Ref GE 91]. The present document does contain some new material related to the video/audio library and the subscriber receiver, and it is possible that these ideas could be further developed into more detailed patents, working prototypes, or products.

**Technical Review:**

The patent document entitled "Audio and Video Transmission and Receiving System" by Yurt and Browne outlines a comprehensive architecture for a video-on-demand system. The general goal of a video-on-demand system is to provide remote subscribers with the capability of accessing video/audio material from a large database in a timely and convenient manner. Concepts for such video-on-demand systems have been under discussion in the telecommunication and video delivery industries for the last ·5-10 years. While specific implementations may vary, the key building blocks of a video-on-demand system are: (a) a large digital video/audio library with appropriate logical organization, data compression, rapid access and multiple I/O capabilities; (b) a "head-end" inquiry/response switching system capable of interpreting, packaging and switching subscriber requests for video/audio material; (c) a high-speed transmission system capable of timely and

AMTC040320

reliable delivery of digital information to subscribers; and (d) a subscriber receiving and storage unit capable of receiving the requested video/audio, decompressing information where necessary, and presenting the information to the user (with appropriate features such as scheduled delivery, fast forward/reverse, scan, etc.)

The technologies required for implementation of each of these four key system building blocks have only recently become feasible (though cost-effectiveness is yet to be proven). Specifically, recent advances in digital storage (e.g., terabit disk systems) and compression (e.g., MPEG-1 standard compression) now make the concept of a digital image/audio library feasible. At the same time, high-speed switching equipment (e.g., the ANCOR broadband switch) for the head-end is also becoming available, although much work remains before commercial operation is possible. Subscriber equipment necessary for video-on-demand is also likely to become cost-effective over the next 3-5 years, given the expected reduction in cost for storage and decompression VLSI (e.g., MPEG-1 IC's). As digital TV and HDTV technologies evolve, the cost/performance curve for the receiver equipment should improve significantly. The last technology component to complete the picture is switched broadband digital communication, not currently available on most telco or cable facilities. While there have been a few pilot programs (e.g., BellSouth's Heathrow field trials) to demonstrate switched B-ISDN (broadband integrated services digital network), the evolution is likely to be slow in view of the large capital investment required. It is important to note that the feasibility of video-on-demand service depends very strongly on the availability of a cost-effective broadband ISDN (or equivalent) network, an aspect that may have been underestimated in the Greenwich document.

The general principles of the system outlined in the patent document appear to be technically correct, though lacking in specific details particularly at the subsystem level. While the document may serve as a useful starting point for further development, significant additional design / simulation / prototyping work will be required for a meaningful "proof-of-concept". Based on our review of published material on this topic [see reference list & attached papers], we do not consider the overall system architecture to be novel in a scientific/technological sense. Similar concepts for storing, accessing, transmitting and displaying compressed video and audio information are widely understood by researchers in the telecommunication and multimedia fields. In some cases, these concepts have also been demonstrated in practice, such as the MPEG-based video-on-demand / interactive multimedia prototype currently being shown at Bell Communications Research, Morristown by Dr. A. Gelman. Other video-on-demand system architectures (e.g., Bellcore) are considered to be further developed than the Greenwich system since they are associated with more technical detail, particularly in the areas of compression and transmission. The present document

AMTC040321

does contain some useful new material related to the architecture and organization of the video/audio library, and it is conceivable that these ideas could be further developed into more detailed subsystem level patents, working prototypes, or products. Such an improved technology position could enhance the commercial value of the present system level technology, and might serve as the basis for future cooperation with other companies in this field.

Further detailed comments about the system description are given below:

Pg. 1-4    The distinctions drawn between this and other previous patents may indeed be valid, and Sarnoff is not supporting or disputing these claims. However, it is remarked here that the concept of delivering video to subscribers with "telephone service" (e.g., Pg. 3) is not feasible since current telephone circuits will require 100's of hours to deliver even a highly compressed (e.g., 1.2 Mbps MPEG video) movie. Also, it appears from page 4, that faster than real-time transmission of video/audio material is envisaged: again, this would require very high-speed (typically fiber-optic) transport, not likely to be available before broadband ISDN is deployed. The concept of providing virtual VCR like features at the receiver is of some interest, but has also been mentioned by others working on this topic.

Pg. 8-10   The description tends to oversimplify the issue of transmission, which must be: (a) high speed, (b) switched; and (c) reliable to support video-on-demand. Many of the media mentioned, e.g., UHF, VHF, telephone, etc. may not be suitable for this demanding application. It is likely that most practical systems for video-on-demand will be based on an all-fiber switched or hybrid switched/broadcast architecture, run either by telcos or CATV operators.

Pg. 12     Copy protection is a complex issue; it is not clear that any current technical approach, including the one mentioned here, is entirely satisfactory.

Pg. 14     The concept of a popularity code may be novel, and could be used for efficient organization of the library.

Pg. 16,19  Video compression is mentioned here only in a generic sense. However, it a key enabling technology that is crucial to the success of video-on-demand in any near- to medium-term. Considerable R&D effort has therefore been invested on this subsystem, which is clearly one of the single most important "value-added" areas for

AMTC040322

digital video system development. Bellcore's interactive multimedia prototype uses MPEG-1 standard compression because of the excellent efficiency and availability of VLSI. The Greenwich document is relatively weak in this area.

Pg. 21    The reference to ADPCM for audio is outmoded, and is now replaced by new ISO standards, e.g., MUSICAM, MPEG audio, etc. For both audio and video, a concrete video-on-demand system architecture must identify algorithms and associated bit-rate/performance choices more clearly than has been done here.

Pg. 17    In formatting information into so-called "data blocks", the proposed system architecture does not take into account various existing and emerging standards necessary for operation on broadband networks. Typically, in B-ISDN, data will be formatted into 53 byte ATM (asynchronous transfer mode) cells with appropriate adaptation (AAL) headers, etc. Similarly, timing services will have to be harmonized with available network services, etc. Unless an entire system is custom-built for this application only, the use of non-standard protocols (as implied at various points in the document) may not be appropriate. Also, even if custom protocols are employed, significant additional design information about the data format and protocol layers must be provided before the transmission system described can be considered viable.

Pg. 23-33 The database organization principles outlined here may be of specific value for further development. Some of the details (such as item encoder for address to item mapping, and queue manager program/ dispatch controller for scheduling distribution) could be novel, although Sarnoff is not in a position to support such claims. A working prototype that demonstrates good organization of video/audio material, fast access of a video jukebox, HIPPI interface, etc. may well be of commercial interest. If Greenwich is interested in pursuing this technology area further, the video/audio database is clearly the most promising area for development.

Pg. 34    As stated earlier, video-on-demand is feasible only on a small subset of the delivery media mentioned here, because most conventional media (incl. telephone, cable, DBS, etc.) will not support such traffic, except possibly on a limited experimental basis. Switched fiber-optic B-ISDN, wideband CATV systems, or at least advanced (copper) digital subscriber lines (ADSL) are an essential pre-requisite for the type of applications being considered here.

AMTC040323

Pg. 37-43 The receiver described may have one or more novel features (e.g., specific VCR-like capabilities) with potential for development into proprietary technology. Next to the video/audio library, the subscriber receiver may be suitable for further design and prototyping work. However, the value of such work will depend on making the design flexible enough to accommodate other system architectures, transport and database access protocols.

AMTC040324

**References:**

[AL 86]   Keith J. Allen, Thomas K. Helstern, "Customer-Controlled Video Switching for Teleconferencing," *IEEE Global Commn. Conf.,* 1986, pp. 907-914.

[BE 86]   Jules A. Bellisio and Shuni Chu, "Television Coding for Broadband ISDN," *IEEE Global Commn. Conf.,* 1986, pp. 894-900.

[BO 90]   John Bourne, Mark Balmes, Jim Justice, "Heathrow - Experience and Evolution," *IEEE Intl. Conf. on Commn.,* 1990, pp. 1091-1095.

[BU 86]   Howard E. Bussey, "Experimental Approaches to Video Services and Technologies," *IEEE Global Commn. Conf.,* 1986, pp. 901-906.

[CO 90]   A.R.J. Cook, D.W. Faulkner, P.J. Smith, R.A. Lobbett, "Low-Cost Digital Passive Optical Networks," *IEEE Intl. Conf. on Commn.,* 1990, pp. 659-662.

[EI 90]   Daryle J. Eigen "Narrowband and Broadband ISDN CPE Directions," *IEEE Communications Magazine,* 1990, pp. 39-46.

[EN 91]   Carl P. Engineer, "Can PON go Broadband?," *Telephony,* January 14, 1991, pp. 30-56.

[FA 89]   David W. Faulkner, David B. Payne, Jeffrey R. Stern, John W. Ballance, "Optical Network for Local Loop Applications," *Journal of Lightwave Technology. Vol. 7, No. 11, 1989,* pp. 1741-1751.

[GE 91]   A. D. Gelman, H. Kobrinski, L.S. Smoot, S.B. Weinstein, "A Store- And-Forward Architecture for Video-On-Demand Service," *IEEE Intl. Conf. on Commn.,* 1991, pp. 842-846.

[GR 89]   Alan F. Graves, "The Heathrow Broadband Access System," *IEEE Global Commn. Conf.,* 1989, pp. 1675-1679.

[HA 86]   Barry G. Haskell and Hsueh-Ming Hang, "Comparison of Discrete Cosine Transform and Vector Quantization of Medical Imagery," *SPIE,* Vol. 626 Medicine XIV/PACS IV, 1986, pp. 399-408.

[HI 86]   Neale C. Hightower, "Integrated Voice, Data, and Video in the Local Loop," *IEEE Global Commn. Conf.,* 1986, pp. 915-919.

[JU 88]   C.N. Judice, "Entertainment Video-On-Demand at T1 Transmission Speeds (1.5 Mb/s)," *SPIE,* Vol. 1001 Visual Communications and Image Processing, 1988, pp. 396-397.

[JU 86]   C.N. Judice, E.J. Addeo, M.I. Eiger, H.L. Lemberg, "Video on Demand: A Wideband Service or Myth?," *IEEE Intl. Conf. on Commn.,* 1986, pp. 1735-1739.

[KA 91]   Wataru Kameyama, Tsuyoshi Hanamura, Hideyoshi Tominaga, "A Proposal of Multimedia Document Architecture and Video Document Architecture," *IEEE Intl. Conf. on Commn.,* 1991, pp. 511-515.

[KO 88]   Takashi Komiya, Yasunobu Suzuki, Hajime Yamada, Keiko Tomita, "An Approach to the Multifunction Graphic Terminal for the ISDN Environment," *IEEE Global Commn. Conf.,* 1988, pp. 32-36.

[KO 91]   Naoki Kobayashi, Toru Nakagawa, "Multimedia Document Structure for Dialog Communication Service," *IEEE Intl. Conf. on Commn.,* 1991, pp. 526-531.

[LE 86]   S. Lederman, "Video-On-Demand - A Traffic Model and GOS Technique," *IEEE Global Commn. Conf.,* 1986, pp. 676-683.

AMTC040325

[LI 89]   Yih-Kang Maurice Lin, Dan R. Spears, "Passive Optical Subscriber Loops with Multiaccess," *Journal of Lightwave Technology, Vol. 7 No. 11, 1989,* pp. 1769-1777.

[LU 86]   C.W. Lundgren, P.S. Natarajan, "Single Mode Fiber Transport and Coaxial Distribution of Video on Demand," *IEEE Global Commn. Conf.,* 1986, pp. 889-893.

[MA 91]   Kazutoshi Maeno, Shiro Sakata, Toyoko Ohmori, "Distributed Desktop Conferencing System (MERMAID) Based on Group Communication Architecture," *IEEE Intl. Conf. on Commn.,* 1991, pp. 520-525.

[MC 90]   F. Ray McDevitt, Joe Sutherland, "Switched vs Broadcast Video for Fiber-To-The Home Systems," pp. 1109-1119.

[MO 91]   Magda M. Mourad, "Object Representation for Multimedia Document Interchange," *IEEE Intl. Conf. on Commn.,* 1991, pp. 532-539.

[MU 90]   Kazuo Murano, Koso Murakami, Eisuke Iwabuchi, Toshio Katsuki, Hiroshi Ogasawara, "Technologies Towards Broadband ISDN," *IEEE Communications Magazine,* 1990, pp. 66-70.

[TO 89]   Arpad G. Toth, "HDTV and Fiber Optic Communications - An Opinion," *EIA Digital ATV workshop,* 1989, pp. 1-11.

[TO 89]   Arpad G. Toth, Joseph Donahue, "ATV Multiport Receiver an overview of the EIA ATV Technical Subcommittee Work," *EIA Digital ATV workshop,* 1989.

[WA 89]   Stuart S. Wagner, Ronald C. Menendez, "Evolutionary Architectures and Techniques for Video Distribution on Fiber," *IEEE Communications Magazine,* 1989, pp. 17-25.

[WE 86]   Stephen B. Weinstein, "Personalized Services on the Intelligent, Wideband Network," *Zurich Seminar,* 1986, pp. 13-18.

