# EXHIBIT 1

TO DECLARATION OF ALAN P. BLOCK IN
SUPPORT OF PLAINTIFF ACACIA MEDIA
TECHNOLOGIES CORPORATION'S MEMORANDUM
OF POINTS AND AUTHORITIES IN OPPOSITION TO
ROUND 3 DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 112
OF THE '992, '863, AND '702 PATENTS; AND
SATELLITE DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF THE
'992, '863, AND '720 PATENTS

Dockets.Justia.com

# MANUAL OF

# PATENT

# EXAMINING
# PROCEDURE

EDITION __5th__

REVISION __13__



### U.S. DEPARTMENT OF COMMERCE
### Patent and Trademark Office

REEL NUMBER __4__

BOOK NUMBERS _____

Exhibit __1__ Page __3__



U.S.. DEPARTMENT OF COMMERCE
Patent and Trademark Office
Washington, D.C. 20231

MANUAL OF PATENT EXAMINING PROCEDURE
Fifth Edition

Instructions Regarding Revision No. 13

This revision consists of replacement pages for the **title page** in the front of the Manual, **entire Chapters 1000 and 1200, Appeal,** replacement pages for pages **2300-41 through 2300-50, L-15 & 16, L-27 through L-30**; and **appendix R**, patent rules.

Additions to the text of the Manual are indicated by arrows (><) inserted in the text. Deletions are indicated by a single asterisk (*) where a single word was deleted and by two asterisks (**) where more than one word was deleted. The use of three or five asterisks in the body of the laws and rules indicates a portion of the law or rule which was not reproduced.

Louis O. Maassel, Editor
Manual of Patent Examining Procedure

| Remove Page | Insert Pages |
|---|---|
| 1000-1 through 1000-6 | 1000-1 through 1000-10 |
| 1200-1 through 1200-32 | 1200-1 through 1200-32 |
| 2300-41 through 2300-50 | 2300-41 through 2300-50 |
| L-15 & L-16 | L-15 & L-16 |
| L-27 through L-30 | L-27 through L-30 |
| R-1 through R-140 | R-1 through R-146 |
| P-1 & P-2 | P-1 & P-2 |

# Manual of
# PATENT
# EXAMINING
# PROCEDURE

Original Fifth Edition, August 1983
Latest Revision October 1989

 

## U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

Rev. 13, Nov. 1989

Exhibit 1 Page 5

The Patent and Trademark Office does not handle the sale of the Manual, distribution of notices and revisions or change of address of those on the subscription list.

Correspondence relating to any of the above items should be sent to the Superintendent of Documents at the following address:

    Superintendent of Documents
    Mail List Section
    Washington, D.C. 20402

Inquiries relating to subscriptions should be directed to:

    Superintendent of Documents
    United States Government Printing Office
    Washington, D.C. 20402

Orders for reproduced copies of individual replacement pages not amounting to a complete revision of the Manual should be sent to the following address:

    Commissioner of Patents and Trademarks
    Attention: Customer Services Division
    Washington, D.C. 20231

The cost for each 30 pages or a fraction thereof is $10.00 (See 37 CFR 1.13(a) and 1.19(a)(3)).

Charges may be made to Deposit Accounts if the requester is an account holder in good standing at the time the request is received. Checks or money orders should be payable to the Commissioner of Patents and Trademarks. Requests must identify the specific pages required and the number of copies of each page.

Employees of the Patent and Trademark Office should direct their requests for the Manual, replacement pages, notices, and revisions to the Patent Academy.

    First Edition, November 1949
    Second Edition, November 1953
    Third Edition, November 1961
    Fourth Edition, June 1979
    Fifth Edition, August 1983
        Revision 1, October 1985
        Revision 2, December 1985
        Revision 3, May 1986
        Revision 4, October 1986
        Revision 5, July 1987
        Revision 6, October, 1987
        Revision 7, December, 1987
        Revision 8, May 1988
        Revision 9, September 1988
        Revision 10, January 1989
        Revision 11, April 1989
        Revision 12, July 1989
        Revision 13, November 1989

Exhibit ___1___ Page ___6___

# Foreword

This Manual is published to provide Patent and Trademark Office patent examiners, applicants, attorneys, agents, and representatives of applicants with a reference work on the practices and procedures relative to the prosecution of patent applications before the Patent and Trademark Office. It contains instructions to examiners, as well as other material in the nature of information and interpretation, and outlines the current procedures which the examiners are required or authorized to follow in appropriate cases in the normal examination of a patent application. The Manual does not have the force of law or the force of the Patent Rules of Practice in Title 37, Code of Federal Regulations.

A separate manual entitled "Trademark Manual of Examining Procedure" is published by the Patent and Trademark Office as a reference work for trademark cases.

Examiners will be governed by the applicable statutes, the Rules of Practice, decisions, and orders and instructions issued by the Commissioner and the Assistant Commissioners. Orders and Notices still in force which relate to the subject matter included in this Manual are incorporated in the text. Orders and Notices, or portions thereof, relating to the examiners' duties and functions which have been omitted or not incorporated in the text may be considered obsolete. Interference procedure not directly involving the Primary Examiner are not included in this Manual and, therefore, Orders and Notices relating thereto remain in force.

Subsequent changes in practice and other revisions will be incorporated in the form of substitute or additional pages for the Manual.

Suggestions for improving the form and content of the Manual are always welcome. They should be addressed to:

Commissioner of Patents and Trademarks,
Editor, M.P.E.P.,
Washington, D.C. 20231

Exhibit \_\_\_\_1\_\_\_\_ Page\_\_\_\_7\_\_\_\_

# Table of Contents

Page

Title Page
Forward
Table of Contents ......................................................................................................... (iv)
Introduction .................................................................................................................... 1
Chapter 100    Secrecy, Access, National Security and Foreign Filing ................................. 100-1
200    Types, Cross-Noting, and Status of Application ............................... 200-1
300    Ownership and Assignment ................................................................. 300-1
400    Representative of Inventor or Owner .................................................. 400-1
500    Receipt and Handling of Mail and Papers ........................................ 500-1
600    Parts, Form and Content of Application ............................................ 600-1
700    Examination of Applications ................................................................ 700-1
800    Restriction in Applications filed under 35 U.S.C. 111; Double Patenting ...... 800-1
900    Prior Art, Classification, Search ......................................................... 900-1
1000    Matters Decided by Various Patent and Trademark Office Officials ............ 1000-1
1100    Interference (old practice) .................................................................. 1100-1
1200    Appeal ................................................................................................ 1200-1
1300    Allowance and Issue .......................................................................... 1300-1
1400    Correction of Patents ......................................................................... 1400-1
1500    Design Patents ................................................................................... 1500-1
1600    Plant Patents ..................................................................................... 1600-1
1700    Miscellaneous .................................................................................... 1700-1
1800    Patent Cooperation Treaty ................................................................. 1800-1
1900    Protest ................................................................................................ 1900-1
2000    Duty of Disclosure; Rejecting and Striking of Applications ...................... 2000-1
2100    Patentability ....................................................................................... 2100-1
2200    Citation of Prior Art and Reexamination of Patents ......................... 2200-1
2300    Interference Proceedings under Public Law 98-622 (new practice) .............. 2300-1

Appendix 1    Partial List of Trademarks .................................................................... A - 1
Appendix II    List of Decisions Cited ......................................................................... A - 5

Appendix L    Patent Laws ......................................................................................... L - 1
Appendix R    Patent Rules ........................................................................................ R - 1
Appendix T    Patent Cooperation Treaty ................................................................... T - 1
Appendix AI    PCT Administrative Instructions ......................................................... AI - 1
Appendix P    Paris Convention for the Protection of Industrial Property ..................... P - 1

Index    ............................................................................................................. I - 1

The forwarding of the application for a Patentability Report is not to be treated as a transfer by the forwarding group. When the P.R. is completed and the application is ready for return to the forwarding group, it is not counted either as a receipt or action by transfer. Credit, however, is given for the time spent. See >MPEP< § 1705.