AMTC040326

# EXHIBIT B

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                     SAN JOSE DIVISION
 4
 5     IN RE:  ACACIA MEDIA        ) C-05-01114-JW
 6     TECHNOLOGIES                )
 7     CORPORATION PATENT          ) SEPTEMBER 8, 2005
 8     LITIGATION.                 )
 9                                 ) VOLUME 1
10                                 )
11     _____    ) PAGES 1-216
12
13
14
15             THE PROCEEDINGS WERE HELD BEFORE
16           THE HONORABLE UNITED STATES DISTRICT
17                    JUDGE JAMES WARE
18     A P P E A R A N C E S:
19     FOR THE PLAINTIFFS: HENNIGAN, BENNETT & DORMAN
20                     BY:  RODERICK G. DORMAN
21                          ALAN P. BLOCK
22                          ROBERT BERMAN
23                          601 SOUTH FIGUEROA STREET
24                          LOS ANGELES, CALIFORNIA  90017
25
26         (APPEARANCED CONTINUED ON THE NEXT PAGE.)
27
28
29
30     OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
31                          CERTIFICATE NUMBER 8074
32                          LEE-ANNE SHORTRIDGE, CSR
33                          CERTIFICATE NUMBER 9595
```

1        Q    AND IF WE LOOK ON THE THIRD PAGE OF THAT

2        DOCUMENT, WHICH YOU HAVE SEEN BEFORE, IS YOUR NAME

3        LISTED AS THE RECIPIENT IN 1995?

4        A    YES, IT IS.

5        Q    AND BY YOUR NAME IT SAYS, "1995, S. MERRILL

6        WEISS FOR HIS LEADERSHIP ROLE IN THE CREATION AND

7        ADOPTION OF SMPTE'S DIGITAL TELEVISION STANDARDS,

8        HIS ACTIVE PARTICIPATION IN NUMEROUS ADVANCED

9        TELEVISION STANDARDIZATION COMMITTEES, AND FOR HIS

10       MANY CONTRIBUTIONS TO THE PROLIFERATION OF THE ART

11       AND KNOWLEDGE OF TELEVISION ENGINEERING."

12             NOW, MY QUESTION, SIR, IS THIS GIVEN

13       YEARLY?

14       A    IT CAN BE.

15       Q    ARE THERE ANY YEARS THAT IT IS NOT GIVEN?

16       A    YES.

17       Q    AND DO YOU HAVE ANY PERSONAL KNOWLEDGE AS TO

18       WHY IN THOSE YEARS IT'S NOT GIVEN?

19       A    IN SOME YEARS THE COMMITTEE DOESN'T FIND --

20       THE COMMITTEE THAT IS RESPONSIBLE FOR NOMINATING

21       RECIPIENTS DOESN'T FIND SOMEONE THAT THEY FEEL

22       APPROPRIATE TO RECEIVE THE AWARD.

23       Q    AND YOU MENTIONED A MOMENT AGO THAT YOU'RE

24       ABOUT TO RECEIVE ANOTHER AWARD FROM SMPTE THIS

25       FALL.  WHAT AWARD IS THAT?

1        A    THAT'S KNOWN AS THE PROGRESS MEDAL.

2        Q    AND DO YOU REGARD THE PROGRESS MEDAL AS EVEN A

3    MORE PRESTIGIOUS AWARD THAN THE SARNOFF AWARD?

4        A    I BELIEVE THE SMPTE, IN ITS DESCRIPTION OF THE

5    PROGRESS MEDAL, CALLS IT ITS PREMIER AWARD.

6        Q    NOW, MR. WEISS, THANK YOU FOR DESCRIBING YOUR

7    QUALIFICATIONS.

8             I WOULD LIKE TO NOW MOVE FORWARD TO YOUR

9    OPINIONS REGARDING THE '702 PATENT.

10            HAVE YOU READ THE '702 PATENT?

11       A    MANY TIMES.

12       Q    CAN YOU DESCRIBE -- YOU HAVE ALREADY DESCRIBED

13   FOR US AT A HIGH LEVEL WHAT IS DESCRIBED IN THAT

14   PATENT.

15            DOES -- TO WHAT EXTENT DOES THE '702

16   DESCRIBE A SYSTEM WHICH WOULD SUPPORT A SYSTEM THAT

17   WE WOULD KNOW AS VIDEO ON DEMAND?

18       A    THAT IS FUNDAMENTALLY WHAT THE PATENT IS

19   ABOUT.

20       Q    WHAT IS VIDEO ON DEMAND?

21       A    VIDEO ON DEMAND IS A SCHEME OR A SYSTEM IN

22   WHICH CONTENT CAN BE DELIVERED, PARTICULARLY VIDEO

23   CONTENT, CAN BE DELIVERED TO END USERS OR CONSUMERS

24   AT THEIR REQUEST.

25       Q    DOES THAT SYSTEM USE VIDEO AND AUDIO

1          COMPRESSION?

2          A    YES, IT DOES.

3          Q    WHAT IS VIDEO AND AUDIO COMPRESSION FOR THE

4          COURT?

5          A    VIDEO AND AUDIO COMPRESSION --

6                    MR. MCMAHON:  YOUR HONOR, MAY I ASK A FEW

7          VOIR DIRE QUESTIONS?

8                    THE COURT:  WELL, UM, TECHNICALLY YOU

9          DIDN'T TENDER HIM AS AN EXPERT AND THAT'S THE TIME

10         I WOULD SEE IF THERE'S ANY FURTHER VOIR DIRE, BUT I

11         WOULD ACCEPT HIM AS AN EXPERT IN VIDEO BROADCAST

12         ENGINEERING BASED UPON HIS BACKGROUND.

13                   BUT ANY OBJECTION TO VOIR DIRING HIM?

14                   MR. DORMAN:  NO, YOUR HONOR.  AND JUST SO

15         YOU'RE AWARE, I WOULD HAVE NORMALLY TENDERED HIM TO

16         YOU, BUT I UNDERSTOOD YOUR EARLIER REQUEST TO

17         ESSENTIALLY BE THAT.

18                    THE COURT:  VERY WELL.

19                    MR. DORMAN:  BUT I DIDN'T FORMALLY DO

20         THIS.

21                    BUT I HAVE NO OBJECTION AS LONG AS THIS

22         IS NOT TIME CHARGED TO ME.

23                    THE COURT:  IT WON'T BE.  GUARANTEED.

24                    GO AHEAD.

25                 /    /    /    /

1              SYSTEM FROM BEGINNING TO END, AND IN THAT PROCESS

2              ASSEMBLED THE FIRST CONTROL SYSTEM THAT WAS BASED

3              ON MICROCOMPUTERS AND, IN FACT, IT BECAME AN

4              INDUSTRY-WIDE STANDARD.

5                   I ALSO, I DESIGNED AND BUILT, DESIGNED

6              AND HAD BUILT, I SHOULD SAY, THE EQUIPMENT THAT WE

7              COULD NOT PURCHASE OFF THE SHELF THAT PROVIDED FOR

8              THE INTERCONNECTION OF THE CONTROL SYSTEM, THE

9              VARIOUS MACHINES THAT WERE OPERATING IN THE STATION

10             AND THE AUTOMATION SYSTEM.

11                  SO THOSE WERE COMPUTERS THAT PROVIDED

12             THAT FUNCTIONALITY.

13             Q    AND CAN YOU TELL US IN GENERAL HOW ONE OF

14             ORDINARY SKILL IN THE ART WOULD HAVE GONE ABOUT

15             IMPLEMENTING THE SYSTEM DESCRIBED IN THE '702

16             PATENT IN 1991?

17             A    WELL, THE FIRST THING WOULD BE TO STUDY THE

18             PATENT AND TO DETERMINE WHAT THE CHARACTERISTICS

19             WERE OF THE VARIOUS SUBSYSTEMS AND THE WAY THEY

20             RELATED WITH ONE ANOTHER, TO DEFINE THE, THE

21             APPLICATION THAT WAS TO BE SERVED BY THE SYSTEM,

22             AND TO KNOW VERY SPECIFICALLY THE, THE REQUIREMENTS

23             OF THAT SYSTEM IN ITS APPLICATION SO THAT THEN THE

24             PARTICULAR CHARACTERISTICS OF THE SYSTEM TO BE

25             BUILT ACCORDING TO THE PATENT COULD BE, COULD BE

1           TAILORED TO THE APPLICATION.

2           Q    WOULD A PERSON OF ORDINARY SKILL IN THE ART IN

3           1991 HAVE BEEN ABLE TO GO OUT AND BUY THE

4           COMPONENTS FOR THE SUBSYSTEM FOR THE '702 PATENT

5           THAT YOU HAVE JUST DESCRIBED?

6           A    SOME OF THEM YES, AND SOME OF THEM NO.

7           Q    AND CAN YOU DESCRIBE FOR THE COURT THE EXAMPLE

8           OF COMPONENTS OF SUBSYSTEMS DISCLOSED IN THE '702

9           PATENT THAT WERE AVAILABLE FOR PURCHASE?

10          A    CERTAINLY THE COMPUTERS THAT WERE USED WERE

11          GENERALLY AVAILABLE.

12                THE SOFTWARE THAT WOULD RUN ON IT

13          PROBABLY WOULD HAVE TO BE SPECIALLY DESIGNED,

14          ALTHOUGH THERE WOULD BE SOFTWARE COMPONENTS THAT

15          COULD BE OBTAINED IN THE MARKETPLACE THAT WOULD BE

16          APPLIED AND IT WOULD BE TAILORED TO THE SPECIFIC

17          APPLICATIONS.

18                THERE WERE DEVICES LIKE WHAT WE CALL TIME

19          CODE GENERATORS THAT WERE EQUIVALENT OF THE TIME

20          ENCODER THAT COULD BE OBTAINED IN THE MARKETPLACE.

21                THERE WERE AT THAT TIME COMPRESSION

22          SYSTEMS THAT WERE NOT QUITE AT THE LEVEL THAT, THAT

23          YOU WOULD NEED FOR BROADCAST, BUT THERE WERE

24          CERTAINLY COMPRESSION SYSTEMS AVAILABLE IN THE

25          MARKETPLACE.

1           THE STORAGE SUBSYSTEMS WERE AVAILABLE IN

2     THE MARKETPLACE.

3           PRETTY MUCH EVERYTHING ELSE I BELIEVE

4     WOULD HAVE HAD TO HAVE BEEN AT LEAST CUSTOMIZED TO

5     WORK TOGETHER IN THE SYSTEM.

6     Q    NOW, IF A COMPONENT WAS NOT AVAILABLE FOR

7     PURCHASE OFF THE SHELF, FOCUSSING NOW ON THE '702

8     PATENT SYSTEM, WHAT WOULD THE PERSON OF ORDINARY

9     SKILL IN THE ART HAVE TO DO IF IT WASN'T AVAILABLE

10    FOR PURCHASE?

11    A    IF IT WERE NOT AVAILABLE FOR PURCHASE, THEN

12    YOU WOULD HAVE TO DEFINE THE SPECIFIC SUBSYSTEM

13    THAT WAS REQUIRED, AND THEN BASED ON THAT

14    DEFINITION, DEVELOP A DESIGN, HAVE IT FABRICATED,

15    AND THEN INCORPORATE IT INTO THE SYSTEM.

16    Q    NOW, IN TERMS OF COMING AND DESIGNING THE

17    SPECIFIC REQUIREMENTS OF THE SUBSYSTEM, AT WHAT

18    LEVEL OF DETAIL DOES THE PATENT SPEAK TO THOSE

19    SPECIFIC REQUIREMENTS GENERALLY?

20    A    AT A VERY HIGH LEVEL.

21    Q    AND WHAT DO YOU MEAN WHEN YOU SAY AT A VERY

22    HIGH LEVEL?

23    A    I MEAN THAT IT DOES NOT DESCRIBE IN A WAY THAT

24    YOU, THAT YOU WOULD BE ABLE TO APPLY IT TO ANY

25    PARTICULAR APPLICATION THE WAY THE SYSTEM WORKS.

1          RATHER, IT DESCRIBES IT IN A WAY THAT YOU

2     CAN UNDERSTAND HOW TO APPLY IT TO ANY PARTICULAR

3     APPLICATION ON WHICH YOU HAPPEN TO BE WORKING.

4     Q    DOES THE '702 PATENT -- STRIKE THAT.

5          DO YOU HAVE A VIEW AS TO WHETHER, BECAUSE

6     THE PATENT SPEAKS TO ALTERNATIVE DISTRIBUTION

7     TECHNOLOGIES AS YOU DESCRIBED, IT'S SATELLITE, UHF,

8     BROADCAST OVER THE AIR, ET CETERA, THAT, THAT ANY

9     LEVEL OF SPECIFICITY BEYOND WHAT THEY PROVIDED

10    MIGHT NOT APPLY TO A PARTICULAR APPLICATION AS YOU

11    JUST DESCRIBED?

12         THAT'S AN INELEGANT QUESTION, BUT I'M

13    TRYING TO SPEAK TO IN THAT IN THE PATENT, YOU CAN

14    DO THIS A NUMBER OF WAYS, AND TO WHAT EXTENT, IF AT

15    ALL, HAS THE PATENTEE DESCRIBED THE SYSTEM SO THAT

16    ONE OF ORDINARY SKILL IN THE ART WHO IS CHARGED BY

17    THEIR EMPLOYER WITH MAKING THIS PARTICULAR SYSTEM

18    WORK IN, FOR EXAMPLE, THEIR CABLE APPLICATION, HAVE

19    THEY PROVIDED, IN YOUR JUDGMENT, SUFFICIENT

20    INFORMATION TO DO THAT?

21    A    I BELIEVE THEY HAVE.  IF THEY HAD GONE INTO

22    MUCH MORE DETAIL, THEN IT WOULD HAVE LIMITED THE

23    RANGE OF APPLICATIONS OVER WHICH THE PATENT COULD

24    BE APPLIED.

25    Q    DO YOU BELIEVE THAT A PERSON OF ORDINARY SKILL

1        AS YOU MAY BE COMING TO APPRECIATE, I

2    WILL TRY TO KEEP US ON TIME SO, SO AS YOU PREPARE

3    FOR TOMORROW, PLEASE TRY AND USE OUR TIME VERY

4    EFFICIENTLY.  WE'LL START UP TOMORROW MORNING AT

5    9:00 O'CLOCK.

6        (WHEREUPON, THE EVENING RECESS WAS

7    TAKEN.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4

 5    IN RE:  ACACIA MEDIA       ) C-05-01114-JW

      TECHNOLOGIES              )

 6    CORPORATION PATENT        ) SEPTEMBER 9, 2005

      LITIGATION.               )

 7                              ) VOLUME 2

                                )

 8    _____ ) PAGES 217-428

 9

10

11

12          THE PROCEEDINGS WERE HELD BEFORE

13          THE HONORABLE UNITED STATES DISTRICT

14                  JUDGE JAMES WARE

15    A P P E A R A N C E S:

16    FOR THE PLAINTIFFS: HENNIGAN, BENNETT & DORMAN

                          BY:  RODERICK G. DORMAN

17                             ALAN P. BLOCK

                               ROBERT BERMAN

18                        601 SOUTH FIGUEROA STREET

                          LOS ANGELES, CALIFORNIA  90017

19

20      (APPEARANCED CONTINUED ON THE NEXT PAGE.)

21

22

23

      OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR

24                          CERTIFICATE NUMBER 8074

                            LEE-ANNE SHORTRIDGE, CSR

25                          CERTIFICATE NUMBER 9595
```