The date status of the application in the reporting group will be determined on the basis of the dates in the group of original jurisdiction. To insure orderly progress in the reported dates, a timely reminder should be furnished to the group making the P.R.

## 705.01(d)  Duplicate Prints of Drawings [R-6]

In Patentability Report cases having drawings, the examiner to whom the case is assigned will furnish to the group to which the case is referred, prints of such sheets of the drawings as are applicable, for interference search purposes. That this has been done may be indicated by a pencil notation on the file wrapper.

When a case that has had Patentability Report prosecution is passed for issue or becomes abandoned, NOTIFICATION of this fact will AT ONCE be given by the group having jurisdiction of the case to each group that submitted a Patentability Report. The examiner of each such reporting group will note the date of allowance or abandonment on *>the< duplicate set of prints. At such time as these prints become of no value to the reporting group, they may be destroyed.

## 705.01(e)  Limitation as to Use

The above outlined Patentability Report practice is not obligatory and should be resorted to only where it will save total examiner time or result in improved quality of action due to specialized knowledge. A saving of total examiner time that is required to give a complete examination of an application is of primary importance. Patentability Report practice is based on the proposition that when plural, indivisible inventions are claimed, in some instances either less time is required for examination, or the results are of better quality, when specialists on each character of claimed invention treat the claims directed to their specialty. However, in many instances a single examiner can give a complete examination of as good quality on all claims, and in less total examiner time than would be consumed by the use of the Patentability Report practice.

Where claims are directed to the same character of invention but differ in scope only, prosecution by Patentability Report is never proper.

Exemplary situation where Patentability Reports are ordinarily not proper are as follows:

(1) Where the claims are related as a manufacturing process and a product defined by the process of manufacture. The examiner having jurisdiction of the process can usually give a complete, adequate examination in less total examiner time than would be consumed by the use of a Patentability Report.

(2) Where the claims are related as product and a process which involves merely the fact that a product having certain characteristics is made. The examiner having jurisdiction of the product can usually make a complete and adequate examination.

(3) Where the claims are related as a combination distinguished solely by the characteristics of a subcombination and such subcombination *per se.* *The examiner having jurisdiction of the subcombination can usually make a complete and adequate examination.*

Where it can be shown that a Patentability Report will save total examiner time, one is permitted with the approval of the group director of the group to which the application is assigned. The "Approved" stamp should be impressed on the memorandum requesting the Patentability Report.

## 705.01(f)  Interviews With Applicants [R-6]

In situations where an interview is held on an application in which a Patentability Report has been adopted, the reporting group may be called on for assistance at the interview when it concerns claims treated by them. See >MPEP< §§ 713 to 713.10 regarding interviews in general.

## 706  Rejection of Claims [R-6]

Although this part of the Manual explains the procedure in *rejecting* claims, the examiner should never overlook the importance of his or her role in *allowing* claims which properly define the invention.

*37 CFR 1.106. Rejection of claims.*

(a) If the invention is not considered patentable, or not considered patentable as claimed, the claims, or those considered unpatentable will be rejected.

(b) In rejecting claims for want of novelty or for obviousness, the examiner must cite the best references at his command. When a reference is complex or shows or describes inventions other than that claimed by the applicant, the particular part relied on must be designated as nearly as practicable. The pertinence of each reference, if not apparent, must be clearly explained and each rejected claim specified.

(c) In rejecting claims the examiner may rely upon admissions by the applicant, or the patent owner in a reexamination proceeding, as to any matter affecting patentability and, insofar as rejections in applications are concerned, may also rely upon facts within his or her knowledge pursuant to § 1.107.

·(d) Subject matter which is developed by another person which qualifies as prior art only under 35 U.S.C. 102(f) or (g) may be used as prior art under 35 U.S.C. 103 against a claimed invention unless the entire rights to the subject matter and the claimed invention were commonly owned by the same person or organization or subject to an obligation of assignment to the same person or organization at the time the claimed invention was made.

(e) The claims in any original application naming an inventor will be rejected as being precluded by a waiver in a published statutory invention registration naming that inventor if the same subject matter is claimed in the application and the statutory invention registration. The claims in any reissue application naming an inventor will be rejected as being precluded by a waiver in a published statutory invention registration naming the inventor if the reissue application seeks to claim subject matter (1) which was not covered by claims issued in the patent prior to the date of publication of the statutory invention registration and (2) which was the same subject matter waived in the statutory invention registration.<

Patent examiners carry the responsibility of making sure that the standard of patentability enunciated by the Supreme Court and by the Congress is applied *in each and every case.* The Supreme Court in *Graham v. John Deere,* 148 USPQ 459 (decided February 21, 1966), stated that,

"Under § 103, the scope and content of the prior art to be determined; differences between the prior art and the claims at issue are to be

Exhibit ___1___ Page ___9___

ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquires may have relevancy.

. . .

"This is not to say, however, that there will not be difficulties in applying the nonobviousness test. What is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context. The difficulties, however, are comparable to those encountered daily by the courts in such frames of reference as negligence and scienter, and should be amenable to a case-by-case development. We believe that strict observance of the requirements laid down here will result in that uniformity and definitiveness which Congress called for in the 1952 Act.

"While we have focused attention on the appropriate standard to be applied by the courts, it must be remembered that the primary responsibility for sifting out unpatentable material lies in the Patent Office. To avail litigation is — for all practical purposes— to debilitate the patent system. We have observed a notorious difference between the standards applied by the Patent Office and by the courts. While many reasons can be adduced to explain the discrepancy, one may well be the free rein often exercised by examiners in their use of the concept of 'invention.' In this connection we note that the Patent Office is confronted with a most difficult task. . . . This is itself a compelling reason for the Commissioner to strictly adhere to the 1952 Act as interpreted here. This would, we believe, not only expedite disposition but bring about a closer concurrence between administrative and judicial precedent."

Accordingly, an application covering an invention of doubtful patentability should not be allowed, unless and until issues pertinent to such doubt have been raised and overcome in the course of examination and prosecution, since otherwise the resultant patent would not justify the statutory presumption of validity (35 U.S.C. 282), nor would it "strictly adhere" to the requirements laid down by Congress in the 1952 Act as interpreted by the Supreme Court.