1        DISCLOSE ANYTHING HAVING TO DO WITH INTRAFRAME

2        ENCODING?

3        A   WELL, CERTAINLY IN THE GENERAL CASE IT'S

4        DESCRIBING THE, THE CODING OF FRAMES AND EQUATING

5        THE FRAMES TO THE BLOCKS.

6        Q   AND IT'S YOUR TESTIMONY THAT IN NO CASE DOES

7        THIS PATENT DISCLOSE ENCODING INTRAFRAME; IS THAT

8        TRUE?

9        A   BEFORE I WOULD SAY IN NO CASE AND MAKE SUCH A

10       STATEMENT, I WOULD HAVE TO LOOK AT THE DOCUMENT.

11       Q   BUT YOU'RE NOT AWARE OF IT AS YOU SIT HERE

12       TODAY?

13       A   I'M NOT AWARE OF -- I DON'T RECOLLECT ANY

14       PARTICULAR DISCUSSION OF SUBFRAME SEQUENCING.

15              MR. LYERLA:  THAT CONCLUDES WHAT I HAVE,

16       YOUR HONOR.  THANK YOU.

17              THE COURT:  VERY WELL.  ANYONE ELSE?

18              ANY REDIRECT?

19              MR. DORMAN:  NO, YOUR HONOR.

20              THE COURT:  THE QUESTION THAT DID NOT

21       COME UP AS YOU WERE BEING EXAMINED, MR. WEISS, THAT

22       I WANTED TO PUT TO YOU IS THIS:  IF, AS YOU SAY,

23       ONE SKILLED IN THE ART IN YOUR OPINION COULD TAKE A

24       TERM LIKE "SEQUENCE ENCODER" AND, FROM ITS LANGUAGE

25       OF THE TWO WORDS THAT MAKE UP THE PHRASE, AND FROM

1          READING THE LANGUAGE IN THE SPECIFICATION COME UP

2          WITH A DEVICE THAT WOULD MEET THAT, IS IT YOUR

3          OPINION THAT, THAT MULTIPLE ENGINEERS DOING THAT

4          PROCESS COULD INDEED COME UP WITH MULTIPLE

5          SOLUTIONS?

6                   THE WITNESS:  IT WOULD SEEM TO ME THAT

7          THE USE OF TIME CODES WERE SO WELL-KNOWN AT TIME

8          THAT THE IMMEDIATE RESPONSE THAT SOMEONE WOULD HAVE

9          IN DESIGNING A SYSTEM TO TRY AND IMPLEMENT THIS

10         PATENT WOULD BE USE OF TIME CODE.

11                  THE COURT:  YOU DIDN'T ANSWER MY QUESTION

12         DIRECTLY, SO PERHAPS THE ANSWER IS, NO, YOU WOULD

13         NOT SEE, IN YOUR OPINION, MULTIPLE ENGINEERS

14         LOOKING AT THIS PROBLEM COMING UP WITH MULTIPLE

15         SOLUTIONS.

16                  THEY WOULD ALL COME TO TIME ENCODING AS

17         THE SOLUTION, AS THE ONLY SOLUTION THAT YOU WOULD

18         SEE THEY WOULD COME TO.

19                  THE WITNESS:  IT'S NOT THE ONLY SOLUTION

20         THAT I COULD CONCEIVE OF, NO.

21                  BUT IT WAS THE ONE THAT WAS SO WELL-KNOWN

22         AND IMPLEMENTED AT THE TIME THAT IT WOULD BE AN

23         AUTOMATIC THING TO ADOPT.

24                  SO IF THE QUESTION IS, IS IT POSSIBLE

25         THAT THERE COULD BE OTHER SOLUTIONS THAT OTHER

1    ENGINEERS MIGHT HAVE DESIGNED, I SUPPOSE THAT'S

2    POSSIBLE.

3              BUT THE NATURE OF VIDEO AND AUDIO IS SUCH

4    THAT IT'S INHERENTLY TIME DEPENDENT, AND SO MUCH

5    THAT THE DISCUSSION IS OF VIDEO AND AUDIO THAT TIME

6    CODING IS THE NATURAL THING TO, TO APPLY.

7              THE COURT:  ALL RIGHT.  I THINK I

8    UNDERSTAND YOUR ANSWER.

9              AND I'LL PUT THE SAME QUESTION TO YOU

10   WITH RESPECT TO THE IDENTIFICATION ENCODER.

11             IS YOUR ANSWER THERE THAT THEY WOULD ALL

12   COME TO THE SAME SOLUTION, OR WOULD MULTIPLE

13   ENGINEERS COME TO MULTIPLE SOLUTIONS?

14             THE WITNESS:  THERE CERTAINLY ARE

15   MULTIPLE WAYS THAT, THAT INDIVIDUAL APPLICATIONS

16   WOULD HAVE DEVISED THE ACTUAL FUNCTIONING OF THE

17   IDENTIFICATION ENCODE.

18             I THINK I SAID YESTERDAY THAT THE SYSTEM

19   WOULD NEED TO BE DESIGNED VERY SPECIFICALLY FOR AN

20   APPLICATION, AND I TALKED YESTERDAY ABOUT THE SCOPE

21   OF THE IDENTIFIER, FOR INSTANCE.

22             THE CHARACTERISTICS OF THE SYSTEM WOULD

23   LEAD TO DIFFERENT SPECIFIC DESIGNS, I BELIEVE, OF

24   THE IDENTIFICATION ENCODER.

25             BUT THE FUNDAMENTAL FUNCTIONS THAT ARE

1      REQUIRED ARE DEFINED IN THE PATENT.

2              THE COURT:  VERY WELL.  I THINK I

3      UNDERSTAND THAT ANSWER AS WELL.

4              I HAVE NO OTHER QUESTIONS.  IF YOU HAVE

5      NONE, YOU'RE EXCUSED.

6              MR. SAVIKAS:  GOOD MORNING, YOUR HONOR,

7      VICTOR SAVIKAS FROM JONES DAY REPRESENTING DIRECT

8      T.V.

9              BECAUSE MR. WEISS DID NOT REALLY GO

10     BEYOND HIS DECLARATION, AND IN VIEW OF THE FACT

11     THAT DR. ALEXANDER DID NOT APPEAR IN PERSON, WE ARE

12     SIMPLY GOING TO RELY ON THE DECLARATION OF

13     DR. LIPPMAN IN SUPPORT OF OUR POSITION ON

14     TRANSCEIVER AND IN OPPOSITION TO ACACIA'S POSITION

15     ON SEQUENCE ENCODER AND TIME ENCODER.

16             SO IT'S THE DEFENDANT'S PROPOSAL THAT WE

17     NOW MOVE TO ARGUMENT, AND IT WOULD BE OUR PROPOSAL

18     THAT WE HANDLE THE ARGUMENT FIRST ON SEQUENCE

19     ENCODER, AND THEN AT A FIRST LOCATION, AND THEN

20     IDENTIFICATION ENCODER AND REMOTE LOCATION AND

21     FINALLY TRANSCEIVER IF THAT WOULD BE ACCEPTABLE TO

22     YOU AND ACACIA.

23             THE COURT:  LET ME HEAR THE OTHER SIDE.

24     I'M A FANCY TIME KEEPER.  YOU MAY USE YOUR TIME AS

25     YOU WISH.

1               AND IS MR. WEISS STILL HERE?

2               MR. WEISS, I ALWAYS WANT TO EXPRESS MY

3        APPRECIATION TO THOSE WHO ARE OUTSIDE OF THE LEGAL

4        FIELD WHO COME TO THE ASSISTANCE OF THE COURT.

5               YOU WERE THE SUBJECT OF A GREAT DEAL OF

6        CRITICISM, BUT THAT'S WHAT THIS PROCESS IS ALL

7        ABOUT.

8               IF PERSONS OUTSIDE OF YOUR EXPERTISE,

9        TECHNICAL EXPERTS WOULD NOT MAKE THEMSELVES

10       AVAILABLE TO LAWYERS BECAUSE THEY FIND THIS PROCESS

11       TOO UPSET TO GO THEIR NORMAL WAY OF LIFE, WE WOULD

12       BE HARMED BY THAT.

13              SO I WANT TO EXPRESS MY PERSONAL

14       APPRECIATION THAT YOU, THAT YOU CAME TO, TO ASSIST

15       US ON THESE, ON THESE TECHNICAL MATTERS.

16              THANK YOU VERY MUCH.

17              VERY WELL.  THE MATTER IS SUBMITTED AND

18       I'LL HEAR YOUR REBUTTAL BRIEFING IN THE ORDER THAT

19       YOU HAVE ALREADY SET UP FOR YOURSELVES.

20              (WHEREUPON, THE EVENING RECESS WAS

21       TAKEN.)

22

23

24

25

# EXHIBIT C

HENNIGAN, BENNETT & DORMAN LLP
RODERICK G. DORMAN (SBN 96908)
ALAN P. BLOCK (SBN 143783)
KEVIN I. SHENKMAN (SBN 223315)
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Attorneys for Plaintiff
ACACIA MEDIA TECHNOLOGIES CORPORATION

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| ACACIA MEDIA TECHNOLOGIES CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> NEW DESTINY INTERNET GROUP, et. al., <br><br> Defendants. <br><br> AND ALL RELATED CASE ACTIONS. | Case No. SACV 02-1040 JW (MLGx) <br><br> **PLAINTIFF ACACIA MEDIA TECHNOLOGIES CORPORATION'S CLAIM CONSTRUCTION BRIEF** <br><br> **DATE:** February 6, 2004 <br> **TIME:** 10:00 a.m. <br> **CTRM:** Hon. James Ware |

# I.    BACKGROUND TO ACACIA'S U.S. PATENT NO. 5,132,992

Today, transmitted digital video is taken for granted. We can view digital video material from many transmission sources, such as the Internet, cable television, and satellite television. Using those sources, we can now select a movie and watch it at a time of our choosing, without ever leaving our home.

This was not the case in early 1990. Then, if a person wished to view a selected movie at their home at a time of their choosing, they would have to rent or purchase the movie on videotape or a laserdisc. This required one, and sometimes two, trips from the home to the video store. While these methods of viewing movies were accepted and widely used in the United States at that time and now, there remained a pressing, long felt need for a system which would permit persons to view movies at their homes at a time of their choosing—without having to leave their homes.

In early 1990, Paul Yurt and H. Lee Browne sought to solve this problem. Yurt and Browne collaborated to develop a digital communication system that would, among other things, permit a person to receive transmissions of audio, video, and/or audiovisual programs at their home, or other location, which the person could play back as it was being received or which the person could retain for playback at a later time of the person's choosing.

On January 7, 1991, Yurt and Browne filed a patent application with the United States Patent and Trademark Office for their invention entitled: "Audio and Video Transmission and Receiving System." This application issued as United States Patent No. 5,132,992 on July 21, 1992 (the '992 patent). (the '992 patent is attached to the Appendix as Exhibit 1; the file history for the '992 patent is attached to the Appendix as Exhibit 2).[1] Four additional continuation patents have issued thereafter, including

---

[1]    All references to Exhibits in this brief refer to the Exhibits attached to the accompanying Appendix of Exhibits, which is filed concurrently herewith.

U.S. Patent No. 6,144,702, which issued on November 7, 2000 (the '702 patent)[2].

Yurt and Browne invented a comprehensive digital transmission and receiving system with many features[3]:

1.  the user may remotely select audio/video material from any location that has either telephone service or a computer. ('992 patent, 1:62-66[4]);

2.  the system transmits over one or more existing communication channels.[5] ('992 patent, 1:67-2:4; 15:65-16:15; 16:53-68; 19:24-27; Figs. 2b and 6);

3.  the system transmits, receives, and plays back only audio information, only video information, or a combination of audio and video information. ('992 patent, 2:11-15);

4.  the system can transmit information in a fraction of real time to any specified receiver. ('992 patent, 1:67-2:4);

5.  the system permits the user to play back the information at any time selected by the user. ('992 patent, 2:5-8);

---

[2]   In this case, Acacia contends that defendants are infringing claims of the '992 and '702 patents. The '702 patent, being a continuation of the '992 patent, has the same effective filing date as the '992 patent -- January 7, 1991 -- and has the same specification and figures as the '992 patent (although the same text is printed at different columns and line numbers for each patent). This motion relates only to the claims of the '992 patent.

[3]   These features are not limiting with respect to any of the claims of the patents, unless explicitly stated in any claim. Nothing in the specification of the '992 patent requires that every embodiment of the invention include these features. See, E-Pass Technologies, Inc. v. 3Com Corporation, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.")

[4]   Throughout this brief, Acacia shall cite to the '992 patent using the convention of column:line-line or column:line - column:line.

[5]   The '992 patent identifies non-limiting examples of communication channels, such as standard telephone, ISDN, B-ISDN, microwave, DBS (direct broadcast satellite), cable television systems, metropolitan area networks, local area networks, high speed modems, communication couplers, VHF, or UHF broadcasting systems. ('992 patent, Fig. 2b; 4:661-63;15:65-16:15 and 16:53-69).

6.    the system permits the user to retain a copy of the information for multiple playbacks in the future. ('992 patent, 2:8-10);

7.    the system permits the conversion of disparate input source material[6] into a compatible format for ease of transmission, receipt, and playback by many users at many locations. (see, e.g.,'992 patent, 5:66-6:22); and

8.    the system permits the user to play back the program using playback controls similar to those used on a standard recorder, such as play, fast forward, rewind, stop, pause, and play slow. ('992 patent, 17:35-38).

This feature-laden invention of Yurt and Browne is disclosed in the '992 patent, which details how source material programs are formatted and transmitted to remote locations, and how the formatted programs are requested, received and played back.