Office policy has consistently been to follow *Graham v. John Deere Co.* in the consideration and determination of obviousness under 35 U.S.C. 103. As quoted above, the three factual inquires; enunciated therein as a background for determining obviousness are briefly as follows:

1. Determination of the scope and contents of the prior art.

2. Ascertaining the differences between the prior art and the claims in issue; and

3. Resolving the level of ordinary skill in the pertinent art.

The Supreme Court reaffirmed and relied upon the Graham three pronged test in its consideration and determination of obviousness in the fact situations presented in both the *Sakraida v. Ag Pro,* 189 USPQ 449 (decided April 20, 1976) and *Anderson's-Black Rock Inc. v. Pavement Salvage Co.,* 163 USPQ 673 (decided December 8, 1969) decisions. In each case, the Court went on to discuss whether the claimed combinations produced a "new or different function" and a "synergistic result", but clearly decided whether the claimed inventions were unobvious on the basis of the three-way test in Graham. Nowhere in its decisions in those cases does the Court state that the "new or different function" and "synergistic result" tests superseded a finding of unobviousness or obviousness under the Graham test.

Accordingly, examiners should apply the test for patentability

under 35 U.S.C. 103 set forth in Graham. It should be noted that the Supreme Court's application of the Graham test to the fact circumstances in Ag Pro was somewhat stringent, as it was in Black Rock. Note *Republic Industries, Inc. v. Schlage Lock Co.* 200 USPQ 769 (C.A. 9th Cir.) The Court of Appeals for the Federal Circuit stated in *Stratoflex Inc. v. Aeroquip Corp.,* 713 F2d 1530, 218 USPQ 871, 880 (Fed. Cir. 1983) that

A requirement for synergism or a synergistic effect is nowhere found in the statute, 35 U.S.C. When present, for example in a chemical case, synergism may point toward nonobviousness, but its absence has no place in evaluating the evidence on obviousness. The more objective findings suggested in Graham, supra, are drawn from the language of the statute and are fully adequate guides for evaluating the evidence relating to compliance with 35 U.S.C. § 103. *Bowser Inc. v. United States,* 388 F. 2d 346, 156 USPQ 406 (Ct Cl 1967)

The standards of patentability applied in the examination of claims must be the same throughout the Office. In every art, whether it be considered "complex," "newly developed," "crowded," or "competitive," all of the requirements for patentability (e.g., novelty, usefulness and unobviousness, as provided in 35 U.S.C. 101, 102, and 103) must be met before a claim is allowed. The mere fact that a claim recites in detail all of the features of an invention (i.e., is a "picture" claim) is never, in itself, justification for the allowance of such a claim.

When an application discloses patentable subject matter and it is apparent from the claims and the applicant's arguments that the claims are intended to be directed to such patentable subject matter, but the claims in their present form cannot be allowed because of defects in form or omission of a limitation, the examiner should not stop with a bare objection or rejection of the claims. The examiner's action should be constructive in nature and when possible should offer a definite suggestion for correction.

If the examiner is satisfied after the search has been completed that patentable subject matter has been disclosed and the record indicates that the applicant intends to claim such subject matter, he or she may note in the Office action that certain aspects or features of the patentable invention have not been claimed and that if properly claimed such claims may be given favorable consideration.

*37 CFR 1.112. Reconsideration.*

After response by applicant or patent owner (§ 1.111) the application or patent under reexamination will be reconsidered and again examined. The applicant or patent owner will be notified if claims are rejected, or objections or requirements made, in the same manner as after the first examination. Applicant or patent owner may respond to such Office action, in the same manner provided in § 1.111 with or without amendment. Any amendments after the second Office action must ordinarily be restricted to the rejection or to the objections or requirements made. The application or patent under reexamination will be again considered, and so on repeatedly, unless the examiner has indicated that the action is final.

See *>37 CFR< 1.112 for reexamination and reconsideration of a patent under reexamination after responses by the patent owner.

>See MPEP Chapter 2300 for rejection of claims in an application for a Statutory Invention Registration.<

# EXHIBIT 2

TO DECLARATION OF ALAN P. BLOCK IN
SUPPORT OF PLAINTIFF ACACIA MEDIA
TECHNOLOGIES CORPORATION'S MEMORANDUM
OF POINTS AND AUTHORITIES IN OPPOSITION TO
ROUND 3 DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 112
OF THE '992, '863, AND '702 PATENTS; AND
SATELLITE DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF THE
'992, '863, AND '720 PATENTS

# MANUAL OF

# PATENT

# EXAMINING

# PROCEDURE

EDITION __5th__

REVISION __13__



## U.S. DEPARTMENT OF COMMERCE
### Patent and Trademark Office

REEL NUMBER __4__

BOOK NUMBERS _____

Exhibit __2__ Page __11__



U.S.. DEPARTMENT OF COMMERCE
Patent and Trademark Office
Washington, D.C. 20231

MANUAL OF PATENT EXAMINING PROCEDURE
Fifth Edition

Instructions Regarding Revision No. 13

This revision consists of replacement pages for the **title page** in the front of the Manual, **entire Chapters 1000 and 1200, Appeal,** replacement pages for pages **2300-41 through 2300-50, L-15 & 16, L-27 through L-30**; and **appendix R,** patent rules.

Additions to the text of the Manual are indicated by arrows (><) inserted in the text. Deletions are indicated by a single asterisk (*) where a single word was deleted and by two asterisks (**) where more than one word was deleted. The use of three or five asterisks in the body of the laws and rules indicates a portion of the law or rule which was not reproduced.

Louis O. Maassel, Editor
Manual of Patent Examining Procedure

| Remove Page | Insert Pages |
|---|---|
| 1000-1 through 1000-6 | 1000-1 through 1000-10 |
| 1200-1 through 1200-32 | 1200-1 through 1200-32 |
| 2300-41 through 2300-50 | 2300-41 through 2300-50 |
| L-15 & L-16 | L-15 & L-16 |
| L-27 through L-30 | L-27 through L-30 |
| R-1 through R-140 | R-1 through R-146 |
| P-1 & P-2 | P-1 & P-2 |



Exhibit___2___Page__12__

# Manual of
# PATENT
# EXAMINING
# PROCEDURE

Original Fifth Edition, August 1983
Latest Revision October 1989

 

## U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

Rev. 13, Nov. 1989

Exhibit __2__ Page __13__

The Patent and Trademark Office does not handle the sale of the Manual, distribution of notices and revisions or change of address of those on the subscription list.

Correspondence relating to any of the above items should be sent to the Superintendent of Documents at the following address:

> Superintendent of Documents
> Mail List Section
> Washington, D.C. 20402

Inquiries relating to subscriptions should be directed to:

> Superintendent of Documents
> United States Government Printing Office
> Washington, D.C. 20402

Orders for reproduced copies of individual replacement pages not amounting to a complete revision of the Manual should be sent to the following address:

> Commissioner of Patents and Trademarks
> Attention: Customer Services Division
> Washington, D.C. 20231

The cost for each 30 pages or a fraction thereof is $10.00 (See 37 CFR 1.13(a) and 1.19(a)(3)).