There are 58 claims in the '992 patent, comprising six categories of system and method claims [transmission system claims (1-18); distribution method claims (19-24); receiving system claims (25-40); method of transmission claims (41-46); distribution system claims (47-53); and method of receiving information claims (54-58)]. To best introduce the Court to the novel technology invented by Yurt and Browne and to explain the way it works in an understandable manner, it is desirable that we examine a disclosed embodiment of their invention which is relevant to the claims-at-issue in this case,[7] and, more particularly, examine in that embodiment the

---

[6]   The '992 patent identifies non-limiting examples of different types of source material items of information: "television programs, movies, audio recordings, still pictures, files, books, computer tapes, computer disks, documents of various sorts, musical instruments, and other physical objects [musical instruments and physical objects are meant to refer to live events, which can be recorded]. . . The different media formats preferably include digital or analog audio and video tapes, laser disks, film images, optical disks, magnetic disks, computer tapes, disks, and cartridges." ('992 patent, 6:12-15 and 6:19-22).

[7]   In this case, Acacia contends that all of the defendants are involved with streaming video and therefore are infringing claims 1, 2, 4, 6, 8, 9, 10, 18, 41, 42, 43, 44, 45, and 46 of the '992 patent and claims 14 and 41 of the '702 patent. Additionally, Acacia contends that defendants Game Link, Inc. and AEBN, Inc. also infringe claims 19, 22, and 24 of the '992 patent and claims 1-4, 6, 8-13, 15, 17-32, and 34-40, because these are the only defendants who, in addition to providing users with streaming videos, also permit users to store a copy of the selected video.

described system elements and steps to: (1) store source material programs (e.g. items of information) in a library; (2) assign each item of information a unique identification code so that the program can be located and accessed later; (3) convert and format separate items into a compatible digital format, (4) place the formatted material in an order or sequence (i.e., using time codes); (5) compress the formatted, ordered data blocks; (6) store the formatted, ordered, and compressed data blocks as a file in a storage library; (7) transmit at least a portion of the file to a remote location; (8) receive the compressed, digital information; (9) store (temporarily or for longer periods of time) at least a portion of the information; (10) decompress the information; and (11) play back the information using playback controls. Notably, this description of embodiment does not limit the scope of the claims, which are broader. This description is provided for illustrative purposes only.

### 1. Description Of System Elements And Steps From The Disclosed Embodiments Of The '992 Patent

#### a) Store Source Material Programs (e.g., Items Of Information) In A Library

Like the local Blockbuster outlet "stores" videos, the source material library (111) of the '992 patent stores "items of information [which] may include analog and digital audio and video information as well as physical objects such as books and records." ('992 patent, 6:2-4). The source material library (111) stores "different types of materials including television programs, movies, audio recordings, still pictures, files, books, computer tapes, computer disks, documents of various sorts, musical instruments, and other physical objects."[8] ('992 patent, 6:12-15). Items of information may be in different media formats, such as digital or analog video tapes, laser disks, film images, optical disks, magnetic disks, computer tapes, disks, and

---

[8] This storage may be permanent or temporary: ". . . a preferred embodiment of the present invention preferably includes source material library means for temporary storage of items prior to conversion." ('992 patent, 5:66 - 6:1).

# IV.   **CONCLUSION**

For the foregoing reasons and authorities, Acacia respectfully requests that its proposed claim constructions be adopted by this Court.

DATED:  January 8, 2003                    HENNIGAN BENNETT & DORMAN LLP


By _____
                Alan P. Block

Attorneys for Plaintiff,
ACACIA MEDIA TECHNOLOGIES
CORPORATION

# EXHIBIT D

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | | |
|---|---|---|
| ACACIA MEDIA TECHNOLOGIES CORPORATION, | ) ) ) | SA CV 02-1040-JW(MLGx); |
| | ) | **Consolidated Cases:** |
| Plaintiff(s), | ) ) | SA CV 02-1048-JW(MLGx); |
| | ) | SA CV 02-1063-JW(MLGx); |
| | ) | SA CV 02-1165-JW(MLGx); |
| vs. | ) | SA CV 03-0217-JW(MLGx); |
| | ) | SA CV 03-0218-JW(MLGx); |
| | ) | SA CV 03-0219-JW(MLGx); |
| | ) | SA CV 03-0259-JW(MLGx); |
| | ) | SA CV 03-0271-JW(MLGx); & |
| NEW DESTINY INTERNET GROUP, *ET AL.*, | ) ) | SA CV 03-0308-JW(MLGx) |
| | ) | **Related Cases:** |
| | ) | |
| Defendant(s). | ) ) | |
| | ) | SA CV 03-1801-JW(MLGx); |
| _____ | ) | SA CV 03-1803-JW(MLGx); |
| AND ALL RELATED AND/OR | ) | SA CV 03-1804-JW(MLGx); |
| CONSOLIDATED CASE ACTIONS. | ) | SA CV 03-1805-JW(MLGx); & |
| | ) | SA CV 03-1807-JW(MLGx) |
| _____ _ | | |

*MARKMAN* ORDER

## I.      INTRODUCTION

This is a patent infringement case, in which the Plaintiff, Acacia Media Technologies Corporation, ("Acacia") asserts that various internet based adult entertainment providers (collectively, "Defendants") infringe both U.S. Patent No. 5,132,992 (the '992 patent) and U.S. Patent No. 6,144,702 (the '702 patent) (collectively, the "patents-in-suit").

The Court conducted a hearing on four separate days in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), to construe the disputed terms and phrases of the asserted claims.[1]  This Order gives the Court's construction of some of the disputed terms and phrases and invites further briefing or motions with respect to other terms.

## II.    Prosecution History of the '702 Patent and the '992 Patent

Both the '992 patent and the '702 patent, are members of the Yurt family of patents that includes five issued patents, all claiming a priority date of the '992 patent and sharing a common specification.[2]  The '702 patent is a division of application Ser. No. 08/630,590, filed April 10, 1996, which issued as U.S. Pat. No. 6,002,720, which is a continuation of application Ser. No. 08/133,982, filed October 8, 1993, which issued as U.S. Pat. No. 5,550,863, which is a continuation of application Ser. No. 07/862,508, filed April 2, 1992, which issued as U.S. Pat. No. 5,253,275, which is a continuation application of Ser. No. 07/637,562, filed January 7, 1991, which issued as the '992 patent.

## III.    STANDARDS

The construction of the claims in a patent is a matter left to the province of the court. *Markman*, 517 U.S. at 391.  A court's objective is to determine the plain meaning, if any, that those of ordinary skill in the art would apply to the language used in the patent claims.  *Warner v. Ford Motor Co.*, 331 F.3d 851, 854 (Fed. Cir. 2003) (citing *Rexnord v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)).  While the court may look to pertinent art dictionaries, treatises and encyclopedias for assistance, *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202-03 (Fed. Cir. 2002), the intrinsic record is the best source of the meaning of claim language. *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Unless the inventor

---

[1] The Court conducted hearings in the Central District of California at the Santa Ana Federal Courthouse on February 6, 2004; April 9, 2004; May 18, 2004; and May 19, 2004.

[2] The Court notes that applicants did make corrections to the specification of the '702 patent, such as adding the phrase "[t]he receiving system recognizes copy protected programs and disables the audio-video recorder."  *See* Miller Decl., Ex. GG ('702 prosecution history) at 211. Nothing in this Order shall be construed as endorsing any claimed priority dates of the patents-in-suit.

has manifested an express intent to depart from the ordinary and accustomed meaning that patent claim language has in the art, there is a heavy presumption that the inventor intended the ordinary meaning to apply. *See Teleflex Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (*en banc*) (citation omitted); *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (citation omitted). The use of extrinsic evidence in the claim construction process is "proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Interactive Gift Express, Inc. v. Compuserve Incorp.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001).

## IV. DISCUSSION

### A. Claim 1 of the '992 Patent

There are fifty-eight claims in the '992 patent, six of which are independent claims. The Court requested that the parties submit a list of disputed terms and phrases appearing in two independent claims: claim 1, an apparatus claim, and claim 41, a method claim. The Court explained that it would construe additional terms in the '992 patent at a later date, if requested by the parties.

With the disputed terms and phrases in bold, Claim 1 of the '992 patent recites:

> 1. A transmission system for providing information to be transmitted to **remote locations**, the transmission system comprising:
>
> **library means for storing items containing information**; **identification encoding means for retrieving the information in the items from the library means and for assigning a unique identification code to the retrieved information;**
>
> conversion means, coupled to the **identification encoding means**, for placing the retrieved information into a predetermined format as formatted data;
>
> **ordering means, coupled to the conversion means, for placing the formatted data into a sequence of addressable data blocks;**
>
> compression means, coupled to the ordering means, for compressing the formatted and sequenced data blocks;
>
> **compressed data storing means**, coupled to the data compression means, **for storing as files the compressed, sequenced data blocks received from the data compression means with the**

**unique identification code assigned by the identification encoding means**; and

transmitter means, coupled to the compressed data storing means, for sending at least a portion of one of the files to one of the **remote locations**.

('992 patent, 20:14-40) (emphasis added).

1. A transmission system for providing information to be transmitted to

**"remote locations"**

The parties request construction of the term "remote locations" that appears in claims 1, 19, 22, 25, 41, 47 and 54 of the '992 patent. Acacia contends that the term should have its ordinary and customary meaning, such that "remote locations" means "positions or sites distant in space from the position(s) or site(s) of the transmission system." To support its position, Acacia points to various parts of the claim language and the specification.

Defendants contend that the word "locations" simply is the plural of "location" and has a commonly understood meaning of more than one place or site. Defendants assert that the dispute centers upon the term "remote." Defendants contend that the term "remote locations" should be construed to mean "more than one location selected by the user."

The Court finds that the ordinary meaning of the term "remote locations" is "positions or sites distant in space from some identified place." In the context of claims 1 and 41, the ordinary meaning of the term is "positions or sites distant in space from the transmission system." In the context of claim 1 the term "remote locations" is described in relation to the transmission system in the preamble that recites "[a] transmission system for providing information to be transmitted to remote locations ..." Similarly, in claim 41 the "remote locations" are sites remote from the transmission system to which at least a portion of the file is sent.

Unlike other claims of the '992 patent that describe systems responsive to requests from a user (*e.g.,* claims 19 and 47), there is no such limitation included in independent claims 1 and 41. Specifically, claims 19 and 47 contain additional limitations that the remote location be specified by the user of the system. In other words, the term "remote locations" is used consistently by the

inventors in all claims but the inventors added additional words that limit the term to a remote location selected by the user in claims 19 and 47.

Defendants' proposed construction of "remote locations" would read the limitations of claims 19 and 47 into broader claims, a construction that would violate the doctrine of claim differentiation. "It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added 'wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.'" *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 949, 950 (Fed. Cir. 1993) (quoting *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433, (Fed. Cir.), *cert. denied*, 488 U.S. 986 (1988); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.").

The Court looks to the specification to determine "whether the presumption of ordinary and customary meaning is rebutted." *Tex. Digital Sys.,* 308 F.3d at 1204; *see also Inverness Med. Switz. Gmbh v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371-72 (Fed. Cir. 2002). The specification discloses a configuration that does not require a user to select a particular location. Figure 1g of the '992 patent shows a transmission system distributing to a receiving system, which preferably transmits requested material over airwave communication channels to a plurality of users. ('992 patent, 4:53-57). Also, the specification discloses "[t]he transmission system 100 of the present invention preferably further includes transmitter means 122, coupled to the compressed data library 118, for sending at least a portion of a specific file to at least one remote location." ('992 patent, 15:61-65).

Here, the specification does not overcome the heavy presumption that the plain and ordinary meaning should apply. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)); *see also Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1374 (Fed. Cir. 1998) ("If the written description supports the definition of the term that is apparent from the claim limitation, then reading in a further limiting definition would be improper."); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) ("Where a

specification does not require a limitation, that limitation should not be read from the specification into the claims.").

Next, the Court considers statements made in the prosecution history of the '992 patent, as well as related patents that share the same specification, to determine whether the patentee effected a disclaimer of claim scope. *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004). Such a disclaimer requires clear and unmistakable statements of disavowal. *See Cordis Corp. v. Medtronic AVE, Inc. at el.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003) (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003)).

A "Petition to Make Special" allows an application to request an accelerated examination of an application. In exchange, the applicant must conduct a preexamination search and must provide "a detailed discussion of the references, which points out, ... how the claimed subject matter is distinguishable over the references." M.P.E.P. § 708.02. VIII (1989). In distinguishing the claimed invention from U.S. Patent No. 4,890,320 (hereinafter, "*Monslow*") that issued in 1989, the applicants explained that in *Monslow* "the viewer-chosen program is transmitted to the television receiver of the requesting viewer." (Miller Decl., Ex. B., p. 156). In distinguishing the claimed invention from U.S. Patent No. 4,506,387 (hereinafter, "*Walter*") that issued in 1985, the applicants explained *Walter* "requires that the viewer be at the location for both ordering and viewing the audio/video material." *Id.* In distinguishing U.S. Patent No. 4,763,191 (hereinafter "*Gordon*") that issued in 1988, the applicants explained *Gordon* did not disclose a provision for storage of requested programming before transmission to the user or for storage before the programming is played. *Id.*

The Court finds that there was no clear disavowment of claim scope during the prosecution history of the '992 patent that limits the plain and ordinary meaning of the term "remote locations." While the prior art references disclosed a system where the requesting device, either a telephone or a computer, is physically located at the same location as the receiving system, the applicants distinguished the present invention in that none of the references provided for the storing of the information at the receiving system location so that the information may be played back at a later time selected by the user. Thus, the requester of the

6

information may be physically located at a "remote location," because the prior art was overcome for more than one reason, creating no disavowment of claim scope.

Defendants contend that the applicants clearly disavowed and thereby limited the term "remote locations" by a statement made during the prosecution of the '720 patent application, a patent in Yurt family that issued in 1998. In the '720 patent application, the applicants amended a claim in response to an examiner's rejection. The applicants stated "to clarify remote location to which the information is transmitted is different from the accessing location at which the user is positioned when making the request." (Miller Decl., Ex. L, p. 502). The amendment and alleged disavowment were in response to the examiner's rejection of the claim as anticipated by U.S. Patent No. 5,195,092 (hereinafter, "*Wilson et al.*") that issued on March 16, 1993.

At the First *Markman* Hearing held on February 6, 2004, Defendants asserted that *Microsoft Corp. v. Multi-Tech Sys., Inc.* allowed a court to rely on comments made in subsequent related patent prosecutions to interpret disputed claims of previous issued patents. The Court disagrees. In *Microsoft*, the Federal Circuit stated that it was relying on comments directed at the common specification shared by both of the patents and was not relying on comments made regarding amendments to claims. *See Microsoft*, 357 F.3d at 1349 n5.