Charges may be made to Deposit Accounts if the requester is an account holder in good standing at the time the request is received. Checks or money orders should be payable to the Commissioner of Patents and Trademarks. Requests must identify the specific pages required and the number of copies of each page.

Employees of the Patent and Trademark Office should direct their requests for the Manual, replacement pages, notices, and revisions to the Patent Academy.

> First Edition, November 1949
> Second Edition, November 1953
> Third Edition, November 1961
> Fourth Edition, June 1979
> Fifth Edition, August 1983
>> Revision 1, October 1985
>> Revision 2, December 1985
>> Revision 3, May 1986
>> Revision 4, October 1986
>> Revision 5, July 1987
>> Revision 6, October, 1987
>> Revision 7, December, 1987
>> Revision 8, May 1988
>> Revision 9, September 1988
>> Revision 10, January 1989
>> Revision 11, April 1989
>> Revision 12, July 1989
>> Revision 13, November 1989

# Foreword

This Manual is published to provide Patent and Trademark Office patent examiners, applicants, attorneys, agents, and representatives of applicants with a reference work on the practices and procedures relative to the prosecution of patent applications before the Patent and Trademark Office. It contains instructions to examiners, as well as other material in the nature of information and interpretation, and outlines the current procedures which the examiners are required or authorized to follow in appropriate cases in the normal examination of a patent application. The Manual does not have the force of law or the force of the Patent Rules of Practice in Title 37, Code of Federal Regulations.

A separate manual entitled "Trademark Manual of Examining Procedure" is published by the Patent and Trademark Office as a reference work for trademark cases.

Examiners will be governed by the applicable statutes, the Rules of Practice, decisions, and orders and instructions issued by the Commissioner and the Assistant Commissioners. Orders and Notices still in force which relate to the subject matter included in this Manual are incorporated in the text. Orders and Notices, or portions thereof, relating to the examiners' duties and functions which have been omitted or not incorporated in the text may be considered obsolete. Interference procedure not directly involving the Primary Examiner are not included in this Manual and, therefore, Orders and Notices relating thereto remain in force.

Subsequent changes in practice and other revisions will be incorporated in the form of substitute or additional pages for the Manual.

Suggestions for improving the form and content of the Manual are always welcome. They should be addressed to:

Commissioner of Patents and Trademarks,
Editor, M.P.E.P.,
Washington, D.C. 20231

# Table of Contents

Page

Title Page
Forward
Table of Contents .................................................................................................... (iv)
Introduction .................................................................................................................. 1
Chapter 100    Secrecy, Access, National Security and Foreign Filing .................... 100-1
        200    Types, Cross-Noting, and Status of Application ............................ 200-1
        300    Ownership and Assignment ............................................................ 300-1
        400    Representative of Inventor or Owner .............................................. 400-1
        500    Receipt and Handling of Mail and Papers ...................................... 500-1
        600    Parts, Form and Content of Application .......................................... 600-1
        700    Examination of Applications ............................................................ 700-1
        800    Restriction in Applications filed under 35 U.S.C. 111; Double Patenting ...... 800-1
        900    Prior Art, Classification, Search .................................................... 900-1
       1000    Matters Decided by Various Patent and Trademark Office Officials ........... 1000-1
       1100    Interference (old practice) .......................................................... 1100-1
       1200    Appeal ...................................................................................... 1200-1
       1300    Allowance and Issue .................................................................. 1300-1
       1400    Correction of Patents ................................................................ 1400-1
       1500    Design Patents .......................................................................... 1500-1
       1600    Plant Patents ............................................................................ 1600-1
       1700    Miscellaneous ........................................................................... 1700-1
       1800    Patent Cooperation Treaty .......................................................... 1800-1
       1900    Protest ...................................................................................... 1900-1
       2000    Duty of Disclosure; Rejecting and Striking of Applications ............... 2000-1
       2100    Patentability .............................................................................. 2100-1
       2200    Citation of Prior Art and Reexamination of Patents ...................... 2200-1
       2300    Interference Proceedings under Public Law 98-622 (new practice) ....... 2300-1

Appendix I     Partial List of Trademarks ............................................................ A - 1
Appendix II    List of Decisions Cited .................................................................. A - 5

Appendix L     Patent Laws .................................................................................. L - 1
Appendix R     Patent Rules ................................................................................. R - 1
Appendix T     Patent Cooperation Treaty .......................................................... T - 1
Appendix AI    PCT Administrative Instructions .................................................. AI - 1
Appendix P     Paris Convention for the Protection of Industrial Property .......... P - 1

Index          ...................................................................................................... I - 1

with the above analytical approach, it should be emphasized that examiners must also carefully examine mathematical algorithm or computer programming related applications to insure that they comply with the disclosure requirements of >35 U.S.C.<112 as well as the novelty and unobviousness requirements of >35 U.S.C.< 102 and 103.

## >2106.01 Computer Programming and 35 U.S.C. 112, First Paragraph [R-6]

The requirements for sufficient disclosure of inventions involving computer programming is the same as for all inventions sought to be patented. Namely, there must be an adequate written description, the original disclosure should be sufficiently enabling to allow one to make and use the invention as claimed, and there must be presentation of a best mode for carrying out the invention.

The following guidelines, while applicable to a wide range of arts, are intended to provide a guide for analyzing 35 U.S.C. 112, first paragraph, issues in applications involving computer programs, software, firmware, or block diagram cases wherein one or more of the "block diagram" elements are at least partially comprised of a computer software component. It should be recognized that sufficiency of disclosure issues in computer cases necessarily will require an inquiry into both the sufficiency of the disclosed hardware as well as the disclosed software due to the interrelationship and interdependence of computer hardware and software.

### Written Description

The function of the description requirement is to ensure that the inventor had possession of, as of the filing date of the application relied upon, the specific subject matter later claimed by him or her; how the specification accomplishes this is not material. *In re Herschler*, 200 USPQ 711, 717 (CCPA 1979) and further reiterated in *In re Kaslow*, 217 USPQ 1089 (CAFC 1983).

### Best Mode

While the purpose of the best mode requirement is to "restrain inventors from applying for patents while at the same time concealing from the public the preferred embodiments of their inventions which they have in fact conceived", *In re Gay*, 135 USPQ 311, 315 (CCPA 1962); "There is no objective standard by which to judge the adequacy of a best mode disclosure. Instead, only evidence of concealment (accidental or intentional) is to be considered. That evidence, in order to result in affirmance of a best mode rejection must tend to show that the quality of an applicant's best mode disclosure is so poor as to effectively result in concealment". *In re Sherwood*, 204 USPQ 537, 544 (CCPA 1980). Also, see *White Consolidated Industries vs Vega Servo-Control*, 214 USPQ 796, 824 (S.D. Michigan, S. Div. 1982); affirmed on other grounds; 218 USPQ 961 (CCPA 1983).