During claims construction of the '992 patent that issued in 1992, it would be improper for the Court to consider a comment made during prosecution of a related patent (the '720 patent) regarding an amendment to a claim made in 1998 to overcome 1993 prior art. *See id*; *Georgia-Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322 (Fed. Cir. 1999).

Therefore, the Court finds "remote locations" to have its ordinary meaning "positions or sites distant in space from some identified place or places." In claims 1 and 41 of the '992 patent, the term "remote locations" means "positions or sites distant in space from the transmission system."

### 2. "library means for storing items containing information" (claim 1 of the '992 patent)

The parties request that the Court construe the phrase "library means for storing items containing information" that appears in claim 1 of the '992 patent.

Acacia contends that the phrase "library means for storing items having information" is not a means-plus-function limitation, because sufficient structure for performing the claimed function is disclosed in the claim. Acacia contends that sufficient structure is elaborated in claim 1 by including the term "library." Acacia supports its position through use of a dictionary that defines the term "library" as "a place where materials are kept or a collection of such materials." Also, Acacia relies on the specification stating that "the library has a geographical location and that multiple libraries in a system may communicate with one another. ('992 patent, 2:65-66; 6:23-30; and 15:13-15)." (Acacia's Claim Construction Brief, January 8, 2004).

Defendants contend that sufficient structure is not recited in the claim. Defendants contend that the claimed function of "storing items containing information" should be construed to require that the library means must have items containing information that may be readily accessed for use by the transmission system, *i.e.*, the library is part of the transmission system. Defendants contend that although a generic "library" is capable of retaining items at a particular location, a generic library does not make these items available for use by the claimed transmission system. Defendants assert that the only type of library that performs the claimed function is the "source material library" disclosed in the specification.

The use of the term "means for" in a claim limitation creates a rebuttable presumption that the limitation is drafted in § 112, ¶ 6 format. *NCR Corp. v. Palm, Inc.*, 217 F. Supp. 2d 491, 502 (D. Del. 2002) (citing *Kemco Sales, Inc. v. Control Papers, Co.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000). One can rebut that presumption by showing that the claim itself recites sufficiently definite structure to perform the claimed function. *Id. See also Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360 (Fed. Cir. 1994);[3] *Unidynamics Corp. v. Automatic Prods. Int'l*

_____

[3]In *Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360 (Fed. Cir. 1994), the claim at issue described a centrifugal fan and filter assembly for clean room environments. The district court had construed "second baffle means" as a means-plus-function element and had looked to the specification to determine its corresponding structure. The first embodiment described a baffle having continuous arcuate surfaces; the district court found that the claims required such arcuate structure. Since the accused product had baffles formed of L-shaped material, the district court granted summary judgment of non-infringement.

On appeal, the Federal Circuit reversed, noting that while the district court had properly

*Ltd.*, 157 F.3d 1311, 1319 (Fed. Cir. 1998)[4]

The clause "library means for storing items having information" is written such that the means-plus-function presumption of § 112, ¶ 6 does apply. *See Greenberg v. Ethicon Endo Surgery, Inc.*, 91 F.3d 1580 (Fed. Cir. 1996) ("Claim drafters conventionally use the preface 'means for' (or 'step for') when they intend to invoke section 112(6), and there is therefore seldom any confusion about whether section 112(6) applies to a particular element."); *Sage Prods.*, 126 F.3d at 1427. "This presumption is overcome in two ways." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002).

"First, a claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶ 6." *Allen Eng'g Corp.*, 299 F.3d at 1347 (citations omitted).

In the case at hand, the presumption is not overcome by the first method because there is a function corresponding to the means recited in the claim: "library means **for storing items having information**." ('992 patent, 20:17) (emphasis added).

"Second, even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112, ¶ 6 does not apply." *Allen Eng'g Corp.*, 299 F.3d at 1347 (citations omitted).

Here, the issue is whether the term "library" is a sufficient recital of structure to perform the function.

_____

performed the first part of the analysis, it had failed to perform the second part of the analysis, which is to determine whether the means clause cited sufficient structure to stand upon its own without invoking § 112, ¶ 6 to identify the claimed structure. The court concluded that the patentee had rebutted the presumption and thus the element was not subject to § 112, ¶ 6 .

[4]In contrast, the Federal Circuit construed "spring means tending to keep the door closed" to be means-plus-function in *Unidynamics Corp. v. Automatic Prods. Int'l Ltd.*, 157 F.3d 1311, 1319 (Fed. Cir. 1998). The Federal Circuit agreed with the lower court that the term "spring" is a structural term, but held that the remainder of the clause was intended to invoke means-plus-function treatment, and that the use of a structural term in the clause did not vitiate this intent, given the statement in the specification that the disclosed "spring 46 is an example of spring means tending to keep the door closed." In other words, the use of the words "is an example of" did not stop the court from limiting the claim to that example. *Id.*

9

The Court finds that the term "library" does not provide sufficient structure to overcome the presumption that the patentees' use of the term "means for" was not intended to invoke § 112, ¶ 6. Even if the term "library" is considered a structural term, the remainder of the clause invokes means-plus-function treatment, and the use of a structural term in the clause does not vitiate the patentees' intent. *See Unidynamics Corp. v. Automatic Prods. Int'l Ltd.*, 157 F.3d at 1319 (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536, 19 USPQ2d 1367, 1369 (Fed. Cir.1991) ("The recitation of some structure in a means-plus-function element does not preclude the applicability of section 112.")).

Moreover, a generic library by itself is not integrated with the claimed invention and does not make the information available. A particular kind of library, a "source material library" is required in the claimed invention.[5]

_____

[5]Every section of the specification that Acacia relies on in support of its position that "library" connotes sufficient structure, makes reference not to a "library" but instead a "source material library." *See* '992 patent, 2:65-66 ("Additionally, the present invention comprises a receiving system responsive to a user input identifying a choice of an item stored in a **source material library** to be played back to the subscriber at a location remote from the **source material library**.") (emphasis added); '992 patent, 6:23-30 ("The **source material library** 111, ... may preferably include a single source material library or a plurality of **source material libraries**. ... The plurality of **source material libraries** ...") (emphasis added); and '992 patent, 15:13-15 ("It is possible to process orders and operate a database of available titles at multiple locations remote of the **source material library 111**.") (emphasis added).

Moreover, comments made by the applicants during the prosecution of the '992 patent require that the library means be limited to the corresponding structure identified in the specification as the "source material library." In the First Office Action of the '992 patent application, the examiner rejected claims 1-6, and a multitude of others as being anticipated by "*Lang*." (Miller Decl., January 8, 2004; Ex. B at 183-185). The examiner stated that "*Lang* discloses a video/audio storage system which is capable of providing information to remote locations. See Fig. 2 for library means (11)." *Id.* at 183 (emphasis added). The applicants disagreed with the examiner. They asserted that *Lang* envisioned a library at some time in the future because *Lang* lacked the knowledge of how to incorporate such a library. *Id.* at 209. Applicants stated that they solved the problems left open in *Lang*. *Id.* The applicants further disputed whether *Lang* disclosed the recited identification encoding means "because the functions of the identification encoding means are to retrieve of [sic] information from the source material library means and to assign a unique identification code to the retrieved information." *Id.* Thus, to overcome *Lang*, the applicants disavowed any corresponding structure of "library means" other than a "source material library."

Having concluded that "library means" is drafted in means-plus-function form, construction of that limitation requires two steps. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369 (Fed. Cir. 2001). First, the Court must identify the function recited in the claim. *Id.* "Second, the court must identify the corresponding structure set forth in the [specification] that performs the particular function set forth in the claim." *Id.*

The function of "library means" is "storing items containing information."

The Court construes the term "items containing information" to mean "items containing information in analog or digital format." The limitation requiring the information be stored in analog or digital format is necessary as the conversion means element 113 only converts analog and digital inputs into a "formatted data" output.[6] ('992 patent, figure 2a). To preserve validity of the patent, the applicants limited claim 1 of the '992 patent as well as other claims involving a source material library to envelop only retrieving "information in the items." ('992 patent, 20:19). Although the specification discloses musical instruments and books being stored in the source material library, it does not enable retrieval of such items, much less conversion of such information in the items into the required input format acceptable by the conversion means (figure 2a (113)). ('992 patent, figure 2a).

///

///

///

///

///

///

///

---

[6]Neither the claims nor the specification of the '992 patent disclose any structure for converting information in the "items" to analog or digital form as required by the "conversion means," before the items are stored in the library means. The claims and the specification disclose structure (figure 2a (113)), which converts only analog or digital information. Before the items are stored, the information in the "items" stored in the library means must out of necessity already be in analog or digital format.



*FIG. 2a*

The Court finds that the corresponding structure of "library means" is the "source material library," as represented by block 111 of Figure 2a of the '992 patent. The claim element covers this corresponding structure and its equivalents.[7]

> **3.     "identification encoding means for retrieving the information in the items from the library means and for assigning a unique identification code to the retrieved information"**
>
> **a.     "identification encoding means"**

The parties agree that the term "identification encoder means" should be construed under § 112, ¶6. The identification encoding means disclosed in claim 1 of the '992 patent has two functions: (1) "retrieving the **information in the items** from the library means" and (2) "assigning a **unique identification code** to the retrieved information." ('992 patent, 20:19-21) (emphasis added). The Court will construe these two functions and then look to the specification

---

[7] In addition to reasons stated above, a "compressed data library" is not considered a corresponding structure of a library means because it represents the corresponding structure for a "compressed data storing means." Compare claim 1 of the '992 patent col. 20, line 17 ("library means ...") with line 32 ("compressed data storing means, coupled ..."). *See e.g.* '992 patent at 12:48, 12:59-66, and 13:9-13.

for corresponding structure.

### 1. retrieving the "information in the items from the library means"

The Court gives the term "retrieve" its ordinary meaning -- "to get something back."  In this case, the function of the identification encoding means is to get back the information that is contained in the items which are stored in the source material library.

### 2. assigning a "unique identification code to the retrieved information"

Although it is undisputed that the "identification encoding means" must assign a "unique identification code," the parties dispute the meaning of the term "unique identification code." The term does not have a plain and ordinary meaning.  The language of  claim 1 of the '992 patent, clarifies that a unique identification code identifies information stored possibly in more than one file and that the unique identification code is stored in the presence of files containing the information to be stored.

The specification refers to a "unique address code" that is not synonymous with the unique identification code.  The "unique address code is an address for uniquely identifying the compressed data items stored in the compressed data library section of a library system."  ('992 patent, 10:48-50).  "The unique address code makes access to the requested data possible."  ('992 patent, 10:64-65).  Also separately defined in the specification and thus not to be considered a unique identification code is program notes and popularity codes.  ('992 patent, 6:48-54).

In summary, the unique identification code is not a genus that includes all other codes, such as, the popularity code, unique address code, program notes, item title, and file name. Instead, the unique identification code is assigned by the identification encoding means and accompanies information stored as compressed sequenced data through the data compression process.  ('992 patent, 10:20-22).

The specification is ambiguous, *inter alia*, with regards to whether the unique identification code is assigned to "the item" or to "the information in the item."

For instance, in the specification states:

> "[p]rior to being made accessible to a user of the transmission and receiving system of the present invention, the item must be stored in at least one compressed data library 118, and given a unique identification code by identification encoder 112."

('992 patent, 6:35-39).

This passage can reasonably be read to provide that the item itself is stored and that the item itself is given a unique identification code.

In another instance, the specification describes that a file containing compressed audio and video data "is addressable through the unique identification code assigned to the data by the identification encoder 112." ('992 patent, 10:28-30). This language suggests that the unique identification code is assigned to "data," which means the information in the item.

Similarly, the "Summary of the Invention" section of the specification describes the identification encoder means assigning a unique identification code to information retrieved from the source material library. ('992 patent, 2:33-34).

Accordingly, the Court construes the function "assigning a unique identification code to the retrieved information" to mean "assigning a one-of-a-kind identifier to the information retrieved from an item that identifies the retrieved information through the conversion, ordering, compression, and storing processes."

The Court now examines the specification for corresponding structure which performs these functions.

Acacia contends that the structure corresponding to the "identification encoding means" is:

(1) a human being;

(2) computer software;

(3) an identification encoder, and all equivalents.[8]

---

[8]"[A] person (*e.g.* system operator), an identification encoder, and computer software having source material utilization capabilities, and all equivalents thereof." (Joint Claim Construction Chart, Docket Item No. 151).

Defendants contend that there is no corresponding structure because (1) human beings are not structures, (2) the dispatching control software disclosed in the specification is not linked to the identification encoder, and (3) the "identification encoder" is a functional term that does not connote structure. The Court will consider these in order.

### (1) A Human Being As Corresponding Structure for the Identification Encoding Means"

To support its argument that a human being is disclosed in the specification as corresponding structure for the "identification encoding means," Acacia refers to a passage in the specification which mentions a human being:

> FIG. 7 is a flow chart 400 of a preferred method of distribution of the present invention. The distribution method is preferably responsive to requests identifying information to be sent from the transmission system 100 to remote locations. **Method 400 assumes that the items have already been stored in compressed data library 118.**
> As illustrated in FIG. 7, **the first step of the distribution method 400 involves retrieving the information for selected items in the source material library 111, upon a request by a user of the distribution system (step 412). This is analogous to taking books off of a shelf at the local public library after the person has decided that he or she would like to read them.**

('992 patent, 18:46-59) (emphasis added).

Defendants contend that this reference to a person taking books off of a library shelf as analogous to a distribution "method" is not disclosure of a human being as corresponding structure of "identification encoding means." Defendants point out that the specification refers to a method and make no reference to the structure under consideration. In addition, Defendants point out that in the cited analogy the item itself is retrieved by the person. The claim requires corresponding structure for retrieving "the information in the item."

The Court finds that the language of claim 1 supports Defendants' position. As discussed above, corresponding structure to the "identification encoding means" must retrieve "**the information in the items** from the library means." ('992 patent, 20:19-20) (emphasis added).[9]

------

[9] Claim 1 of the '992 patent recites, in pertinent part, that:
1. A transmission system for providing information to be

15

The specification describes "retrieving the information for selected items in the source material library" and does not mention retrieving the item itself.[10] ('992 patent, 18:53-56).