### Enablement

When basing a rejection on the failure of the applicant's disclosure to meet the enablement provisions of the first paragraph of 35 U.S.C. 112, the examiner must establish on the record that he has a *reasonable basis* for questioning the adequacy of the disclosure to enable a person of ordinary skill in the art to make and use the claimed invention without resorting to *undue experimentation*. See *In re Brown*, 177 USPQ 691 (CCPA 1973), *In re Ghiron*, 169 USPQ 723, (CCPA 1971). Once the examiner has advanced a reasonable basis for questioning the adequacy of the disclosure, it becomes incumbent on the applicant to rebut that challenge and factually demonstrate that his or her application disclosure is in fact sufficient. See *In re Doyle*, 179 USPQ at 232 (CCPA 1973), *In re Scarbrough*, 182 USPQ 298, 302 (CCPA 1974), *In re Ghiron, Supra*. <

## >2106.02 Disclosure in Computer Programming Cases [R-6]

To establish a reasonable basis for questioning the adequacy of a disclosure, the examiner must present a factual analysis of a disclosure to show that a person skilled in the art would not be able to make and use the claimed invention without resorting to undue experimentation.

In computer cases, it is not unusual for the claimed invention to involve two areas of prior art or more than one technology, (*White Consolidated, Supra*, 214 USPQ at 821); e.g., an appropriately programmed computer and an area of application of said computer. In regard to the "skilled in the art" standard, in cases involving both the art of computer programming, and another technology, the examiner must recognize that the knowledge of persons skilled in both technologies is the appropriate criteria for determining sufficiency. See *In re Naquin*, 158 USPQ 317, (CCPA 1968); *In re Brown*, 177 USPQ 691 (CCPA 1973); and *White Consolidated, supra* at B22.

In a typical computer case, system components are often represented in a "block diagram" format, i.e., a group of hollow rectangles representing the elements of the system, functionally labelled and interconnected by lines. Such block diagram computer cases may be categorized into 1) systems which include but are more comprehensive than a computer and 2) systems wherein the block elements are totally within the confines of a computer.

### BLOCK ELEMENTS MORE COMPREHENSIVE THAN A COMPUTER

The first category of such block diagram cases involves systems which include a computer as well as other system hardware and/or software components. In order to meet his burden of establishing a reasonable basis for questioning the adequacy of such disclosure, the examiner should initiate a factual analysis of the system by focusing on each of the individual block element components. More specifically, such an inquiry should focus on the diverse functions attributed to each block element as well as the teachings in the specification as to how such a component could be implemented. If based on such an analysis, the examiner can reasonably contend that more than routine experimentation would be required by one of ordinary skill in the art to implement such a component or

components, that component or components should specifically be challenged by the examiner as part of a 35 U.S.C. 112, first paragraph rejection. Additionally, the examiner should determine whether certain of the hardware or software components depicted as block elements are themselves complex assemblages which have widely differing characteristics and which must be precisely coordinated with other complex assemblages. Under such circumstances, a reasonable basis may exist for challenging such a functional block diagram form of disclosure. See *In re Ghiron, supra, In re Brown, supra.* Moreover, even if the applicant has cited prior art patents or publications to demonstrate that particular block diagram hardware or software components are old, it should not always be considered as self evident how such components are to be interconnected to function in a disclosed complex manner. See *In re Scarbrough, supra,* at 301 and *In re Forman,* 175 USPQ 12, 16 (CCPA 1972). Furthermore, in complex systems including a digital computer, a microprocessor, or a complex control unit as one of many block diagram elements, timing between various system elements may be of the essence and without a timing chart relating the timed sequences for each element, an unreasonable amount of work may be required to come up with the detailed relationships an applicant alleges that he has solved. See *In re Scarbrough, supra* at 302.

For example, in a block diagram disclosure of a complex claimed system which includes a microprocessor and other system components controlled by the microprocessor, a mere reference to a prior art, commercially available microprocessor, without any description of the precise operations to be performed by the microprocessor, fails to disclose how such a microprocessor would be properly programmed to either perform any required calculations or to coordinate the other system components in the proper timed sequence to perform the functions disclosed and claimed. If, in such a system, a particular program is disclosed, such a program should be carefully reviewed to insure that its scope is commensurate with the scope of the functions attributed to such a program in the claims. See *In re Brown, supra* at 695. If the disclosure fails to disclose any program and if more than routine experimentation would be required of one skilled in the art to generate such a program, the examiner clearly would have a reasonable basis for challenging the sufficiency of such a disclosure. The amount of experimentation that is considered routine will vary depending on the facts and circumstances of individual cases. No exact numerical standard has been fixed by the courts, but the "amount of required experimentation must, however, be reasonable" (*White Consolidated, Supra,* at 963. One court apparently found that the amount of experimentation involved was reasonable where a skilled programmer was able to write a general computer program, implementing an embodiment form, within four hours. (*Hirschfield, Supra,* at 279 et seq.). On the other hand, another court found that, where the required period of experimentation for skilled programmers to develop a particular program would run to 1 1/2 to 2 man) years, this would be "a clearly unreasonable requirement" (*White Consolidated, supra* at 963).

## BLOCK ELEMENTS WITHIN A COMPUTER

The second category of block diagram cases occurs most frequently in pure data processing applications where the combination of block elements is totally within the confines of a computer, there being no interfacing with external apparatus other than normal input/output devices. In some instances, it has been found that particular kinds of block diagram disclosures were sufficient to meet the enabling requirement of 35 U.S.C. 112, first paragraph. See *In re Knowlton,* 178 USPQ 486 (CCPA 1973), *In re Comstock and Gilmer,* 178 USPQ 616 (CCPA 1973). Most significantly, however, in both the Comstock and Knowlton cases, the decisions turned on the appellants' disclosure of 1) a reference to and reliance on an identified prior art computer system and 2) an operative computer program for the referenced prior art computer system. Moreover, in Knowlton the disclosure was presented in such a detailed fashion that the individual program's steps were specifically interrelated with the operative structural elements in the referenced prior art computer system. The Court in *Knowlton* indicating that the disclosure did not merely consist of a sketchy explanation of flow diagrams or a bare group of program listings together with a reference to a proprietary computer in which they might be run. The disclosure was characterized as going into considerable detail into explaining the interrelationships between the disclosed hardware and software elements. Under such circumstances, the Court considered the disclosure to be concise as well as full, clear and exact to a sufficient degree to satisfy the literal language of 35 U.S.C. 112, first paragraph. It must be emphasized that because of the significance of the program listing and the reference to and reliance on an identified prior art computer system, absent either of these items, a block element disclosure within the confines of a computer should be scrutinized in precisely the same manner as the first category of block diagram cases discussed above.