Except for the Figure 7 analogy above to a library user, there is no other discussion in the specification which could be understood by one skilled in the relevant art as disclosing a human being as corresponding structure for performing the functions of the "identification encoding means." ('992 patent, 20:19-20).[11]

Therefore, the Court finds that there is no disclosure in the specification of a human being as corresponding structure for the identification encoding means. Accordingly, the Court declines to include a human being as corresponding structure in its construction of the "identification encoding means."

### (2) The Dispatching Control Software As Corresponding Structure to the "Identification Encoding Means."

Acacia contends that a computer software program, the dispatching control software, is disclosed as corresponding structure of the "identification encoding means."

Computer software that performs uncommon functions can be corresponding structure in a means-plus-function element if the algorithm or enabling software is disclosed. *See Medical Instrumentation & Diagnostics Corp.*, 344 F.3d at 1211 ("The correct inquiry is to look at the

---

transmitted to remote locations, the transmission system comprising:

library means for storing items containing information; identification encoding means for retrieving **the information in the items** from the library means and for assigning a unique identification code to the retrieved information; ...

('992 patent, 20:14-22).

[10]The Court notes that the elements of the patent under consideration do not claim a structure for retrieving the items themselves. The Court leaves for later consideration the effect, if any of no structure for retrieving the items from the library means.

[11] Because the specification of the '992 patent, does not disclose a human being as a corresponding structure for the identification encoding means, the Court does not reach the legal issue of whether a human being can even be a corresponding structure.

disclosure of the patent and determine if one of skill in the art would have understood that disclosure to encompass software for digital-to-digital conversion and been able to implement such a program, not simply whether one of skill in the art would have been able to write such a software program."); *S3, Inc. v. Nvidia*, 259 F.3d 1364, 1369 (Fed. Cir. 2001) ("The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose.") (internal quotations omitted).

In the specification, no algorithm for the "dispatching control software"[12] is disclosed to explain how the information in the items stored in the source material library is allegedly retrieved by the software. *See WMS Gaming, Inc. v. Int'l Game Tech*, 184 F.3d 1339, 1348-49 (Fed. Cir. 1999); *see also Tehrani v. Hamilton Med., Inc.*, 321 F.3d 1355, 1362-63 (Fed. Cir. 2003).

In addition, in a means-plus-function claim element, in order for a structure disclosed in the specification to qualify as "corresponding," there must be language in the specification, which would lead one skilled in the art to link that structure to the function. *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1313 (Fed. Cir. 2001) (finding particular structures not to be corresponding structures because "one skilled in the art would not perceive any clear link or association between these structures and the [recited] function of connecting adjacent elements together").

The specification does not disclose the dispatching control software as structure for the identification encoder means, but instead discloses using the software to receive requests from the remote order processing and item database, and to send requests for information through the distribution system. ('992 patent, 17:54-57). In other words, the dispatching control software, *inter alia*, controls the flow of requests, and maintains a list of the available titles in a particular compressed data library when particular titles are not available in the compressed data libraries. The dispatching control software is not a corresponding structure for the identification encoding means because it does not retrieve "the information in the items" but instead manages the

---

[12]To the extent the "identification encoder," which is discussed later in this order, is computer software, the specification does not disclose any algorithm or enabling software.

17

"efficient use of the available distribution channels." ('992 patent, 17:65-66).

"It is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent." *Medical Instrumentation & Diagnostics Corp.*, 344 F.3d at 1212.

Here, one skilled in the art would not link the dispatch control software, which is linked to other functions, with the retrieving function of the identification encoding means.[13] Therefore, the Court declines to include "dispatching control software" as corresponding structure in its construction of "identification encoding means."

### (3) An Identification Encoder As Corresponding Structure of the "Identification Encoding Means."

The Court now turns its attention to Acacia's contention that the specification discloses an apparatus identified as "identification encoder" as corresponding structure for the "identification encoding means."

The term "identification encoder" is used in the specification. In the specification of the '992 patent, the patentees explain that "[p]rior to being made accessible to a user of the transmission and receiving system of the present invention, the item must be stored in at least one compressed data library 118, and given a unique identification code by **identification encoder 112**." ('992 patent, 6:35-39). Figures 2a and 2b of the '992 patent demonstrate that the unique identification code must be assigned by the identification encoding process, Figure 2a (112), prior to the information being compressed and stored in the compressed data library, Figure 2b (118). A preferred embodiment describes that the transmission system having a "compressed data storing means, coupled to the compression means, for storing as a file the

---

[13] The specification does not support Acacia's contention that the dispatching control software coordinates the retrieval of information and items from the source material library. (Plaintiff's Supp. Briefing Re Identification Encoding Means, p. 4-7). The specification of the '992 patent states that "[t]he dispatch software may also preferably coordinate network traffic, source material library 111 utilization, source material library contents, and connection costs." ('992 patent, 17:61-64). The specification discusses dispatching control software with performing the function of managing the flow of requests such that there is effective utilization of the system not retrieving information in the items.

compressed sequenced data with the unique identification code received from the data compression means." ('992 patent, 10:18-22) (emphasis added). The specification describes that a file containing compressed audio and video data "is addressable through **the unique identification code assigned to the data by the identification encoder 112**." ('992 patent, 10:28-30).

Although the specification identifies a structure called an "identification encoder" ( block 112 in Figure 2a), because the Court is construing a means-plus-function claim, the Court must examine the specification to determine the substance of the identified structure and to determine if the identified structure performs the required functions.

Other than the term itself, the specification contains no description of the structure of an "identification encoder." It is unclear whether it is hardware, software, or as claimed with another element, a human being.

Thus, the issue is whether the use of the term, "identification encoder," without further description connotes sufficient structure to define the bounds of the invention. Acacia contends "identification encoder" can be computer software. However, the specification only defines the identification encoder by its function of assigning a unique identification code and does not disclose any structure, not even computer software.

In a means-plus-function claim, the patentee must disclose sufficient structure in the specification that one of ordinary skill in the art would recognize as being capable of performing the claimed function.[14] In the absence of such a link, the Court cannot create one. *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003).

In the *Medical Instrumentation & Diagnostics Corp.* case, the lower court concluded that "the specification is not very explicit in its disclosures of a means for performing a

---

[14] The '992 patent issued in 1992. Prior to 1994, the United States Patent and Trademark Office ("PTO") did not examine applications for compliance with the corresponding structure requirement of § 112, ¶ 6. *See In re Donaldson*, 16 F.3d 1189, 1194 (Fed. Cir. 1994). In *In re Donaldson*, the Federal Circuit ended the "PTO's sweeping and long-standing practice of not applying paragraph six during examination." *Id.* The Federal Circuit explained that "the fact that the PTO may have failed to adhere to a statutory mandate over an extended period of time does not justify its continuing to do so." *Id.*

19

digital-to-digital conversion." *Medical Instrumentation & Diagnostics Corp.*, 344 F.3d at 1211. Nevertheless, the lower court concluded that because techniques for performing those conversions were known to those of skill in the art at the time the application was filed, a person of skill in the art would understand software to be a corresponding structure for the converting function. *Id.*

On appeal, the Federal Circuit explained that the patentee, MIDCO, presented evidence before the district court that a skilled programmer at the time of the application's filing could have written a program for digital-to-digital conversion of image size. *Id*. at 1212. Also, MIDCO provided examples of programs for digital-to-digital image conversion that would have been available at the time the patent was filed. *Id.* The Federal Circuit noted, however, that none of the examples of programs for digital-to-digital conversion were cited in the patent. *Id.*

After acknowledging that a district court should look at the disclosure from the point of view of one skilled in the relevant art, *id.* (citing *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001), the Federal Circuit reversed the lower court because its inquiry was not correct. The Federal Circuit explained that "[t]he correct inquiry is to look at the disclosure of the patent and determine if one of skill in the art would have understood that disclosure to encompass software for digital-to-digital conversion and been able to implement such a program, **not simply whether one of skill in the art would have been able to write such a software program**." *Id.* (emphasis added) citing (*Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1380 (Fed. Cir. 1999); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1331-32 (Fed. Cir. 2003) (explaining that statements from experts cannot be used to "rewrite the patent's specification" to create a clear link where the language in the specification provides none). "It is important to determine whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing that structure." *Medical Instrumentation & Diagnostics Corp.*, 344 F.3d at 1212 (citing *Atmel*, 198 F.3d at 1382 ("Fulfillment of the § 112, ¶ 6 trade-off cannot be satisfied when there is a total omission of structure. There must be structure in the specification.")).

In this case, the Court cannot define the term "identification encoding means" because there is no corresponding structure in the specification that is linked to the functions recited in the claims.[15] If the Court adopts this finding as its final conclusion on this matter, this would render claims 1, 3, 4, 5, 9, 10 and 11 of the '992 patent indefinite.

The Court invites Acacia to file a motion for an evidentiary hearing on the issue of whether one of skill in the art could identify a corresponding structure and determine the bounds of the "identification encoding means" in view of the specification.

The Court invites the Defendants to file a motion for summary judgment that the term "identification encoding means" is indefinite, rendering claims 1, 3, 4, 5, 9, 10 and 11 of U.S. Patent 5,132,992 to be invalid, respectively, pursuant to 35 U.S.C. § 112, ¶ 2. At the same time, Defendant may file a motion for summary judgment pursuant to § 112, ¶ 1.[16]

The Court will consider these invited motions in accordance with the procedure set forth in the "Conclusion" section of this Order.

///

///

///

///

---

[15]The encoding means identified in claim 1 of the '992 patent has two functions: (1) "retrieving the information in the items from the library means" and (2) "assigning a unique identification code to the retrieved information." ('992 patent, 20:19-21). Although the specification does disclose a human being assigning a unique identification code, it does not disclose what structure he uses to accomplish this function other than the identification encoder (Figure 2a (112)). As mentioned above, the specification does not disclose any structure for the term "identification encoder." Thus, the Court is unable to define a corresponding structure to the "identification encoding means" that is linked to the function of "assigning a unique identification code."

[16] Section 112, ¶ 2 is directed at the claims of the invention, while § 112, ¶ 1 is directed at the relationship of the claims to the specification. Federal Circuit case law allows a district court to address validity under § 112, ¶ 2 during claim construction. Notwithstanding, the Court postpones ruling on the validity of claims under § 112, ¶ 2 until the parties have had an opportunity to present expert testimony. In the interest of time and progressing the litigation initiated in 2002, the Court will also address motions for summary judgment regarding § 112, ¶ 1 on terms that the Court has construed or attempted to construe.

**4.** "conversion means, coupled to the identification encoding means, for placing the retrieved information into a predetermined format as formatted data; **ordering means, coupled to the conversion means, for placing the formatted data into a sequence of addressable data blocks"**

**a.** **"conversion means"**

The parties do not dispute the meaning of the term conversion means. For clarification of how the term interacts with other disputed terms, the Court notes the meaning of the term. The function of the conversion means is to "place retrieved information into a predetermined format." The specification discloses the "converter," figure 2a (113), as the corresponding structure. The specification explains that "after identification encoding is performed by identification encoder 112, the retrieved information is placed into a predetermined format as formatted data by the converter 113." ('992 patent, 6:59-63). The specification defines the inputs to the converter as data in analog or digital form. ('992 patent, 6:62-66) ("The items stored in source material library 111 and encoded by identification encoder 112 may be in either analog or digital form. Converter 113 therefore includes analog input receiver 127 and digital input receiver 124.").

**b.** **"ordering means"**

Pursuant to § 112, ¶6, the "ordering means, coupled to the conversion means" limitation of claim 1 of the '992 patent recites the function of "placing items into a sequence of addressable data blocks." The corresponding structure of the ordering means is the "time encoder (Figure 2a (114)." ('992 patent, 7:59-8:2 and 8:59-62). The claim element covers this corresponding structure and its equivalents.

**c.** **"coupled to"**

The Court construes the phrase "coupled to" to have its plain and ordinary meaning, which is "directly connected to or attached to." *See e.g.* Webster's Ninth New Collegiate Dictionary 298 (1991) (defining "couple" to mean: to connect for consideration together); *see also CCS Fitness*, 288 F.3d at 1366 (holding that there is a heavy presumption that a claim term carries its ordinary and customary meaning). The term "coupled to" as used in the claims and specification means two elements are directly attached to one another such that using a diskette

22

to transfer information from one to another would mean that the two computers are not "coupled to" one another.[17]

### d. "placing the formatted data into a sequence of addressable data blocks" (claim 1 and 41 of the '992 patent)

In light of the Court's construction of the term "ordering means," the phrase "placing the formatted data into a sequence of addressable data blocks" does not require construction.

### 5. "compressed data storing means, coupled to the data compression means, for storing as files the compressed, sequenced data blocks received from the data compression means with the unique identification code assigned by the identification encoding means"

### a. "compressed data storing means" (claim 1 of the '992 patent)

Pursuant to § 112, ¶ 6, the functions of the "compressed data storing means" inherent in the phrase "for storing as files" are (1) creating a file and (2) storing the file. The corresponding structure for creating and storing a file is the compressed data formatter 117. The claim element covers this corresponding structure and its equivalents. The corresponding structure for storage of the file is the compressed data library 118.[18] ('992 patent, figure 2a and 2b). The claim element covers this corresponding structure and its equivalents.

### b. "coupled to" (claim 1 of the '992 patent)

As explained above, the Court construes the phrase "coupled to" to have its plain and

---

[17] Similarly, transferring a diskette from one computer to another would not make the two computers "in data communication with" one another. *See '702 patent claims.*

[18] The Court does not address in this Order whether the specification of the '992 patent discloses sufficient structure for any term, in particular, the "compressed data formatter." *See Atmel*, 198 F.3d at 1382 (holding that Section 112, ¶ 6 "represents a quid pro quo by permitting inventors to use a generic means expression for a claim limitation provided that the specification indicates what structure(s) constitute(s) the means." "If our interpretation of the statute results in a slight amount of additional written description appearing in patent specifications compared with total omission of structure, that is the trade-off necessitated by an applicant's use of the statute's permissive generic means term.").

ordinary meaning, which is "directly connected to or attached to."