Regardless of whether a disclosure involves block elements more comprehensive than a computer or block elements totally within the confines of a computer, the examiner, when analyzing method claims, must recognize that the specification must be adequate to teach how to practice the claimed method. If such practice requires particular apparatus, it is axiomatic that the application must therefore provide a sufficient disclosure of that apparatus if such is not already available. See *In re Ghiron, supra* at 727 and *In re Gunn,* 190 USPQ 402, 406 (CCPA 1976). When the examiner questions the adequacy of computer system or computer programming disclosures, the examiner's reasons for finding the specification to be non-enabling should be supported by the record as a whole. In this regard, it is also essential for the examiner to reasonably challenge evidence submitted by the applicant. For example, in *In re Naquin, supra,* an affiant's statement unchallenged by the examiner, that the average computer programmer was familiar with the subroutine necessary for performing the claimed process, was held to be a statement of fact which rendered the examiner's rejection baseless. In other words, unless the examiner presents a reasonable basis for challenging the disclosure in view of the record as a whole, a 35 U.S.C. 112, first paragraph rejection in a computer

Exhibit ___2___ Page _18_


system or computer programming case will not be sustained on appeal. See *In re Naquin, supra, In re Morehouse and Bolton*, 192 USPQ 29, 32 (CCPA 1976).

While no specific universally applicable rule exists for recognizing an insufficiently disclosed application involving computer programs, an examining guideline to generally follow is to challenge the sufficiency of such disclosures which fail to include either the computer program itself or a reasonably detailed flowchart which delineates the sequence of operations the program must perform. In programming applications whose software disclosure only includes a flowchart, as the complexity of functions and the generality of the individual components of the flowchart increase, the basis for challenging the sufficiency of such a flowchart becomes more reasonable because the likelihood of more than routine experimentation being required to generate a working program from such a flowchart also increases.

As stated earlier, once an examiner has advanced a reasonable basis or presented evidence to question the adequacy of a computer system or computer programming disclosure, the applicant must show that his or her specification would enable one of ordinary skill in the art to make and use the claimed invention without resorting to undue experimentation. In most cases, efforts to meet this burden involve submitting affidavits, referencing prior art patents or technical publications, arguments of counsel or combinations of these approaches

## AFFIDAVIT PRACTICE (37 CFR 1.132)

In computer cases, affidavits must be critically analyzed. Affidavit practice usually initially involves analyzing the skill level and/or qualifications of the affiant, which should be of the routineer in the art. When an affiant's skill level is higher than that required by the routineer for a particular application, an examiner may challenge the affidavit since it would not be made by a routineer in the art, and therefore would not be probative as to the amount of experimentation required by a routineer in the art to implement the invention. An affiant having a skill level or qualifications above that of the routineer in the art would require less experimentation to implement the claimed invention than that for the routineer. Similarly, an affiant having a skill level or qualifications below that of the routineer in the art would require more experimentation to implement the claimed invention than that for the routineer in the art. In either situation, the standard of the routineer in the art would not have been met.

In computer systems or programming cases, the problems with a given affidavit, which relate to the sufficiency of disclosure issue, generally involve affiants submitting few facts to support their conclusions or opinions. Some affidavits may go so far as to present conclusions on the ultimate legal question of sufficiency. *In re Brandstadter, Kienzle and Sykes*, 179 USPQ 286 (CCPA 1973) illustrates the extent of the inquiry into the factual basis underlying an affiant's conclusions or opinions. In *Brandstadter*, the invention concerned a stored program controller (computer) programmed to control the storing, retrieving and forwarding of messages in a communications system. The disclosure consisted of broadly defined block diagrams of the structure of the invention and no flowcharts or program listings

of the programs of the controller. The Court quoted extensively from the Examiner's Office Actions and Examiner's Answer in its opinion where it was apparent that the Examiner consistently argued that the disclosure was merely a broad system diagram in the form of labelled block diagrams along with statements of a myriad of desired results. Various affidavits were presented in which the affiants stated that all or some of the system circuit elements in the block diagrams were either well known in the art or "could be constructed" by the skilled design engineer, that the controller was "capable of being programmed" to perform the stated functions or results desired, and that the routineer in the art "could design or construct or was able to program" the system. The Court did consider the affiants' statements as being some evidence on the ultimate legal question of enablement but concluded that the statements failed in their purpose since they recited conclusions or opinions with few facts to support or buttress these conclusions. With reference to the lack of a disclosed computer program or even a flow chart of the program to control the message switching system, the record contained no evidence as to the number of programmers needed, the number of man-hours and the level of skill of the programmers to produce the program required to practice the invention.

It should be noted also that it is not opinion evidence directed to the ultimate legal question of enablement, but rather factual evidence directed to the amount of time and effort and level of knowledge required for the practice of the invention from the disclosure alone which can be expected to rebut a prima facie case of nonenablement. See *Hirschfield v. Banner, Commissioner of Patents and Trademarks*, 200 USPQ 276, 281 (D.D.C. 1978). It has also been held that where an inventor described the problem to be solved to an affiant, thus enabling the affiant to generate a computer program to solve the problem, such an affidavit failed to demonstrate that the application alone would have taught a person of ordinary skill in the art how to make and use the claimed invention. See *In re Brown, supra* at 695. The Court indicated that it was not factually established that the applicant did not convey to the affiant vital and additional information in their several meetings in addition to that set out in the application. Also of significance for an affidavit to be relevant to the determination of enablement is that it must be probative of the level of skill of the routineer in the art as of the time the applicant filed his application. See *In re Gunn, supra* at, 406. In this case each of the affiants stated what was known at the time he executed the affidavit, and not what was known at the time the applicant filed his application.

## REFERENCING PRIOR ART DOCUMENTS

Earlier it has been discussed that citing in the specification the commercial availability of an identified prior art computer system is very pertinent to the issue of enablement. But in some cases, this approach may not be sufficient to meet the applicant's burden. Merely citing in an affidavit extracts from technical publications in order to satisfy the enablement requirement is not sufficient if it is not made clear that a person skilled in the art would know which, or what parts, of the cited circuits could be used to construct the claimed device or how they could be interconnected to act in combination to produce

Exhibit __2__ Page __19__

the required results. See *In re Forman, supra* at 16. This analysis would appear to be less critical where the circuits comprising applicant's system are essentially standard components comprising an identified prior art computer system and a standard device attached thereto.

Prior art patents are often relied on by applicants to show the state of the art for purposes of enablement. However, these patents must have an issue date earlier than the effective filing date of the application under consideration. See *In re Budnick,* 190 USPQ 422, 424 (CCPA 1976). An analogous point was made in *In re Gunn, supra* where the court indicated that patents issued after the filing date of the applicant's application are not evidence of subject matter known to any person skilled in the art since their subject matter may have been known only to the patentees and the Patent and Trademark Office.

Merely citing prior art patents to demonstrate that the challenged components are old may not be sufficient proof since, even if each of the enumerated devices or labelled blocks in a block diagram disclosure were old per se, this would not make it self-evident how each would be interconnected to function in a disclosed complex combination manner. Therefore, the specification in effect must set forth the integration of the prior art, otherwise it is likely that undue experimentation, or more than routine experimentation would be required to implement the claimed invention. See *In re Scarbrough, supra* at 301. The Court also noted that any cited patents which are used by the applicant to demonstrate that particular box diagram hardware or software components are old must be analyzed as to whether such patents are germane to the instant invention and as to whether such components provide better detail of disclosure as to such components than an applicant's own disclosure. Also any patent or publication cited to provide evidence that a particular programming technique is well known in the programming art does not demonstrate that one of ordinary skill in the art could make and use correspondingly disclosed programming techniques unless both programming techniques are of approximately the same degree or complexity. See *In re Knowlton, supra* at 37 (CCPA 1974).