**B.     Claim 41 of The '992 Patent**

With the disputed terms and phrases in bold font, claim 41 of the '992 patent recites:

> 41. A method of transmitting information to **remote locations**, the transmission method comprising the steps, performed by a transmission system, of:
>
> **storing items having information in a source material library**;
>
> retrieving the information in the items from the source material library;
>
> assigning a **unique identification code** to the retrieved information;
>
> placing the retrieved information into a predetermined format as formatted data;
>
> **placing the formatted data into a sequence of addressable data blocks**;
>
> compressing the formatted and sequenced data blocks;
>
> **storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code**; and sending at least a portion of the file to one of the remote locations.

('992 patent, 24:53 - 25:5).

**1.     "storing items having information in a source material library"**

**(claim 41 of the '992 patent)**

The parties request that the Court construe the term "storing items having information in a source material library" that is an element in claim 41 of the '992 patent.  Claim 41 in pertinent part recites: "[a] method of transmitting information to remote locations, the transmission method comprising the steps, performed by a transmission system, of: storing items having information in a source material library."  ('992 patent, 24:54-56).

Acacia construes the phrase to mean "the act of placing items having information in a source material library for later use where a source material library is a place where source material is kept or a collection of such material, source material are physical things at the point of origin or procurement, items having information are units or members of groups which have

24

information, and information is any meaning assigned to data by known conventions." (Joint Claim Construction Chart, Docket Item No. 151). Acacia rebuts Defendants' assertion that the transmission system has readily accessible for use original source items of the transmission system in a library by citing the '992 patent, col. 18, lines 53-59, stating that act of retrieving the information for items is analogous to taking books off a shelf at the local public library.

Defendants construe "storing items having information in a source material library" to mean that "the transmission system has readily accessible for use (stores) original source items of the transmission system in a library," where library requires organization of the items. (Joint Claim Construction Chart, Docket Item No. 151). Defendants assert that Acacia initially required a library to be a collection of materials "arranged for ease of use" and that once Acacia abandoned its previous position Defendants added the phrase "organized collection."

The Court finds that the plain and ordinary meaning of the term "library" could mean either a collection of books or a place where books could be stored. The specification supports defining library to be a collection of original material, which contains analog or digital information, that the transmission system may convert, compress, and transmit. In other words, the specification defines the source material library as a collection of original sources of information. In the transmission system described in claim 41 of the '992 patent, the Court construes the phrase "storing items having information in a source material library" to mean "adding items having information to a collection of existing materials."

2. **"storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code" (claim 41 of the '992 patent)**

As a preliminary matter, the disputed phrase "storing, as a file, the compressed, . . ." is not a step-plus-function claim element as asserted by defendants ITI and Offendale. The claim does not employ the "step for" language that signals the drafter's intent to invoke § 112, ¶ 6; rather the claim employs the phrase "A method . . . comprising the steps . . . of," which is an acceptable way to draft method claims. *See Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002). "Courts must be cautious before adopting changes that disrupt the settled expectations of

the inventing community." *Id.* (citations omitted). Defendants ITI and Offendale have failed to overcome the presumption that claim 41 should not be construed as a step-plus-function claim.

The parties dispute the meaning of the term "with." Consistent with the Court's claim construction of the term unique identification code, the Court construes the term "with" to mean "accompanying or in the presence of" such that sequenced data blocks are accompanied by a corresponding unique identification code when stored. The Court construes the phrase "storing, as a file, the compressed, formatted, and sequenced data blocks with the assigned unique identification code" to mean "storing, as a file, the compressed, formatted, and sequenced data blocks accompanied by its unique identification code."

## C.     The '702 Patent

The '702 patent has 42 claims, three of which are independent claims -- 1, 17 and 27. Every claim of the '702 patent is directed toward a "communication system," which comprises both a transmission system and a reception system. Independent claim 1 with the font of the disputed terms and phrases in bold recites:

1. A communication system comprising:

**a transmission system at a first location in data communication with a reception system at a second location**, wherein said transmission system comprises

**a sequence encoder**,

**an identification encoder**, and

a compressed data library in data communication with said **identification encoder**,

wherein said **identification encoder** gives items in said compressed data library a unique identification code; and

wherein said reception system comprises

a **transceiver in data communication** with said transmission system,

a storage device **in data communication** with said transceiver,

user playback controls **in data communication** with said storage device,

**a digital compressor in data communication** with said storage

26

device, and

a playback device **in data communication** with said digital decompressor.

('702 patent, 19:26-47).

1. **"a transmission system at a first location in data communication with a reception system at a second location" (claims 1, 17 and 27 of the '702 patent)**

Independent claims 1, 17, and 27 of the '702 patent all recite "a transmission system at a first location in data communication with a reception system at a second location." This claim limitation is made up of the following constituent phrases: "transmission system," "reception system," "in data communication with," "at a first location," and "at a second location." Each phrase will be addressed individually.

a. **"transmission system" (various claims of the '702 and '992 patents)**

Acacia's proposed construction of the term "transmission system" is: "an assembly of elements, such as people, machines, and/or methods, capable of functioning together to transmit signals."[19] In support of its construction, Acacia relies on *IEEE Standard Dictionary of Electrical and Electronic Terms*, Fifth Ed. 1405 (1993) (hereinafter "IEEE Dictionary") that defines "transmission system" to mean "in communication practice, an assembly of elements capable of functioning together to transmit signal waves" and one of nineteen different definitions of the term "system" regarding software that recites "[a] collection of people, machines, and methods organized to accomplish a set of specific functions." (Plaintiff's Claim Construction Brief May 7, 2004 at 14).

Acacia contends that the specification supports its plain and ordinary meaning of the term "transmission system" that includes humans acting as system operators. *See* Plaintiff's Claim

---

[19] Plaintiff also contends that the "transmission system may be located in one facility or may be spread over a plurality of facilities." The Court will address Plaintiff's contention *infra* in connection with "at a first location" and "at a second location."

Construction Brief (May 7, 2004) at 14 (citing '702 patent, 8:29-32; 10:36-39; 10:59-63; and 14:13-26).

Defendants' proposed construction of the term "transmission system" is the *IEEE Dictionary* definition of the term that recites "as assembly of elements capable of functioning together to transmit signal waves," where Defendants contend that "signal waves" are "electric signals." (Defendants' Claim Construction Brief May 7, 2004 at 8) (citing Miller Decl., ex. NN at 575). Defendants contend that the Court need not define "elements" as used in the *IEEE Dictionary* definition of the term "transmission system" because the claims of the '702 patent state the elements that comprise a transmission system, and that list does not include a human operator. Also, Defendants assert that a human cannot be a part of a claim because a human is not patentable subject matter as defined by 35 U.S.C. § 101.[20]

The Court finds "transmission system" to mean "an assembly of elements, hardware and software, that function together to convert items of information for storage in a computer compatible form and subsequent transmission to a reception system."

### b.    "reception system"

The parties' respective positions regarding "reception system" are reciprocal to their respective positions regarding "transmission systems." The term "reception system" does not appear in the specification. Plaintiff's proposed construction of a "reception system" is: "an assembly of elements, such as people, machines, and/or methods, capable of functioning together to receive signals." Whereas, the Defendants' proposed construction is "an assembly of elements that function together to receive electrical signals from the transmission system."

The Court construes "reception system" to mean "an assembly of elements, hardware and software, capable of functioning together to receive items of information."

---

[20] Title 35 U.S.C. § 101 (1952) recites that:
> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

### c. "in data communication with"

Acacia's proposed construction of the phrase "in data communication with" is one of two IEEE definitions of the term "data communication," which is "the movement of encoded information by means of communication techniques." *See* Plaintiff's Claim Construction Brief (May 7, 2004) at 17 (citing IEEE dictionary at 305, Block Decl., ex. 11).

Defendants' contend that the phrase "in data communication with" never appears in the specification. Relying on a IEEE dictionary definition, Defendants' contend that "in data communication with" should be construed to mean "connected to allow transfer of electrical signals."

The plain and ordinary meaning to one of ordinary skill in the art of the phrase "in data communication with" is "one or more devices connected such that data is being transferred between the devices in real-time." Acacia's proposed construction does not account for the words "in" and "with" that indicate two or possibly more devices are in real-time connection with one another.

A thorough review of the specification does not reveal the use of the phrase "in data communication with," although the phrase is used in every independent claim of the '702 patent. Thus, the specification does not rebut the plain and ordinary meaning, and neither does the prosecution history.

The Court construes "in data communication with" to mean "one or more devices connected such that data is being transferred between the devices in real-time."

### d. "at a first location"

The issue is whether claims reciting "a transmission system at a first location" limit the system to being located at a particular location notwithstanding the disclosures in the specification and use of the word "comprising" in the claims. Case law from the United States Court of Appeals for the Federal Circuit supports a finding that articles "an" or "an" may mean "one or more than one" in particular instances, especially in claims that use the transitional term "comprising." *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999); *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

The claim language "at a first location" requires that "a transmission system" be limited to one particular location. Absent from all of Acacia's briefing regarding this disputed phrase is any mention of the preposition "at," which is used to indicate presence or position, "staying at a hotel" or "located at the mall." *See e.g. Webster's Ninth New Collegiate Dictionary* 111 (1991). The claim language supports limiting "a transmission system at a first location" to a transmission system being at one and only one particular location or premises.[21, 22] *See Ethico EndoSurgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582 (Fed. Cir. 1996); *Exxon Chemical Patents, Inc. v. Lubizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) (recognizing that "[w]e must give meaning to all the words in Exxon's claims.").

The specification supports the phrase "a transmission system at a first location" enveloping one single transmission system at a single location. Figures 1a, 1b, 1d, 1e, 1f and 1g of the '702 patent illustrate a transmission system at a single location.[23] The specification does not rebut the plain and ordinary meaning of the claim, which is more limited in scope than the specification.

The prosecution history does not refute the plain and ordinary meaning of the phrase or

---

[21] As Plaintiff asserts, the use of the terms "first" and "second" is a common patent law convention to distinguish between repeated instances of an element or limitation, but the Court does not consider use of the phrases "at a first location" and "at a second location" in the '702 patent to qualify as repeated instances of an element or limitation. *See* Plaintiff's Opposition to Defendants' Claim Construction Brief (May 13, 2004) (citing *3M Innovative Products Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003)).

[22] Relying on the prosecution history of U.S. Patent No. 6,002,720 ("the '720 patent"), a patent in the Yurt Family of Patents, which the '702 patent derives by way of a divisional application based upon the '720 patent, Defendants' assert that term "location" should be construed to mean "premises." The term location is being applied in different context in that particular situation, and the Court elects not to rely on the prosecution history of a different patent, although the two patents share almost an identical specification, to construe the term location.

[23] As is often the case in the Yurt family of patents, the specification discloses a "high level block diagram" of the invention but does not explain the actual structural components (*e.g.* software or hardware) required to have a transmission system at more than one location. ('702 patent, 4:1). Thus, it is conceivable that the patentees limited the claim to not cover a transmission system in more than one location in an effort to preserve validity of the claims.

the way it is used in the claim language. In the Second Preliminary Amendment, the applicants added new claims, without commentary, to the '702 patent application and the phrase appeared as part of claims 33 (that issued as claim 1) and claim 50 (that issued as claim 27). ('702 Patent Prosecution History, Miller Decl., ex. GG at 115-16).



**FIG. 1a**

The Court construes "a transmission system at a first location" to mean "a transmission system at one particular location separate from the location of the reception system."

  **e. "at a second location"**

The Court construes "a reception system at a second location" to mean "a reception system at one particular location separate from the location of the transmission system." ('702 patent, Fig. 1a). *See Andrew Corp. v. Gabriel Elec., Inc.*, 847 F.2d 819 (Fed. Cir. 1988) (holding the a patentee may claim less than the entire invention).

  **2. "sequence encoder" (claims 1, 7, 17 and 18 of the '702 patent)**

Acacia contends that term "sequence encoder" as found in claims 1, 7, 17, and 18, does not invoke 28 U.S.C. § 112, ¶ 6 because there is no use of the "means" in the claim, the term connotes sufficient structure, and the term "encoder" is well-known to those skilled in the art of electrical engineering, electronics, and computing. *See* Plaintiff's Claim Construction Brief (May 7, 2004) at 17. Acacia contends that an encoder is "a device or system that encodes data." *Id.* (citing *IEEE Dictionary* at 437). Acacia asserts that a "sequence encoder" is "an encoder which creates a sequence." *Id.* at 18.

The Court finds that 28 U.S.C. § 112, ¶ 6 does not apply to construction of the "sequence encoder" claim element. Therefore, from the intrinsic record, if possible, the court must determine the plain meaning, if any, that those of ordinary skill in the art would apply to the term.

The term "sequence encoder" has no plain meaning. Although the general term "encoder" does have a plain meaning, namely, an apparatus which encodes, such a general meaning is not useful in making a determination of the meaning of an apparatus called a "sequence encoder." At most it appears to take a nonspecific function–encoding a sequence–and claim an apparatus for performing that function. Since there is no plain meaning, the Court looks to the patent specification for defining the apparatus.

The term "sequence encoder" never appears in the specification of the '702 patent.

The legal consequence of claiming an apparatus which has no plain meaning and which is not defined or referred to in the specification is for the Court to declare the patent claim indefinite.

Acacia acknowledges that "sequence encoder" does not appear in the specification of the '702 patent. To avoid indefiniteness, Acacia asserts the description of a time encoder in the specification clarifies that the time encoder is a sequence encoder. *See* Acacia's Opposition to Defendants' Claim Construction Brief (May 13, 2004) at 15. Citing *Personalized Media Communications,* Plaintiff's contend that if the phrase "digital detector" in that case connotes sufficient structure to avoid application of § 112, ¶ 6, so does "sequence encoder."

Unlike the "digital detector" in *Personalized Media Communications*, that was at least functionally described in a block diagram, the term "sequence encoder" does not appear at all in the drawings or specification of the '702 patent.