### ARGUMENTS OF COUNSEL

Arguments of counsel may be effective in establishing that an examiner has not properly met his or her burden or has otherwise erred in his or her position. In these situations, an examiner may have failed to set forth any basis for questioning the adequacy of the disclosure or may have not considered the whole specification, including the drawings and the written description. However, it must be emphasized that arguments of counsel alone cannot take the place of evidence in the record once an examiner has advanced a reasonable basis for questioning the disclosure. See *In re Budnick, supra* at, 424;*In re Schulze,* 145 USPQ 716 (CCPA 1965); and *In re Cole,* 140 USPQ 230 (CCPA 1964). For example, in a case where the record consisted substantially of arguments and opinions of applicant's attorney, the Court indicated that factual affidavits could have provided important evidence on the issue of enablement. See *In re Knowlton, supra* at, 37 and *In re Wiseman,* 201 USPQ 658 (CCPA 1979).<

## 2120   The Statutory Bars of "Public Use" and "On Sale" (35 U.S.C.102(b)) [R-6]

35 U.S.C. 102(b). "A person shall be entitled to a patent unless
— * * *

> (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *."

### INTRODUCTION

The legal standards applied in judicial decisions treating public use and on sale issues lack uniformity. Whatever may be advanced as a reason for this lack of uniformity, the Patent and Trademark Office is still confronted with the pragmatics of 37 CFR 1.56 (>MPEP< Chapter 2000) and the * active participation of "protestors" (>MPEP< Chapter 1900) in the patent examination process. One result has been the growing significance of public use and on sale issues to patent examiners.

The Office is mindful that public use and on sale questions

> "encompass . . . an infinite variety of factual situations which, when viewed in terms of the policies underlying § 102(b), present an infinite variety of legal problems wholly unsuited to mechanically-applied, technical rules." *Philco Corp. v. Admiral Corp.,* 131 USPQ 413, 419 (D.Del. 1961)

However, notwithstanding an infinite variety of factual situations, there are still decisions to be made by examiners regarding the particular view to adopt or the particular legal decision or decisions to follow in any one of the many facets of >35 U.S.C.< 102(b) activity.

Accordingly, guidance in this area is offered, short of "mechanically-applied, technical rules", so that patent applicants and examiners have a common reference point from which to foster uniformity and consistency of decision, at least within the framework of the patent examination process.

### 2121   General Overview [R-6]

#### THE DIFFERENCES BETWEEN PUBLIC USE AND ON SALE ACTIVITY

"Public use" and "on sale" activities are often referred to interchangeably. Although these activities have much in common, each has certain attributes which stand alone and relate to differing policy considerations. *Dart Industries v. E.I. duPont de Nemours & Co.,* 179 USPQ 392, 396 (7th Cir. 1973).

For example, there may be a public use of an invention absent *any* sales activity. Likewise, there may be a non-public, e.g., "secret", sale or offer to sell an invention which nevertheless constitutes a statutory bar. *Hobbs v. United States,* 171 USPQ 713, 720 (5th Cir. 1971).

In similar fashion, not all "public use" and "on sale" activities will necessarily occasion the identical result. Although both activities affect how an inventor may use an invention prior to the filing of a patent application, "non/commercial" >35 U.S.C.< 102(b) activity may not be viewed the same as similar "commercial" activity. Likewise, "public use" activity by an applicant may not be considered in the same light as similar

Exhibit ___2___ Page ___20___

# EXHIBIT 3

TO DECLARATION OF ALAN P. BLOCK IN
SUPPORT OF PLAINTIFF ACACIA MEDIA
TECHNOLOGIES CORPORATION'S MEMORANDUM
OF POINTS AND AUTHORITIES IN OPPOSITION TO
ROUND 3 DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 112
OF THE '992, '863, AND '702 PATENTS; AND
SATELLITE DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF THE
'992, '863, AND '720 PATENTS

What is claimed is:

1. A transmission system for providing information to remote locations, the transmission system comprising:

library means for storing items;

identification encoding means for retrieving the information for the items from the library means and for assigning a unique identification code to the retrieved information;

conversion means, coupled to the identification encoding means, for placing the retrieved information into a predetermined format as formatted data;

ordering means, coupled to the conversion means, for placing the formatted data into a sequence of addressable data blocks;

compression means, coupled to the ordering means, for compressing the formatted and sequenced data;

compressed data storing means, coupled to the data compression means, for storing as a file the compressed, sequenced data received from the data compression means with the unique identification code assigned by the identification encoding means; and

transmitter means, coupled to the compressed data storing means, for sending at least a portion of a file to one of the remote locations.

2. A transmission system as recited in claim 1, wherein the transmitter means includes:

LAW OFFICES
NNEGAN, HENDERSON
FARABOW, GARRETT
8 DUNNER
1300 I STREET, N. W.
ASHINGTON, DC 20005
1. 202. 408. 4000

Exhibit 3 Page 21

~~transmission format means for placing the composite formatted~~
data block onto a communication path.

3. A transmission system as recited in claim 1, wherein the information in the items includes analog signals, and wherein the conversion means further comprises:

converting means, coupled to the identification encoding means, for A/D converting the analog data of the retrieved information into a series of digital data bytes; and

formatting means, coupled to the converting means, for converting the digital data bytes into formatted data with a predetermined format.

4. A transmission system as recited in claim 1, wherein the information in the items includes digital signals, and wherein the conversion means further comprises:

digital input receiver means, coupled to the identification encoding means, for converting the digital data of the retrieved information into predetermined voltage levels; and

formatting means, coupled to the digital input receiver means, for converting the predetermined voltage levels into formatted data with a predetermined format.

5. A transmission system as recited in claim 3, wherein the information in the items includes digital signals, and wherein the conversion means further comprises:

LAW OFFICES
FINNEGAN, HENDERSON
FARABOW, GARRETT
& DUNNER
1300 I STREET, N. W.
WASHINGTON, DC 20005
1-202 408 4000

-45-

Exhibit 3 Page 22

digital input receiver means, coupled to the identification encoding means, for converting the digital data of the retrieved information into predetermined voltage levels; and

formatting means, coupled to the digital input receiver means, for converting the predetermined voltage levels into formatted data with the predetermined format.

6. A transmission system as recited in claim 2, wherein the compressed data storing means further comprises:

compressed data library means for separately storing composite formatted data blocks for each of the files converted and stored.

7. A transmission system as recited in claim 6, further comprising:

system control interface means, coupled to the transmission format means, for generating a visual listing of available items; and

library access interface means, coupled to the transmission format means, for receiving transmission requests to transmit items, and for retrieving formatted data blocks stored in the compressed data library means corresponding to the requests from subscribers.

8. A transmission system as recited in claim 1, further comprising:

LAW OFFICES
INNEGAN, HENDERSON
FARABOW, GARRETT
& DUNNER
1300 I STREET, N. W.
WASHINGTON, DC 20005
1·202·408·4000

-46-

Exhibit 3 Page 23

precompression data processing means, coupled to the ordering means, for storing the formatted data blocks

9. A transmission system as recited in claim 1, wherein the information in the items includes analog audio information, and wherein the conversion means further comprises:

audio converting means, coupled to the identification encoding means, for converting the analog audio signals into streams of digital audio data.