With absolutely no reference or drawing , one of ordinary skill in the art would not know what a sequence encoder is, or what structure the encoder has, and how it interacts with other elements of the transmission system. Furthermore, a person skilled in the art would not find a time encoder that "places the blocks of converted formatted information from converter 113 into a group of addressable blocks" to be synonymous with a "sequence encoder." A time encoder that is described in dependant claim 7 of the '702 patent is a limitation describing an additional

function of the sequence encoder but does not assist one skilled in the art with defining the boundaries of the claimed element, "a sequence encoder." *See Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375 (Fed. Cir. 2002).

"As mandated by the definiteness requirement of 35 U.S.C. § 112, ¶ 2, a specification shall include claims 'particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention'" *Personalized Media Communications*, 161 F.3d at 705 (citing 35 U.S.C. § 112, ¶ 2). "Determining whether a claim is definite requires an analysis of 'whether one skilled in the art would understand the bounds of the claim when read in light of the specification.... If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more.'" *Id.* (citing *Miles Lab., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993)).

Here, one of ordinary skill in the art would not be able to understand the bounds of the claim element, a sequence encoder, because the specification never mentions the term at all. The term "encoder" is a generic term to which the modifier "sequence" does not add clarity to one skilled in the art. The term "sequence encoder" not appearing at all in the specification distinguishes the case at hand from *Personalized Media Communications*, where the specification explicitly defined a "digital detector" as a device that "acts to detect the digital signal information" in another stream of information.[24] *Personalized Media Communications*, 161 F.3d at 706. Also, in *Personalized Media Communications*, the patentee asserted that the specification clearly apprises one of ordinary skill of the scope of the term. Acacia cannot suggest the general public is on notice of the scope of the term "sequence encoder" as the term never appears in the specification. Because the term "sequence encoder" does not appear in the specification of the claim, extrinsic evidence, such as expert testimony, may not be useful to the Court, as the intrinsic evidence appears unambiguous. *Id.* at 706 ("Extrinsic evidence may not be

---

[24] Also, in *Personalized Media*, the patentee asserted that the specification clearly apprises one of ordinary skill of the scope of the term. In the case at hand, Acacia cannot suggest the one of ordinary skill in the art is on notice of the scope of the term "sequence encoder" as the term never appears in the specification.

relied upon during claim construction when the intrinsic evidence unambiguously defines the disputed claim language.") (citing *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997). If the Court adopts this finding as its final conclusion on this matter, this would render claims 1, 7, 17, 18, 32 and 33 of U.S. Patent No. 6,144,702 indefinite.

The Court directs Acacia to file a motion for an evidentiary hearing and Defendants to file motions directed to, *inter alia*, the legal consequence that "sequence encoder" is indefinite.

### 3. "identification encoder" (claims 1, 5, 6, 17, 19, 27 and 31 of the '702 patent)

The parties dispute the meaning of the term "identification encoder" that is found in claims 1, 5, 6, 17, 19, 27 and 31 of the '702 patent.[25] Acacia contends that "identification encoder" should be construed to mean "a device or software capable of expressing the identification of an item in terms of code."

Defendants contend that "identification encoder" does not connote structure to one skilled in the art. Defendants' position is that the patentees use of the term "identification encoder" is functional claiming. In support of their position, Defendants cite to the prosecution history where the applicant's modified the identification encoder by requiring it to assign a unique identification code. Specifically, Defendants contend that the specification does not describe how the identification encoder assigns a unique identification code, a limitation added by the applicants to overcome a rejection in view of *Tindell*. (Defendants' Claim Construction Brief May 7, 2004 at 16). The applicants stated that the limitation was added too "more clearly define the **function** of the identification encoder." (Miller Decl., ex. KK at 165) (emphasis added).

Defendants assert that because "identification encoder" is a functional term, § 112, ¶ 6 applies. Defendants contend that there is no corresponding structure disclosed in the specification. (Defendants' Claim Construction Brief May 7, 2004 at 17). Because there is no

---

[25]Consideration of the term "identification encoder" for this patent is on a different legal footing than consideration of this same term as corresponding structure of a means-plus function claim in the '992 patent, since here there is no requirement that the Court first identify the function which the apparatus must perform and then look to the specification for corresponding structure which performs that function.

corresponding structure disclosed for the functional term, Defendants contend that the Court cannot construe the claim in accordance with § 112, ¶ 6 such that pursuant to § 112, ¶ 2 claims with the term "identification encoder" are invalid for indefiniteness. *Id.*

The Court finds that 28 U.S.C. § 112, ¶ 6 does not apply to construction of the "identification encoder" claim element.[26] Therefore, from the intrinsic record, if possible, the court must determine the plain meaning, if any, that those of ordinary skill in the art would apply to the term.

The term "identification encoder" has no plain meaning. Although the general term "encoder" does have a plain meaning, namely, an apparatus which encodes, such a general meaning is not useful in making a determination of the meaning of an apparatus called a "identification encoder." At most it appears to take a nonspecific function–encoding an identification–and claim an apparatus for performing that function. The five prior art patents cited by Acacia that disclose an identification encoder in five completely different ways, none of which are applicable here nor cited by the patents-in-suit, further exemplifies that one of skill in the art would not understand the meaning of the term "identification encoder." (Block Decl. ex. 24-28).

Since there is no plain meaning, the Court looks to the patent specification for defining the apparatus. Here, the specification of the '702 patent only discloses an identification encoder as a box that performs the function of assigning a unique identification code. ('702 patent, 6:30-39). The specification does not disclose an algorithm, software or apparatus to perform the function of assigning a unique identification code. Thus, one of ordinary skill in the art would not understand the scope or bounds of the claim, when it is read in light of the specification rendering an "identification encoder" insolubly ambiguous.

Although arguably indefinite, the Court construes "identification encoder" to mean "a

---

[26] The Court considers the term "identification encoder" to be indefinite consist with the Court's analysis of the term "identification encoding means." However, due to the rules of claim construction the Court does not believe it is appropriate to apply a means-plus-function analysis where the patentee has not chosen to raise the presumption by using the phrase "means for."

35

structure that assigns a unique identification code."  The Court declines to address further the issue of indefiniteness during claim construction.  The Court invites Defendants to file a motion for summary judgment pursuant to § 112, ¶ 1 and ¶ 2 regarding the term "identification encoder."

### 4.    "transceiver"  (claims 1, 17 and 27)

The parties do not dispute that a "transceiver" is "a device capable of both sending and receiving information."  However, the parties dispute whether that device must share circuit components.  The *Dictionary of Computing*, 3rd ed. (1990), cited by both parties defines as a transceiver as follows:

> Acronym for transmitter and receiver.  A device that can both transmit and receiver signal on a communication medium.  Many communication devices, including *modems, *codecs, and terminals, are transceivers.

*Dictionary of Computing* 474 (3rd ed. 1990).

Defendants contend that examples of transceivers listed in the *Dictionary of Computing* are devices that perform two functions using shared circuitry; such as modems, an acronym for a device that is a modulator and demodulator; and codecs, an acronym for a device that is a coder and decoder.

In the specification, the description of a transceiver is at a block level that does not elaborate on the workings of the transceiver, much less its circuitry.  The specification does illustrate the transceiver as a single box on figures 2b and 6 of the '702 patent.

The Court construes "transceiver" to mean "a singular device capable of both sending and receiving information."

### 5.    "wherein said identification encoder allows entry of a popularity code"  (claims 6 and 27 of the '702 patent)

The disputed phrase "wherein said identification encoder allows entry of a popularity code" appears in claims 6 and 27 of the '702 patent.  Acacia's proposed construction of the phrase is: "a popularity code is the symbols, letters, or words or combinations thereof used to represent the popularity of a particular item.  The identification encoder allows entry of the popularity code."  *See* Plaintiff's Claim Construction Brief at 28 (May 7, 2004).

Defendants contend that Acacia's definition is too broad. Defendants assert that the specification discloses a specific function in the transmission system "[t]he popularity code can be used to determine the most appropriate form of media storage of the compressed data in a mixed media system." (Defendants' Opposition to Plaintiff's Claim Construction May 13, 2004 at 18) (citing '702 patent, col 12, ll. 8-10). "In some cases, where multiple compressed data libraries 118 are organized, the popularity code may dictate the distribution of a particular item to multiple distribution systems." ('702 patent, 12:41-43).

"The storage encoding process performed by [the] identification encoder 112 allows entry of a popularity code." ('702 patent, 12:4-5). According to figure 2a, the "identification encoding process" occurs as the first step of converting material in a source material library into a format suitable for storage in a compressed data library and subsequent transmission. ('702 patent, fig. 2a). The specification indicates that the "popularity code is preferably assigned on the basis of how often the corresponding item is expected to be requested from the compressed data library 118." ('702 patent, 12:6-8).

The specification mentions that the popularity code may be updated by "factoring item usage against system usage." ('702 patent, 12:12-13). However, the specification does not disclose an algorithm, software program, or even a high level block diagram of how requests for a particular item (with copies possibly in other locations) is tracked by the popularity code and how the code is updated.

The specification does not disclose using a popularity code to retrieve items of information, but rather discloses the popularity code as a way of efficiently determining what storage media should be used for particular information to enhance retrieval. For example, how often an item of information is retrieved from the compressed data library determines whether the item is stored on cassette tapes (lower number of requests) or magneto-optical disks (highest number of requests). ('702 patent, 12:20-23). If a popularity code is assigned, the popularity code dictates distribution of a particular item to multiple distribution systems. ('702 patent, 12: 41-43).

Acacia contends that the term "popularity code" has a plain and ordinary meaning such that the Court need not look to the specification to define the term. While a term "popularity rating" connotes a meaning that it is a rating of how popular an item is, the same does not hold true for a "popularity code." Even if the term had a plain and ordinary meaning, which it does not, the patentees acted as their own lexicographers in assigning a specific meaning to the term in one of the few portions of the specification that are unambiguous.

As defined in the specification of the '702 patent, the popularity code, if assigned, has no function separate from the compressed data library. ('702 patent, 12:5-47). Accordingly, the Court construes "popularity code" to mean "a code that indicates initially the projected requests for an item of information in the compressed data library relative to other items contained therein for purposes of determining its place in the storage hierarchy; where said popularity code may be updated over time to reflect actual requests from users for particular information."

The Court construes "wherein said identification encoder allows entry of a popularity code" to mean "an identification encoder assigns an optional popularity code."[27]

### 6. "temporary storage device" (claims 14 and 41 of the '702 patent)

Acacia contends that "temporary storage device" should be construed to mean "a device into which data may be placed, retained for a limited time, and retrieved" or in accordance with the definitions cited by Defendants, "a storage device capable of storing data on an intermediate, or impermanent, basis."

Defendants contend that "[i]n the context of data transmission, one of skill in the art would understand that a temporary storage device is a device in which data may be stored on an

---

[27] During the prosecution of the '992 patent, the applicants disagreed with the examiner that *Lang* disclosed the recited "identification encoding means." The applicants explained that "the functions of the identification encoding means are to retrieve of [sic] information from the source material library means and to assign a unique identification code to the retrieved information." *Id.* Thus, in addition to retrieving information from a source material library means and assigning a unique identification code to the retrieved information, here said identification encoder must perform the additional step of assigning an optional popularity code.

impermanent basis."  (Defendant's Response to Plaintiff's Claim Construction May 13, 2004 at 25).

The plain and ordinary meaning of the term "temporary storage device" is defined by the intent of the person storing the information, not whether data is stored on media that can be overwritten.  The specification supports the plain meaning by explaining in Figure 6 that "[s]torage 203 allows for temporary storage of the requested item until playback is requested." ('702 patent, 17:37-38).  The prosecution history does not rebut the plain and ordinary meaning. The Court construes "temporary storage device" to mean "a device intended to store data for an impermanent basis and allows for stored data to be retrieved from the storage device while the data resides therein."

### 7.    "Digital Compressor"  Should Be Rewritten to Read "Digital Decompressor" (claim 1 of the '702 patent)

The Patent and Trademark Office ("PTO") made a typographical error when formatting the '702 patent, such that the term "digital decompressor" appeared as "digital compressor" in claim 1.  *See* '702 patent, col. 19, l. 44.  Plaintiff's requested a certificate of correction to correct the PTO's mistake on December 12, 2002 and obtained a certificate of correction on April 15, 2003.

At the May 19, 2004 *Markman* Hearing, Defendants agreed that an error had occurred and that the term "compressor" should be "decompressor," but Defendants position is that the error is major such that the Court does not have the authority to change "compressor" to "decompressor."  The result of the Court not correcting the PTO's mistake is that all lawsuits filed prior to issuance of the certificate of correction would be governed by claim 1 having the term "compressor" in the claim instead of the corrected term "decompressor."

After the enactment of 35 U.S.C. §§ 254 and 255, the Federal Circuit has allowed district courts to continue to correct obvious minor typographical and clerical errors in patents.  *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003); *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1203 & n. 3 (Fed. Cir.1992) (adding the word "toy" to the preamble of a claim because "[t]he deletion of 'toy' appears from the record of the proceedings before the PTO

to have been an inadvertent error when the patent was printed rather than an amendment to the claim").

"A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus.*, 350 F.3d at 1357. Here, the parties do not debate that a mistake was made such that the term "compressor" should be replaced with the term "decompressor." Also, the subject is not subject to reasonable debate because the reception system receives compressed data and then decompresses the data in a decompressor, not a compressor. The second element of the test is met because during the prosecution history, claim 1 consistently appears with the correct term "decompressor" and not "compressor," a mistake that did not occur until publication of the patent.

The Court construes "digital compressor" in claim 1 of the '702 patent to mean "digital decompressor." *See I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 442 (1926).

## V. CONCLUSION

To promote judicial economy, the parties should meet, confer and file with the Court no later than August 6, 2004, a joint statement that lists all now pending motions and any motions which the parties propose to file in light of the Court's *Markman* Order. The joint statement shall include each party's individual priority list of the order in which the Court should hear the listed motions and a concise (no more than one-page per party) explanation why the Court should adopt a particular party's proposed schedule.

The Court sets a telephonic case management conference ("CMC") for August 17, 2004 at 11:00 a.m. Plaintiff is to coordinate and initiate the CMC. After the CMC, the Court will set a schedule for briefing and hearing any motions.


Dated: July 12, 2004                              /s/ James Ware
                                                  JAMES WARE
                                                  United States District Judge


40