10. A transmission system as recited in one of claims 1 and 9, wherein the information in the items includes analog video information, and wherein the conversion means further comprises:

video converting means, coupled to the identification encoding means, for converting the analog video signals into streams of digital video data.

11. A transmission system as recited in one of claims 1 and 9, wherein the information in the items includes partly encoded information, and wherein the conversion means further comprises:

digital input means, coupled to the identification encoding means, for receiving partial encoded information in the items.

12. A transmission system as recited in claim 1, wherein the data compression means comprises:

means for performing a multi-dimensional analysis of the formatted data for inclusion in a predetermined algorithm; and

LAW OFFICES
FINNEGAN, HENDERSON
FARABOW, GARRETT
& DUNNER
1300 I STREET, N. W
WASHINGTON, DC 20005
1 202 408 4000

-47-

Exhibit 3 Page 24

compression processors for running the predetermined algorithm and for compressing the formatted data.

13. A transmission system as recited in claim 1, wherein the compression means comprises:

*β* ∴ means for identifying ~~repeating~~ patterns in the formatted data for inclusion in a predetermined algorithm; and

compression processors for running the predetermined algorithm and for compressing the formatted data.

14. A transmission system as recited in claim 12, wherein the multi-dimensional analysis means includes means for performing the multi-dimensional analysis in the horizontal dimension.

15. A transmission system as recited in claim 12, wherein the multi-dimensional analysis means includes means for performing the multi-dimensional analysis in the vertical dimension.

16. A transmission system as recited in claim 12, wherein the multi-dimensional analysis means includes means for performing the multi-dimensional analysis in the time dimension.

17. A transmission system as recited in claim 12, wherein the multi-dimensional analysis means includes means for performing the multi-dimensional analysis in the zig-zag dimension.

LAW OFFICES
NNELAN, HENDERSON
FARABOW, GARRETT
& DUNNER
1300 I STREET, N.W.
WASHINGTON, DC 20005 ··
( 202 408 4000

18. A distribution method responsive to requests identifying
information to be sent from a transmission system to remote
locations, the method comprising the steps of:

storing audio and video information in a compressed data
form;

requesting transmission, by a user, of at least a part of the
stored compressed data to a remote location selected by the user;

sending at least a portion of the stored compressed
information to the remote location;

receiving the sent information at the remote location;

buffering the received information at the remote location;
and

playing back the buffered information in real time at a time
requested by the user.


19. The distribution method as recited in claim 18, wherein
the information in the items includes analog and digital signals,
and wherein the step of processing *storing* further comprises the steps of:

converting analog signals of the information to digital
components;

formatting the digital data signals of the information;

ordering the converted analog data and the formatted digital
data in a predetermined sequence and;

compressing the ordered information.

LAW OFFICES
INNEGAN, HENDERSON
FARABOW, GARRETT
& DUNNER
1300 I STREET, N. W.
WASHINGTON, DC 20005
1-202-408-4000

Exhibit 3 Page 26

20. The method of claim 18 wherein the step of storing the items includes the substep of storing the items in a plurality of compressed picture and sound information.

21. The method of claim 18 further comprising the steps of:

storing a list of items available to the user from at least one compressed data library; and

providing the user with the list so that the user may remotely select a particular item for transmission.

LAW OFFICES
FINNEGAN, HENDERSON
FARABOW, GARRETT
& DUNNER
1300 I STREET, N. W.
WASHINGTON, D.C. 20005
1 202 408 4000

22. A receiving system responsive to a user input identifying a choice of an item stored in a source material library to be played back to the subscriber at a location remote from the source material library, the item containing information to be sent from a transmitter to the receiving system, the receiving system comprising:

transceiver means, for automatically receiving the requested information from the transmitter as compressed formatted data blocks;

receiver format conversion means, coupled to the transceiver means, for converting the compressed formatted data blocks into a format suitable for storage and processing for playback in real time;

storage means, coupled to the receiver format conversion means, for storing the compressed formatted data;

decompressing means, coupled to the receiver format conversion means, for decompressing the compressed formatted information; and

output data conversion means, coupled to the decompressing means, for playing back the decompressed information in real time at a time specified by the user.

26
23. A receiving system as recited in claim 22, further comprising:

LAW OFFICES
INNEGAN, HENDERSON
FARABOW, GARRETT
& DUNNER
1300 I STREET N.W.
WASHINGTON, DC 20005
1-202 408 4000

-51-

Exhibit 3 Page 28

user interface means for translating the input into a request for sending the requested information from the transmitter to the receiving system.

27
24. A receiving system as recited in claim 22, 25 wherein the output data conversion means includes recording means which controls the playback of the copy.

C

26
25. A receiving system as recited in claim 22, 25 wherein the storage means stores the formatted information until playback is requested by an operator.

26. A receiving system as recited in claim 22, wherein the decompression means further comprises:

video signal decompression means for decompressing video information contained in the compressed formatted information.

27. A receiving system as recited in claim 26, wherein the output data conversion means further comprises:

digital video output means, connected to the video signal decompression means, for outputting a digital video signal contained in the video information; and

analog video output means, connected to the video signal decompression means, for outputting an analog video signal contained in the video information.

LAW OFFICES
FINNEGAN, HENDERSON
FARABOW, GARRETT
& DUNNER
1300 I STREET, N. W.
WASHINGTON, D.C. 20005
1 202 408 4000

-52-

Exhibit 3 Page 29

28. A receiving system as recited in claim 27, wherein the video output means further comprises:

copy protection means for preventing copying by the user of protected information.

29. A receiving system as recited in claim 22, wherein the decompression means further comprises:

audio signal decompression means for decompressing audio information contained in the compressed formatted information.

30. A receiving system as recited in claim 29, wherein the output data conversion means further comprises:

digital audio output means, connected to the audio signal decompression means, for outputting a digital audio signal contained in the audio information; and

analog audio output means, connected to the audio signal decompression means, for outputting an analog audio signal contained in the audio information.

31. A receiving system as recited in claim 22, wherein the decompression means further comprises:

video signal decompression means for decompressing video information contained in the compressed formatted information; and

audio signal decompression means for decompressing audio information contained in the compressed formatted information.

LAW OFFICES
FINNEGAN, HENDERSON
FARABOW, GARRETT
& DUNNER
1300 I STREET, N.W.
WASHINGTON, DC 20005
1-202-408-4000

-53-

Exhibit __3__ Page __30__

25.

32. A receiving system as recited in claim 25, wherein the transceiver means receives the information via any one of telephone, ISDN, broadband ISDN, satellite, common carrier, computer channels, cable television systems, MAN, and microwave.

LAW OFFICES
FINNEGAN, HENDERSON
FARABOW, GARRETT
& DUNNER
1300 I STREET, N. W.
WASHINGTON, DC 20005
1 202 408 4000

-54-

Exhibit 3 Page 31